# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### (ATLANTA DIVISION)

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. _____** |
| **DRIVE PLANNING, LLC and RUSSELL TODD BURKHALTER,** | |
| **Defendants,** | |
| **and** | |
| **JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,** | |
| **Relief Defendants.** | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR EMERGENCY RELIEF

## **INTRODUCTION**

The Securities and Exchange Commission ("SEC") seeks emergency relief from this Court to preserve assets for the victims of a massive Ponzi scheme orchestrated by Defendants Todd Burkhalter and his company Drive Planning, LLC.  Since September 2020, Defendants have falsely told investors that they will earn 10% returns every three months by investing in Drive Planning's Real Estate Acceleration Loan ("REAL") program.  The REAL program, however, was a scam.  Contrary to Defendants' representations, the program generated little revenue; Defendants used later investor funds to pay the promised returns to earlier investors; and Defendants misappropriated millions of dollars of investor funds. As of May 2024, there are more than 2,500 investors in the REAL program, residing in nearly every state, who are owed more than $200 million.

Emergency relief is necessary to prevent the dissipation of assets and ensure that Defendants do not cause more harm to investors.  Specifically, the SEC asks the Court to: (i) freeze Defendants' assets (including $50 million in bank accounts funded almost entirely with investor funds) and freeze Relief Defendants' assets; (ii) appoint a Receiver over Drive Planning; (iii) prohibit Defendants from running the REAL program or other investments; (iv) prevent the destruction of documents and require an accounting of the REAL program; and (v) order Burkhalter to surrender his passport.  The SEC's understanding is that although Defendants and

Relief Defendants deny engaging in any wrongdoing, they do not oppose this
relief, except Defendant Burkhalter does not agree to surrender his passport.

## BACKGROUND

### I.      Drive Planning's REAL Program

####       A.      Burkhalter Establishes Drive Planning

Burkhalter has worked in the securities industry for more than 20 years.
(Joseph Morgan Decl. Ex. 1.)  In 2014, he founded Drive Planning, which has an
office in Alpharetta, Georgia.  (*Id.*)  Drive Planning claims on its website to be a
"comprehensive financial" planning firm that offers clients a "personalized approach
to financial planning" that is tailored to each client's "unique needs."  (*Id.* at Ex. 2.)
Burkhalter is Drive Planning's CEO and he controls the company's business
activities and finances.  (Morgan Decl. Ex. 1; Cody Turley Decl. ¶¶ 6, 15; Julie
Edwards Decl. ¶ 10.)

####       B.      Drive Planning's REAL Program

In addition to providing financial planning services, Drive Planning also offers
several "private investments."  (Morgan Decl. Ex. 2.)  The first investment listed on
Drive Planning's website is the REAL program.  (*Id.*)  Drive Planning states that the
REAL "opportunity allows you to participate in real estate development with
established companies."  (Morgan Decl. Ex. 3.)  Drive Planning's website says that
the REAL program requires a "minimum investment" of $20,000, it promises a "rate

of return" of 10% that is "collateralized with real estate . . . and cash," and states that the "holding period" is "3 months." (*Id.*)

Drive Planning distributed promotional materials for the REAL program to investors by U.S. mail and the internet. (Edwards Decl. ¶ 13; Richard Beck Decl. ¶ 5.) A brochure for the REAL program provides additional information about the investment. Specifically, the brochure states: "The Real Estate Acceleration Loan (R.E.A.L.) Opportunity is a bridge loan. Bridge loans are short-term loans made to real estate developers to both finish up existing projects and to fund new projects. It allows the Borrower (the developer) to have immediate cash flow for all current and future projects." (Edwards Decl. Ex. 1.)

The brochure reiterates that investors will earn a 10% return on their investment every three months. (*Id.*) The brochure also claims that the REAL "loan is fully collateralized (guaranteed) by real estate." (*Id.*) In addition, the brochure highlights "a few important things to remember," including that investors with as little as $20,000 can participate; investors "can use money from [their] retirement account," savings, or a line of credit; and investors "do not have to be an accredited investor" to invest. (*Id.*) The brochure concludes by stating: "We are passionate about helping regular people grow their wealth the way the uber-wealthy do." (*Id.*)

In addition to written materials, Burkhalter also personally spoke to investors about the REAL program. He told investors that Drive Planning would use their

-3-

funds to make bridge loans to real estate developers or that Drive Planning would enter into joint ventures with the developers.  (Christian Carlson Decl. ¶ 4; Chris Eason Decl. ¶ 5; Charles Thompson Decl. ¶ 6.)  Burkhalter also told investors that they were guaranteed a 10% return every three months and that investments in the REAL program were secured by real estate holdings.  (Thompson Decl. ¶ 6; Eason Decl. ¶ 6; Carlson Decl. ¶ 4.)  Burkhalter signed promissory notes reflecting investments in the REAL program.  (Edwards Decl. ¶ 15.)

Moreover, Burkhalter recruited sales agents to solicit investors for the REAL program.  (Joseph Maniaci Decl. ¶¶ 9-19; Angelo Sandone Decl. ¶ 8.)  Burkhalter made the same representations about the REAL program to sales agents that he made to investors—*i.e.*, that the REAL program was a safe investment involving bridge loans to property developers and that it paid investors 10% returns every three months.  (*Id.*)  Burkhalter told sales agents that they would earn a 4% commission on the funds their clients invested in the program.  (Maniaci Decl. ¶ 17.)

## II.    The REAL Program was a Giant Ponzi Scheme

Defendants' statements regarding the REAL program were false and misleading.  Contrary to their many representations, Defendants did not use most of the investor funds in real estate deals; the program did not earn much revenue; and Defendants spent the bulk of investor money on fictitious returns to investors, commissions to sales agents, and payments to themselves or affiliated entities.

(Turley Decl. ¶¶ 21-47; Edwards Decl. ¶¶ 38-40.)

A.    <u>The REAL Program Raised More than $300 million from Investors but Generated Little Revenue</u>

Drive Planning received a substantial amount of investor funds for the REAL program.  (Turley Decl. ¶¶ 10, 16-22.)  From September 2020 through June 2024, bank records reflect that investors deposited $372 million in the REAL program.  (*Id.*)  More than $66 million invested in the REAL program came from retirement accounts.  (*Id.* ¶ 16.)  Drive Planning's records show that over 2,500 investors placed funds in the REAL program, including through wire transfers, and that these investors reside in at least 48 states.  (*Id.* ¶¶ 11, 18.)  The records also show that the REAL program continued to grow in 2024, and that it received approximately $800,000 every day in new investor money.  (*Id.* ¶¶ 19-20.)  The most recent records available to the SEC show that Drive Planning owes investors in the REAL program more than $280 million in principal and interest.  (Turley Decl. ¶ 17.)

Although the REAL program received a large amount of investor funds, the program did not generate much revenue.  (Turley Decl. ¶¶ 21-22; Edwards Decl. ¶¶ 38-39.)  In fact, from September 2020 until June 2024, Drive Planning's main bank accounts received deposits of around $389 million.  (Turley Decl. ¶ 22.)  Approximately $372 million of the deposits—roughly 95%—came from REAL investors.  (*Id.*)  The company only received around $17.6 million from other

sources, with $4 million of that amount coming from investors in one of Drive Planning's other investment programs.  (*Id.*)

### B.    Defendants Paid Fictitious Returns to Investors

Between September 2020 and June 2024, Drive Planning paid $154 million in purported returns to investors in the REAL program.  (Turley Decl. ¶ 23.)  At least $137 million of the funds returned to REAL investors were funds from other investors in the program.  (*Id.*)  Moreover, without new investor money, Drive Planning would not have been able to meet its repayment obligations to investors in the REAL program.  (*Id.* ¶¶ 24-28.)  Drive Planning's inability to meet its financial obligations to REAL investors without new investor money holds true during whole months and shorter time periods as well.  (*Id.*)

### C.    Defendants' Misappropriated Investor Funds

From the inception of the REAL program, Defendants used investor funds in ways that were contrary to how the funds were supposed to be used.  (Turley Decl. ¶¶ 29-47.)  In fact, Drive Planning appears to have used funds from the very first investment in the REAL program to pay returns to an investor in a different program offered by the company.  (*Id.* ¶¶ 29-31.)  Bank records also show that Defendants spent approximately $2 million of investor funds on a yacht that they renamed "Live More" and titled in Burkhalter's name.  (*Id.* ¶¶ 32-33.)

Moreover, despite generating little revenue, Drive Planning paid roughly

$65 million in commissions to sales agents who helped solicit investments in the REAL program.  (*Id.* ¶¶ 41-42.)  Drive Planning also spent $4.6 million on private jets and luxury car services; $1.3 million to repay investors in other programs; $700,000 to Coinbase; and $319,000 on clothing, jewelry, and beauty treatments, including $75,000 at Louis Vuitton and $69,000 at Diamonds Direct.  (*Id.* ¶¶ 34-40.)

In addition to these payments, Defendants also transferred significant sums to or acquired property for Relief Defendants Jacqueline Burkhalter (Defendant Burkhalter's wife), the Burkhalter Ranch Corporation, Drive Properties, LLC, TBR Supply House, Inc., and Drive Gulfport Properties.  (Turley Decl. ¶¶ 44-47.)  For example, Drive Planning transferred $1.2 million to Ms. Burkhalter and $17 million to the Burkhalter Ranch.  (*Id.*)  Defendants also spent millions of dollars on property for Relief Defendants, including approximately $6.6 million for property held jointly by Ms. Burkhalter and her husband, $5.8 million for the Burkhalter Ranch, $777,000 for Drive Properties, $944,000 for Drive Gulfport Properties, and $900,000 for TBR Supply House.  (*Id.* ¶ 47.)  The available records do not show why Relief Defendants, which are affiliated with the Burkhalters, received these assets from Drive Planning.

## III.   Burkhalter Recently Provided False Information about REAL

The record is still being developed, but it appears that Burkhalter continued to make false statements about the REAL program even after he learned about the SEC's investigation.  In June 2024, he falsely told sales agents that there was not a

regulatory issue with the program and that the company had decided to halt new investments due to an internal audit.  (Maniaci Decl. ¶¶ 27-36.)  He later falsely claimed that the SEC had instructed Drive Planning to stop paying investors in the program.  (*Id.*; Turley Decl. ¶ 61.)  Moreover, Burkhalter, Ms. Burkhalter, and Drive Planning's Chief Operating Officer all asserted their Fifth Amendment right against self-incrimination in response to the SEC staff's questions about Drive Planning.  (T. Burkhalter Tr. 14-32; J. Burkhalter Tr. 10-29; D. Bradford Tr. 9-25.)

## ARGUMENT

Under Section 20(b) of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), the Court may enter preliminary injunctive relief, such as an asset freeze, if the SEC shows that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of such relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).  "The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors."  *Collins & Co., General Contractors v. Claytor*, 476 F. Supp. 407, 409 (N.D. Ga. 1979).  The Court should enter such relief here.

## I.  The Defendants Committed Securities Fraud

The antifraud provisions of the securities laws include Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a).  Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in connection with the purchase or sale of securities using the instrumentalities of interstate commerce.  *Lorenzo v. SEC*, 587 U.S. 71, 77-78 (2019); *SEC v. Merch. Cap.*, 483 F.3d 747, 773 n.17 (11th Cir. 2007).  To prevail on these claims, the SEC must show: (1) a misstatement or omission; (2) that was material; (3) made with scienter; and (4) in connection with the purchase or sale of securities.  *SEC v. Monterosso*, 756 F.3d 1326, 1333-34 (11th Cir. 2014).  The SEC may also meet its burden by showing a scheme to defraud, such as a Ponzi scheme.  *United States v. Silvestri*, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005).

Section 17(a) prohibits fraudulent conduct in the offer or sale of securities.  *See* 15 U.S.C. § 77q(a).  Section 17(a)(1) has nearly identical elements as Section 10(b) and "requires substantially similar proof."  *Monterosso*, 756 F.3d at 1334.  Section 17(a)(2) and Section 17(a)(3) have similar elements as well, but the SEC only has to show that a defendant acted negligently.  *Merch. Cap.*, 483 F.3d at 766.

### A.  Investments in the REAL Program are Securities

"Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."

*SEC v. Edwards*, 540 U.S. 389, 393 (2004).  "To that end, [Congress] enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment." *Id*.; *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (noting that Congress "painted with a broad brush" in defining the term "security").  The REAL investment comfortably meets this standard.

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act expressly include "notes" in the definition of a "security."  *See* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).  The Supreme Court has held that notes are "presumed to be a 'security,'" and that this presumption may be rebutted only when the note at issue is or "bears a strong resemblance" to a financial instrument on a judicially crafted list of exemptions.  *Reves*, 494 U.S. at 67 (listing notes "delivered in consumer financing" or "secured by a mortgage on a home" as examples of notes that are not securities); *Barron v. Lampley*, 2016 WL 5334472, at *15 (N.D. Ga. Jan 25, 2016) (same).

Under *Reves*' "family resemblance test," courts consider: (1) the motivation of the parties; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) whether some factor (such as the existence of another regulatory scheme) reduces the risk of the note, thereby rendering application of the securities laws unnecessary.  *Id.*  No single factor is dispositive.  *SEC v. Thompson*, 732 F.3d 1151, 1159 (10th Cir. 2013).

In this case, none of the *Reves* factors undermines the presumption that the

-10-

REAL notes are securities. *SEC v. Scott*, 2015 WL 13742024, at *7-9 (E.D.N.Y. July 15, 2015) (finding a "short-term promissory note" offered to investors that defendant claimed would be used "to fund bridge loans to third party borrowers" a security). The defendants touted the REAL notes as an investment; investors viewed the notes as investments and were motivated by the high rate of return that they offered; the defendants offered and sold the notes to more than 2,500 investors in nearly every state; and there is no other regulatory regime that reduced the risk of the notes. *Thompson*, 732 F.3d at 1159-60; *SEC v. Zada*, 787 F.3d 375, 380-81 (6th Cir. 2015); *SEC v. Watkins*, 317 F.Supp.3d 1244, 1253 (N.D. Ga. 2018).[1]

Alternatively, the REAL program is a "security" because it qualifies as an "investment contract" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. *See* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). An investment contract exists if there is (1) an investment of money, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *SEC v. ETS Payphones*, 408 F.3d 727, 731 (11th Cir. 2005).

In this case, the REAL investment meets all three elements. *United States v.*

---

[1] That the notes matured in less than nine months does not change the result. *Bellah v. First Nat. Bank*, 495 F.2d 1109, 1111 (5th Cir. 1974); *Thompson*, 732 F.3d at 1158, n.6; *SEC v. R.G. Reynolds*, 952 F.2d 1125, 1131-33 (9th Cir. 1991).

*Rowzee*, 550 F. App'x 452, 455 (9th Cir. 2013) (investments were securities where investor funds were "used to provide bridge loans to companies[] in exchange for a typical return of 25 percent to 35 percent within three to four months"). The first element is satisfied because investors paid money for the notes based on the promised rate of return. *Howey*, 328 U.S. at 298; *ETS Payphones*, 408 F.3d at 731.

The second element is met because, under "the concept of vertical commonality, . . . a common enterprise exists where the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999). Here, vertical commonality exists because the REAL investors' fortunes depended on the efforts and expertise of Defendants in using their funds to make profitable real estate deals. *Id.* Finally, the third element is met because control over the use of investor funds was vested exclusively in the Defendants. Investors simply had no role in how Defendants utilized their funds. *Id.*

## B. Defendants Made Material Misrepresentations and Engaged in an Overall Scheme to Defraud REAL Investors

The Securities Act and Exchange Act prohibit both "false statements" and "omissions of material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011). In this case, the

-12-

Defendants repeatedly made false and misleading statements to investors.  They fraudulently touted REAL as a safe investment, when in fact the program generated little revenue.  In addition, Defendants failed to disclose that investors funds were used to pay fictitious returns and for their personal expenses.  (Eason Decl. ¶¶ 14-16; Thompson Decl. ¶¶ 10-12.)  These are precisely the type of statements and omissions the securities laws prohibit.  *See, e.g.*, *SEC v. Zandford*, 535 U.S. 813, 821-22 (2002).

The misstatements and omissions were also material.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (information is material if it would significantly alter the total mix of information available to investors).  Defendants' misrepresentations and omissions went to the very nature of the investment, including how investor funds would be used and returns would be generated.  Courts have consistently found that such information—going to the core of the investment decision—is material. *See, e.g.*, *SEC v. Smart*, 678 F.3d 850, 857 (10th Cir. 2012).

The securities laws also reach beyond false statements and encompass any wrongdoing that rises to the level of a scheme or deceptive practice.  *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10 (1971).  "To be liable for a scheme to defraud, a defendant must have 'committed a manipulative or deceptive act in furtherance of the scheme.'"  *SEC v. Blockvest*, 2018 WL 4955837, at *5 (S.D. Cal. 2018) (quoting *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997)).

Numerous courts have concluded that a Ponzi scheme—like the REAL

-13-

program—is an inherently deceptive scheme under the securities laws.  *See*, *e.g.*, *Silvestri*, 409 F.3d at 1317 n.6 (noting that a Ponzi scheme is "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors"); *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (same).  Thus, in addition to making material false statements and omissions, Defendants also violated the securities laws by operating their fraudulent scheme.  *Id.*

### C.    Defendants Acted With Scienter

Scienter under Section 10(b), Rule 10b-5, and Section 17(a)(1) "refers to a mental state embracing an intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  "Scienter may be established by a showing of knowing misconduct or severe recklessness."  *SEC v. Carriba Air*, 681 F.2d 1318, 1324 (11th Cir. 1982).  Burkhalter's scienter is imputed to Drive Planning, which was under his control.  *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1087 n.1 (2d Cir. 1972).  For its Section 17(a)(2) and 17(a)(3) claims, the SEC need only show that Defendants acted negligently.  *Merch. Cap.,* 483 F.3d at 766.

In this case, Defendants knowingly or at least recklessly made false statements to investors.  Among other misrepresentations, Defendants told investors that their funds would be invested in real estate projects and that the REAL investment had minimal risk.  The Defendants knew that these—and many other—statements were untrue.  In reality, Defendants perpetrated an egregious fraud against these investors

-14-

by running a Ponzi scheme.  As a result, there is ample evidence that Defendants

acted with the requisite scienter.  *Monterosso*, 756 F.3d at 1335.

### D. Defendants Made the False Statements "In Connection With" the Offer, Purchase, or Sale of Securities

The "in connection with" and "in the offer of" elements are satisfied whenever

"assertions are made . . . in a manner reasonably calculated to influence the investing

public[.]"  *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968); *U.S. v.*

*Naftalin*, 441 U.S. 768, 777-78 (1979); *E-Smart Tech.*, 74 F. Supp. 3d at 320.  In this

case, Defendants' false statements to investors regarding the REAL program clearly

meet this standard.  *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 244-45 (4th Cir. 2009).

### E. Defendants Used the Instrumentalities of Interstate Commerce

The "interstate commerce element is satisfied where the defendant uses the

telephone, Internet, or e-mail to accomplish the alleged fraud."  *SEC v. Tourre*, 2013

WL 2407172, at *11 (S.D.N.Y. June 4, 2013); *SEC v. Phoenix Telecom, LLC*, 239 F.

Supp.2d 1292, 1298 (N.D. Ga. 2000).  Here, Defendants' use of the internet and wire

services to solicit and receive funds satisfies this element.  *Id.*

## II. Emergency Relief is Necessary to Protect Investors

### A. The Court Should Freeze Defendants' Assets

"A district court may exercise its full range of equitable powers, including

an asset freeze, to preserve sufficient funds for the payment of a disgorgement

award." *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1324 (N.D. Ga. 2016); *SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (holding that "[t]he district court may freeze assets in order to preserve funds while a party seeks an equitable remedy such as disgorgement."). The purpose of an asset freeze is to "preserve the status quo" and ensure that a defendant does not dissipate assets. *ETS Payphones*, 408 F.3d at 734; *Torchia*, 183 F. Supp. 3d at 1324.

In this case, the SEC is likely to prevail on the merits because there is overwhelming evidence that Defendants committed securities fraud. As described above, Defendants offered and sold more than $300 million in the sham REAL program. In sharp contrast to what they told investors, Defendants used funds to pay fictitious returns to other investors and they misappropriated millions of dollars of investor funds. The amount of disgorgement likely exceeds $200 million, and Burkhalter may be held jointly and severally liable with Drive Planning for disgorgement. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475-76 (2d Cir. 1996). In these circumstances, the Court should freeze Defendants' assets to preserve the status quo and ensure they do not dissipate additional funds. *ETS Payphones*, 408 F.3d at 734; *Torchia*, 183 F. Supp. 3d at 1324.

Moreover, the other preliminary injunction factors all militate in favor of an asset freeze as well. *Starbucks Corp.*, 144 S. Ct. at 1576. The SEC and investors in the REAL program will be irreparably harmed without an asset freeze. *SEC v.*

-16-

*Chappell*, -- F.4th --, 2024 WL 3335652, at *17 (3d Cir. July 9, 2024). Burkhalter has demonstrated his proclivity for spending large amounts of investor funds improperly, and he still appears to have access to the company's bank accounts. An order freezing Defendants' assets is needed to stop his excessive and improper spending and to preserve existing assets from further dissipation. *Id.*; *SEC v. Bivona*, 2016 WL 2996903, at *2 (N.D. Cal. May 25, 2016) (freezing defendant's assets to prevent "the irreparable harm of those assets being dissipated").

In addition, the public interest would be served by an asset freeze. "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Chappell*, 2024 WL 3335652, at *18. Here, freezing Defendants' assets—including $50 million in bank accounts—so that the funds are not dissipated is resoundingly in the public interest. *See, e.g.*, *SEC v. Nationwide Automated Sys.*, 2014 WL 12811969, at *9 (C.D. Cal. Sept. 30, 2014) ("The public interest in preserving the illicit proceeds of a Ponzi scheme for restitution to the victims is great.") (cleaned up). An asset freeze is also in the public interest because it will prevent further dissipation or a preferential distribution if third parties seek to recover funds from Defendants before this matter is adjudicated.

Finally, balancing the equities favors an asset freeze. For this factor, "a court should also consider the possibility of harm to other interested persons from

-17-

the grant or denial of the" freeze. *Chappell*, 2024 WL 3335652, at \*18. In this case, there are over 2,500 investors in the REAL program who are owed more than $200 million by Defendants. On balance, the equities favor freezing Defendants' assets to ensure that funds are available to pay a future disgorgement award to these victims. *Id.*; *SEC v. Harris*, 2010 WL 11617972, at \*4 (N.D. Tex. June 24, 2010) (finding "the importance of preserving the assets for return to investors outweighs the consequences an asset freeze might have on" a defendant).

**B.    The Court Should Freeze Relief Defendants' Assets**

"The plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer." *Smith v. SEC*, 653 F.3d 121, 128-29 (2d Cir. 2011). It is well-settled that "[f]ederal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). The power to freeze assets of relief defendants includes the assets of a defendant's spouse. *Smith*, 653 F.3d at 128-29; *SEC v. Ahmed*, 123 F. Supp. 3d 301, 307-11 (D. Conn. 2015). A contrary rule "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds by the simple procedure of giving [assets] to friends and relatives." *Cavanaugh*, 155 F.3d at 137.

In this case, the Court should freeze Relief Defendants' assets. Bank records

-18-

reflect that Drive Planning transferred a large sum of funds to Ms. Burkhalter and the Burkhalter Ranch from accounts that were funded almost entirely with money from REAL investors.  (Turley Decl. ¶¶ 44-47.)  Drive Planning also spent millions of dollars to acquire property for Relief Defendants.  (*Id.*)  The records do not, however, reflect Relief Defendants' entitlement to these assets.  When the SEC asked Ms. Burkhalter about her relationship with Drive Planning and receipt of funds from it, she asserted her Fifth Amendment right against self-incrimination.  As a result, the SEC is likely to prevail on its claims for disgorgement against the Relief Defendants.

The other factors support an asset freeze as well.  The SEC will suffer irreparable harm without an asset freeze because the assets transferred to Relief Defendants may be sold or otherwise dissipated.  *Chappell*, 2024 WL 3335652, at *17.  In addition, the balance of the equities and public interest favor an asset freeze because the requested freeze simply maintains the status quo.  *Cf. Smith*, 653 F.3d at 128-29; *SEC v. Byers*, 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009).

### C.   The Court Should Preliminarily Enjoin Defendants from Continuing the REAL Program and Other Investments

The Court should also preliminarily enjoin Defendants from further violations of the securities laws and from operating the REAL program or any other investment.  *Starbucks Corp.*, 144 S. Ct. at 1576.  As explained above, the SEC is likely to prevail on its claims that Defendants violated the securities laws.  Indeed, the

overwhelming evidence shows that Defendants perpetrated an egregious offering fraud that raised more than $300 million from 2,500 investors.  They did so knowingly (or at least recklessly) over several years and duped investors in nearly every state.  *ETS Payphones*, 408 F.3d at 733; *Torchia*, 183 F. Supp. 3d at 1322-24.

A preliminary injunction is needed to prevent harm from Defendants committing additional violations.  The egregious and repeated nature of Defendants' conduct and their high degree of scienter make it likely that, if given the chance, they will harm investors again.  *Carriba Air*, 681 F.2d at 1322; *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981).  Until this case is resolved, they should not be anywhere near investor funds.

Defendants' decision to halt temporarily the REAL program after learning of the SEC's investigation does not obviate the need for an injunction against them. *ETS Payphones*, 408 F.3d at 733 (affirming preliminary injunction even though the defendant "has complied with the SEC since the inception of the SEC suit"); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir.1972) (noting that the "cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations").  "The reason is obvious: violators generally stop their illegal activities when under judicial scrutiny.  But just because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again." *SEC v. Murphy*, 50 F.4th 832, 851 (9th

Cir. 2022).  In short, Defendants' attempt to stave off an injunction is "too little, too late." *Torchia*, 183 F. Supp. 3d at 1322-24.

The remaining factors support a preliminary injunction as well.  The public interest and balance of equities are advanced by preventing violations of the securities laws.  Any restriction on Drive Planning and Burkhalter continuing to manage the sham REAL program or another investment is far outweighed by the risk that they will again defraud investors and cause substantial harm to them. *Naftalin*, 441 U.S. at 775-76; *Hochfelder*, 425 U.S. at 195.

### D.      The Court Should Appoint a Receiver Over Drive Planning

"The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief." *SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981); *Torchia*, 183 F. Supp. 3d at 1322-23.  Courts have consistently recognized that appointing a receiver "is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public." *First Fin. Grp.*, 645 F.2d at 438; *SEC v. Keller Corporation*, 323 F.2d 397, 403 (7th Cir.1963) (stating that "[i]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of [the corporate defendant's] affairs for the benefit of those shown to have been defrauded.").  In such cases, courts explain, "it is likely that, in the absence of the

appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought." *First Fin. Grp.*, 645 F.2d at 438; *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) (same).

In this case, the appointment of a Receiver over Drive Planning is critical. *Torchia*, 183 F. Supp. 3d at 1322-23. Drive Planning, with Todd Burkhalter at the helm, has run a massive Ponzi scheme for several years that raised $300 million. Defendants' misled investors in nearly every state into investing in their fraudulent scheme and they would have continued the scheme if the SEC had not intervened. A receivership is essential in these circumstances. *SEC v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970) (holding that "a receiver is permissible and appropriate where necessary to protect the public interest and where it is obvious, as here, that those who have inflicted serious detriment in the past must be ousted.").

The SEC respectfully requests that the Court appoint Kenneth Murena as the Receiver in this case. As the attached profile reflects, Mr. Murena is a Partner at the law firm Damian Valori Culmo LLP. He has been an attorney for 25 years and has spent most of his career representing court-appointed receivers, monitors, and other fiduciaries in government enforcement actions. Mr. Murena has worked as lead counsel for the receiver in several enforcement matters brought by the SEC,

CFTC, and FTC, including in this district. *SEC v. Price*, 1:12-cv-02296-TCB (N.D. Ga.). Mr. Murena has agreed to reduce his fees and he has already identified an experienced Atlanta-based financial consulting firm that will assist him at reduced rates. Mr. Murena's team also has proficiency in Spanish which will facilitate the recovery of assets in South America and Mexico and for communicating with any investors for whom English is not their first language.

In short, Mr. Murena is well-positioned to perform the duties of a receiver in this case—*e.g.*, to determine the nature, location and value of all assets and property; marshal and maintain those assets with a view to distribution; and commence additional legal proceedings, if needed, for the benefit of investors and other creditors. *See, e.g.*, *Donnell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008); *SEC v. Investors Sec. Corp.*, 560 F.2d 561, 567 (3d Cir. 1977).

Defendants' recent engagement of a financial consulting firm does not eliminate the need for a receiver in this case. A financial consulting firm hired by Burkhalter is not a substitute for an independent, court-appointed receiver that can administer Drive Planning's assets going forward, plan and propose a distribution to the harmed investors, and seek recovery from third parties. *Id.*

Moreover, the retained consulting firm is not an appropriate receiver. Burkhalter retained the firm knowing that this action was imminent. He should not get to pick his successor. Further, without questioning the firm's integrity, it is

tainted by its association with Burkhalter.  In addition, Murena is a better candidate because he has agreed to reduce his fees and, as an attorney, he is well-situated to pursue claims against third parties.

### E.     The Court Should Order an Accounting

The Court also has the power to order Defendants and Relief Defendants to provide an accounting of their assets and the REAL program.  *Manor Nursing*, 458 F.2d at 1105; *SEC v. Lybrand*, 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000). Specifically, the Court should order Defendants to: (i) identify the name, address, and phone number of each investor in REAL since September 2020; (ii) identify the amount each investor invested in REAL and the date each investment was made; (iii) explain how each investor's funds were used and where the funds are now; and (iv) identify all of Defendants' assets and how they obtained them.  *Lybrand*, 2000 WL 913894, at *12.  The Court should also order Relief Defendants to identify all of their assets and how they obtained them.  *Id.*

### F.     Document Preservation

In accordance with Rule 26 and the Court's equitable power, the SEC requests that the Court issue an order prohibiting the destruction of evidence given the serious allegations of fraud and the need to preserve all relevant evidence in this case.

### G.     The Court Should Order Burkhalter to Surrender his Passport

Finally, the Court should require Defendant Burkhalter to surrender his

passport to the Clerk of Court and prohibit him from leaving the country pending further order of the Court.  This relief is a proper use of the Court's equitable powers that will preserve the status quo and minimize the risk that Burkhalter evades the Court's jurisdiction.  *SEC v. Creative Cap. Consortium*, 2009 WL 10664454, at *1, 4 (S.D. Fla. Jan. 8, 2009) (ordering that defendant in Ponzi scheme case "surrender all passport(s) issued to him to the Clerk of the Court and . . . [barring him] from traveling outside the United States, pending the resolution of this case on the merits."); *SEC v. MCC Int'l Corp.*, 2022 WL 2341216, at *6 (S.D. Fla. Apr. 26, 2022); *SEC v. Univ. Consult. Res.*, 2010 WL 4873733, at *2, 7 (D. Colo. Nov. 23, 2010).  This case involves serious allegations of fraud and $300 million in investor funds.  Burkhalter has declined to testify about the use of such funds.  He should not leave the country until the case is resolved or at least the Receiver completes a full accounting.  *Id.*  In making this request, the SEC notes that Drive Planning funds were used to purchase a $4.1 million condo in Mexico.  (Turley Decl. ¶ 18.)

## CONCLUSION

For the foregoing reasons, the SEC asks that the Court grant this motion and enter the two unopposed orders granting a preliminary injunction and appointing a receiver, and also enter the order requiring Defendant Burkhalter to surrender his passport and remain in the country.

Dated: August 13, 2024          Respectfully submitted,

/s/ Pat Huddleston II
M. Graham Loomis (GA Bar No. 457868)
Pat Huddleston II (GA Bar No. 373984)
Harry B. Roback (GA Bar No. 706790)
U.S. Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 942-0690
Facsimile:  (404) 842-7679
RobackH@sec.gov

Attorneys for Plaintiff

## <u>CERTIFICATION OF COMPLIANCE</u>

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1 (B).

<u>/s/ Harry B. Roback</u>
Harry B. Roback