THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )  File No. A-04060-A
DRIVE PLANNING, LLC        )

WITNESS:  David Bradford
PAGES:    1 Through 27
PLACE:    Securities and Exchange Commission
          Atlanta Regional Office
          950 East Paces Ferry Rd NE, Suite 900
          Atlanta, GA 30326
DATE:     Monday, June 17th, 2024


        The above entitled matter came on for hearing,
pursuant to notice, at 9:59 a.m.




Diversified Reporting Services, Inc.
(202) 467-9200

1   APPEARANCES:

2

3   On behalf of the Securities and Exchange Commission:

4        AUSTIN STEPHENSON, ESQ.

5        PAT HUDDLESTON, ESQ.

6        CODY TURLEY, ESQ.

7        PETER DISKIN, ESQ.

8        JUSTINE RAINFORD, INTERN

9        Securities and Exchange Commission

10       950 East Paces Ferry Rd NE, Suite 900

11       Atlanta, GA 30326

12       (404) 842-7600

13

14   On behalf of the Witness:

15       DANIEL P. GRIFFIN, ESQ.

16       Griffin Durham Tanner & Clarkson, LLC

17       75 14th Street, Suite 2130

18       Atlanta, GA 30309

19       (404) 891-9151

20       dgriffin@griffindurham.com

21

22

23

24

25

1                    C O N T E N T S

2

3   WITNESS                              EXAMINATION

4   David Bradford                                 5

5

6   EXHIBITS:        DESCRIPTION              IDENTIFIED

7      7      Subpoena                             5

8      8      Email Chain                          7

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2            MR. STEPHENSON:  On the record at 9:59
 3   a.m. on Monday, June 17th, 2024.
 4            Good morning, Mr. Bradford.
 5            MR. BRADFORD:  Good morning.
 6            Forgive me.  My voice isn't great
 7   right now. Allergies or something.
 8   Whereupon,
 9                DAVID BRADFORD
10   having been previously sworn, testifies as
11   follows:
12            MR. STEPHENSON:  Mr. Bradford, please
13   state your full name and spell it for the
14   record.
15            THE WITNESS:  David John Bradford, Sr.
16   David, D-a-v-i-d; John, J-o-h-n; Bradford,
17   B-r-a-d-f-o-r-d.
18            MR. STEPHENSON:  I'm Austin
19   Stephenson.  I'm joined here by Peter Diskin,
20   Pat Huddleston, and Cody Turley.  We're all
21   officers of the Commission for purposes of this
22   proceeding.  We're also joined by Justine
23   Rainford, who's an intern for the Commission.
24            This is an investigation by the United
25   States Securities and Exchange Commission in the
```

1  matter of Drive Planning, LLC, to determine
2  whether there have been violations of certain
3  provisions of federal securities laws.
4          However, the facts developed in
5  this investigation many constitute violations
6  of other federal or state, civil, or criminal
7  laws.
8          Now, prior to the opening of the
9  record, you were provided with a copy of the
10  Formal Order of Investigation in this matter.
11  It will be available for your examination during
12  the course of this proceeding.
13          Mr. Bradford, have you had an
14  opportunity to review the formal order?
15          THE WITNESS:  Yes, I have.
16          MR. STEPHENSON:  I have a document I'm
17  going to share rather quickly.
18              (SEC Exhibit No. 7 was marked
19              for identification.)
20                  EXAMINATION
21          BY MR. STEPHENSON:
22      Q    **Mr. Bradford, can you see a .pdf on**
23  **your screen marked as Exhibit 7?**
24      A    Yes, I can.
25      Q    **Okay.  Prior to the opening of the**

1    record, you were provided a copy of the

2    Commission's Supplemental Information Form, what

3    we call Form 662.  A copy of that exhibit has

4    now been marked Exhibit 7.

5              Mr. Bradford, have you had the

6    opportunity to review Exhibit No. 7?

7        A    Yes.

8        Q    Let me know if you want me to scroll.

9    I can scroll.  If you've already --

10       A    I've seen it before.  Not necessary.

11       Q    Do you have any questions concerning

12   this form?

13       A    No, I do not.

14       Q    Mr. Bradford, are you represented by

15   counsel today?

16       A    Yes.

17             MR. STEPHENSON:  Would counsel please

18   identify themselves for the record?

19             MR. GRIFFIN:  Daniel P. Griffin and

20   Patrick Schwedler.

21             MR. STEPHENSON:  Mr. Griffin, are you

22   representing Mr. Bradford as his counsel today?

23             MR. GRIFFIN:  I am.

24             MR. STEPHENSON:  Forgive me a moment

25   while I pull up one more form.

1              (SEC Exhibit No. 8 was marked
2              for identification.)
3         BY MR. STEPHENSON:
4     Q    Mr. Bradford, do you see a document
5  marked Exhibit 8 on your screen?
6     A    I do.
7     Q    Mr. Bradford, this is a copy of a
8  subpoena that has been marked as Exhibit No. 8.
9  Is this a copy of the subpoena you're appearing
10  pursuant to today?
11     A    Yes.
12     Q    And that's your previous counsel
13  listed.   Your
14  current counsel is here today, Mr. Daniel
15  Griffin; correct?
16     A    Correct.
17     Q    Thank you.
18          Mr. Bradford, what's your date of
19  birth?
20     A    ████████████, 1972.
21     Q    And what is your social security
22  number, Mr. Bradford?
23     A    ████████████.
24     Q    What's your current residential
25  address?

1    A    ████████████████████ --

2    ██████, Peachtree -- one word -- Corners,

3    Georgia ██████.

4    **Q    Do you have any other residential**

5    **addresses?**

6    A    I have an address in St. Petersburg.

7    I don't know if you want to call that

8    residential.  I'd be happy to give you the --

9    **Q    Go ahead and give that address.  We're**

10   **not so certain that's a residence.**

11   A    It's not going to --

12        MR. GRIFFIN:  We'll give an address.

13        THE WITNESS:  ██████████████████,

14   St. Petersburg, Florida.  And forgive me.  I

15   don't remember the ZIP Code off the top of my

16   head.  I'm sorry.  ██████████.

17        BY MR. STEPHENSON:

18   **Q    Do you have any other**

19   **residential addresses besides the one that you**

20   **mentioned in Georgia and then this one we're not**

21   **sure is residential in Florida?**

22   A    No.

23   **Q    How did you first become involved in**

24   **the financial industry, Mr. Bradford?**

25   A    I was a client with a Todd Burkhalter,

1 and then he --

2 　　　　MR. GRIFFIN:  That's enough.

3 　　　　Once we start talking about Driving

4 Planning and Todd Burkhalter, we're going to be

5 asserting privilege.

6 　　　　BY MR. STEPHENSON:

7 　　**Q**　**Mr. Bradford, can you clarify which**

8 **privilege you're asserting as to that question?**

9 　　A　On the advice of my lawyer, I

10 respectfully decline to answer on the basis of

11 the Fifth Amendment, which according to United

12 States Supreme Court, protects everyone, even

13 innocent people, from the need to answer

14 questions if the truth might be used to create

15 the misleading impression that they are somehow

16 involved in a crime that they did not commit.

17 　　　　Can I make a statement?  I want to be

18 crystal --

19 　　**Q**　**Before you do, I have**

20 **something to read now that you've invoked your**

21 **Fifth Amendment privilege before you do that.**

22 　　A　Yeah.  That's --

23 　　**Q**　**So it's something I'm required to read**

24 **to you here.**

25 　　　　**I'm not authorized to compel you to**

1  give evidence or testimony as to which you
2  assert your privilege against self-
3  incrimination, and I have no intention of doing
4  so.  In addition, I do not have the authority to
5  compel your testimony by granting you immunity
6  from prosecution.  Any questions that I ask
7  hereafter will be with the understanding that if
8  you wish to assert your privilege, you need
9  merely to state that you're refusing to answer
10 on the grounds that your answer might
11 incriminate you.
12          In other words, you are not compelled
13 to answer any further questions if you believe a
14 truthful answer to the question might show that
15 you committed a crime and you wish to assert
16 your privilege against self-incrimination.
17 Accordingly, if you answer any questions, you
18 will be doing so voluntarily.
19          Do you understand this?
20     A    Yes, I do.
21     Q    Okay.  And you should be aware, if you
22 refuse to answer the question based on your
23 Fifth Amendment
24 privilege, a judge or jury may take an adverse
25 inference against you in a civil action that the

1    SEC may determine to bring against you.  That

2    means the judge or jury would be permitted to

3    infer that your answer to the question might

4    incriminate you.

5             Do you understand this?

6        A    I do.

7        Q    Okay.  Having said that, was there

8    anything you wanted to add?

9        A    No.

10            MR. GRIFFIN:  I think I will say on

11   our behalf at this time, things might change in

12   a couple of weeks where you will -- where we can

13   talk to you and give a fulsome -- but at this

14   time, he's going to assert his privilege --

15            MR. STEPHENSON:  Understood.

16            MR. GRIFFIN:  -- in response to those

17   questions.

18            MR. STEPHENSON:  Understood.  There's

19   still a few questions I'd like to ask.  If you

20   agree, he can just answer by saying that he

21   asserts his Fifth Amendment privilege.

22            MR. GRIFFIN:  Rather than read our

23   statement? Yes; that's what we'll do.

24            Just all you have to do is say "I take

25   the

1    Fifth" in answer to a question we can't answer.

2            Okay.  Yes.  We understand.

3            MR. STEPHENSON:  Thank you, Mr.

4    Bradford.

5            BY MR. STEPHENSON:

6        **Q    Mr. Bradford, when did you become**

7    **involved in Drive Planning?**

8        A    I take the Fifth.

9        **Q    Mr. Bradford, did you ever inform**

10   **Drive Planning's clients that their funds may be**

11   **used to pay off existing loans of other clients?**

12       A    I take the Fifth.

13       **Q    Did you inform Drive Planning's**

14   **financial consultants that clients' funds may be**

15   **used to pay off existing loans of other clients?**

16       A    I take the Fifth.

17       **Q    Did you inform Drive Planning's**

18   **clients that their funds may be used to**

19   **compensate executives personally?**

20       A    I take the Fifth.

21       **Q    Did you inform Drive Planning's agents**

22   **that client funds may be used to compensate**

23   **Drive executives personally?**

24       A    I take the Fifth.

25       **Q    Did you inform Drive Planning's**

1    clients of all the risks relevant to lending

2    money to Drive Planning?

3         A    I take the Fifth.

4         Q    Did you inform Drive Planning's agents

5    of all the risks relevant to lending money to

6    Drive Planning?

7         A    I take the Fifth.

8         Q    Did you provide Drive Planning's

9    clients with a complete list of collateral

10   underlying Drive Planning's loans?

11        A    I take the Fifth.

12        Q    Did you provide Driving Planning's

13   agents with a complete list of collateral

14   underlying Drive Planning's loans?

15        A    I take the Fifth.

16        Q    Is Drive Planning's collateral

17   insufficient to cover its existing liabilities

18   to its clients?

19        A    I take the Fifth.

20        Q    Did you, Mr. Bradford, ever use Drive

21   Planning's client funds to pay off existing

22   loans of other clients?

23        A    I take the Fifth.

24        Q    Did you ever use Drive Planning's

25   client funds for your own personal use?

1      A     I take the Fifth.

2            Can I have a moment, please?

3            MR. STEPHENSON:  Of course.

4            MR. GRIFFIN:  I'm stepping away, and

5      I'm putting it on mute right now.

6            (Whereupon, a discussion was held off

7      the record.)

8            MR. GRIFFIN:  We're back, Austin.

9            MR. STEPHENSON:  Okay.

10           Since we took a short break, I

11     apologize for this, but I do want to read this

12     Fifth Amendment script.  I want to be really

13     clear on our record that he's taking the Fifth

14     and he understands that he's taking the Fifth

15     and that we're all on the same page.

16           MR. GRIFFIN:  It's not necessary,

17     Austin, but you may if you like.

18           MR. STEPHENSON:  Thank you.

19           BY MR. STEPHENSON:

20        **Q     Mr. Bradford, I'm not authorized to**

21     **compel you to give evidence or testimony as to**

22     **which you assert your privilege.  In addition, I**

23     **do not have the authority to compel your**

24     **testimony by granting you immunity from**

25     **prosecution.  Any questions that I ask hereafter**

1   will be with the understanding that if you wish

2   to assert your privilege, you need merely to

3   state that you're refusing to answer on the

4   grounds that your answer might incriminate you.

5          In other words, you are not compelled

6   to answer any further questions if you believe a

7   truthful answer to the question might show that

8   you committed a crime and you wish to assert

9   your privilege against self-incrimination.

10         Accordingly, if you answer

11  any questions, you will be doing so

12  voluntarily.

13         Do you understand this?

14     A    I do.

15     Q    Okay.  If you refuse to answer the

16  question based on your Fifth Amendment

17  privilege, a judge or jury may take an adverse

18  inference against you in a civil action that the

19  SEC may determine to bring against you. That

20  means the judge or jury would be permitted to

21  infer that your answer to the question might

22  incriminate you.

23         Do you understand this?

24     A    I understand.

25     Q    Okay.  Thank you.

1          Mr. Bradford, did you promise
2    unrealistic rates of return to Drive Planning
3    clients?
4          A    I take the Fifth.
5          Q    Did you promise unrealistic rates of
6    return to Drive Planning agents?
7          A    I take the Fifth.
8          Q    Did Drive Planning have income aside
9    from loans sufficient to cover its interest
10   payments to clients each quarter?
11         A    I take the Fifth.
12         Q    Mr. Bradford, did you promote Drive
13   Planning's products to Drive Planning's clients?
14         A    I take the Fifth.
15         Q    Did you promote Drive Planning's
16   products to Drive Planning's agents?
17         A    I take the Fifth.
18         Q    Did you make any misrepresentations to
19   Drive Planning's clients?
20         A    I take the Fifth.
21         Q    Did you make any misrepresentations to
22   Drive Planning's agents?
23         A    I take the Fifth.
24         Q    Mr. Bradford, did you know that Drive
25   Planning was using new-investor money to pay

1    back old investors?

2        A    I take the Fifth.

3        Q    **Mr. Bradford, did you continue raising**

4    **money for new investors after Burkhalter stated**

5    **that they would use new money to pay back old**

6    **investors?**

7        A    I take the Fifth.

8        Q    **Mr. Bradford, did you know that the**

9    **cash that Drive Planning had was not sufficient**

10   **to meet existing obligations to investors?**

11       A    I take the Fifth.

12            MR. STEPHENSON:  Pat, either I can

13   take a break and chat, or if you have questions,

14   that's fine.

15            MR. HUDDLESTON:  Yeah; I have just a

16   few. Morning, Mr. Bradford.

17            BY MR. HUDDLESTON:

18       Q    **If you'd be willing to identify for us**

19   **any employees of Drive Planning?**

20       A    Would that be okay?  Okay.

21            I take the Fifth.  We take the Fifth,

22   sir.

23       Q    **Okay.  Did Drive Planning use a**

24   **payroll company to process payroll?**

25       A    I take the Fifth.

```
 1        Q     Did Drive Planning send 1099s to
 2   investors?
 3        A     I take the Fifth.
 4        Q     If it did, could you tell me who
 5   prepared the tax returns for Drive Planning?
 6        A     I take the Fifth.
 7        Q     Can you identify Drive Planning's
 8   landlord at the office?
 9        A     I take the Fifth.
10        Q     Have you ever been on Mr. Bradford's
11   yacht?
12        A     Repeat the question, please.
13        Q     Have you ever been on Mr. --
14              I'm sorry.
15              I misstated that.
16              Have you ever been on Burkhalter's
17   yacht?
18        A     I was going to say, I don't have a
19   yacht.
20              I plead the Fifth.
21        Q     I think I'm going to ask a little bit
22   about your background.  Tell us where you
23   graduated high school.
24        A     Certainly.  I graduated from Hillcrest
25   High School in Dalzel -- D-a-l-z-e-l -- in 1991.
```

1    It's no longer a high school, by the way.  It's
2    now a middle school.
3        **Q    Okay.  What state is that in?**
4        A    South Carolina.  Sorry.
5        **Q    Okay.**
6             **And did you have any other education**
7    **past high school?**
8        A    Yeah.  Majored in philosophy and
9    graduated with a bachelor's from Wofford College
10   in 1995.
11       **Q    Okay.**
12       A    And then graduated from Westminster
13   Theological Seminary in 1999 with a Master of
14   Divinity.
15       **Q    Did you start work after you graduated**
16   **Wofford?**
17       A    Did I start work?
18       **Q    I'm wondering whether there was some**
19   **employment between Wofford and Westminster.**
20       A    I was always working to provide for my
21   family.
22       **Q    Okay.**
23            **What kind of work?**
24       A    Temp jobs, various things.
25       **Q    Okay.**

1           After you graduated from Westminster,

2    what was your first job?

3        A    I was an intern at Independent

4    Presbyterian Church in Savannah, Georgia.

5        Q    How long did you do that job?

6        A    One year.

7        Q    What did you do after that?

8        A    I was a pastor of Providence Church in

9    Savannah, Georgia, for ten years.

10       Q    While you were a working as pastor for

11   Providence Church in Savannah, did you have any

12   other employment?

13       A    No.

14       Q    And so that would have -- when were

15   you last

16   pastor at Providence?  What year?

17       A    I believe that would be 2010.

18       Q    Okay.

19            What did you do next?

20       A    Trying to figure out what was next.  I

21   had a bad divorce, and I had kids to provide

22   for.  Moved back to South Carolina.  What did I

23   do next?

24            I moved to Sumter, South Carolina, and

25   worked at Simpson Hardware and Sporting Goods.

1   I was the chief buyer.  I ran the shoe
2   department.
3       **Q      How long did you do that work?**
4       A     Two years, I believe.
5       **Q     Okay.**
6             **What was your next job?**
7       A     I was working for -- new to Atlanta.
8   I got married, moved to Atlanta in that order.
9       **Q     Okay.**
10      A     Worked for Abadaba Shoes -- it's an
11  independent shoe company for -- I don't know --
12  about six months.  And then that wasn't paying
13  the bills so.
14            MR. GRIFFIN:  He's asking where you
15  worked.
16            THE WITNESS:  Sorry.
17            I worked for Gwinnett Place Nissan a
18  year in Duluth, Georgia.
19            BY MR. HUDDLESTON:
20      **Q     Mm-hm.**
21      A     And then Proexel Media for almost two
22  years. That would be it, Pat.
23      **Q     Did you say Prointel Media?  Did I**
24  **hear that correctly?**
25      A     It's Pro -- I'm sorry.  Let me spell

1    it out. Since I've seen the spelling.

2              P-r-o-e-x-c-e-l.  Proexel.

3         **Q    Thank you.**

4         A    It's e-x-e-l.  Forgive me.

5         **Q    What kind of job was that?**

6         A    Outside sales.

7              We provided a technology service

8    probably to car dealerships, helping them find

9    service and salespeople.

10        **Q    Any other employment between Proexel**

11   **and Drive Planning?**

12        A    No.

13        **Q    Did Drive Planning have any accounting**

14   **software?**

15        A    I take the Fifth.

16        **Q    While you were at Drive Planning, did**

17   **you have an administrative assistant?**

18        A    I take the Fifth.

19        **Q    Did Mr. Burkhalter have an**

20   **administrative assistant?**

21        A    I take the Fifth.

22        **Q    How did you keep your calendar at**

23   **Drive Planning?**

24        A    I take the Fifth.

25        **Q    Who made your travel arrangements**

1    while you were working at Drive Planning?

2         A    I take the Fifth.

3         Q    At Drive Planning did you have access

4    to a company credit card?

5         A    I take the Fifth.

6         Q    Can you identify for me all the

7    accounting/bookkeeping personnel at Drive

8    Planning?

9         A    I take the Fifth.

10        Q    Where was Mr. Burkhalter living last

11   year?

12        A    I take the Fifth.

13        Q    Could you tell us what type of car he

14   was driving last time you saw it?

15        A    I take the Fifth.

16        Q    Can you identify for us any sales

17   agents for Drive Planning before you stepped

18   away from Drive but before you became aware of

19   the OCC investigation?

20        A    I take the Fifth.

21        Q    Did you have a website administrator?

22        A    I take the Fifth.

23        Q    Who all was responsible for the

24   content on the website?

25        A    I take the Fifth.

1       Q    Did you have authority to add or

2   change things to the Drive Planning website?

3       A    I take the Fifth.

4       Q    Can you describe for us the process

5   for onboarding your new sales representatives?

6       A    I take the Fifth.

7       Q    Did Drive Planning use any

8   sales/marketing platform?

9       A    I take the Fifth.

10      Q    Did --

11         MR. GRIFFIN:  What platform?  Like,

12  what would that be?

13         BY MR. HUDDLESTON:

14      Q    So I'm talking, like, something from

15  Salesforce, like, customer relations.

16      A    Yeah.

17         I take the Fifth.

18      Q    Did Drive Planning have a chief

19  technology officer?

20      A    I take the Fifth.

21      Q    Thank you, Mr. Bradford.

22         That's all the questions I have right

23  now.

24      A    You're welcome.

25         MR. STEPHENSON:  Pat, I don't have any

1   further questions.

2           Pat, are you -- would you like to have

3   a break or --

4           MR. HUDDLESTON:  I'm okay.  Okay.

5           MR. STEPHENSON:  Okay.

6           Mr. Griffin, you have the right to ask

7   your client any questions that you might want to

8   at this juncture.

9           MR. GRIFFIN:  Not at this time.

10          MR. STEPHENSON:  Okay.

11          Mr. Bradford, that concludes our

12  questions for you today.  We appreciate your

13  time.

14          THE WITNESS:  Thank you.

15          MR. STEPHENSON:  Off the record.

16          (Whereupon, at 10:45 a.m., the

17  examination was concluded.)

18                  *  *  *  *  *

19

20

21

22

23

24

25

1                    PROOFREADER'S CERTIFICATE

2

3   In The Matter of:    DRIVE PLANNING, LLC

4   Witness:             David Bradford

5   File No.             A-04060-A

6   Date:                Monday, June 17th, 2024

7   Location:            Atlanta, GA

8

9          This is to certify that I, Kyleigh McGinnis,

10  (the undersigned), do hereby certify that the foregoing

11  transcript is a complete, true, and accurate

12  transcription of all matters contained on the recorded

13  proceedings of the investigative testimony.

14

15

16                                  7/2/2024

17  Kyleigh McGinnis                Date

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2   GEORGIA:

3   FULTON COUNTY:

4              I hereby certify that the foregoing

5   proceedings were stenographically recorded by me as

6   stated in the caption, and the colloquies, questions and

7   answers were reduce to typewriting under my direction;

8   that the foregoing transcript is a true and correct

9   record of the evidence given.

10             The above certification is expressly withdrawn

11  and denied upon the disassembly or photocopying of the

12  foregoing transcript, unless said disassembly or

13  photocopying is done under the auspices of BULL AND

14  ASSOCIATES, INC., Certified Court Reporters, and the

15  signature and original seal is attached thereto.

16             I further certify that I am not a relative,

17  employee, attorney or counsel of the parties, nor am I a

18  relative or employee of such attorney or of any party,

19  nor am I financially interested in the outcome of the

20  action.  This day Monday, June 17th, 2024.

21

22

23                    MEG ARMISTEAD,

24                    Certified Court Reporter (B-2011)

25             My commission expires March 31, 2025