## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES SECURITIES**
**AND EXCHANGE COMMISSION,**

    **Plaintiff,**

**v.**

                                 **Civil Action No. 1:24-cv-03583-VMC**

**DRIVE PLANNING, LLC, and**
**RUSSELL TODD BURKHALTER,**

    **Defendants,**
**and**

**JACQUELINE BURKHALTER,**
**THE BURKHALTER RANCH**
**CORPORATION, DRIVE**
**PROPERTIES, LLC, DRIVE**
**GULFPORT PROPERTIES LLC,**
**and TBR SUPPLY HOUSE, INC.,**

    **Relief Defendants.**

_____/

## RECEIVER'S SECOND STATUS REPORT

Kenneth D. Murena, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits his second status report setting forth his activities and efforts to fulfill his duties under the Order Appointing Receiver [ECF No. 10] (the "Appointment Order") for the period from October 1, 2024, through December 31, 2024 (the "Reporting Period").

## **<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION .........................................................................5

II.   COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND
      APPOINTMENT OF RECEIVER .................................................9

      A.   Preliminary Injunction.........................................................9

      B.   Appointment and Duties of Receiver .................................10

III.  THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER
      THE APPOINTMENT ORDER ...................................................11

      A.   Receiver's Employment of Professional ............................11

      B.   Securing and Reviewing Books and Records of Drive Planning ......12

           i.    Subpoenas and Demand Letters ...............................13
           ii.   Privilege Review of Drive Planning's Records......................15
           iii.  *Investigation of CORE Tax Lien Investments*..........................16

      C.   Forensic Reconstruction of Accounts of Drive Planning .................17

      D.   Recovery of Defendant's Funds from Financial Institutions and
           Securing Funds in Fiduciary Accounts for Receivership Estate .......19

      E.   Real Property, Businesses, and Personal Property in Which
           Receivership Estate Has an Interest...................................21

           i.    Real Property and Businesses ...................................21

                 a.   Real Properties and Businesses in Georgia .........................22

                      1.  *The Burkhalter Ranch*....................................23
                      2.  *Staurolite Barn*..........................................24
                      3.  *TBR Supply House* ......................................24
                      4.  *TBR Outdoor Supply, LLC*..............................25

        b.  Real Properties and Businesses in Florida...........................26

            1.  *Rental Properties* ...............................................27
            2.  *Club 201 at the Detroit* ..................................30

        c.  Real Property in Indiana ......................................30

        d.  Real Property in Mexico ......................................31

        e.  Real Property in Medellin, Colombia.................................33

        f.  Real Property Owned or Occupied by Third-Parties...........33

        g.  Deeds of Trust for Property in Tennessee ..........................36

        h.  Transfers to Embry Development Company for Real Estate
           Projects..............................................................37

     ii.  Personal Property ......................................................38

        a.  Furniture for Properties in Georgia and Florida.................38

        b.  "Live More" Yacht ...............................................39

        c.  Vehicles..............................................................40

        d.  Interests in Private Jets and Lease Agreements with
           NetJets, Inc.......................................................43

F.    Transfers to Tampa Bay Rays for Marketing .....................44

G.    Lawsuits Filed Against Drive Planning .............................45

H.    Known Investors and Creditors.........................................47

I.  Investor Communications ...................................................................47

J.  Identifying and Pursuing Liquidated and Unliquidated Claims ........49

IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ................50

V. CONCLUSION..............................................................................................51

## I. **INTRODUCTION**

Since his appointment on August 13, 2024, the Receiver has made significant progress in identifying, securing, and recovering all identified funds, assets, and records of Drive Planning LLC (the "Receivership Estate").  As of the end of the Reporting Period, the Estate held $54,131,710.46 in cash-on-hand in the fiduciary accounts at City National Bank of Florida, Synovus Bank, and Axos Bank.  These accounts are maintained in insured cash sweep accounts that are fully FDIC insured and were earning interest at a rate of at least 4.5% until September 18, 2024, then at least 4.0% until November 7, 2024, then at least 3.75% until December 18, 2024, and then at least 3.5% until the end of the Reporting Period.  During the Reporting Period, the Estate earned $524,028.85 in interest on the funds held in the fiduciary accounts.  The Estate also held $65,196.96 in the Truist Bank account used to manage and maintain the Florida real properties, as of the end of the Reporting Period.

During the Reporting Period, the Receiver finalized the organization and upload of Drive Planning's electronic records to the Lexbe document management platform, worked on separating potentially privileged documents using search terms agreed upon by the parties, produced the non-privileged documents to the SEC, and facilitated the privilege review by Defendant Burkhalter's counsel of the email and document folders in the name of Mr. Burkhalter on Drive Planning's Google

account. Moreover, the Receiver's team reviewed significant portions of the non-privileged datasets to identify assets and transactions of Drive Planning LLC ("Drive Planning") and affiliated entities.  Further, the Receiver received productions of documents from Truist Bank and J.P. Morgan Chase Bank in response to subpoenas issued during the initial reporting period and provided those documents to the Receiver's forensic accountant for purposes of preparing the forensic reconstruction of the accounts of Drive Planning.  The forensic accountant substantially completed the account reconstruction, which the Receiver used to prepare the required sworn statement and accounting filed with the Court and which will assist the Receiver to identify, investigate, and pursue assets and claims of the Receivership Estate.

Additionally, the Receiver issued subpoenas and demand letters to third parties, affiliates, and insiders, leading to recoveries and settlements, as well as the identification of potential recovery claims that the Receiver will investigate and pursue for the benefit of the Receivership Estate.  In particular, the Receiver issued subpoenas to several entities with which Drive Planning and its investors were involved, including American IRA, Tardus Wealth Strategies, and National Life Insurance Company, seeking documentation regarding their relationships and dealings with Drive Planning and the investors.  Additional subpoenas were sent to the Sanders Family Office, Integrated Wealth Strategies, HubSpot, and Embry

Development Company, requesting records related to financial transactions, contracts, communications, and other activities tied to Drive Planning.

Also during the Reporting Period, the Receiver oversaw the listing of real properties for sale in Georgia, Florida, Indiana, and Mexico, resolving title and zoning issues and negotiating with tenants regarding their rights of first refusal as to the purchase of the properties they are leasing. The sale of one property in Georgia generated $1.9 million, the net proceeds of which were deposited into the Receivership Estate. Additionally, the Receiver managed rental operations and short-term rentals along the central west coast of Florida, which rentals produce income for the Receivership Estate as reported on the Standardized Fund Accounting Report attached as **Exhibit A**.

The Receiver also worked on disposing of or otherwise monetizing the Estate's interests in aircraft, vehicles, a luxury yacht, and other personal property. During the Reporting Period, the Receiver's negotiations with NetJets resulted in NetJets's agreement to repurchase a fractional aircraft ownership interest, netting the Receivership Estate $585,419.78. The Receiver also continued to search for potential purchasers of the Aston Martin owned by Defendant Burkhalter and certain trucks previously used but no longer necessary for the cattle ranch in Blue Ridge, Georgia. And, the Receiver continued to maintain and market for sale the "Live More" yacht valued at approximately $2.8 million. Further, the Receiver worked on

selling substantial furniture and furnishings that had been purchased for a property but which the Receiver determined would generate a greater recovery for the Estate if sold separately from that property.

Further, through good-faith negotiations, the Receiver reached a settlement with the Tampa Bay Rays regarding the significant marketing payments made by Drive Planning. The Rays agreed to return $200,000 to the Receivership Estate, representing the funds for which marketing services were not provided, avoiding costly litigation.

The Receiver also issued subpoenas and began investigations into potentially fraudulent or otherwise improper transfers to third parties, affiliates, and insiders of Drive Planning, with plans to pursue viable recovery claims with this Court's approval. Moreover, the Receiver sent document preservation demand letters to all known agents/advisors of Drive Planning who had received approximately $68 million in commissions for soliciting investors and commenced discussions with many of those agents/advisors regarding their involvement with Drive Planning, relevant records, and the Receiver's recovery claims against them.

The Receiver also traced approximately $6.7 million in transfers to Embry Development Company and has begun discussions to recover those funds. Similarly, the Receiver uncovered $7.7 million in loans made to three real estate developers secured by real properties in Tennessee. The Receiver reached an

agreement with one such developer for the return of the loan proceeds plus interest, with efforts underway to recover the loan proceeds from the other developers.

The Receiver will continue to work diligently with his team of professionals to fulfill his duties under the Appointment Order and report his efforts and activities in status reports and other court filings until such time as the Court may discharge him of his duties.

## II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief against Drive Planning, LLC and Russell Todd Burkhalter, alleging they operated a massive Ponzi scheme under the guise of real estate-related investment programs. *See* ECF No. 1.

### A.    Preliminary Injunction

The SEC also filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and the continued defrauding of investors. *See* ECF No. 2.   In its motion, the SEC presented evidence to show that, from September 2020 through June 2024, over 2,500 investors residing in at least 48 states invested approximately $372 million based on promises of unrealistically high returns from real estate ventures. *See id*. at pp. 5-6.  Defendants primarily used new investor funds to pay earlier investors, in typical Ponzi fashion, with more than $280 million still being

owed to investors. *See id*. at pp. 4-6. Based on the foregoing, and other evidence presented in the SEC's motion, the Court found that the SEC presented sufficient evidence to support a *prima facie* case that Mr. Burkhalter and Drive Planning had violated federal securities laws by making material misrepresentations and misappropriating investor funds. *See* ECF No. 11 at ¶ 2. The Court further found that the Relief Defendants improperly received funds derived from the fraudulent activities. *See* ECF No. 11 at ¶ 4. Accordingly, the Court entered a Preliminary Injunction Freezing Assets and Granting Other Equitable Relief (the "Preliminary Injunction"), freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting of the Defendants' assets and activities, among other things. *See id.*

### B.    Appointment and Duties of Receiver

On August 13, 2024, the Court entered the Appointment Order, appointing Kenneth D. Murena, Esq., as the Receiver over the assets of Drive Planning and all assets owned by or purchased with funds derived from investors or clients of Drive Planning. *See* ECF No. 10. The Court found that the appointment of a Receiver was necessary to marshal, preserve, and recover assets derived from fraudulent activities tied to the Defendants' alleged Ponzi scheme. *See id*. at pp. 1-2. The Receiver was tasked with, *inter alia*, securing assets acquired with or otherwise traceable to investor funds, managing the Receivership Estate, and liquidating assets for the

benefit of defrauded investors.  *See id.* at ¶¶ 4-7.  The Receiver also was authorized to engage professionals subject to Court approval, issue subpoenas, and take any legal actions necessary to recover assets and protect the Receivership Estate.  *See id.* at ¶ 7(f).  Additionally, the Appointment Order requires the Receiver provide the Court with quarterly written reports detailing the Receiver's efforts to marshal, collect, and preserve assets and otherwise fulfill his duties.  *See id.* at ¶ 54.

## III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER

### A. Receiver's Employment of Professionals

Promptly after his appointment, pursuant to his authority under the Appointment Order and with this Court's approval, the Receiver employed legal counsel, forensic accountants, and other professionals to assist in taking possession, custody, and control of all identified assets of Drive Planning, marshaling records and assets in the hands of third parties, affiliates, and insiders of Drive Planning, analyzing and reconstructing Drive Planning's financial records, investigating potential assets and claims of the Estate, developing a secure online portal to obtain information and documents from investors, and otherwise fulfilling his duties under the Appointment Order.  Specifically, the Receiver employed Damian Valori Culmo as his lead counsel ("Lead Counsel"), Henry F. Sewell Jr. LLC as his Georgia counsel ("Georgia Counsel"), and Hays Financial Consulting LLC as his forensic accountant and financial advisor ("Forensic Accountant").  *See* ECF Nos. 21, 24.

Further, the Receiver employed Preti Flaherty Beliveau & Pachios LLP as counsel in New Hampshire to assist with litigation pending against Drive Planning, and Johnathan Pikoff as counsel in San José del Cabo, Mexico, to take control of and facilitate the marketing and sale of real property of the Receivership Estate and ensure the sale proceeds are transferred to the Estate. *See* ECF Nos. 46, 47.

Additionally, the Receiver obtained the Court's approval to employ Stretto to set up a secure online portal through which investors can upload information and documents necessary for the Forensic Accountant to complete the reconstruction of Drive Planning's accounts and which will facilitate the processing of claims in any claims process that may be approved by the Court and implemented by the Receiver in this Receivership. *See* ECF No. 37. Finally, the Court approved the Receiver's employment of a captain to maintain the 70-foot yacht of which the Receiver took control. *See* ECF No. 42.

### B. Securing and Reviewing Books and Records of Drive Planning

During the Reporting Period, the Receiver continued to take steps to obtain, secure, organize, and review the books and records of Drive Planning in compliance with the Appointment Order. In particular, the Receiver obtained additional records stored in Drive Planning's Google account and completed the upload to the Lexbe document management platform of those records and all other documents, emails, and chats stored in Drive Planning's Google account, along with other electronic

records of Drive Planning, to facilitate the review, searches, and productions of those records.  The Receiver and his team began reviewing the extensive dataset to identify and trace potential assets of the Receivership Estate.  As a result, the Receiver made numerous demands for the turnover of funds and assets traceable to Drive Planning's investors and entered into agreements providing for the return of those funds and assets to the Estate, as described below.

i.    *Subpoenas and Demand Letters*

The Receiver continued to issue demand letters and subpoenas to obtain records and relevant information from third parties, professionals, affiliates, and insiders of Drive Planning to enable the Receiver to trace assets, investigate transactions, and evaluate recovery opportunities for the Receivership Estate.

During the Reporting Period, the Receiver identified attorneys who had previously represented Drive Planning in various capacities and promptly issued demand letters requesting all files, invoices, and other relevant records related to Drive Planning.  The Receiver also requested detailed billing records to assess whether the attorneys were holding any recoverable retainers or unused funds of Drive Planning or otherwise traceable to investors.  After the Reporting Period, Johnson Litigation Group PLLC, which had previously represented Drive Planning, returned to the Estate $1,340 of unused retainer funds that Drive Planning had paid.

During the Reporting Period, the Receiver also issued subpoenas or demand letters to, *inter alia*, the following individuals and entities:

A. American IRA is a self-directed IRA custodian that facilitates investments directed by account holders. The Receiver's subpoena requested, *inter alia*, documents related to correspondence, contracts, and promotional activities involving Drive Planning.

B. Tardus Wealth Strategies is a wealth-coaching company based in Honolulu, Hawaii, that charges clients annual membership fees ranging from $5,500 to $12,000 for its services. The Receiver's subpoena requested, *inter alia*, documents related to its promotion and endorsement of Drive Planning, including communications, contracts, and financial arrangements.

C. National Life Insurance Company is an insurance provider that appears to have had financial dealings with Drive Planning, including the payment of commissions  based on policies sold by brokers who also worked as Drive Planning agents/advisors. The Receiver's subpoena requested, *inter alia*, documents related to policies sold through Drive Planning, including applications, payment records, and commission agreements.

D. Sanders Family Office ("SFO") is a wealth management firm that appears to have had a significant referral relationship with Drive Planning, which promoted and referred investment opportunities managed or created by SFO to potential or existing investors. The Receiver's demand letter requested, *inter alia*, documentation of its business relationship with Drive Planning, including details of referral agreements, fees paid, and joint investments.

E. Gerardo Linarducci was an agent/advisor of Drive Planning who has been accused by investors of facilitating the alleged fraud of Drive Planning. The Receiver's subpoena requested, *inter alia*, all communications, contracts, and documents related to Mr. Linarducci's business relationship with Drive Planning. The Receiver also recorded a Notice of *Lis Pendens* as to Mr. Linarducci's residence in Indiana because it was purchased by Drive Planning.

F.  Title Services, LLP is a title company that Drive Planning used to close the sale of a property purchased by Drive Planning and titled in the name of Gerardo Linarducci.  The Receiver's subpoena requested, *inter alia*, all closing documents related to the Linarducci property.

G.  Integrated Wealth Strategies, based in New Jersey, is believed to have directed several investors to Drive Planning.  The Receiver's subpoena requested, *inter alia*, documents related to its referrals to Drive Planning, including communications, contracts, and financial arrangements.

H.  HubSpot, Inc. is a customer relationship management (CRM) platform that provides tools for tracking contracts, managing communications, and utilizing templates for client interactions.  During the Reporting Period, it was discovered that HubSpot was utilized by Drive Planning personnel to manage contracts and other operational data.  The Receiver's subpoena requested, *inter alia*, records related to Drive Planning's use of the platform, including account details, saved contracts, communication logs, and template usage.

I.  Embry Development Company ("Embry") is a well-known construction company that had a business relationship with Drive Planning.  The Receiver's subpoena requested, *inter alia*, documents related to the loans from Drive Planning, communications between Embry and Drive Planning, and details of any financial agreements or joint ventures.  The Receiver is negotiating with Embry for the repayment of the loans.

## ii.    *Privilege Review of Drive Planning's Records*

In connection with developing the discovery plan in this enforcement action, the parties discussed the existence of documents within Drive Planning's records that may be protected by the attorney-client privilege, compiled a list of attorneys for Drive Planning, Defendant Burkhalter, and the Relief Defendants, and agreed upon a list of search terms to identify potentially privileged documents so they could be separated and not produced to any parties not holding the privilege.  With consent

of the parties, the Receiver's counsel used the search terms to identify and separate the potentially privileged documents among Drive Planning's records stored on the Lexbe platform (from the Google accounts) and various other documents and images of the computers retrieved from Drive Planning's offices. The Receiver then produced various non-privileged documents and emails to the SEC pursuant to its document requests. Also, the Receiver had provided Defendant Burkhalter's counsel with access to Defendant Burkhalter's folders in Drive Planning's Google accounts on the Lexbe platform so he could perform a privilege review and separate the emails and documents claimed to be privileged. The Receiver anticipates that, soon after this Report is filed, Defendant Burkhalter's counsel will produce to the Receiver the non-privileged documents, emails, and chats from Defendant Burkhalter's Google folders, after which the Receiver will produce them to the SEC in response to its document requests.

### iii.    *Investigation of CORE Tax Lien Investments*

At the commencement of this Receivership, the Receiver took control of funds that investors had deposited with Drive Planning for the purchase of tax lien certificates or investments therein. The Receiver and his counsel reviewed documents and communications on Drive Planning's Google Drive and did not locate any tax lien certificates or receipts for the purchase of such liens. The Receiver's counsel then spoke with two Drive Planning agents/advisors who are also

investors with knowledge of the tax lien investment scheme. They each advised the Receiver's counsel that the tax liens were not directly purchased by Drive Planning but rather through an investment advisory firm with a fund specializing in purchasing tax lien certificates, foreclosing on those liens, taking ownership of the encumbered real property, and reselling the property for a profit. The Receiver located Drive Planning's CORE Fund brochure advertising this investment scheme for the purchase of interests in tax liens through a highly experienced investment firm. The Receiver also reviewed emails from agents to investors explaining the tax lien program as investments made to purchase tax liens through an experienced firm that reviews each property prior to purchasing the tax lien issued against it. The Receiver has identified several companies that may have invested in tax liens using investor funds, has sent them subpoenas, and is in the process of preparing subpoenas to additional companies seeking information concerning their involvement with Drive Planning. In addition, now that the forensic reconstruction is nearly complete, the Receiver will investigate all transfers to investment advisory firms to confirm whether those transfers involve investments in tax lien certificates.

## C. Forensic Reconstruction of Accounts of Drive Planning

During the Reporting Period, the Receiver and his professionals focused on forensically reconstructing Drive Planning's financial accounts to enable the Receiver to prepare the sworn statement and accounting (the "Sworn Accounting")

required by the Appointment Order and to bolster his ability and efforts to identify and marshal assets and pursue claims of the Estate.  ECF No. 10.  This process proved to be significantly more complex than initially anticipated given Drive Planning's lack of a formal accounting system and its extraordinary volume of financial transactions, including more than ten thousand wire transfers.

To process and incorporate the wire transfer confirmations into the reconstruction, the Receiver initially engaged a firm specializing in automated document analysis to extract and process data from Drive Planning's bank statements and wire confirmation reports; however, that firm underestimated the scope of the project, leading to a revised cost estimate of $50,000.  As a result, the Receiver terminated the firm's services and sought alternative solutions.

The Receiver subsequently engaged Nanonets, a firm providing AI-powered OCR and machine learning tools, to process the thousands of wire transfer confirmations.  While initial testing demonstrated the software's capability to extract critical data (including unique wire reference numbers, sending/receiving parties, transaction memos, dates, and amounts), additional time was required for onboarding, testing, and preparing the files for extraction.  There were also unforeseen delays that occurred in dividing the files into manageable parts and initiating the extraction process.

Once the wire transfers were incorporated into the account reconstruction, and the Forensic Accountant substantially completed the process of identifying various transferees and categorizing various transactions, the Receiver was able to prepare his Sworn Accounting as required by the Appointment Order [ECF No. 10 at ¶10], which the Receiver filed shortly after the close of the Reporting Period.  *See* ECF No. 81.  The Sworn Accounting provides a comprehensive financial report of Drive Planning's known assets and transactions.   In its five exhibits, it details all receivership property, including securities, funds, real estate, and other assets; identifies all bank and brokerage accounts, along with their balances and transactions; and provides an extensive forensic reconstruction of Drive Planning's accounts and transactions.  The Sworn Accounting's exhibits also include schedules of investor deposits, distributions, and transfers, as well as expenditures exceeding $1,000 as required by the Appointment Order.

### D. Recovery of Defendant's Funds from Financial Institutions and Securing Funds in Fiduciary Accounts for Receivership Estate

During the prior reporting period, the Receiver identified and took possession and control of more than $51 million in cash held in accounts of Drive Planning at financial institutions, including Truist Bank and JP Morgan Chase Bank, and more than $1.1 million worth of cryptocurrencies held in Mr. Burkhalter's account at Coinbase.  The Receiver transferred those funds (including the proceeds of the sale of the cryptocurrencies) to the fiduciary accounts he opened for the Receivership

Estate at City National Bank of Florida, Synovus Bank, and Axos Bank.  As of the end of this Reporting Period, the Estate held $54,131,710.46 in cash-on-hand in these fiduciary accounts.  All of the funds held in the fiduciary accounts at City National Bank of Florida, Synovus Bank, and Axos Bank are maintained in insured cash sweep accounts that are fully FDIC insured.  As of the end of the Reporting Period, the Estate also held $65,196.96 in the Truist Bank account used to manage and maintain the Florida real properties.

The Receiver negotiated favorable interest rates for the fiduciary accounts with the above-referenced banks, which resulted in the Estate's funds earning interest at a rate of at least 4.5% until the Federal Reserve reduced interest rates on September 18, 2024, then at least 4.0% until November 7, 2024, then at least 3.75% until December 18, 2024, and then at least 3.5% until the end of the Reporting Period.  During the Reporting Period, the Estate earned $524,028.85 in interest on the funds held in the fiduciary accounts.

A detailed accounting of the funds recovered and deposited into the Receiver's fiduciary accounts for the Receivership Estate and the operating account for the Florida properties, since the inception of the Receivership, is set forth in the Standardized Fund Accounting Report attached as Exhibit A.

### E. Real Property, Businesses, and Personal Property in Which Receivership Estate Has an Interest

Upon his appointment, the Receiver immediately reviewed the SEC's analysis of Defendants' and Relief Defendants' interests in real property and associated personal property and businesses and began marshaling those assets, taking control of or monitoring those businesses as directed in the Appointment Order, and demanding turnover of all such assets held by third parties to the extent there is equity and value for the Receivership Estate. The Receiver continues to work on determining the ownership status, source of purchase money, potential liens, and value of the real property and any associated personal property owned or previously owned by Drive Planning but in the possession of third parties, affiliates, or insiders of Drive Planning.

### i.   Real Property and Businesses

During the initial reporting period and the current Reporting Period, the Receiver and his professionals inspected and photographed all properties in Georgia, Florida, Indiana, and Mexico owned or controlled by Drive Planning and the Relief Defendants to document and evaluate their conditions, identify and address necessary repairs, renovations, and maintenance issues, ensure they are secure and protected from the elements, trespassers, and vandals, and prepare them for marketing to potential purchasers and their eventual sale. The Receiver also compiled and reviewed records to confirm the amounts for which the properties were

purchased, whether they are encumbered, and if they are subject to tax or other liabilities to determine each property's value and marketability.

During the Reporting Period, the Receiver and the experienced real estate agents he engaged finalized the market analyses and established the listing prices for the properties in Georgia, Indiana, and Mexico and entered into listing agreements for several properties, and are currently in the process of determining the listing prices and preparing the listing agreements for the Florida properties. The Receiver intends to sell each property at its full market value to maximize recovery for the Receivership Estate for the benefit of the investors.

### a. Real Properties and Businesses in Georgia

During the Reporting Period, the Receiver, with the assistance of a reputable local realtor, began the process of listing the Georgia properties for sale. This effort involved cleaning the properties, addressing deferred maintenance, and staging the interiors to improve their appeal to potential buyers. In one instance, the Receiver negotiated the release of a lien on a property to clear the title for sale. These efforts resulted in the successful sale of the property for $1,900,000, the net proceeds of which were remitted to the Receivership Estate for the benefit of investors.

To date, all of the Georgia properties have been listed for sale except two parcels that are subject to a right of first refusal held by the tenants. The Receiver is negotiating the potential sale of the parcels to the tenants, who made a cash offer

equivalent to the 2023 appraised values of the parcels.  The Receiver is obtaining

updated appraisals of the parcels and will make a counteroffer that approximates the

current market value.

Some of the listed Georgia properties are short-term rentals actively managed

by the Receiver's office, with rental income being used to fund ongoing maintenance

and operational expenses.  The Receiver is also engaged in discussions with tenants

interested in purchasing their rented properties.

### 1.  The Burkhalter Ranch

During the initial reporting period, the Receiver began overseeing the business

operations of the Burkhalter Ranch Corporation (the "Ranch"), which is managed

day-to-day by ranch manager Mark Gregory.  The Receiver maintains control over

the Ranch's bank account held at South State Bank, ensuring all expenditures are

appropriate and aligned with the business operations and the interests of the Estate.

During the Reporting Period, the Receiver approved the sale of certain cattle

to generate income to cover the costs to manage the care and maintenance of the

remaining livestock and other Ranch operations.  Also, the Receiver discovered that

certain ranch equipment that Drive Planning had purchased is encumbered by liens.

As such, the Receiver initiated negotiations to secure the release of those liens, the

turnover of certain unnecessary equipment, and the waiver of any deficiency claims

against the Ranch or the Estate.  Additionally, the Receiver determined that certain

monthly expenditures at the Ranch were unnecessary or excessive, including payroll for certain employees and contractors and lawn maintenance and landscaping. Accordingly, following the Reporting Period, the Receiver reduced the salary of the ranch manager and scaled back the frequency and scope and extent of the lawn maintenance and landscaping.  In addition, Relief Defendant Jacqeline Burkhalter ceased working at the Ranch, which further reduced its monthly expenses.

### 2. Staurolite Barn

During the Reporting Period, two events were held at Staurolite Barn, an event space on the Ranch property that was built using Drive Planning funds.  The Receiver approved minor repairs to the event space, identified and reduced excessive spending on advertising and website-related expenses, and significantly reduced the salary of the event coordinator.

Currently, there are no events scheduled at Staurolite Barn, but efforts are underway to secure future bookings and generate additional income.  The Receiver and his professionals are actively exploring opportunities to increase utilization of the venue and improve its profitability while it is marketed for sale with the Ranch.

### 3. TBR Supply House

During the Reporting Period, the Receiver discovered that TBR Supply House, a western retail store located in Blue Ridge, Georgia, could no longer sustain its payroll and other operational expenses.  The store, which was previously funded

by Drive Planning, had never achieved profitability. The Receiver analyzed whether the business should be sold along with the property from which it operates and determined that, despite the Receiver's reductions in expenses, it still was not profitable and likely would remain unprofitable for at least another year, and that continuing operations would require significant cash infusions from the Receivership Estate to fund inventory and other expenses. As a result, the Receiver recommended to Ms. Burkhalter that TBR Supply House run aggressive holiday sales to liquidate its existing inventory, terminate the employment of certain employees or contractors, reduce the salaries of others, and wind down the store's operations. Ms. Burkhalter agreed with the Receiver's recommendations and assisted with their implementation, which the Receiver continues to oversee.

### 4. TBR Outdoors Supply, LLC

During his prior investigation, the Receiver discovered that on April 6, 2023, Drive Planning had purchased a 75% interest in TBR Outdoors Supply LLC ("TBR Outdoors") for $1.4 million on behalf of Jacqueline Burkhalter and Russell Burkhalter, with each owning a 37.5% interest in the business. TBR Outdoors is an outdoor supply and gun store that is operating from a property owned by Relief Defendant, Burkhalter Ranch Corporation. During this Reporting Period, the Receiver subpoenaed TBR Outdoors and investigated the ownership and structure of its membership interests. The Receiver received financial records from TBR

Outdoors and assessed its operations, revenues, and expenses. During the next reporting period, the Receiver will formulate and implement a strategy to recover the $1.4 million that Drive Planning had transferred to TBR Outdoors.

Because TBR Outdoors was not paying any form of rent to the Burkhalter Ranch Corporation, the Receiver sent a letter to the other owner and manager of TBR Outdoors, Jon Clement, demanding that rent payments be made to the Ranch. During the Reporting Period, the Receiver rejected an offer of $2,500 in monthly rent as it was significantly below the market rental rate for a similar commercial property. Instead, the Receiver proposed $5,000 per month, as any lower amount would negatively impact the property's value and marketability. Jon Clement has not responded to the Receiver's proposed terms, so no agreement has been reached. The Receiver will continue his efforts to secure market rate rent from TBR Outdoors and will provide an update on negotiations in his next status report.

### b. Real Properties and Businesses in Florida

During the Reporting Period, the Receiver worked closely with a reputable local realtor to assess, repair, and prepare multiple Florida properties for listing for sale. The realtor conducted detailed evaluations of each property, assigning condition grades and identifying necessary repairs to maximize marketability. Most of the properties along the central west coast of Florida in which the Estate holds an interest suffered some level of damage from Hurricanes Helene and Milton,

requiring cleanup, roofing repairs, tree and debris removal, mold remediation, and other repairs and maintenance. This work is nearly complete, but some properties need interior painting and a final cleaning to be ready for professional marketing photographs. The properties are expected to be listed for sale within the next two months.

### 1. Rental Properties

During the prior reporting period, the Receiver and his counsel identified real properties that were used as short-term and long-term rentals owned by Defendants and Relief Defendants in St. Petersburg, Holmes Beach, Panama City Beach, and Gulfport, Florida. During the Reporting Period, the Receiver, with the assistance of a property manager, continued to rent out apartments in the two commercial buildings located in St. Petersburg. The rental income from the multi-family properties is used to fund necessary maintenance, repairs, and utilities for those properties, and the surplus income is held for the benefit of the investors. The Receiver negotiates lease renewals with tenants at those two properties and intends to keep the units occupied, if possible, to maximize the value of the buildings for purposes of its sale. Those buildings required roof repairs, debris cleanup, tree-cutting services, mold remediation, and plumbing repairs. Because such work is nearly complete, the Receiver expects to list those buildings for sale during the next reporting period.

The Receiver also took control of a condominium unit in the historic Detroit building in downtown St. Petersburg, which Drive Planning was intending to use as office space to manage its rental properties in Florida and a podcast recording studio for Drive Planning and third parties.  That unit suffered significant damage from Hurricanes Helene and Milton.  The roof of the building failed, and the unit was flooded.  For the past few months, the Receiver has been working with the homeowner's association to have the unit repaired.  The unit still needs drywall and baseboard installation, painting, floor refinishing, and other miscellaneous repairs before it can be cleaned and photographed for purposes of marketing it for sale.  This likely will be the last property of the Estate to be listed for sale.

Additionally, during the Reporting Period, the Receiver continued to operate the triplex located in Gulfport, Florida, as a rental property listed online through Airbnb and VRBO.  The Receiver's counsel confirmed with the City of Gulfport that short-term rentals are prohibited under local zoning laws.  As such, the Receiver immediately ceased all short-term rental operations for the Gulfport triplex units and transitioned them into long-term rentals, which require minimum stays of one month and are limited to three rentals per year.  The three units are currently occupied by renters until early April 2025 and produce income for the Receivership Estate.  The Receiver's realtor performed a market analysis of the triplex as an income-producing property, took professional photographs, and is finalizing the listing agreement for

the triplex.  The Receiver expects to list the triplex for sale during the next reporting period.

After Hurricane Milton, the hotel/condominium unit in the City of Holmes Beach, Florida (on Ana Maria Island) became inaccessible because Ana Maria Island suffered such severe damage that the city closed off all access to non-residents. During the closure, repairs were completed to the building, and the unit was cleaned and prepared for marketing it for sale.  Now that access to the island has been restored, the Receiver's realtor performed a market analysis as an income-producing property, took professional marketing photos of the unit, and is finalizing the listing agreement.  In addition, the unit is once again being rented out as a short-term hotel rental to produce income for the Receivership Estate and to aid in covering the costs of ownership and rental management.  The Receiver expects to list this unit for sale in the next two weeks.

The condominium unit in Panama City Beach, Florida was previously used for short-term rentals, but as of the commencement of the Receivership, the property has not been rented out.  In addition, Hurricanes Helene and Milton caused severe damage to the area surrounding the condominium, significantly slowing down tourism and home sales and rentals in the area.  During the Reporting Period, the Receiver located a reputable local realtor to market the unit for sale.  The realtor coordinated a deep cleaning, minor repairs, and pest control services at the unit.

Then, she performed a market analysis of similar condominium units, took professional photos of the unit, and listed it for sale for $299,000.

### 2. *Club 201 at the Detroit*

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter located at the historic Detroit building in downtown St. Petersburg, Club 201 at the Detroit ("Club 201"), the operations of which the Receiver was tasked with monitoring by the Appointment Order.

The Preliminary Injunction required Defendant Burkhalter to provide the Receiver with weekly reports detailing the funds deposited into and withdrawn from the account associated with Club 201 and other information regarding its business operations. *See* ECF No. 11 at p. 4. During the Reporting Period, the Receiver received from Mr. Burkhalter periodic reports regarding Club 201, including details of sales, revenue trends, cash activity, and other relevant financial data.

### c. **Real Property in Indiana**

During the initial reporting period, the Receiver conducted an in-depth investigation into a property owned by Drive Planning in Fishers, Indiana. The property was acquired for $625,000 and was intended to serve as a new office space for Drive Planning. During this Reporting Period, the Receiver contracted with a reputable Indiana realtor to list the property for sale for $800,000, reflecting its estimated current market value.

Since listing the property for sale, the Receiver has fielded multiple offers, including a financed offer and two lower cash offers. The cash offers were rejected in favor of the higher financed offer, contingent upon the buyer obtaining rezoning approval from the Town of Fishers to operate a package liquor store on the premises. However, the agreement fell through after the Town of Fishers would not approve the necessary rezoning.

Despite this setback, the property continues to attract multiple lower offers. The Receiver is continuing to market the property for sale in order to obtain an offer that more closely approximates the estimated market value to maximize the recovery for the Receivership Estate.

### d. Real Property in Mexico

During the prior reporting period, the Receiver investigated and recovered a luxury condominium unit at The Residences at Solaz (the "Solaz"), Unit 203, in San José del Cabo, Mexico purchased with Drive Planning funds through a Mexican entity, Drive David LLC, SRL ("Drive David"), which was owned by Drive Planning and another entity owned by Drive Planning agent/advisor David Bradford and his wife. During the Reporting Period, the Receiver secured ownership and control of 100% of Drive David and the condominium unit. The Receiver hired a reputable luxury property manager to inspect and inventory the unit, to coordinate minor repairs, maintenance of the wood decking and lighting, deep cleaning of the

vacant unit, an update and repair of the home automation system, to take control of utilities accounts and pay past due balances, and to address various other issues raised by the Receiver's realtor and the building manager of the Solaz. Also, during the Reporting Period, the Receiver's counsel in Mexico advised the Receiver on properly registering himself as the control person of Drive David in Mexico and prepared the proper corporate transfer documents and presented those documents to the Solaz homeowners' association for approval. Mexican counsel also assisted the Receiver in retaining an accountant in Mexico to obtain a tax identification number for the Receiver, to complete and file quarterly financial disclosures that were past due, and to keep the Receiver and Drive David in compliance with local tax laws. After ensuring that he had the legal right to sign a listing agreement on the Solaz unit, the Receiver negotiated and entered into a listing agreement with a reputable luxury real estate broker in San José del Cabo. The realtor gathered the necessary condominium documents, photographed the Solaz unit and building, prepared an international listing for the unit, and listed the property for sale for $4.4 million. To the best of the Receiver's knowledge, there is no outstanding debt secured by this property or any other pending liens thereon, so the net proceeds of that sale will be transferred to the Receiver's fiduciary account for the Estate for benefit of the investors.

### e. Real Property in Medellin, Colombia

During the Reporting Period, the Receiver investigated Drive Planning's $1,200,000 investment in a boutique hotel project in Medellín, referred to as "La Casa Project," which Drive Planning promoted in its marketing materials. The Receiver identified and contacted the hotel project company that received the funds and requested information on Drive Planning's investment and the status of the project, which is reportedly in pre-construction. The Receiver will continue to investigate the project's location, construction status, and relevant contacts to aid in the recovery of the investment for the benefit of the Receivership Estate.

### f. Real Property Owned or Occupied by Third-Parties

A number of properties that were purchased by Drive Planning or with funds traceable to its investors are not currently owned by Drive Planning and/or are occupied by third parties who have refused to turn them over, notwithstanding the Receiver's demands pursuant to the Appointment Order. One St. Petersburg, Florida property is occupied by an individual with a personal relationship with Mr. Burkhalter. That occupant's attorney is in negotiations with the Receiver for the possible turnover of the property or the financed purchase of the property from the Receivership Estate for the amount that Drive Planning had paid to purchase it.

Further, the Receiver identified several real properties acquired with Drive Planning funds that were subsequently deeded to third parties and took steps to

recover those properties for the benefit of the Estate.  In particular, the Receiver took control of David Bradford's luxury condominium unit in St. Petersburg, Florida with his cooperation.  The Receiver's realtor has assessed the condition of the unit and recommended minor repairs and the purchase and installation of missing fixtures. The Receiver is having those minor repairs made and the fixtures purchased and installed, after which the property will be photographed and listed for sale.

A second luxury condominium unit in the same building in St. Petersburg, Florida was purchased with $1.4 million transferred from a Drive Planning account containing investor funds, pursuant to a loan that Drive Planning made to Mark Haye, another agent/advisor (and investor) of Drive Planning.  At the closing, title to the property was deeded to a trust associated with Mr. Haye.  Drive Planning holds a promissory note from Mr. Haye for $1.4 million.  The Receiver has demanded that Mr. Haye either make the outstanding and future monthly payments due pursuant to the note, pay the entire balance due under the note, or transfer the property to the Estate.  Mr. Haye has proposed making monthly payments significantly less than the amount required under the note and claimed that he was working on obtaining financing to pay the outstanding balance.  As of the filing of this Report, Mr. Haye has not obtained the necessary financing or made any payments to the Estate

pursuant to the note,[1] but he appears to be paying the expenses to maintain the unit including the association dues and insurance, though he has not yet made the 2024 property tax payment. And, Mr. Haye has not agreed to transfer the property to the Estate to satisfy the outstanding balance due under the note. Accordingly, during the next reporting period, the Receiver will pursue appropriate legal and equitable remedies to recover the amount due under the note or the property for the benefit of the Estate.

The Receiver has also requested the turnover of the property in Indianapolis, Indiana, that Drive Planning had purchased for approximately $1.9 million for Gerry Linarducci, a Managing Partner and agent/advisor of Drive Planning. Thus far, Mr. Linarducci has refused to turn over the property or repay the purchase price to the Estate. So, the Receiver recorded a Notice of *Lis Pendens* against the property to assert the Receivership Estate's ownership interest therein. If the Receiver is unable to recover the value of the property by agreement with Mr. Linarducci, the Receiver will pursue appropriate legal and equitable remedies.

During the prior reporting period, the Receiver sent a demand letter to Kelvin and Katheryn Elkins, who occupy a property located in Mineral Bluff, Georgia

---

[1] Mr. Haye claims to have made certain payments to Drive Planning pursuant to the note prior to the commencement of the Receivership. Based on the Receiver's investigation of this claim, it appears that such payments were diverted commissions, paid from investor funds, which he received based on his solicitation of investors for Drive Planning.

purchased by Relief Defendant Burkhalter Ranch Corporation with funds traceable to investors of Drive Planning. The property was transferred to the Elkins, and a promissory note in favor of the Burkhalter Ranch Corporation was executed. The Receiver demanded that the Elkins repay the debt to Drive Planning by either refinancing or selling the property. Thereafter, the Elkins obtained a new mortgage loan on the property. Shortly after the close of the Reporting Period, the Elkins closed on that loan and paid the balance due under the original note totaling $560,270.72 to the Burkhalter Ranch Corporation, which remitted the proceeds to the Estate.

### g. Deeds of Trust for Property in Tennessee

During the Reporting Period, the Receiver discovered that Drive Planning had transferred funds totaling $7,749,400 to three developers, including 212 Limestone, LLC, Canaan Builders, LLC, and Manchester Pointe Townhomes, LLC, to finance real estate projects in Tennessee. Repayment of those transfers was secured by the real properties being developed. The Receiver and his counsel performed a thorough investigation, including conducting interviews and analyzing the transactions and underlying documents to understand the financial arrangements, outstanding obligations, and potential recoverable amounts. As a result of his investigation, the Receiver uncovered the following deeds-of-trust secured by promissory notes:

A. Drive Planning transferred $600,000 to 212 Limestone, LLC, secured by property located in Davidson County, Tennessee. This

project involved the development of lots for future residential construction.

B. Drive Planning transferred $4,534,400 to Canaan Builders, LLC, secured by properties along Horton Highway in Williamson County, Tennessee.  The project was designed as a six-lot subdivision intended for high-end homes valued at approximately $3.5 million each.

C. Drive Planning transferred another $615,000 to Canaan Builders, secured by property in the West Meade Hills subdivision in Davidson County.  This project was sold shortly after the close of the Reporting Period, and Drive Planning's entire loan amount of $615,000 was recovered.  In addition, the Receiver negotiated the payment of $20,000 in interest to the Receivership Estate.

D. Drive Planning transferred $2,200,000 to Manchester Pointe Townhomes, LLC, secured by a deed in trust for 23.65 acres of real property in Coffee County, Tennessee.  This project was planned as a long-term apartment complex development, with the funds allocated for horizontal construction (infrastructure) but not for vertical construction of the apartments.  The project remains at least 2.5 years away from vertical construction.

During the next reporting period, the Receiver will finalize the settlement agreement related to the Canaan Builders, LLC loan, recover the funds, and devise the most cost-effective strategies for recovering the funds that Drive Planning had transferred for the other construction developments.

### h. Transfers to Embry Development Company for Real Estate Projects

During the Reporting Period, the Receiver traced funds totaling approximately $6.7 million transferred from Drive Planning to Embry Development Company ("Embry").  These transfers included an initial $1.3 million loan and a

subsequent $4.5 million loan tied to land associated with Embry's real estate projects. Despite these substantial transfers, the Receiver has been unable to locate any formal agreements or contracts between Drive Planning and Embry, suggesting that the transactions were based on informal discussions.

During the Reporting Period, the Receiver issued a subpoena to Embry requesting records of financial agreements, joint ventures, and communications involving Drive Planning. The Receiver anticipates receiving the requested documents soon after the filing of this Report. The Receiver and Embry have begun discussions regarding the repayment of the funds that Drive Planning had transferred to Embry. During the next reporting period, the Receiver will continue to evaluate the transactions and underlying properties tied to such transfers.

### ii. Personal Property

### a. Furniture for Properties in Georgia and Florida

During the prior reporting period, the Receiver discovered that Drive Planning had purchased a substantial amount of luxury furniture from Z&Co for two properties (one in Mineral Bluff, Georgia and one in St. Petersburg, Florida), and that furniture was in storage and ready to be delivered to and assembled in those properties. The Receiver then coordinated the payment for the furniture intended for the Mineral Bluff property, and authorized the delivery, installation, and

assembly in that house.  The Mineral Bluff home is currently being market for sale with the luxury furniture to maximize its value and ultimate sale price.

During the Reporting Period, the Receiver determined that the Estate would achieve a greater return if the furniture intended for the St. Petersburg property were not delivered to and sold with that property but rather were sold separately to a designer or luxury furniture store.  Accordingly, the Receiver worked on determining the market value of the furniture by obtaining from Z&Co an inventory list detailing the retail prices (totaling $105,000) for the furniture.  Given that these prices include a 35% to 40% customer markup and do not include any warranty coverage, and based on his Georgia realtor's assessment, the Receiver estimates the sale of the furniture to an interior designer or a luxury furniture store will yield approximately 20-25% less than the total retail price.

While consignment shops could sell the items individually, they typically yield only 30% of retail pricing and would require a longer period to realize returns. To streamline the process and maximize value for the Receivership Estate, the Receiver, through his Georgia realtor, is currently soliciting offers from several interior designers and furniture stores to sell the entire inventory in one transaction.

### b. "Live More" Yacht

During the initial reporting period, the Receiver identified and took control of the "Live More" yacht, a 70-foot Galeon 680 Fly purchased by Mr. Burkhalter for

$3,386,004 using Drive Planning's funds derived from investors. During the Reporting Period, the Receiver worked to secure new insurance for the yacht after the previous insurer refused to renew the policy due to a perceived change in risk related to the Receivership. Further, the Receiver selected the yacht broker (MarineMax) that he believed was the most qualified, had the most experience selling yachts similar to "Live More," had agreed to reduce its commission rate, and was most likely to expeditiously locate a buyer willing pay the market price for the yacht. Soon thereafter, MarineMax performed a market analysis and listed the yacht for sale at a price approximating its market value. The yacht remains for sale for $2,690,000 and MarineMax is actively marketing it through its vast network of potential purchasers and will feature the yacht at the upcoming boat shows in Florida.

### c. Vehicles

The Receiver has identified the following vehicles purchased in whole or in part with funds traceable to Drive Planning and its investors:

1. 2017 Aston Martin DB11;

2. 2020 Porsche 911;

3. 2024 Land Rover Range Rover Sport;

4. 2021 Land Rover Defender;

5. 2022 Ford Expedition;

6. 2021 Ford Bronco;

7. 2022 Ford F250;

8. 2019 Ford F350;

9. 2022 Ford 450;

10. 2020 Golf Cart; and

11. 2023 Tomberlin Ghost Hawk.

Mr. Burkhalter owns the Aston Martin, the Land Rover Range Rover, the golf cart, and the Ghost Hawk. Of those vehicles, Mr. Burkhalter only agreed to the Receiver's sale of the Aston Martin and indicated through counsel that he would continue to use the other vehicles. Accordingly, the Receiver began marketing the Aston Martin for sale and obtained purchase offers below the current market value of the vehicle. When the Receiver receives an offer that more closely approximates the market value, he will present it to this Court for approval.

During the Reporting Period, the Receiver negotiated the disposition of three vehicles under Jackie Burkhalter's control that were purchased in part or in whole with funds from Drive Planning. Ms. Burkhalter agreed to turn over to the Receiver the Ford Bronco, which was purchased by Drive Planning for approximately $67,000. She will provide photographs and details regarding the vehicle, including its mileage and condition, so the Receiver can market it for sale. Ms. Burkhalter purchased the Porsche with a $26,575 down payment made by Drive Planning,

financing the balance of the purchase price.  She currently owes approximately $122,000 on the Porsche and plans to sell it.  A potential buyer offered $115,000, which would leave a $7,000 shortfall.  Nevertheless, the Receiver negotiated for the repayment of the $26,575 down payment to the Estate upon the closing of the sale. Lastly, the Receiver agreed to Ms. Burkhalter's keeping the Land Rover Defender, which was acquired in 2021 by her trading in her previous vehicle for $45,000, which was not directly connected to Drive Planning, though payments toward the vehicle were made from an account in which Drive Planning-derived funds were likely commingled with other funds.  Given the minimal Drive Planning funds traceable to the Defender, the Receiver did not believe it would be cost-effective to further investigate the Estate's interest therein or seek to recover any amount from Ms. Burkhalter therefor.

The 2022 Ford Expedition is designated for business purposes and is currently in active use by Staurolite Barn's event coordinator to facilitate event planning and management activities.  The Ford F-250, currently located in Florida, is not in active use and is therefore being prepared for sale for the benefit of the Receivership Estate. Similarly, the Ford F-350, situated at the Burkhalter Ranch, remains unused due to the absence of a registration tag and, as such, is also being prepared for sale.  The Ford F-450 is regularly used on the Burkhalter Ranch for various ranch-related operations.

### d. Interests in Private Jets and Lease Agreements with NetJets, Inc.

During the prior reporting period, the Receiver discovered and investigated Drive Planning's fractional ownership and leasehold interests in three private business jets managed through NetJets, Inc. ("NetJets").   In particular, Drive Planning holds fractional interests in the following three aircraft, including leases for two and an ownership stake in a third:

1. Phenom 300 Aircraft (Tail No. N333QS): Drive Planning leases a 6.25% fractional interest in this aircraft.

2. Citation Latitude Aircraft (Tail No. N511QS): Drive Planning leases a 6.25% fractional interest in this aircraft.

3. Citation Latitude Aircraft (Tail No. N952QS): Drive Planning owns a 6.25% fractional interest in this aircraft.

During the Reporting Period, the Receiver engaged in negotiations with NetJets regarding the repurchase of the ownership interest.   NetJets initially proposed a repurchase price of $1,123,699.19, netting the Receivership Estate $403,765.23 after deducting amounts owed by Drive Planning under the contract.

NetJets has since agreed to waive the asserted liquidated damages, increasing the net payment to the Receivership Estate to $585,419.78 for the buyback of the ownership interest.   The Receiver and NetJets are finalizing the terms of their settlement agreement, and the Receiver will promptly file a motion seeking this Court's approval once the agreement is executed.

### F. Recovery of Transfers to Tampa Bay Rays for Marketing

During the initial reporting period, the Receiver discovered that Drive Planning had paid $400,000 to the Tampa Bay Rays under a marketing agreement between Drive Planning and the Major League Baseball team. An initial $200,000 was paid in April 2024, and an additional $200,000 was paid on August 13, 2024, the date the Appointment Order was entered in this case. In exchange for this payment, Drive Planning was promised advertising and promotional rights with the Tampa Bay Rays, including visible branding and the use of hospitality suites during postseason events.

During this Reporting Period, the Receiver demanded the return of the funds the Rays had received from Drive Planning because they are traceable to investors and the services for which they were transferred did not provide reasonably equivalent value to Drive Planning or its investors. Counsel for the Rays responded to the Receiver's demand, after which the parties engaged in good-faith negotiations and reached an amicable settlement to avoid the uncertainties and expenses of litigation. Subject to this Court's approval, the Tampa Bay Rays will pay to the Receivership Estate $200,000, representing 100% of the funds the Rays had received from Drive Planning without providing services.

### G. Lawsuits Filed Against Drive Planning

During the initial reporting period, the Receiver identified lawsuits filed against Drive Planning and related entities.  The Receiver has sought a stay and/or dismissal of each matter pursuant to the stay provision in the Appointment Order and certain of the matters have been stayed or dismissed.  *See* ECF No. 10 at ¶ 32.

 In the case styled *Joseph J. Prieto v. Ketler Bosse d/b/a Bosse Future Capital Group and Drive Planning, LLC*, filed in the Hillsborough County Superior Court, New Hampshire (Case No. 24-cv-03583-VMC), Joseph J. Prieto, brought claims against Ketler Bosse and Drive Planning, alleging breach of contract, fraudulent misrepresentation, and violations of the New Hampshire Consumer Protection Act. As Mr. Prieto declined to file the Appointment Order in the New Hampshire court upon the Receiver's request, the Receiver, with this Court's approval, retained Preti Flaherty Beliveau & Pachios, LLP ("Preti Flaherty") as local counsel in New Hampshire to have the case stayed.  *See* ECF Nos. 45, 47.  During the prior reporting period, Preti Flaherty appeared in the action on behalf of the Receiver and filed a notice of the Receivership and motion to stay the case, pursuant to the Appointment Order.  During the Reporting Period, this case was dismissed.

In the case styled *Douglas G. Magruder, Jr. v. Drive Planning, LLC*, filed in the Sixth Judicial Circuit in and for Pinellas County, Florida (Case No. 24-002887-CI), Mr. Magruder, brought claims for breach of contract and damages against Drive

Planning.  The Receiver's Lead Counsel filed a Notice of Receivership and Motion to Stay this matter, which remains pending.  A hearing on the Receiver's Motion to Stay is scheduled for February 23, 2025.

In the case styled *Justin Hanson v. Drive Planning, LLC*, filed in the Sixth Judicial Circuit in and for Pinellas County, Florida (Case No. 24-003369-CI), Mr. Hanson brought claims against Drive Planning for breach of promissory notes.  The Receiver's Lead Counsel filed a Notice of Receivership and Motion to Stay this matter, which remains pending.  A hearing on the Receiver's Motion to Stay is scheduled for February 13, 2025.

In the case styled *Embry Development Company v. Drive Planning, LLC and R. Todd Burkhalter*, filed in the Superior Court of Fulton County, Georgia (Case No. 2023CV384406), Embry Development Company brought claims against Drive Planning and Mr. Burkhalter for unauthorized use of the Embry name, breach of trust in capital raising activities, and violations of the Georgia Uniform Deceptive Trade Practices Act, seeking emergency injunctive relief and damages.  The Receiver's Local Counsel filed a Notice of Receivership and Motion for Stay, pursuant to which this matter was stayed during the prior reporting period.

In the case styled *Bryan R. Burney v. Drive Planning, LLC and Russell Todd Burkhalter*, filed in the Hamilton Superior Court, Indiana (Cause No. 29D01-2408-PL-009063), Mr. Burney brought claims against Drive Planning and Mr. Burkhalter

for breach of contract, fraud, and violations of federal and state securities laws.  The Receiver filed a Notice of Receivership and Motion to Stay the case and, on October 15, 2024, the Court granted that motion.

### H.    Known Investors and Creditors

The Receiver is aware of nearly 2,400 investors who transferred more than $380,000,000 to Drive Planning.  The Receiver and his Forensic Accountant have substantially completed the forensic reconstruction of Drive Planning's accounts, which reflects losses to investors of approximately $220 million dollars.  All investor deposits and distributions have been reported to this Court in the Receiver's Sworn Statement and Accounting [ECF No. 81].

### I. Investor Communications

The Receiver and his team have devoted significant time and effort communicating with investors of Drive Planning.  Soon after his appointment, the Receiver set up a dedicated telephone line and an email address for investors to communicate with the Receiver's office and obtain information regarding the enforcement action and the Receivership, and created a website (www.DrivePlanningReceivership.com), which contains a summary of this action, important court filings, key dates and deadlines, answers to frequently asked questions, and other information relevant to investors.  During the Reporting Period, the Receiver responded to hundreds of investor inquiries by email and telephone

regarding the status of the Receivership Estate, the timing and requirements of a future claims process and distributions, concerns regarding tax reporting issues, the upload of information regarding their investments and losses and supporting documents, confirmation of their contact information, and other related issues.

During the prior reporting period, the Receiver obtained Court approval to employ Stretto as his data collection agent to prepare a secure online portal to collect and process information and documents from investors necessary for the Receiver's Forensic Accountant to complete the bank account reconstruction and assist the Receiver to otherwise fulfill his duties under the Appointment Order, and to facilitate the Receiver's team's review of all the data received from investors. *See* ECF No. 38. During the Reporting Period, the majority of investors uploaded their contact information and investor documents. Many of them contacted the Receiver's team (by email and telephone) to obtain assistance with identifying and gathering the requested documents and called Stretto's technical support hotline for assistance with accessing the portal and uploading the documents. Additionally, Stretto is assisting the Receiver in organizing the significant data that investors have uploaded to the portal and will assist the Receiver in sending future mass emails to investors, providing them with periodic updates regarding the Receivership.

### J.    Identifying and Pursuing Liquidated and Unliquidated Claims

During the Reporting Period, the Receiver continued investigating whether Drive Planning holds liquidated and unliquidated claims against third parties, affiliates, insiders, and investors of Drive Planning who received net gains. The Receiver will continue to investigate these potential claims and, after consulting with the SEC and obtaining this Court's approval, will pursue all viable claims to obtain significant recoveries for the Estate.

Also, during the Reporting Period, the Receiver prepared and sent document preservation letters to various agents/advisors and other parties involved with Drive Planning who may be the subjects of the Receiver's future recovery actions. These letters demanded the preservation of all relevant documents, electronically stored information, and communications related to their involvement with the company. The letters also asked the recipients to contact the Receiver's office to discuss the return of the funds they improperly received from Drive Planning. The Receiver and his professionals conducted informal interviews of those agents/advisors who responded to the Receiver's letters, answered their questions, and provided information regarding the enforcement action, the Receivership, and the Receiver's claims to recover the funds they received from Drive Planning. Now that the forensic reconstruction is nearly completed, the Receiver can confirm the amount of funds that Drive Planning agents/advisors and other insiders, affiliates, and third

parties received from Drive Planning. Accordingly, during the next reporting period, the Receiver will begin sending formal letters demanding the return of those amounts to the Receivership Estate.

The Receiver and his professionals will continue to analyze potential sources of recovery and gather evidence for purposes of developing and pursuing the Receivership Estate's claims to recover funds or other assets belonging to or improperly transferred from Drive Planning, including without limitation turnover and fraudulent transfer actions. Further, the Receiver will investigate the Estate's potential claims against professionals and institutions that may have facilitated the alleged misconduct of Defendants or otherwise contributed to the damages alleged to have been sustained by Defendants' investors. The Receiver will complete his investigation of those claims and, after consultation with the SEC and with this Court's approval, pursue those claims he believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of December 31, 2024, the Receiver held a total of $54,131,710.46 in cash-on-hand in his fiduciary accounts for the Receivership Estate at City National Bank, Synovus Bank, and Axos Bank and in the operating account for the Florida rental properties at Truist Bank.

The SEC's Standardized Fund Accounting Report for the Reporting Period, attached as Exhibit A, sets forth the receipts and disbursements of the Receivership Estate.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and his Court-approved professionals, including Lead Counsel, Georgia Counsel and other local counsel, and the Forensic Accountant, for the work they performed or the costs they incurred in connection with fulfilling the Receiver's duties under the Appointment Order. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshaled and deposited into his fiduciary accounts since he was appointed.

## V. CONCLUSION

The Receiver and his professionals appreciate the opportunity to assist the Court in this matter.    Until further order of the Court, the Receiver and his professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the Appointment Order in the most cost-effective manner while seeking to maximize the ultimate recovery by the Receivership Estate.

Respectfully submitted,

s/*Russell Landy*
Russell Landy, Esq.
Florida Bar No. 44417
*Admitted Pro Hac Vice*

*Lead Counsel for Kenneth D. Murena,*
*as Court-Appointed Receiver*
Adriana M. Pavon
    Florida Bar No. 1025060
    apavon@dvcattorneys.com
*Admitted Pro Hac Vice*
Russell Landy
    Florida Bar No. 44417
    rlandy@dvllp.com
*Admitted Pro Hac Vice*
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*Local Counsel for Kenneth D. Murena,*
*as Court- Appointed Receiver*
Henry F. Sewell, Jr.
    Georgia Bar No. 636265
    Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

## CERTIFICATE OF SERVICE, FONT AND MARGINS

    I hereby certify that on January 30, 2025, I electronically filed the foregoing *Notice* using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record.

    I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: January 30, 2025.

                                      s/*Russell Landy*
                                      Russell Landy, Esq.
                                        Florida Bar No. 44417
                                        *Admitted Pro Hac Vice*