# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER,<br><br>    Defendants,<br><br>and<br><br>JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,<br><br>    Relief Defendants. | Civil Action No.<br>1:24-cv-03583-VMC |

## OPINION AND ORDER

Before the Court is the Receiver's Motion for Turnover of and Imposition of Constructive Trust on Real Property Traceable to Drive Planning, LLC ("Motion," Doc. 114). Through the Motion, the Receiver seeks an order requiring the immediate turnover of real property in the possession and titled in the name of Julie Ann Edwards, and imposing a constructive trust on such real property in

favor of the receivership estate. Ms. Edwards filed a response to the Motion (Doc. 123). The Receiver filed a Reply in support of the Motion. (Doc. 130). For the reasons that follow, the Court will grant the Motion.

## Background[1]

This matter arises in a civil action brought by the United States Securities and Exchange Commission ("SEC") against Drive Planning, LLC ("Drive Planning") and the company's CEO Todd Burkhalter under federal securities laws. (Declaration of Cody C. Turley dated Aug. 9, 2024, "Turley Decl.," ¶ 4, Doc. 2-6; *see generally* Compl., Doc. 1).

### I.   Drive Planning

Drive Planning, under the direction of Mr. Burkhalter, offered an investment opportunity called the "Real Estate Acceleration Loan" or "REAL" program. (Turley Decl. ¶ 7). Drive Planning produced and distributed advertisements for REAL in the form of brochures, online videos, social media posts, and web pages. (*Id.* ¶ 8). These advertisements were distributed to the general public through means such as U.S. Mail, email, YouTube, Facebook, and the company's website. (*Id.*).

---

[1] The Court draws the following factual background from the declarations of record. Fed. R. Civ. P. 43(c). Quotation marks are omitted from declaration excerpts to improve readability.

Drive Planning's offering materials for REAL stated that the investment was a safe and low risk opportunity for investors to generate passive income. (*Id.* ¶ 9). The advertisements and offering materials stated that an individual could invest with a minimum of $20,000 and receive a guaranteed return of 10% every 90 days. (*Id.*). The advertisements stated that Drive Planning would use investments in REAL to fund bridge loans to real estate developers. (*Id.*). Drive Planning claimed that such bridge loans were fully collateralized by real estate and other assets. (*Id.*).

Financial and bank records show that from September 2020 through June 2024 Drive Planning and Mr. Burkhalter raised $372 million in REAL. (*Id.* ¶ 10). During this period, more than 2,500 investors invested funds in REAL. (*Id.* ¶ 11). These investors reside in at least 48 states (including Georgia), two territories, and multiple countries. (*Id.*).

The SEC contends that Drive Planning did not generate sufficient revenue to pay the promised returns to investors in REAL, Drive Planning and Mr. Burkhalter used investor funds to pay returns to other investors, and that Mr. Burkhalter used investor funds for what appear to be large personal purchases. (*Id.* ¶ 12). As a result of its investigation, the SEC filed this case on August 13, 2024 and sought the appointment of a receiver. (Docs. 1, 2).

## II. Receivership History

On August 13, 2024, the Court entered an Order appointing Kenneth D. Murena as Receiver over "all assets of Defendant Drive Planning, LLC ('Receivership Assets') and the assets of Defendant Burkhalter and the Relief Defendants that: (a) are attributable to funds derived from investors or clients of the Defendants; (b) are held in constructive trust for the Defendants; and/or (c) may otherwise be includable as assets of the estates of the Defendants (collectively, the 'Recoverable Assets')." ("Receivership Order," Doc. 10 at 1–2). The Court also took "exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of" Drive Planning. (*Id.* ¶ 1).

The Receivership Order further provided the Receiver to take possession of the receivership estate as follows:

> The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records and all other documents or instruments relating to the Receivership Defendant. All persons and entities having control, custody or possession of any Receivership Property are hereby directed to turn such property over to the Receiver. . . .
>
> The Receivership Defendant, as well as its agents, servants, employees, any persons acting for or on behalf of the Receivership Defendant, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendant are hereby directed

>   to deliver the same to the Receiver, his agents and/or employees. . . .
>
>   The Receiver is authorized to take immediate possession of all real property of the Receivership Defendant, wherever located, including but not limited to all ownership and leasehold interests and fixtures. . . .

(*Id.* ¶¶ 15–16, 19).

### III. The Edwards Property

Julie Ann Edwards was the Chief Administrative Officer and agent/advisor of Drive Planning. (Declaration of Kenneth D. Murena, Receiver, dated May 12, 2025, "Receiver's Decl.," ¶ 4, Doc. 114-1). On June 6, 2024, $630,000 was transferred from Drive Planning's Truist account no. ending in 2951 to Ms. Edwards's Wells Fargo checking account. (*Id.* ¶ 5). An additional $175,000 was transferred from the same Drive Planning Truist Bank account to Ms. Edwards between November 2023 and April 2024. (*Id.* ¶ 6). At the time the $630,000 and $175,000 were transferred from Drive Planning's Truist account no. ending in 2951 to Julie Ann Edwards's Wells Fargo checking account, Drive Planning's account contained millions of dollars of Drive Planning investor funds and was used by Drive Planning to receive and disburse investor funds. (*Id.* ¶ 7).

On September 27, 2024, a Limited Warranty Deed was executed and recorded in the public record by the grantor Orchards of South Forsyth LP,

5

transferring its interest in property located in Cummings, Georgia (the "Edwards Property"), to Julie Ann Edwards. (*Id.* ¶ 3).

Based on the Receiver's investigation into the purchase of the Edwards Property and a review of the relevant Settlement Statement (Doc. 114-3), the Receiver confirmed that funds that Ms. Edwards had received from Drive Planning were used to purchase the Edwards Property, including the down payment and closing costs. (Receiver's Decl. ¶¶ 8–9). Specifically, the total purchase price of the Edwards Property was $666,460.00, and Ms. Edwards's closing costs were $7,443.34, and therefore, Ms. Edwards used a total of $673,903.34 in misappropriated investor funds to purchase the Edwards Property. (*Id.*).

The Receiver filed this Motion seeking turnover of the Edwards Property on May 13, 2025. (Doc. 114). Ms. Edwards agreed to email service of the Motion, which she received on May 13, 2025. (Doc. 116).

## Discussion

### I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding regarding estate property by virtue of the Receivership Order. *Riehle v. Margolies*, 279 U.S. 218, 223 (1929) ("The appointment of a receiver of a debtor's property by a federal court confers upon it, regardless of citizenship and of the amount in controversy,

6

federal jurisdiction to decide all questions incident to the preservation, collection, and distribution of the assets. It may do this either in the original suit . . . or by ancillary proceedings. . . .") (citing *Rouse v. Letcher*, 156 U.S. 47, 49, 50 (1895); *White v. Ewing*, 159 U.S. 36 (1895)); *see also* 28 U.S.C. § 754 ("A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.").

The Court has personal jurisdiction over Ms. Edwards by virtue of her consent to service by email. (Doc. 116). Service of Ms. Edwards in this district is proper under Federal Rule of Civil Procedure 4(k), as well as under 28 U.S.C. § 1692, which provides that "[i]n proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts." *Newman v. William L. Gunlicks Irrevocable Tr.*, 897 F. Supp. 2d 1270, 1274 (M.D. Fla. 2012); *Huddleston v. Grafton Enters. Midway LLC*, No. 1:09-CV-2799-ODE, 2010 WL 11549771, at *3 (N.D. Ga. Jan. 19, 2010).

Venue is proper in this district because Ms. Edwards resides in this district and because the Edwards Property is in this district.[2] Moreover, because the receivership is pending in this district, venue over this case is proper in this district. *Huddleston*, 2010 WL 11549771, at \*7 (citing *Haile v. Henderson Nat'l. Bank*, 657 F.2d 816, 822 n.6 (6th Cir. 1981)). Ms. Edwards did not object to the Receiver bringing this matter by motion rather than by complaint, *see* Fed. R. Civ. P. 12(b)(4), (h)(1) (defense of insufficient process waived by failure to raise responsively), and the Court sees no obstacle to resolving the merits of the Motion on the briefs. Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."); *Riehle*, 279 U.S. at 223 (holding federal courts may resolve competing claims to estate property in "the original suit" or "by ancillary proceedings."); *see also* Fed. R. Civ. P. 71 ("When an order . . . may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."); Fed R. Civ. P. 78(b) ("By rule or

---

[2] Ms. Edwards resides in the Gainesville division of the district, 28 U.S.C. § 9(a)(1), but Ms. Edwards did not object to proceeding in the Atlanta division, and the Court would find venue appropriate in the Atlanta division anyway based on the pendency of the receivership as discussed below.

order, the court may provide for submitting and determining motions on briefs, without oral hearings."). The Court therefore turns to the merits.

## II. Applicable Law

Though this is a federal receivership arising in a federal question case, "[p]roperty interests are created and defined by state law." *Sec. & Exch. Comm'n v. Pension Fund of Am. L.C.*, No. 05-20863-CIV, 2006 WL 8433996, at *8 (S.D. Fla. Sept. 11, 2006) (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)). In determining the state law to apply in a federal question case, courts in this circuit generally apply the conflict of law rules of the forum state. *Mukamal v. Bakes*, 378 Fed. App'x 890, 896 (11th Cir. 2010); *see also PRN Real Est. & Invs., Ltd. v. Cole*, 85 F.4th 1324, 1348 (11th Cir. 2023) (recognizing that *Mukamal* is unpublished and that the Eleventh Circuit has not reached the issue in a published case). "In cases involving real property, Georgia courts generally follow the traditional conflict of law rule of lex loci rei sitae, that is, the law of the place where the thing is." *United States v. One 1990 Lincoln Town Car*, 817 F. Supp. 1575, 1581 (N.D. Ga. 1993) (citing *Veach v. Veach*, 53 S.E.2d 98 (Ga. 1949)). The Court therefore applies Georgia law.

Georgia law recognizes two types of implied trusts: resulting trusts and constructive trusts. O.C.G.A. § 53-12-2(2); *Loggins v. Daves*, 40 S.E.2d 520, 521 (Ga. 1946) ("Implied trusts are either resulting or constructive."). The Georgia Supreme Court has explained the difference as follows:

9

> In an implied resulting trust the intention of the parties is an essential element, although no valid agreement setting up such an intention is shown, but such mutual intent is implied only from proven facts and circumstances. An implied constructive trust is different, in that here there is no intention of the parties to create such a relationship, but on the contrary in most, if not every case, such a trust arises by virtue of the fraudulent conduct of one misappropriating the money of another, and the trust arises contrary to any intent on his part.

*Loggins*, 40 S.E.2d at 521 (citing 4 Pomeroy's Equity Jurisprudence, §§ 1031, 1044).

Georgia has codified the circumstances where implied trusts are available in O.C.G.A. Title 53, Article 7. Relevant here, "[a] constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." O.C.G.A. § 53-12-132. "A constructive trust may be imposed only where the plaintiff's funds are themselves located or traced into other funds or property." *In re Whitacre Sunbelt, Inc.*, 211 B.R. 411, 418 (Bankr. N.D. Ga. 1997).

"[A] constructive trust is a remedy created by a court in equity to prevent unjust enrichment." *APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1366 (N.D. Ga. 2004) (quoting *St. Paul Mercury Ins. Co. v. Meeks*, 508 S.E.2d 646 (Ga. 1998)). "It is not an independent cause of action." *Id.* (citing *Meeks*, 508 S.E.2d at 646).

Significantly, "[u]njust enrichment . . . does not apply when the conferred benefit was a gift or voluntary payment." *Roberts v. Smith*, 801 S.E.2d 915, 921 (Ga. Ct. App. 2017) (quoting *Reeves v. Newman*, 695 S.E.2d 626, 627 n.2 (Ga. 2010) and citing *Crook v. Foster*, 775 S.E.2d 286, 289 (Ga. Ct. App. 2015)). At first glance, this appears to be a matter of distinction between Florida and Georgia law. *See SEC v. Drive Planning, LLC* ("Drive Planning I"), No. 1:24-cv-03583-VMC, 2025 WL 1805796, at *5 (N.D. Ga. June 30, 2025) (citing *Lee v. Wiand*, 603 B.R. 161, 176 (M.D. Fla. 2018) for the proposition that "Courts [applying Florida law] have held that recipients of funds from a Ponzi scheme are unjustly enriched such that a constructive trust is an appropriate remedy."). This is consequential here because the Receiver does not allege that Ms. Edwards received the money as fake investment proceeds from Drive Planning, stole the money from Drive Planning, or even that she personally induced the investors to pay money to Drive Planning. (*See generally* Doc. 114). As best the Court can tell, the Receiver is relying on a theory that Ms. Edwards was unjustly enriched by a gratuitous transfer of investor funds by Burkhalter or another agent of Drive Planning.

Cases in this district have examined unjust enrichment claims in the Ponzi scheme context and reached differing results. First, *Stenger v. World Harvest Church, Inc.*, No. 1:04-cv-00151-RWS, 2006 WL 870310 (N.D. Ga. Mar. 31, 2006) involved "an elaborate Ponzi scheme overseen by . . . individuals [who] . . . induced others

11

to invest hundreds of millions of dollars in an enterprise known as Cash 4 Titles ('C4T')." *Id.* at *1. "A substantial portion of the funds . . . generated by the C4T Ponzi scheme . . . found their way into the hands of [the] Defendant World Harvest Church." *Id.*

The *Stenger* court expressed concern with utilizing an unjust enrichment theory to claw back funds from World Harvest Church. "In the broadest sense," he wrote "'[t]he theory of unjust enrichment[,]' under Georgia law, 'is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay.'" *Id.* at *3 (quoting *Morris v. Britt*, 620 S.E.2d 422, 424 (Ga. Ct. App. 2005)). "To apply, however," he explained, "the party conferring the labor and things of value must act with the expectation that the other will be responsible for the cost." *Id.* (quoting *Morris*, 620 S.E.2d at 424). The facts of that case therefore "[did] not fit neatly into the unjust enrichment theory" because the defendant church "took the proffered sums . . . as tithes or gifts." *Id.* "Rather," the court explained, "the injustice that flows from Defendant's retention of the funds in this case arises, if at all, due to the fact that the funds were conveyed to Defendant fraudulently—either as gifts when the transferor was insolvent, or in an effort to defraud creditors when Defendant was on notice of that intention." *Id.* (citing O.C.G.A. § 18-2-22(2) & (3) (repealed 2002)). The *Stenger* court therefore indicated that a "[s]uit for fraudulent

12

conveyance, rather than for unjust enrichment, is the proper vehicle to seek redress for such an evil." *Id.*

In contrast, a Ponzi receiver was able to make out a claim for unjust enrichment against net winners[3] under Georgia law in *Hill for Credit Nation Capital, LLC v. Duscio*, 292 F. Supp. 3d 1370, 1377–78 (N.D. Ga. 2018). The *Duscio* court saw no obstacle to imposing a constructive trust where the operator of the scheme caused the Ponzi company "to make payments to [net-winner] Duscio that it did not owe him." *Id.* at 1378. Instead, the court found that the receiver stated a claim for unjust enrichment by pleading "that a benefit was provided to Duscio, compensation for that benefit was not received, and the failure to compensate renders the transaction unjust." *Id.* Another court in this district cited *Duscio* approvingly for the concept that unjust enrichment is available without regard to whether the relief defendants "have committed some wrong for which they should be held liable," but "[r]ather, . . . [because they] received money traceable to the [scheme]." *Kittrell v. Allen*, No. 1:24-CV-00786-SDG, 2025 WL 698128, at *6 (N.D. Ga. Mar. 4, 2025) (declining to dismiss unjust enrichment claims against children of scammers). "The vehicle through which Plaintiffs are seeking relief is a claim

---

[3] *See Duscio*, 292 F. Supp. 3d at 1373 ("Defendants—also investors—allegedly invested their money in the promissory notes and life insurance policies, but, unlike the others, received back the full amounts of their investments plus additional payments denominated as interest. . . . Defendants thus allegedly profited by receiving money paid in by other investors.").

13

for unjust enrichment, which can be brought 'when there has been a benefit conferred which would result in an unjust enrichment unless compensated.'" *Id.* (quoting *Cochran v. Ogletree*, 244 Ga. App. 537, 538 (Ga. Ct. App. 2000)).

The question is closely linked to the concept of certain causes of action being "'cleansed' through receivership." *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1306 (11th Cir. 2020).[4] The leading case on point is *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995). In that case, Judge Posner rejected the concept that a fraudulent transfer claim was unavailable to a receiver of a Ponzi entity based on the general rule "that the maker of the fraudulent conveyance and all those in privity with him . . . are bound by it." *Id.* (citations omitted). Instead, he explained that the purpose of the rule was "that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors," but "[t]he appointment of the receiver removed the wrongdoer from the scene." *Id.* ("The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes.").

---

[4] This is a distinct question from receivership standing, discussed below, which is more concerned with whether the architects of the Ponzi scheme exercised complete control over the company and whether the claim in question more appropriately belongs to investors rather than to the receivership entity. *Isaiah*, 960 F.3d at 1308.

14

The concern that the *Stenger* court expressed, that Georgia's theory of unjust enrichment does not embrace clawing back gratuitous transfers, seems akin to the general principle that a maker of a fraudulent transfer is ordinarily bound by it. *Stenger*, 2006 WL 870310, at *3. While the Court could not locate any Georgia case law on the point of whether gratuitous transfer claims are "cleansed by receivership" under Georgia law, the Court makes an *Erie* guess that the Georgia Supreme Court would reach that result. *See Perkins v. Hartford Ins. Grp.*, 932 F.2d 1392, 1395 (11th Cir. 1991) ("[State] law does not provide a direct answer on this issue, but the law is clear enough so that we may make an educated *Erie* guess.") (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[5]

The Court bases this conclusion on the Georgia Supreme Court's decision in *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296 (Ga. 2005). There, the Georgia Supreme Court affirmatively answered the following question certified by the Eleventh Circuit: "Will Georgia law allow the representative of a [bankruptcy] debtor corporation to bring an alter ego claim against the corporation's former principal?" *In re Icarus Holding, LLC*, 391 F.3d 1315, 1322 (11th Cir. 2004). The question centered on whether a corporation that had engaged in misconduct but

---

[5] The Court declines to certify the question to the Georgia Supreme Court because the law is clear enough to make an educated guess. Moreover, Ms. Edwards lacks counsel and absent an effective adversary presentation the Court is concerned the question would not be helpfully framed for that court.

was now under the control of a fiduciary could pierce its own corporate veil. In allowing the claim, the Georgia court recognized that "[i]t may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort creditor." *Id.* at 300 (quoting *Phar-Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1240 n.20 (3rd Cir. 1994)). But "[b]ecause piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor corporation to pursue a claim based upon such a theory." *Id.* (quoting *Phar-Mor,* 22 F.3d at 1240 n.20). The court explained that "Georgia alter ego law is not focused solely on the relationships between parties, but also is premised on equitable principles designed to prevent unjust treatment in appropriate circumstances." *Id.* (citing *Farmers Warehouse of Pelham, Inc. v. Collins*, 137 S.E.2d 619, 625 (1964)). The same logic supports allowing a receivership entity to bring an unjust enrichment claim premised on a voluntary transfer of misappropriated investor funds even when such claim would be unavailable outside of the receivership context. Thus, the Court finds that such a claim is available here.

### III. Standing

The Court has determined that under Georgia law, the recipient of a gratuitous transfer from a Ponzi scheme may be subject to a constructive trust on

the funds received under an unjust enrichment theory. However, this does not answer the question of whether the Receiver has standing to enforce such a constructive trust, which the Court must consider sua sponte. *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1310 (11th Cir. 2024).

In an earlier opinion in this case applying Florida law, the Court discussed the concept of Receiver standing to bring common law tort claims, an inquiry that considered in part the pre-receivership management of the Ponzi entity. *Drive Planning I*, 2025 WL 1805796, at *4–5. This case in contrast is under Georgia law, and a bankruptcy judge in this district recently rejected application of that line of cases under Georgia law. *In re Aliera Cos., Inc.*, 665 B.R. 468, 494 (Bankr. N.D. Ga. 2024) ("What *Isaiah*, *Perlman*, and *Wiand* all share in common is that they not only involve a receiver of a Ponzi debtor asserting Florida common law tort claims, but that the Eleventh Circuit ultimately resolved the standing issue by application of Florida law. The instant case before this Court, however, involves liquidating trustees of liquidating trusts pursuant to 11 U.S.C. § 1123 and claims arising under Georgia law—not Florida law. As the Court will demonstrate, neither the Bankruptcy Code nor Georgia law preclude a trustee from having standing to bring a claim for injury to the debtor even if the debtor was involved in wrongdoing."). The Court finds persuasive the discussion of Ponzi debtor standing under Georgia law set forth in that case and adopts it here.

17

As the *Aliera* court explained, the relevant standing question under Georgia law is who suffered the harm?—"Georgia district and bankruptcy courts, as well as the Eleventh Circuit, have found a bankruptcy trustee [and by extension a receiver] does not have standing to bring a claim based on harm to the estate's creditors instead of the debtor." *Id.* at 494. The court in *Aliera* found a liquidating trustee had standing to bring a Georgia RICO action because it stemmed "conduct that directly harmed [the debtor] by leaving it with inadequate funds to pay its creditors, rather than a claim arising from 'unique or personal harm' to a specific creditor. . . . On the flip side, the alleged conduct indirectly harmed [the debtor's] creditors as a whole by severely limiting [its] ability to pay those creditors." *Id.* at 495–96 (citing *E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 985–87 (11th Cir. 1990)).

For similar reasons, Ms. Edwards's receipt of investor funds harmed Drive Planning and its investors as a whole rather than any specific investor because it hampered Drive Planning's ability to return all investors' principal. The Court therefore finds the Receiver has standing to bring this action.

IV. **Application to the Facts**

For the reasons the Court gave in *Drive Planning I*, the Court finds that the Edwards Property was purchased with funds traceable to misappropriated investor funds and that the Receiver has made out a case for unjust enrichment.

18

2025 WL 1805796, at *5–6. Ms. Edwards does not dispute any of this. Instead, she seeks more time to refinance the Edwards Property for the purpose of keeping her home. The Court recognizes the hardship attendant with losing one's home, but the Court's sympathies cannot overcome the Receiver's entitlement to relief.

## Conclusion

For the above reasons, it is

**ORDERED** that the Receiver's Motion for Turnover of and Imposition of Constructive Trust on Real Property Traceable to Drive Planning, LLC (Doc. 114) is **GRANTED**. It is

**FURTHER ORDERED** that the Court **DECLARES** that any interest of Julie Ann Edwards in the Edwards Property is subject to a constructive trust in favor of the Receivership Estate as beneficiary relating back to the moment of acquisition of the Edwards Property by Ms. Edwards. It is

**FURTHER ORDERED** that (unless the Receiver and Ms. Edwards agree to service by another method) the Receiver is **DIRECETED** to promptly serve Ms. Edwards by priority mail express (or similar delivery service, or by personal delivery) a form quitclaim deed conveying the Edwards Property to the Receiver on behalf of the Receivership Estate and prepaid return envelope. It is

**FURTHER ORDERED** that, within 45 days from the date of mailing of the form quitclaim deed (or such later time as the Receiver may in his discretion

19

permit), Ms. Edwards is **DIRECTED** to execute the form as directed by the Receiver and to vacate the Edwards Property. To encourage compliance with this directive, the Receiver may in his discretion agree to pay a reasonable moving expense to Ms. Edwards from estate funds, not to exceed $3,000, without the need for court approval. It is

**FURTHER ORDERED** that, in the event that Ms. Edwards fails to timely execute the quitclaim deed, the Receiver may present a proposed order vesting title to the Edwards Property under Federal Rule of Civil Procedure 70(b). Upon entry of such Rule 70(b) order, or in the event that Ms. Edwards executes the quitclaim deed but does not timely vacate the Edwards Property, the Receiver may seek a writ of possession from this Court or the appropriate Georgia state court.

**SO ORDERED** this 2nd day of July, 2025.

_____
Victoria Marie Calvert
United States District Judge