## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**UNITED STATES SECURITIES**
**AND EXCHANGE COMMISSION,**

    **Plaintiff,**

**v.**

                        **Civil Action No. 1:24-cv-03583-VMC**

**DRIVE PLANNING, LLC, and**
**RUSSELL TODD BURKHALTER,**

    **Defendants,**
**and**

**JACQUELINE BURKHALTER,**
**THE BURKHALTER RANCH**
**CORPORATION, DRIVE**
**PROPERTIES, LLC, DRIVE**
**GULFPORT PROPERTIES LLC,**
**and TBR SUPPLY HOUSE, INC.,**

    **Relief Defendants.**

_____/

## RECEIVER'S SIXTH STATUS REPORT

Kenneth D. Murena, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits his Sixth status report setting forth his activities and efforts to fulfill his duties under the Order Appointing Receiver [ECF No. 10] (the "Appointment Order") for the period from October 1, 2025, through December 31, 2025 (the "Reporting Period").

# **TABLE OF CONTENTS**

I.    SUMMARY ................................................................................................4

II.   COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER ................................................................22

    A.   Preliminary Injunction and Appointment of Receiver .........................22

III.  THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER ..........................................................................23

    A.   Receiver's Employment of Professionals ............................................23

    B.   Securing and Reviewing Books and Records of Drive Planning.........25

        1.  Subpoenas.....................................................................................25

        2.  Analysis of Records and Consolidation of Investor Accounts ..........27

        3.  Demand Letters to Agents and Third-Parties......................................28

    C.   Real Property, Businesses, and Personal Property in Which Receivership Estate Has an Interest ........................................................

        1.  Real Properties and Businesses in Georgia, Florida, Indiana, and Mexico..................................................................................29

            *i.  Efforts to Sell Properties*.................................................*29*
            *ii. Multi-Unit Property in St. Petersburg, Florida*.............*30*
            *iii. The Burkhalter Ranch*....................................................*30*
            *iv. Staurolite Barn*..............................................................*32*
            *v.  Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC*.....................................................*33*
            *vi. Club 201 at the Detroit in St. Petersburg, Florida*........*34*

        2.  Real Properties in South Carolina and Alabama................................36

        3.  Investment in Real Property in Medellin, Colombia ..........................37

4.  Real Property Owned or Occupied by Third-Parties ..........................37

5.  Deeds of Trust and Investments in Real Property
    in Tennessee .......................................................................41

6.  Transfers to Embry Development Company for
    Real Estate Projects ...........................................................43

7.  Drive Plan Financial Services LLC.......................................43

8.  Personal Property ...............................................................45

    i. Luxury Furniture ............................................................45
    ii. "Live More" Yacht ........................................................45

9.  SFHR Development LLC (Sarah and Andy Fisher) ...........47

D.  Lawsuits Filed Against Drive Planning .................................48

E.  Known Investors and Creditors.............................................49

F.  Investor Communications .....................................................49

G.  Claims Process .....................................................................50

H.  Identifying and Pursuing Liquidated and Unliquidated Claims .............53

IV.  CASH ON HAND AND ACCRUED EXPENSES OF ESTATE ...............55

V.  CONCLUSION.............................................................................56

## I. **SUMMARY**

Since his appointment on August 13, 2024, the Receiver has made significant progress in identifying, securing, and recovering all identified funds, assets, and records of Drive Planning LLC (the "Receivership Estate"). These efforts resulted in the recovery of $2,871,325.23 during the Reporting Period from the sale of real estate, the liquidation and proceeds from certain assets that David Bradford had turned over to the Estate, settlements with parties with which Drive Planning did business or to which it transferred funds, and settlements with certain Drive Planning agents and insiders who had received commissions for soliciting investors. As of the end of the Reporting Period, the Estate held $65,307,313.33 in the Receiver's fiduciary accounts at City National Bank of Florida, Synovus Bank, Huntington National Bank, and Axos Bank and in the operating account for the Florida properties at Truist Bank. During the Reporting Period, the Estate earned $519,737.15 in interest on the funds held in the fiduciary accounts.

During the Reporting Period, the Receiver and Receiver's Lead Counsel undertook extensive efforts to fulfill the Receiver's duties under the Appointment Order. In particular, the Receiver and Receiver's Lead Counsel devoted time to the management, maintenance, and sale of real properties and personal property owned by Drive Planning and/or acquired with investor funds. This included overseeing the marketing for sale of real estate in Georgia, Florida, Indiana, South Carolina,

Alabama, and Mexico, coordinating with realtors and property managers, and addressing operational issues with rental properties, such as payment of maintenance expenses, HOA fees, and property taxes, insurance renewals, renegotiating leases, and addressing tenant disputes. During the Reporting Period, the Receiver completed two Court-approved sales of real property in Blue Ridge and Mineral Bluff, Georgia recovering $1,622,661.18. Shortly following the close of the Reporting Period, and pursuant to Court approval, the Receiver completed the sale of three additional properties: (i) the St. Petersburg condominium unit sold for $1,825,000, (ii) the Panama City Beach, Florida condominium unit sold for $217,509, and (iii) the Sumter County, South Carolina condominium unit sold for $185,000.[1]

During the Reporting Period, the Receiver continued his investigation into improper transfers made to insiders, affiliates, and third parties. In prior reporting periods, the Receiver issued demand letters to former Drive Planning agents, advisors, and other individuals who received significant transfers of investor funds without providing reasonably equivalent value to Drive Planning in return. The Receiver obtained Court approval to enter into agreements (pursuant to certain settlement procedures and meeting particular settlement amount thresholds) with

---

[1] The proceeds of these three post-Reporting Period sales are not included in the $2,871,325.23 in total recoveries or the cash-on-hand as of the end of the Reporting Period, as reported above.

various agents for the return of all or a portion of the commissions they had received from Drive Planning. Pursuant to those agreements, the Receiver collected $280,631.87 in settlement payments during the Reporting Period with additional payments to be made by certain agents in monthly installments over time.

During the prior reporting period, upon receiving leave of this Court, the Receiver initiated an ancillary action to recover more than $27.5 million based on fraudulent transfers and unjust enrichment claims against forty-six former agents and affiliates of Drive Planning. In the ancillary complaint filed in the U.S. District Court for the Northern District of Georgia, the Receiver asserts claims under the Georgia Uniform Voidable Transactions Act and Georgia common law for unjust enrichment, seeking to avoid, recover, and disgorge commissions paid to those agents for promoting and expanding Drive Planning's Ponzi scheme between 2020 and 2024. During the Reporting Period, the Receiver engaged in extensive settlement negotiations with the named agents and reached agreements with certain of them. For those agreements that provide for payment of amounts within the Court-approved thresholds, the Receiver entered into the agreements and recovered the settlement amounts (or portions thereof), and for those agreements that do not meet such thresholds (because the settling agent lacks sufficient assets, or for other reasons), the Receiver will present them to the Court for approval during the next reporting period. With respect to the other agents who have not settled, negotiations

remain ongoing with many of them, and the Receiver will continue to actively litigate and pursue recovery against any non-settling parties.

During a prior reporting period, the Receiver completed negotiations and entered into an agreement with former Drive Planning agent, David Bradford, who had received the largest amount of transfers from Drive Planning, providing for his turnover of millions of dollars' worth of assets, including thirteen (13) real properties in South Carolina and Alabama, one (1) 30% interest in a multi-unit apartment community in Alabama, seven (7) private placement investments, twenty-five (25) life insurance policies, and one (1) IRA. During the Reporting Period, Mr. Bradford transferred $805,964 to the Receivership Estate pursuant to his agreement to turn over an investment. Further, Mr. Bradford and his wife deeded all the aforementioned properties to the Estate, and the Receiver continued to work with realtors in South Carolina and Alabama to market the properties for sale, secured control over the rental arrangements, and collected monthly rent. Several properties are actively listed for sale, one property is under contract, and another is scheduled for closing. With respect to the remaining properties, the Receiver and his realtors are in the process of obtaining access, assessing conditions, coordinating necessary inspections and photography, and preparing those properties for market.

During a prior reporting period, the Receiver filed three motions against former Drive Planning agents and/or high-level insiders seeking the turnover of real

properties in Florida, Georgia, and Indiana acquired with misappropriated investor funds and the imposition of constructive trusts over those assets. *See* ECF Nos. 98, 114, 131. The Court granted two of the Receiver's motions, ordering the owners/occupants of properties in Florida and Georgia to sign Quit Claim Deeds transferring title to the Estate and vacating the premises by dates certain. *See* ECF Nos. 152 and 163. During the prior reporting period, Ms. Edwards, the owner of one of those properties, executed a Quit Claim Deed transferring title to the Receivership Estate, and the Receiver recorded that deed. Ms. Edwards had requested permission to remain in the property as a tenant, paying monthly rent, homeowners' association fees, and property insurance while the property is marketed for sale. The Receiver agreed to permit Ms. Edwards to remain in the property under a rental arrangement that has generated and will continue to generate income for the Receivership Estate through rent payments while ensuring the property remains maintained and insured during the marketing period. During the Reporting Period, the Receiver listed the property for sale and continued to collect rent from Ms. Edwards.

With respect to the Florida property owned by Mark Haye, the Court entered an order granting the Receiver's motion for turnover and constructive trust, and Mr. Haye subsequently filed a notice of appeal and dozens of motions and other filings seeking to stay enforcement of the Court's order pending appeal. During the

Reporting Period, the Receiver responded to the initial appellate brief filed by Mr. Haye. His motions to stay and other filings were denied, stricken, or disregarded as duplicative.  As Mr. Haye failed to comply with the Court's order requiring him to deed the property to the Receivership Estate and vacate the property, the Receiver filed a motion under Federal Rule of Civil Procedure 70 requesting that the Court authorize the Clerk to execute the deed on Mr. Haye's behalf.  During the Reporting Period, the Court granted that motion, and the Receiver coordinated with local counsel to secure the Clerk's signature and worked to record the deed transferring title of the property to the Receivership Estate.  Thereafter, the Receiver took actions to remove Mr. Haye from the property, including obtaining a Writ of Possession from the U.S. District Court for the Middle District of Florida (where the property is located), so it could be marketed for sale. During the Reporting Period, the Receiver negotiated an agreement with Mr. Haye that provides for a substantial and immediate monetary recovery for the Receivership Estate in exchange for deeding the property back to Mr. Haye, subject to this Court's approval. The agreement further requires dismissal with prejudice of Mr. Haye's pending appeal of this Court's turnover and constructive trust order, grants the Receiver expedited enforcement rights in the event of default of his obligations under the agreement, and preserves the Estate's ability to immediately retake possession of the property.

Mr. Haye did not execute the agreement and so the Receiver is moving forward with the U.S. Marshals to remove Mr. Haye from the property.

The third motion seeking turnover of and imposition of a constructive trust over real property filed by the Receiver during the prior Reporting Period involved property located in Indianapolis, Indiana purchased with approximately $1.9 million in misappropriated investor funds and titled in the name of former Drive Planning agent Gerardo Linarducci. ECF No. 131.  Shortly after the Receiver's filing, Mr. Linarducci filed a petition for bankruptcy protection.  *See* ECF No. 151.  During the Reporting Period, the Receiver continued pursuing recovery of the Indianapolis property through Mr. Linarducci's bankruptcy case.  During the prior reporting period, the Receiver filed an objection to Linarducci's claimed exemption in the property, asserting that it is held in constructive trust for the benefit of the Receivership Estate and also filed a verified adversary complaint to except Mr. Linarducci's debts to the Estate from discharge under 11 U.S.C. § 523(a)(2), (4), (6), and (19), alleging that he received more than $5.8 million in fraudulent commissions and participated in the unlawful sale of unregistered securities as an agent of Drive Planning. During the Reporting Period, the Receiver filed a motion for relief from the automatic stay in the Gerardo Linarducci bankruptcy to permit the Receiver to refile in this SEC action his motion for turnover of and imposition of a constructive trust over Mr. Linarducci's Indiana residence purchased with more than $1.9 million

in misappropriated Drive Planning investor funds. The Receiver's objection to claimed exemptions, adversary proceeding to except from discharge Mr. Linarducci's debt to the Estate, and motion for stay relief remain pending in the bankruptcy court.

During the prior reporting period, the Receiver filed a Motion for Turnover of and Imposition of a Constructive Trust over the Bliss Condominium Unit owned by Defendant Russell Todd Burkhalter and Relief Defendant Jacqueline Burkhalter (the "Bliss Condominium Unit"), as more than $1 million in Drive Planning investor funds were traced to its acquisition, and seeking an order declaring the Bliss Condominium Unit to be Receivership Property subject to a constructive trust in favor of the Receivership Estate. During the Reporting Period, the Court entered an order granting the Receiver's Motion, finding that the property is subject to a constructive trust in favor of the Receivership Estate and ordering the turnover of title and possession to the Receiver. *See* ECF No. 246. Following entry of the Court's order, because Mr. Burkhalter had failed to deed the property to the Estate or vacate the property, the Receiver filed a motion under Rule 70 to have the Clerk of Court execute the deed on Mr. Burkhalter's behalf.  Before the Court ruled on that motion, Mr. Burkhalter executed the deed and vacated the Bliss Condominium Unit, after which the Receiver secured possession of the property and coordinated the removal of Mr. Burkhalter's personal possessions. Upon taking possession, the Receiver

discovered approximately $25,000 in cash left at the property, which was promptly secured and deposited into the Receivership Estate's operating account for the Florida properties. During the next reporting period, the Receiver intends to complete preparations necessary to list and market the Bliss Condominium Unit for sale for the benefit of the Receivership Estate.

During the Reporting Period, the Receiver also worked to resolve his claims against Embry Development Group, LLC ("Embry"), a Georgia-based developer to which Drive Planning had transferred in excess of $6 million, but an agreement has not been reached.

Also during the Reporting Period, the Receiver issued a Subpoena for Deposition Duces Tecum to Jon Clement and his company Trigger Time Gun and Pawn, LLC ("Trigger Time"), seeking documents and testimony concerning funds and assets transferred from Drive Planning and its affiliates to Mr. Clement and Trigger Time, including records regarding the operation of Trigger Time, the disposition of assets purchased with investor funds, and Mr. Clement's communications with the Burkhalters and other Drive Planning representatives. After initially delaying compliance and following court intervention, Mr. Clement ultimately appeared for deposition. Based on the testimony and documents obtained, the Receiver is now finalizing a complaint against Mr. Clement and Trigger Time to recover assets of the Receivership Estate under their control and to avoid fraudulent

transfers received from Drive Planning, which will be filed during the next reporting period.

During the Reporting Period, the Receiver continued to investigate Drive Plan Financial Services, LLC ("DPFS"), which was formed by Drive Planning (80%) and Accelerated Financial Services, Inc. (20%), an entity owned by former Drive Planning agent James Thomasson. The Receiver previously confirmed that $675,724.97 in investor funds was used to purchase property on Carpenter Drive in Sandy Springs, Georgia (the "Sandy Springs Property") in May 2024 and that, after the Receivership began, Mr. Thomasson improperly sold the property without authority and retained control of a $550,000 seller-financed promissory note arising from that transaction. Following the Receiver's demand, Mr. Thomasson agreed to assign all rights under the note to the Receivership Estate, including the right to receive the October 2026 balloon payment, and to turn over funds already collected pursuant to the note. The Receiver has now implemented that assignment and is currently receiving $5,000 per month from the buyer of the Sandy Springs property. The Receiver continues to negotiate with Mr. Thomasson to finalize the transfer of funds that he received from Drive Planning or DPFS.

During the prior reporting period, the Receiver investigated and traced more than $1 million in investor funds from Drive Planning into SFH Holdings and its affiliate, SFHR Development, including funds that were used for marketing and

sponsorship activities and funds that were applied toward the acquisition and operation of the Whiteland Raceway Park property. Of the amount transferred, $500,000 was paid pursuant to a May 2024 Unit Purchase Agreement under which Drive Planning agreed to purchase up to a 50% membership interest in SFH Holdings for a total purchase price of $1,250,000, with the remaining funds expended on marketing, advertising, and sponsorship activities promoting the Whiteland Raceway Park project. Under the Unit Purchase Agreement, Drive Planning's ownership interest was to be issued incrementally "per transaction" as installment payments were made, and Drive Planning made only the initial $500,000 payment before ceasing further performance. As a result, Drive Planning's $500,000 payment vested 20 units, representing a 20% membership interest in SFH Holdings, with any additional ownership contingent on subsequent installment payments that were never made. The Receiver issued a formal demand for repayment of the misappropriated investor funds.

When SFH Holdings advised that it intended to sell the Whiteland Raceway Park property, the Receiver asserted a claim to the sale proceeds based on the traced transfers and required that a portion of the proceeds be placed into escrow pending a resolution of the Receiver's claim after the transaction closed. That arrangement was memorialized in a written Escrow Agreement among SFH Holdings, the Receiver, and the Escrow Agent, which requires that $600,000 of the sale proceeds

be held in escrow and may be released only by written agreement of SFH Holdings and the Receiver or by court order, preserving a source of recovery for the Receivership Estate while litigation or settlement efforts continue.

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg, Florida known as Club 201 at the Detroit ("Club 201"). The Receiver was tasked with monitoring its operations pursuant to the Appointment Order. The Receiver traced wire transfers totaling $652,375.04, from a Drive Planning account at Truist Bank containing investor funds, to the purchase of Club 201. Thereafter, additional transfers totaling $220,000 were made to Club 201 from the same account and another Drive Planning account at Chase Bank. In total, $861,839.65 was transferred from investor-funded accounts to Club 201, including the aforementioned transfers and 62 smaller transfers totaling $14,464.61. As a result, the Receiver requested that Mr. Burkhalter turn over Club 201 to the Receiver to be sold with the proceeds being remitted to the Estate. Defendant Burkhalter would not agree to do so. Accordingly, on October 3, 2025, the Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201, LLC, Including all its Assets and Membership Interest [ECF No. 293], seeking a declaration that the business is property of the Receivership Estate and compelling immediate turnover of all assets, membership interests, and operations to the Receiver. Following entry

of the Court's December 11, 2025 Order granting the Receiver's Motion, the Receiver assumed control of Club 201 at the Detroit and its operations, obtained access to the Club's accounts and systems, and begun collecting financial records and other business information. Thereafter, Mr. Burkhalter delivered to the Receiver the executed Bill of Sale and Assignment of Membership Interests. The Receiver is now stabilizing operations and compiling the data necessary to evaluate and pursue potential sale opportunities for the benefit of the Receivership Estate.

During the Reporting Period, the Receiver continued to monetize and stabilize the Burkhalter Ranch and its associated assets for the benefit of the Receivership Estate. The Receiver launched and maintained a dedicated asset-sale website to market unused and unnecessary ranch equipment, tools, trailers, and related personal property to the public, in which should facilitate the sale of multiple items and the recovery of funds for the Estate. In addition, the Receiver sold certain furniture and furnishings that had been purchased with investor funds but were not necessary for ongoing operations, further reducing carrying costs while generating liquidity. With respect to the cattle operation, the Receiver, working with professional ranch management, has undertaken the steps necessary to register eligible cattle, obtain DNA testing where required, and ensure proper documentation so that the animals can be sold at full registered value rather than as unregistered livestock. At the same

time, a registered bull has been introduced to the herd for breeding purposes, which will increase the herd's size and value before sale.

During the prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent. *See* ECF No. 240. The motion outlined a comprehensive procedure for administering and adjudicating claims of investors and creditors of Drive Planning, including the form of the Legal Notice of Claims Process and Proof of Claim and Release Form. On August 25, 2025, the Court entered an Order granting the motion and approving the Receiver's proposed claims process. *See* ECF No. 251. Since entry of that Order, the Receivership has administered thousands of individualized claim packets, an online claims portal was launched, and Stretto Inc. staffed a dedicated call center and email response team to assist investors with technical issues, uploading documentation, correcting beneficiary information, understanding their pre-calculated net loss amounts, and addressing their disputes with the pre-calculated loss amounts. The claims process has required extensive hands-on involvement because many investors lacked complete records, disputed the Receiver's calculations of their net gains or net losses, or required individualized explanations of how commissions, withdrawals, and affiliate payments affected their net loss calculations. As of the Claims Bar Date established in the Court's August 25, 2025 Order, more than 2,200 claim records had been created in the system,

representing approximately $236 million in asserted losses. Because claims continue to be filed, amended, disputed, and reconciled, the Receiver requested, and all parties agreed, that the deadline for the Receiver to issue Final Claims Determinations be extended to January 22, 2026, with corresponding extensions for claimant appeals and the Receiver's responses thereto. *See* ECF No. 349.  On December 29, 2025, the Court granted the Receiver's request.  *See* ECF No. 350.  After the Reporting Period, the Receiver sent more than 2000 final determinations to claimants by the extended deadline but requested a further extension of time to send the final determinations to the remaining claimants given the late filing of their claims and/or the need for additional information or documentation to process them.

Moreover, during the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically: (i) the Franklin Limestone / Mount View Road Project, which is under contract with a national homebuilder and progressing through final governmental approvals with anticipated repayment by the end of 2026, (ii) the Horton Highway Project, which remains undeveloped and requires additional infrastructure investment and potential parcel sales or restructuring strategies to facilitate recovery, and (iii) the Manchester Pointe Townhomes Project, for which horizontal development is nearing completion

and the developer is actively pursuing vertical construction financing anticipated to repay the Receivership Estate by Summer 2026.

During the Reporting Period, the Receiver discovered that Drive Planning had purchased a 2008 Holiday Motorhome after receiving a formal abandoned-vehicle notice from A & T Towing in Jasper, Georgia, which was attempting to claim ownership of the vehicle based on unpaid storage charges. Upon receipt of that notice, the Receiver immediately investigated the matter, confirmed that the motorhome had been purchased with Drive Planning funds, and asserted the Estate's ownership rights under the Court's Appointment Order. The Receiver coordinated with the tow facility, provided proof of receivership authority, and negotiated the release of the vehicle by paying the outstanding storage and towing charges to prevent further accrual of fees and loss of the asset. The motorhome was recovered and transferred to the Burkhalter Ranch for secure storage and disposition, eliminating ongoing storage costs while preserving the asset for sale. Based on market comparisons, the 2008 Holiday Motorhome is estimated to have a resale value of approximately $80,000, making its recovery a meaningful addition to the Receivership Estate.

During the Reporting Period, the Receiver continued to preserve and manage all remaining assets of the Receivership Estate to maximize their value as they are marketed for sale, including the *Live More* yacht, equipment, luxury furniture, and

vehicles.  Towards the end of the Reporting Period, the Receiver received a written offer to purchase the yacht for an amount that the Receiver believes was slightly below its market value.  The potential purchaser identified certain issues with the yacht, which the Receiver, the yacht captain, and the yacht broker began addressing to increase the value and marketability of the yacht.  The Receiver engaged in negotiations with the potential purchaser, who ultimately increased his offer by $200,000 subject to resolution of the issues he identified.  Based on the Receiver's broker's extensive marketing efforts, assessment of the condition and desirability of the yacht, analysis of recent sales of comparable yachts, and evaluation of current market conditions, the Receiver and his broker believe that the potential purchaser's increased offer represents the current market value of the yacht.  As such, and given the significant monthly costs to maintain the yacht, including $2,500 for the yacht captain required under the insurance policy, and approximately $3,500 for dockage and electricity, the Receiver believes that selling the yacht pursuant to this offer would be in the best interest of the Estate.  Therefore, during the next reporting period, the Receiver will file a motion to approve the sale of the yacht pursuant to this offer.

During the prior reporting period, the Receiver engaged Indiana bankruptcy counsel, Bose McKinney & Evans LLP (the "Bankruptcy Counsel"), to preserve the Receivership Estate's claims and interests immediately following Gerardo

Linarducci's filing of a Chapter 13 bankruptcy petition. Bankruptcy Counsel coordinated closely with the Receiver and undertook efforts to prevent the Mr. Linarducci from using the bankruptcy process to shield a residence purchased with Drive Planning investor funds from the Receiver. This work included filing and prosecuting an adversary proceeding to except from discharge Mr. Linarducci's debt to the Receivership Estate, objecting to Mr. Linarducci's claimed homestead exemption, pursuing dismissal of the Chapter 13 case based on Mr. Linarducci's bad faith and ineligibility for relief under Chapter 13, and preparing and filing a motion for relief from the automatic stay pursuant to the imposition of a constructive trust over Mr. Linarducci's property by operation of applicable law, making such property not property of his bankruptcy estate and permitting this Court to adjudicate the Receiver's motion for turnover of and constructive trust over that property.

During the Reporting Period, the Receiver and his counsel also worked with counsel for the SEC and counsel for the Relief Defendants on a global settlement of the SEC's claims against the Relief Defendants, which included the resolution of issues related to various real properties in Georgia and the Receiver's preparation of documents providing for the transfer of certain properties to the Estate and the retention of other properties by one Relief Defendant and related parties in exchange for payments to the Estate.

The Receiver will continue to work diligently with his team of professionals to fulfill his duties under the Appointment Order and report his efforts and activities in status reports and other court filings until such time as the Court may discharge him of his duties.

## II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief against Drive Planning, LLC and Russell Todd Burkhalter, alleging they operated a massive Ponzi scheme under the guise of real estate-related investment programs. *See* ECF No. 1.

### A.    Preliminary Injunction and Appointment of Receiver

As detailed in the SEC's initial filings and the Court's prior orders, the SEC filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and continued defrauding of investors. *See* ECF No. 2. The Court found that the SEC had established a *prima facie* case of securities law violations by Defendants Burkhalter and Drive Planning, and that the Relief Defendants improperly received funds derived from the fraudulent activities. *See* ECF No. 11 at ¶¶ 2, 4. Accordingly, the Court entered a Preliminary Injunction freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting. *See id.* On August 13, 2024, the Court also entered an Order Appointing

Kenneth D. Murena, Esq., as Receiver over Drive Planning and all assets derived from investor funds. *See* ECF No. 10. The Receiver was tasked with, *inter alia*, securing and recovering assets traceable to investor funds, managing and liquidating Receivership assets, and filing quarterly reports with the Court. *See id.* at ¶¶ 4–7, 54.

## III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER

### A.    Receiver's Employment of Professionals

Promptly after his appointment, pursuant to his authority under the Appointment Order and with this Court's approval, the Receiver employed legal counsel, forensic accountants, and other professionals to assist in taking possession, custody, and control of all identified assets of Drive Planning, marshaling records and assets in the hands of third parties, affiliates, and insiders of Drive Planning, analyzing and reconstructing Drive Planning's financial records, investigating potential assets and claims of the Estate, developing a secure online portal to obtain information and documents from investors, and otherwise fulfilling his duties under the Appointment Order. Specifically, the Receiver employed Damian Valori Culmo as his lead counsel ("Lead Counsel"), Henry F. Sewell Jr. LLC as his Georgia counsel ("Georgia Counsel"), and Hays Financial Consulting LLC as his forensic accountant and financial advisor ("Forensic Accountant"). *See* ECF Nos. 21, 24.

Further, the Receiver employed Preti Flaherty Beliveau & Pachios, LLP as counsel in New Hampshire to assist with litigation pending against Drive Planning, and Johnathan Pikoff as counsel in San José del Cabo, Mexico, to take control of and facilitate the marketing and sale of real property of the Receivership Estate and ensure the sale proceeds are transferred to the Estate. *See* ECF Nos. 46, 47.

Additionally, the Receiver obtained the Court's approval to employ Stretto Inc. to set up and manage a secure online portal through which investors can upload information and documents necessary for the Forensic Accountant to complete the reconstruction of Drive Planning's accounts and which will facilitate the processing of claims in any claims process that may be approved by the Court and implemented by the Receiver in this Receivership. *See* ECF No. 37. Finally, the Court approved the Receiver's employment of a captain to maintain the 70-foot yacht of which the Receiver took control and began marketing for sale. *See* ECF No. 42.

During a prior reporting period, the Receiver sought and obtained the Court's approval to employ Bose McKinney & Evans LLP as his local bankruptcy counsel in Indiana. *See* ECF Nos. 240, 242. Bose McKinney & Evans, through partner James P. Moloy, was engaged to represent the Receiver in the Chapter 13 bankruptcy case filed by former Drive Planning agent Gerardo Linarducci (Case No. 25-03768-JMC-13) in the United States Bankruptcy Court for the Southern District of Indiana.

24

## B.    Securing and Reviewing Books and Records of Drive Planning

During the Reporting Period, the Receiver continued to take steps to obtain, secure, organize, and review the books and records of Drive Planning in compliance with the Appointment Order.  The Receiver and his team continued the review of these records to identify communications, transaction histories, and other documents that assisted in tracing investor funds and determining the extent, use, and location of assets of the Receivership Estate.

### 1. Subpoenas

During prior reporting periods and the Reporting Period, the Receiver issued a number of subpoenas to third parties believed to have received investor funds or engaged in transactions with Drive Planning, its principal, and/or affiliated entities. These subpoenas are part of the Receiver's ongoing effort to trace the flow of misappropriated investor funds and identify recoverable assets.

During the prior reporting period, the Receiver issued a subpoena to BHG Financial.  Since that time, the Receiver and his counsel have engaged in ongoing communications and meet-and-confer efforts with BHG Financial's counsel to obtain responsive information and documents.  Based on the information developed to date, the Receiver understands that BHG Financial issued certain loans for the sole purpose of enabling borrowers to invest in Drive Planning-related offerings.

During the Reporting Period, the Receiver continued ongoing discussions with counsel for BHG to obtain documents responsive to the subpoena.

During the Reporting Period, the Receiver issued targeted third-party subpoenas duces tecum to obtain additional financial and payment-processing records necessary to trace investor funds and identify recoverable assets. Specifically, on December 15, 2025, the Receiver served subpoenas to Stripe, Inc., which the Receiver identified as the credit card processing system used by Drive Planning.

During a prior reporting period, the Receiver issued a cease-and-desist letter to Wesley McNelley, the son of the deceased lender for property on Blue Ridge Drive in Georgia owned by Relief Defendant TBR Supply House, Inc., directing him to stop asserting the existence of a purported seventy-foot easement and an exorbitant prepayment penalty under the note secured by the property, which were determined to be unsupported by the public record and loan documents and which were impeding the Receiver's marketing and sale of the property. Shortly thereafter, the Receiver served a Subpoena for Deposition Duces Tecum on Mr. McNelley seeking documents and testimony concerning the Blue Ridge Drive property, including his communications with Defendant Burkhalter and Relief Defendant Jacqueline Burkhalter, Drive Planning, and any claimed encumbrances or ownership interests. Mr. McNelley, through counsel, produced responsive materials, and his

deposition was taken on September 19, 2025.  During the Reporting Period, the Receiver worked to negotiate a potential loan payoff in connection with a prospective sale of the property, but Mr. McNelley's baseless easement claim and payoff demand resulted in the potential purchaser withdrawing its offer.  The Receiver continues to evaluate the information obtained from Mr. McNelley's production and testimony to determine whether further relief or legal action is warranted.

### 2.  Analysis of Records and Consolidation of Investor Accounts

During the Reporting Period, the Receiver and his forensic accounting team continued analyzing Drive Planning's financial records and investor transaction data to ensure accurate calculation of each investor's net loss.  This review included identifying and reconciling accounts in which investors transacted through limited liability companies or other entities, rather than in their individual names.  In several instances, the same individuals both invested and received commissions through affiliated entities, requiring consolidation of those accounts to avoid duplication and properly determine their net investment position.

The Receiver's forensic accountant completed the cross-referencing of deposits, withdrawals, and commission payments across personal, joint, and entity accounts to produce a comprehensive money-in, money-out analysis for each claimant.  This work ensured that all investments, redemptions, and commission

payments were attributed to the correct beneficial owner and formed the basis of each claimant's pre-filled allowed claim amount under the approved claims process.

### 3. Demand Letters to Agents and Third-Parties

Based on the Receiver's forensic analysis and reconstruction of Drive Planning's financial records, during prior reporting periods, the Receiver issued demand letters to numerous former agents and advisors of Drive Planning who received commissions funded by investor monies in return for procuring investments in Drive Planning's fraudulent scheme. The letters demanded the return of commissions to the Receivership Estate and detailed the Receiver's legal claims under the applicable fraudulent transfer statutes, as well as unjust enrichment. For those agents who were also investors and had no knowledge of the fraudulent nature or activities of Drive Planning, the Receiver considered the amounts they invested and the investment returns and commissions they received from Drive Planning in determining whether they received a recoverable net gain (as a fraudulent transfer and/or unjust enrichment) or suffered a net loss. For those investor/agents who suffered a net loss, the Receiver determined that no recovery was warranted and withdrew his demand letters.

During the prior reporting period and the current Reporting Period, the Receiver received partial or full payments from certain recipients of the demand letters and actively negotiated with others who were not named as defendants in the

Court-authorized ancillary action the Receiver filed against Drive Planning agents who had received significant commissions.  And, during the Reporting Period, the Receiver began preparing a complaint to be filed in the U.S. District Court for the Northern District of Georgia against those agents (including agent/investors who received net gains) with whom the Receiver is unable to reach settlements for the repayment of some or all of the commissions (or net gains) they received.

### C.    Real Property, Businesses, and Personal Property in Which Receivership Estate Has an Interest

Upon his appointment, the Receiver immediately reviewed the SEC's analysis of Defendants' and Relief Defendants' interests in real property and associated personal property and businesses and began marshaling those assets, taking control of or monitoring those businesses as directed in the Appointment Order, and demanding turnover of all such assets held by third parties to the extent there is equity and value for the Receivership Estate.

### 1. Real Properties and Businesses in Georgia, Florida, Indiana, and Mexico

#### i.    *Efforts to Sell Properties*

During the Reporting Period, the Receiver, with the assistance of reputable and experienced realtors, continued the process of marketing the Georgia, Florida, Indiana, and Mexico properties for sale.

Based on a review of the acquisition history and independent market evaluations, the Receiver determined that many of these properties were acquired at the height of the respective real estate markets or for prices significantly above market value.   During the Reporting Period, the Receiver lowered the listing prices for certain properties for which no purchase offers were received.  Additionally, the Receiver obtained appraisal reports for select properties, which confirmed that their current fair market values are substantially lower than the original purchase prices. And, the Receiver, with this Court's approval, closed on the sale of three properties in St. Petersburg, Florida and Blue Ridge and Mineral Bluff, Georgia.

### ii.    Multi-Unit Property in St. Petersburg, Florida

During the Reporting Period, the Receiver, with the assistance of a property manager, continued to rent out units at a multi-unit apartment complex located in St. Petersburg, Florida.  The rental income from this multi-unit property was used to fund necessary maintenance, repairs, and utilities for the property, and the property manager's salary, and the surplus income is held in the operating account at Truist Bank that the Receiver is using to manage the property.

### iii.    The Burkhalter Ranch

During the Reporting Period, the Receiver continued overseeing operations of the Burkhalter Ranch and made several key staffing and cost-efficiency improvements.  Following the Receiver's decision to reduce ranch management

hours to align with current operational needs and budget, during the prior reporting period, former ranch manager Mark Gregory resigned. The Receiver subsequently retained Sean Cook as the new ranch manager. Mr. Cook has proven to be both cost-effective and highly capable, implementing improved maintenance procedures and exploring new opportunities for revenue generation, including registration of the herd with the American Highland Cattle Association to increase the market value of the calves.

Under Mr. Cook's supervision, the Receiver employed one full-time ranch hand and one part-time ranch hand to assist with maintenance, livestock care, and property management. The Receiver also continued to reduce operational costs by eliminating unnecessary service contracts, including outsourced garbage collection and landscaping, and by utilizing ranch staff to perform repairs and maintenance in-house. These changes have lowered expenses while maintaining the property and equipment in marketable condition.

During the Reporting Period, the Receiver identified and listed multiple pieces of ranch equipment that were not necessary for ongoing operations for sale through the Receivership's asset sales platform. The listed equipment is estimated to have an aggregate value in the range of approximately $30,000 to $60,000, based on current market conditions and comparable listings. In addition, the Receiver listed cattle for sale through the same platform and continues to evaluate the appropriate timing and

structure of future livestock sales to maximize the recovery by the Receivership Estate.

In parallel, the Receiver has been working to obtain and confirm historical records, lineage information, and registration eligibility for the herd through the American Highland Cattle Association. This process is ongoing and is intended to ensure accurate classification and documentation of the cattle, which the Receiver believes will improve transparency for potential buyers and increase potential sale proceeds for the Estate.

### iv. Staurolite Barn

Staurolite Barn is a luxury event venue located on the Ranch property and managed by event coordinator Shelby Cook. The venue is being marketed for sale together with the Ranch, and its potential as a revenue-generating event space is expected to increase the overall sale price. During the Reporting Period, the Receiver continued to identify and reduce expenses for managing and marketing the event space. Ms. Cook located potential clients interested in renting the space, is working on scheduling the events, and is working with the Receiver's counsel to finalize the rental agreements; however, as event activity has declined in the area and given the Receiver's ongoing cost reduction efforts, in the prior reporting period, Ms. Cook's hours were significantly reduced, and the Receiver is evaluating whether

her continued engagement remains necessary.  Ms. Cook anticipates 2-3 event bookings in the next few months.

>     *v. Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC*

During the Reporting Period, the Receiver continued efforts to secure and recover Receivership assets associated with Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC, all of which were funded with approximately $1.4 million in investor money transferred from Drive Planning.  On September 11, 2025, the Receiver issued a cease-and-desist letter to Mr. Clement demanding that he immediately halt all sales and operations involving firearms, ammunition, and related merchandise held at the Blue Ridge, Georgia location, after learning that he was continuing to operate the business and dispose of Receivership assets without remitting any portion of the sale proceeds to the Estate, in violation of the Court's Appointment Order.

Despite repeated demands, Mr. Clement failed to cooperate or to conduct the agreed-upon liquidation of inventory and turnover of proceeds.  The Receiver therefore served Subpoenas for Deposition Duces Tecum on Mr. Clement individually and on Trigger Time Gun and Pawn, LLC requiring production of financial records, bank statements, inventory lists, and communications related to the $1.4 million transfer from Drive Planning and subsequent use of those funds.  Mr. Clement and Trigger Time Gun and Pawn, LLC did not initially comply with

the subpoenas and delayed their appearance for deposition, and threatened to take actions against the Receivership Estate's interest in TBR Outdoor Supply, LLC, which would violate the Appointment Order. As a result of his continued non-compliance with the Receiver's demands, and misappropriation of Receivership property, the Receiver will be filing an ancillary action seeking to recover the $1.4 million transferred to Mr. Clement and Trigger Time Gun and Pawn, LLC, asserting claims for fraudulent transfer and unjust enrichment under Georgia law. The Receiver continues to pursue enforcement of the Appointment Order and recovery of these assets for the benefit of the Estate.

### vi.    *Club 201 at the Detroit in St. Petersburg, Florida*

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg, Florida known as Club 201 at the Detroit ("Club 201"). The Receiver was tasked with monitoring its operations pursuant to the Appointment Order. The Receiver traced a wire transfer in the amount of $25,000.00 made on March 18, 2024 and a wire transfer in the amount of $627,375.04 made on March 27, 2024, from a Drive Planning account containing investor funds to the purchase of Club 201. Thereafter, additional transfers totaling $234,464.61 were made to Club 201 from the same account and another account of Drive Planning containing investor funds. In total, $861,839.65 was transferred from investor-funded accounts to Club 201. As a result,

the Receiver requested that Mr. Burkhalter turn over Club 201 to the Receiver so it could be sold and the proceeds could be remitted to the Estate. Defendant Burkhalter did not agree to do so. Accordingly, on October 3, 2025, the Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201 LLC, Including all its Assets and Membership Interest [ECF No. 293], requesting that the Court declare the business to be property of the Receivership Estate and compel immediate turnover of all assets, membership interests, and operations to the Receiver.

During the Reporting Period, the Court granted the Receiver's Motion [ECF No. 293], determining that Club 201 constitutes property of the Receivership Estate and authorizing the Receiver to take control of the business and its related assets. *See* ECF No. 339. Following entry of the Court's order, Defendant Burkhalter executed an Assignment of Membership Interests and Bill of Sale transferring all right, title, and interest in Club 201 and its assets to the Receiver in accordance with the Court's directive. As a result, the Receiver obtained full legal and operational control of Club 201 on behalf of the Receivership Estate.

Since obtaining control of Club 201, the Receiver has begun evaluating options for disposition of the business in a manner designed to maximize for the recovery by the Estate. The Receiver has been approached by multiple prospective purchasers expressing interest in acquiring Club 201 and the Receiver plans to solicit offers to purchase Club 201 in the next reporting period.

In connection with the Receiver's review of Club 201's records and operations, the Receiver identified certain outstanding sales tax issues that must be resolved prior to any sale or transfer of the business. The Receiver is currently investigating the nature and scope of these issues and coordinating with the appropriate taxing authorities to determine the amounts owed, if any, and the steps necessary to bring the business into compliance. In addition, the Receiver has identified liens and other encumbrances affecting Club 201 that will need to be addressed or resolved in order to deliver clear title to any buyer and effectuate a sale of the business. The Receiver continues to analyze these matters and will take appropriate steps to resolve them in the most cost-effective manner possible.

### 2. Real Properties in South Carolina and Alabama

During a prior reporting period, the Receiver reached an agreement with David Bradford, a former Drive Planning agent, providing for his turnover of eleven (11) rental homes in Sumter, South Carolina and two (2) properties in Montevallo, Alabama to the Receivership Estate. During the Reporting Period, the deeds transferring these properties to the Receivership Estate were properly recorded. The Receiver has taken operational control of the properties and is collecting rent from existing tenants to preserve the properties and generate income for the Receivership Estate. Also during the Reporting Period, multiple properties were listed for sale and two of the properties are set to close during the next reporting period.

### 3.  Investment in Real Property in Medellin, Colombia

During the Reporting Period, the Receiver continued to investigate Drive Planning's $1,200,000 investment in the boutique hotel project in Medellín, known as "La Casa Project."   Although the project was promoted in Drive Planning's marketing materials as a forthcoming luxury development, all indications suggest it remains in the pre-construction phase.  The Receiver made repeated efforts to engage with individuals and entities associated with the project, including prior contacts and other affiliated parties. Those outreach efforts, however, have yielded limited responses and no new substantive information.   The Receiver is continuing to explore alternative avenues to obtain documentation and verify the current status and location of the project to assess potential recovery options.

### 4.  Real Property Owned or Occupied by Third-Parties

During a prior reporting period, the Receiver identified a number of properties that were purchased by Drive Planning or with funds traceable to its investors but are not currently owned by Drive Planning and/or are occupied by third parties who have refused to turn them over to the Estate, notwithstanding the Receiver's demands pursuant to the Appointment Order.

During the prior reporting period, the Receiver filed motions against former Drive Planning agents and/or high-level insiders Mark Haye, Julie Ann Edwards, and Gerardo Linarducci, seeking the turnover of real properties acquired with

misappropriated investor funds and the imposition of constructive trusts over those assets. *See* ECF Nos. 98, 114, 131.

The Court granted the Receiver's motion for turnover and constructive trust as to Mr. Haye's luxury condominium unit in St. Petersburg, Florida (the "Haye Property"), which was purchased for approximately $1.4 million using investor funds transferred from a Drive Planning bank account. *See* ECF No. 152. Since the Court's ruling, Mr. Haye has launched a campaign of serial filings seeking to reverse the Court's ruling, which has caused the Estate to incur further and unnecessary expenses. Further, Mr. Haye filed a notice of appeal of the Court's Opinion and Order granting the Receiver's motion for constructive trust to the Eleventh Circuit Court of Appeals and a motion to stay the Opinion and Order pending the appeal. This Court and the Appellate Court denied Mr. Haye's stay motions, and the Receiver filed his answer brief before the Eleventh Circuit.

Pursuant to the Opinion and Order, the Receiver filed a Motion under Federal Rule of Civil Procedure 70 requesting that the Court authorize the Clerk of Court to execute a Quit Claim Deed transferring title of the Haye Property to the Receivership Estate. The Court granted the motion, the clerk executed the deed, and the Receiver is now the record title holder to the property.

Thereafter, the Receiver took actions to remove Mr. Haye from the property, including obtaining a Writ of Possession from the U.S. District Court for the Middle

District of Florida in which the property is located so it could be marketed for sale. During the Reporting Period, the Receiver negotiated an agreement with Mr. Haye that provides for a substantial and immediate monetary recovery for the Receivership Estate in exchange for deeding of the property to Mr. Haye, subject to this Court's approval; however, Mr. Haye has refused to sign the agreement, has refused to vacate the property despite demand, and has employed a series of improper tactics aimed at delaying his removal from the property.[2]  Accordingly, the Receiver is moving forward with the aid of the U.S. Marshals to remove Mr. Haye from the property.

The Court also granted a similar motion for turnover and constructive trust against Ms. Edwards with respect to a personal residence in Cumming, Georgia (the "Edwards Property"), which was purchased for approximately $630,000 using investor funds transferred from a Drive Planning bank account.  *See* ECF No. 163. During the prior reporting period, Ms. Edwards executed a Quit Claim Deed, which has since been recorded, transferring title to the Receivership Estate.  Ms. Edwards has requested permission to remain in the property as a tenant, paying monthly rent, homeowners' association fees, and property insurance while the property is

---

[2] Mr. Haye has wired the amount due under the proposed agreement to the fiduciary account for the Estate and the Receiver is holding those funds in escrow pending Mr. Haye's execution and the Court's approval of the agreement, but without a signed agreement, the Receiver cannot submit it to the Court for approval.

marketed for sale. The Receiver agreed to permit Ms. Edwards to remain in the property under a rental arrangement that will generate income for the Receivership Estate while ensuring the property remains maintained and insured during the marketing period.

The Receiver also filed a motion seeking turnover of and imposition of a constructive trust over a residential property in Indianapolis, Indiana, purchased with investor funds for approximately $1.9 million for the benefit of Drive Planning agent Gerardo Linarducci. *See* ECF No. 131. Shortly after the Receiver's filing, Mr. Linarducci filed a petition for bankruptcy protection. *See* ECF No. 151. During the prior reporting period, the Receiver filed an objection to Linarducci's claimed exemption in the residence, asserting that the property constitutes Receivership Property held in constructive trust in favor of the Receivership Estate (for the benefit of investors), and a verified adversary complaint to except Mr. Linarducci's debts to the Receivership Estate from discharge under 11 U.S.C. § 523(a)(2), (4), (6), and (19). The Receiver also filed a motion for stay relief to permit the Receiver to refile his motion for constructive trust in the SEC action and this Court to rule on that motion. The Receiver's filings seek to ensure that Mr. Linarducci cannot discharge debts arising from his receipt of more than $5.8 million in fraudulent commissions from Drive Planning and that the Receivership Estate's equitable interest in the property is preserved for the benefit of defrauded investors. A preliminary hearing

on the Receiver's motion for stay relief was held on January 29, 2026. The bankruptcy court requested additional briefing on certain legal issues and set a subsequent hearing on February 18, 2026.

### 5. Deeds of Trust and Investments in Real Property in Tennessee

During the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically:

1. Franklin Limestone / Mount View Road Project (Davidson County): The Court previously approved the Receiver's unopposed motion to reallocate $600,000 in investor funds from the stalled Franklin Limestone Project to the Mount View Road Project. The new project, a 54-unit townhome development, is supported by a letter of intent from a national homebuilder and provides the Receivership Estate with a first-lien position. It is currently under contract with the national builder for $5.8 million and is progressing toward final governmental approvals. This property has little debt in comparison to its value. The builder anticipates that he will be able to repay the entire investment to the Receivership Estate by the end of 2026.

2. Horton Highway Project (Williamson County): Drive Planning transferred $4,534,400 to Canaan Builders, LLC, in connection with a planned six-lot subdivision for luxury residential development. The project was structured to be fully funded by Drive Planning, and as a result remains stalled. The builder has been unable to obtain a construction loan due to Drive Planning's existing first-lien position. During the Reporting Period, the Receiver evaluated the current status of the project, including the fact that all six lots remain undeveloped, and that additional capital would be required to complete a necessary bridge (required to access the lots) at approximately $500,000. The Receiver also reviewed recent appraisals valuing the individual lots for their potential listing. Although the subdivision has

received permit approvals, meaningful recovery of invested capital may require either securing construction financing to complete home builds or implementing a restructuring strategy involving partial lien releases and lot sales to fund the bridge for access. The Receiver continues to assess these options, including potential listing strategies and financing alternatives, to determine the best path forward for maximizing recovery for the Receivership Estate.  The Receiver anticipates listing these lots for sale during the next reporting period.

3. <u>West Meade Hills Project (Davidson County)</u>: Drive Planning also transferred $615,000 to Canaan Builders, LLC, secured by property in the West Meade Hills subdivision.  In the prior Reporting Period, the Receiver recovered the full $615,000 investment upon sale of the property.  Additionally, the Receiver successfully negotiated the payment of $20,000 in interest to the Receivership Estate.

4. <u>Manchester Pointe Townhomes Project (Coffee County)</u>: Drive Planning invested $2,200,000 in Manchester Pointe Townhomes, LLC, secured by a deed of trust on 23.65 acres in Coffee County. The funds were allocated for horizontal development of a multi-phase apartment complex. The development phase remains ongoing, and site plans for vertical construction are actively being prepared. The project is planned to proceed in multiple phases, including an initial phase of approximately 100 units followed by a second phase of approximately 152 units. During the Reporting Period, the Receiver continued to monitor the progress of the Manchester Pointe Townhomes project, which remains active and advancing in accordance with its long-term development timeline. The horizontal development work is expected to be completed within the next 90 days, and the developer is in the process of finalizing plans for vertical construction. In parallel, the developer is actively working to secure construction financing for the vertical phase, which would enable the developer to repay the entire investment to the Receivership Estate. The builder anticipates the Estate will have its investment returned as soon as Summer 2026.

During the next reporting period, the Receiver will continue to devise and seek to implement the most cost-effective strategies for recovering the funds that Drive Planning had transferred for the real estate developments.

**6. Transfers to Embry Development Company for Real Estate Projects**

During the Reporting Period, the Receiver continued settlement discussions and financial analysis of Drive Planning's investment with Embry Development Company and its principal, which collectively had received approximately $6.7 million in funds from Drive Planning. If a settlement is not reached in short order, the Receiver is prepared to bring suit against Embry in the next reporting period.

**7. Drive Plan Financial Services LLC**

During the Reporting Period, the Receiver continued investigating Drive Plan Financial Services, LLC ("DPFS"), which was formed jointly by Drive Planning, LLC (80%) and Accelerated Financial Services, Inc. (20%), an entity owned by former Drive Planning agent James Thomasson. The Receiver confirmed that investor funds totaling $675,724.97 were used to purchase the commercial property located at on Carpenter Drive in Sandy Springs, Georgia (the "Sandy Springs Property") on May 1, 2024. Title was taken in the name of DPFS.

Following the commencement of the Receivership, the Receiver discovered that in October 2024, Mr. Thomasson, acting without authority, sold the Sandy Springs Property for $650,000 and executed all sale documents as the purported

"sole member" of DPFS. The sale was partially seller-financed through a $550,000 promissory note maturing on October 1, 2026, with only $98,000 received in cash at closing. These actions violated the DPFS Operating Agreement and the Court's Appointment Order, as the Receiver did not consent to the sale or receive any sale proceeds or an assignment of the note.

On September 18, 2025, the Receiver issued a demand to Mr. Thomasson to turn over the $675,724.97 in investor funds misappropriated through the purchase and sale of the Sandy Springs Property and notifying him that his conduct constituted a willful violation of the Court's Order. Following this demand, Mr. Thomasson engaged in communications with the Receiver's counsel and agreed to assign all rights and future payments due under the seller-financed note to the Receivership Estate, including the October 2026 balloon payment of $430,000.

The Receiver prepared a formal Assignment of LLC Membership Interest and Withdrawal as Member, pursuant to which Accelerated Financial Services, Inc. would transfer its 20% ownership interest in DPFS to the Receiver, consolidating control of the company within the Receivership Estate. During the Reporting Period, the assignment was executed. The Receiver has now implemented that assignment and is currently receiving $5,000 per month in payments from the tenant/buyer of the Sandy Springs Property. The Receiver continues to negotiate with Mr.

Thomasson to finalize the transfer of money that he received from Drive Planning or DPFS.

### 8. Personal Property

#### i. Luxury Furniture

During the Reporting Period, the Receiver contacted five consignment shops (Sarah Cyrus Home, Swoox Curated Consignment, Southern Comforts New & Consigned, Board of Trade Fine Consignments, and Whiskey Creek Furniture Consignments) to explore options for liquidating the high-end furnishings that the Receiver is storing in a secure storage facility. The Receiver provided a detailed price list and photo catalog to the vendors and received preliminary pricing feedback from three of them. However, the proposed consignment values were significantly below market expectations and would yield minimal recovery for the Estate. As a result, the Receiver is now exploring alternative options, including estate sales or bulk liquidation, to maximize the Estate's recovery and facilitate prompt disposition of the furnishings. During the Reporting Period, the Receiver sold a Hermes Blanket for $1,700.

#### ii. "Live More" Yacht

During the initial reporting period, the Receiver identified and took control of the "Live More" yacht, a 70-foot Galeon 680 Fly purchased by Mr. Burkhalter for $3,386,004 using Drive Planning's funds derived from investors.

During the Reporting Period, the Receiver continued to maintain and market for sale the *Live More* yacht. The Receiver received an initial offer to purchase the yacht in the amount of approximately $1.7 million subject to a list of issues identified by the potential purchaser being resolved. Through negotiations conducted by the Receiver and the retained yacht broker, and without the Receiver issuing a counteroffer, the prospective purchaser increased the proposed purchase price to $1.85 million and then $1.9 million. The Receiver and the yacht broker determined that the increased offer closely approximated fair market value under current market conditions. As such, the Receiver executed a Purchase and Sale Agreement, subject to SEC and Court approval, received the initial deposit required thereunder, and will submit the Agreement to the Court for approval during the next reporting period

In parallel with marketing efforts, the Receiver identified certain maintenance and operational issues affecting the yacht, including items necessary to preserve the vessel's condition and ensure marketability, some of which the potential purchaser requested be addressed prior to his purchase of the yacht. The Receiver has taken steps to address these issues, including coordinating routine maintenance and necessary repairs, to protect the asset from deterioration, to avoid any adverse impact on the yacht's value, and to meet the requirements of the proposed Purchase and Sale Agreement.

### 9. SFHR Development LLC (Sarah and Andy Fisher)

During the prior Reporting Period, the Receiver began investigating Drive Planning's ownership stake in the Whiteland Raceway Park property. The Receiver requested copies of all agreements and communications related to (1) the sponsorship arrangement between Drive Planning and SFHR Development LLC, and (2) any agreements concerning the acquisition or investment in the Whiteland Raceway go-kart facility, to determine whether investor funds were properly used and whether any recovery is available to the Receivership Estate. The Receiver investigated and traced more than $1 million in investor funds from Drive Planning into SFH Holdings and its affiliate, SFHR Development, including funds that were used for marketing and sponsorship activities and funds that were applied toward the acquisition and operation of the Whiteland Raceway Park property. Of the amount transferred, $500,000 was paid pursuant to a May 2024 Unit Purchase Agreement under which Drive Planning had agreed to purchase up to a 50% membership interest in SFH Holdings for a total purchase price of $1,250,000, with the remaining funds expended on marketing, advertising, and sponsorship activities promoting the Whiteland Raceway Park project. Under the Unit Purchase Agreement, Drive Planning's ownership interest was to be issued incrementally "per transaction" as installment payments were made, and Drive Planning made only the initial $500,000

payment. As a result, Drive Planning's $500,000 payment vested 20 units, representing a 20% membership interest in SFH Holdings.

The Receiver issued a formal demand for repayment of the misappropriated investor funds. When SFH Holdings advised that it intended to sell the Whiteland Raceway Park property, the Receiver asserted a claim to the sale proceeds based on the traced transfers and required that a portion of the proceeds be placed into escrow pending a resolution of the Receiver's claim after the transaction closed. That arrangement was memorialized in a written Escrow Agreement among SFH Holdings, the Receiver, and the Escrow Agent, which requires that $600,000 of the sale proceeds be held in escrow and may be released only by written agreement of SFH Holdings and the Receiver or by court order, preserving a source of recovery for the Receivership Estate while negotiations continue.

### D.    Lawsuits Filed Against Drive Planning

As detailed in a prior status report, the Receiver identified lawsuits filed against Drive Planning and related entities. The Receiver sought a stay and/or dismissal of each matter pursuant to the stay provision in the Appointment Order [ECF No. 10 at ¶ 32], and certain of the matters have been stayed or dismissed.

*Shipers v. Drive Planning, et al.*

During the Reporting Period, the Receiver addressed the civil action styled *Shipers v. Drive Planning, LLC, et al.*, filed in the Superior Court of Fulton County,

Georgia. The complaint named Drive Planning, LLC and Relief Defendant the Burkhalter Ranch Corporation and alleged personal injury claims arising from the haunted hayride incident on October 28, 2023. Upon review, the Receiver determined that the action was subject to the stay imposed by the Appointment Order and the Preliminary Injunction. Accordingly, during the Reporting Period, the Receiver took action to enforce the stay and successfully obtained a voluntary dismissal without prejudice.

### E.    Known Investors and Creditors

The Receiver is aware of nearly 2,400 investors who transferred more than $380,000,000 to Drive Planning.   The Receiver and his Forensic Accountant completed the forensic reconstruction of Drive Planning's accounts, which reflects losses to investors of approximately $220 million.   All investor deposits and distributions have been reported to this Court in the Receiver's Sworn Accounting [ECF No. 81].   Through the Court-approved claims process, which the Receiver commenced during the prior reporting period and continued to implement during the Reporting Period, the Receiver is confirming the investors who actually suffered losses and the precise amounts of those losses.

### F.    Investor Communications

The Receiver and his team have devoted significant time and effort to communicating with investors of Drive Planning.   Soon after his appointment, the

Receiver set up a dedicated telephone line and an email address for investors to communicate with the Receiver's office and obtain information regarding the enforcement action and the Receivership, and created a website (www.DrivePlanningReceivership.com), which contains a summary of this action, important court filings, key dates and deadlines, answers to frequently asked questions, and other information relevant to investors. During the Reporting Period, the Receiver responded to hundreds of investor inquiries by email and telephone regarding the status of the Receivership Estate, the deadlines and requirements of the Court-approved  claims process and future distributions, concerns regarding tax reporting issues, the submission of information regarding their investments and losses and supporting documents, confirmation of their contact information, and other issues.

**G. Claims Process**

During the prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent. *See* ECF No. 240. The motion outlined a comprehensive procedure for administering and adjudicating claims of investors and creditors of Drive Planning, including the form of the Legal Notice of Claims Process and Proof of Claim and Release Form. Under the proposed process, Stretto Inc. would assist the Receiver by creating and maintaining an online claims portal, sending pre-filled

claim forms to all known investors and creditors, and managing the receipt, review, and registration of claims. Each claimant would be required to confirm or dispute their pre-calculated "Allowed Claim Amount," which reflects a money-in, money-out determination of net loss based on Drive Planning's bank records, the records provided by investors, and the Receiver's forensic accounting analysis.

On August 25, 2025, the Court entered an Order granting the Motion and approving the Receiver's proposed claims process. *See* ECF No. 251. Thereafter, the Receiver and his counsel and other professionals worked on finalizing the spreadsheet of net losses suffered by investors for purposes of determining investors' eligibility to participate in the claims process and to assist Stretto Inc. to prepare the pre-filled Proof of Claim and Release Forms to be sent to investors to facilitate the submission and processing of their claims.

During the Reporting Period, the Receiver completed this work, and Stretto Inc. prepared all Proof of Claim and Release Forms and sent those forms to all eligible investors and creditors of Drive Planning. The Receivership has administered thousands of individualized claim packets, an online claims portal was launched, and Stretto Inc. staffed a dedicated call center and email response team to assist investors with technical issues, uploading documentation, correcting beneficiary information, understanding their pre-calculated net loss amounts, and addressing their disputes with the pre-calculated loss amounts. The claims process

has required extensive hands-on involvement because many investors lacked complete records, disputed the Receiver's calculations of their net gains or net losses, or required individualized explanations of how commissions, withdrawals, and affiliate payments affected their net loss calculations. As of the Claims Bar Date established in the Court's August 25, 2025 Order, more than 2,200 claim records had been created in the system, representing approximately $236 million in asserted losses. Because claims continue to be filed, amended, disputed, and reconciled, the Receiver requested, and all parties agreed, that the deadline for the Receiver to issue Final Claims Determinations be extended to January 22, 2026, with corresponding extensions for claimant appeals and the Receiver's responses thereto. *See* ECF No. 349. At the end of the Reporting Period, the Court granted the Receiver's request. *See* ECF No. 350.

As the extended deadline approached, the Receiver had successfully completed the reconciliation of the overwhelming majority of claims but identified a limited subset of seventy-seven (77) claims that required additional documentation or clarification from claimants or third-party financial institutions. These remaining claims were either filed after the Claims Bar Date, contained discrepancies requiring further investigation, or raised issues that could not be responsibly resolved without additional information. Rather than disallowing those claims outright and triggering avoidable appeals, the Receiver again sought a narrowly tailored, unopposed

extension to issue Final Claims Determinations limited solely to those unresolved claims. On January 22, 2026, the Receiver filed, and the Court granted, a second unopposed motion extending the deadline to issue Final Claims Determinations for this limited subset to February 20, 2026, with corresponding extensions of the appeal and response deadlines. *See* ECF No. 354.

The Receiver continues to work with Stretto Inc. and claimants to resolve these remaining claims and will issue Final Claims Determinations in accordance with the extended deadline approved by the Court.

### H.    Identifying and Pursuing Liquidated and Unliquidated Claims

During the Reporting Period, the Receiver continued investigating whether Drive Planning holds liquidated and unliquidated claims against third parties, affiliates, insiders, and investors of Drive Planning who received net gains.

The Receiver and his professionals will continue to analyze potential sources of recovery and gather evidence for purposes of developing and pursuing the Receivership Estate's claims to recover funds or other assets belonging to or improperly transferred from Drive Planning, including without limitation turnover and fraudulent transfer actions. During a prior reporting period, the Receiver prepared and filed a motion for authority to commence ancillary actions to recover commissions from Drive Planning agents, net gains from investors, and other amounts from third parties and to approve settlement procedures to streamline the

resolution of claims before and during litigation.  Thereafter, the Court granted that motion and the Receiver finalized and filed a complaint commencing an ancillary action in the U.S. District Court for the Middle District of Florida, Case No. 1:25-cv-04587-VMC, asserting fraudulent transfer and unjust enrichment claims against forty-six agents, seeking to recover the commissions they had received from Drive Planning in connection with bringing investors into the Drive Planning scheme.

During the next reporting period, the Receiver anticipates commencing another ancillary action against additional agents and a separate recovery action against various investors who received significant net gains, and will consider commencing other actions against third parties who received significant transfers from Drive Planning without providing reasonably equivalent value to Drive Planning.  Further, the Receiver will investigate the Estate's potential claims against professionals and institutions that may have facilitated the alleged misconduct of Defendants or otherwise contributed to the damages sustained by Defendants' investors.  The Receiver will complete his investigation of those claims and, after consultation with the SEC and with this Court's approval, pursue those claims he believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## IV. CASH ON HAND AND ACCRUED EXPENSES OF ESTATE

As of December 31, 2025, the Receiver held a total of $65,307,313.33 in his fiduciary accounts for the Receivership Estate at City National Bank of Florida, Synovus Bank, Huntington Bank, and Axos Bank and in the operating account for the Florida properties at Truist Bank.  During the Reporting Period, the fiduciary accounts earned $519,737.15 in interest.

The SEC's Standardized Fund Accounting Report (the "SFAR") for the Reporting Period, setting forth the receipts and disbursements of the Receivership Estate, is attached hereto as **Exhibit A**.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and his Court-approved professionals, including Lead Counsel, Georgia Counsel, and local counsel in other jurisdictions, and the Forensic Accountant, for the work they performed and the costs they incurred in connection with fulfilling the Receiver's duties under the Appointment Order.  Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshaled and deposited into his fiduciary accounts since he was appointed.

## V. CONCLUSION

The Receiver and his professionals appreciate the opportunity to assist the Court in this matter.  Until further order of the Court, the Receiver and his professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the Appointment Order in the most cost-effective manner while seeking to maximize the ultimate recovery by the Receivership Estate.

Respectfully submitted,

s/*Adrian M. Pavon*
Adriana M. Pavon
Florida Bar No. 1025060
*Admitted Pro Hac Vice*

*Lead Counsel for Kenneth D. Murena,*
*as Court-Appointed Receiver*
Adriana M. Pavon
    Florida Bar No. 1025060
    apavon@dvcattorneys.com
*Admitted Pro Hac Vice*
Russell Landy
    Florida Bar No. 44417
    rlandy@dvllp.com
*Admitted Pro Hac Vice*
DAMIAN  |  VALORI  |  CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*Local Counsel for Kenneth D. Murena,*
*as Court- Appointed Receiver*
Henry F. Sewell, Jr.
    Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

## <u>CERTIFICATE OF SERVICE, FONT AND MARGINS</u>

I hereby certify that on January 30, 2026, I electronically filed the foregoing *Status Report* using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record, and sent the *Status Report* to Defendant Burkhalter by email.

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Dated:  January 30, 2026.

s/*Adriana M. Pavon*
Adriana M. Pavon, Esq.
Florida Bar No. 1025060
*Admitted Pro Hac Vice*
