**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

      **Plaintiff,**

v.

                                  **Civil Action No. 1:24-cv-03583-VMC**

DRIVE PLANNING, LLC, and
RUSSELL TODD BURKHALTER,

      **Defendants,**
**and**

JACQUELINE BURKHALTER,
THE BURKHALTER RANCH
CORPORATION, DRIVE
PROPERTIES, LLC, DRIVE
GULFPORT PROPERTIES LLC,
and TBR SUPPLY HOUSE, INC.,

      **Relief Defendants.**
_____/

## <u>RECEIVER'S SEVENTH STATUS REPORT</u>

Kenneth D. Murena, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits his Seventh Status Report setting forth his activities and efforts to fulfill his duties under the Order Appointing Receiver [ECF No. 10] (the "Appointment Order") for the period from January 1, 2026, through March 31, 2026  (the "Reporting Period").

**TABLE OF CONTENTS**

I.  SUMMARY ..............................................................................................4

II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND
    APPOINTMENT OF RECEIVER ..............................................................18

    A. Preliminary Injunction and Appointment Order .....................................19

III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER
     THE APPOINTMENT ORDER..................................................................20

    A. Receiver's Employment of Professionals.................................................20

    B. Securing and Reviewing Books and Records of Drive Planning............21

        1. Subpoenas................................................................................22

        2. Analysis of Records and Consolidation of Investor Accounts ...........23

        3. Demand Letters to Agents and Third-Parties.....................................24

        4. Demand Letters to Net Winners.........................................................25

    C. Real Property, Businesses, and Personal Property in Which
       Receivership Estate Has an Interest .........................................................26

        1. Real Properties and Businesses in Georgia, Florida, Indiana, and
           Mexico....................................................................................26

            i.   *Efforts to Sell Properties*...........................................26

            ii.  *Property in Florida* ....................................................28

            iii. *The Burkhalter Ranch* ...............................................28

            iv.  *Staurolite Barn*..........................................................30

            v.   *Jon Clement TBR Outdoors Supply, LLC, and Trigger Time*

*Gun and Pawn, LLC* ...............................................................31

    vi.    *Club 201 at the Detroit in St. Petersburg, Florida*...................32

2.  Real Properties in South Carolina and Alabama................................34

3.  Investment in Real Property in Medellin, Colombia .........................35

4.  Real Property Owned or Occupied by Third-Parties .........................36

5.  Deeds of Trust and Investments in Real Property in Tennessee.........39

6.  Transfers to Embry Development Company for Real Estate
    Projects ............................................................................41

7.  Drive Plan Financial Services LLC....................................................42

8.  Personal Property ...............................................................................43

    i.    *Luxury Furniture*........................................................43

    ii.    *"Live More" Yacht*....................................................44

9.  SFHR Development LLC (Sarah and Andy Fisher) ..........................45

10. Bradford Private Placement Investments ...........................................47

D.  Known Investors and Creditors.............................................................48

E.  Investor Communications......................................................................49

F.  Claims Process......................................................................................49

G.  Identifying and Pursuing Liquidated and Unliquidated Claims...............51

IV.    CASH-ON-HAND AND ACCRUED EXPENSES OF ESTATE ..........52

V.    CONCLUSION ...................................................................................53

## I. **SUMMARY**

Since his appointment on August 13, 2024, the Receiver has made significant progress in identifying, securing, and recovering all identified funds, assets, and records of Drive Planning LLC (the "Receivership Estate"). These efforts resulted in the recovery of $4,241,620.02 during the Reporting Period from the sale of real estate, rental income, the liquidation and proceeds from certain assets that David Bradford had turned over to the Estate, settlements with companies with which Drive Planning did business or to which it transferred funds, and settlements with certain Drive Planning agents and insiders who had received commissions for soliciting investors. As of the end of the Reporting Period, the Estate held $69,083,240.13 in cash-on-hand in the fiduciary accounts at City National Bank of Florida, Synovus Bank, and Huntington National Bank and in the operating account for the Florida properties at Truist Bank. These funds in the fiduciary accounts are maintained in insured cash sweep accounts that are fully FDIC insured and earned interest at a rate of 3.05% totaling $510,668.04, during the Reporting Period.

During the Reporting Period, the Receiver and Receiver's Lead Counsel undertook extensive efforts to fulfill the Receiver's duties under the Appointment Order. In particular, the Receiver and Receiver's Lead Counsel devoted time to the management, maintenance, and sale of real properties and personal property owned by Drive Planning and/or acquired with investor funds. This included overseeing

the marketing for sale of real estate in Georgia, Florida, Indiana, South Carolina, Alabama, and Mexico, coordinating with realtors and property managers, and addressing operational issues with rental properties, such as payment of maintenance expenses, HOA fees, and property taxes, insurance renewals, renegotiating leases, and addressing tenant disputes.  During the Reporting Period, and pursuant to Court approval (ECF Nos. 311, 337, 348, 365), the Receiver closed on the sales of three properties: (i) the St. Petersburg, Florida condominium unit sold for $1,825,000; (ii) the Panama City Beach, Florida condominium unit sold for $217,509; (iii) a Sumter County, South Carolina condominium unit sold for $185,000; and (iv) another Sumter County, South Carolina condominium unit sold for $173,000.  Further, the Receiver sought and obtained Court approval to sell the condominium unit in San José del Cabo, Mexico for $4,138,000.  *See* ECF Nos. 377 and 378.

After the Reporting Period, the Receiver requested and obtained Court approval for the sale of Regency Villas for $2,650,000.  *See* ECF Nos. 396 and 398. Additionally, the Receiver sought and obtained Court approval for the sales of one property in Montevallo, Alabama for $160,000.  *See* ECF Nos. 386, 387, 397, 399. And, the Receiver sought and obtained Court approval for the sale of one property in Sumter County, South Carolina for $164,000, which subsequently closed.  *See* ECF Nos. 384 and 385.  Finally, the Receiver entered into an agreement for the sale of another property in Sumter County, South Carolina for $162,500 and will seek

Court approval of that sale in short order.  The Receiver anticipates that all of the foregoing sales will close during the next reporting period.

During the Reporting Period, the Receiver continued his investigation into improper transfers made to insiders, affiliates, and third parties.  In prior reporting periods, the Receiver issued demand letters to former Drive Planning agents, advisors, and other individuals who received significant transfers of investor funds without providing reasonably equivalent value to Drive Planning in return.  The Receiver obtained Court approval to enter into agreements (pursuant to certain settlement procedures and meeting particular settlement amount thresholds) with various agents for the return of all or a portion of the commissions they had received from Drive Planning.  Pursuant to those agreements, the Receiver collected $1,819,232.07 in settlement payments during the Reporting Period with additional payments to be made by certain agents in monthly installments over time.

During a prior reporting period, upon obtaining leave of this Court, the Receiver initiated an ancillary action to recover more than $27.5 million based on fraudulent transfer and unjust enrichment claims against forty-six former agents and affiliates of Drive Planning.  In the ancillary complaint filed in the U.S. District Court for the Northern District of Georgia, the Receiver asserts claims under the Georgia Uniform Voidable Transactions Act and Georgia common law for unjust enrichment, seeking to avoid, recover, and disgorge commissions paid to those

agents for promoting and expanding Drive Planning's Ponzi scheme between 2020 and 2024. During the Reporting Period, the Receiver engaged in extensive settlement negotiations with the named agents and reached agreements with certain of them. For those agreements that provide for payment of amounts within the Court-approved thresholds, the Receiver entered into the agreements and recovered the settlement amounts (or portions thereof), and for those agreements that do not meet such thresholds (because the settling agent lacks sufficient assets, cannot provide sufficient financial disclosures, and/or for other reasons), the Receiver will present them to the Court for approval during the next reporting period. With respect to the other agents who have not settled, negotiations remain ongoing with some of them, and the Receiver will continue to actively litigate or seek defaults and pursue recovery against any non-settling parties. Shortly following the Reporting Period, the Receiver will be filing his second ancillary action against certain agents seeking to recover the commissions they received for selling illegal unregistered securities and procuring investors for Drive Planning.

During a prior reporting period, the Receiver completed negotiations and entered into an agreement with former Drive Planning agent, David Bradford, who had received the largest amount of transfers from Drive Planning, providing for his turnover of millions of dollars' worth of assets, including thirteen real properties in South Carolina and Alabama, a 30% interest in a multi-unit apartment community

7

in Alabama, seven private placement investments, twenty-five life insurance policies, and one IRA. During the Reporting Period, the Receiver and his professionals continued to undertake substantial efforts to effectuate the transfer of and realization of value from the private placement investments. These efforts included, among other things, identifying and analyzing the governing subscription agreements and operating documents for each investment; preparing, revising, and negotiating assignment and transfer agreements necessary to convey Bradford's interests to the Receivership Estate; and coordinating execution of such assignments with Mr. Bradford and relevant counterparties. The Receiver further engaged in extensive outreach and communications with fund managers and administrators associated with the private placements to obtain consent to ensure proper recognition of the Receivership Estate as the substituted member or investor.

During a prior reporting period, the Receiver filed three motions against former Drive Planning agents and/or high-level insiders seeking the turnover of and imposition of constructive trusts over real properties in Florida, Georgia, and Indiana acquired with misappropriated investor funds and the imposition of constructive trusts over those assets. *See* ECF Nos. 98, 114, 131. The Court granted two of the Receiver's motions, ordering the owners/occupants of properties in Florida and Georgia to sign Quit Claim Deeds transferring title to the Estate and vacating the premises by dates certain. *See* ECF Nos. 152 and 163.

With respect to the Florida property owned by Mark Haye, the Court entered an order granting the Receiver's motion for turnover and constructive trust, and Mr. Haye subsequently filed a notice of appeal and dozens of motions and other filings seeking to stay enforcement of the Court's order pending appeal. During the Reporting Period, the Receiver continued to enforce the Court's orders, including obtaining relief pursuant to Rule 70 authorizing the Clerk of Court to execute a quit claim deed on Mr. Haye's behalf vesting ownership of the property in the Receivership Estate, and pursuing a writ of possession to secure control of the property. At the same time, the Receiver engaged in protracted negotiations with Mr. Haye to resolve the ongoing disputes, eliminate the risks and expense associated with continued litigation and appellate proceedings, and maximize recovery for the Receivership Estate. Those efforts culminated in a negotiated agreement pursuant to which Mr. Haye agreed to pay $1,600,000 to the Receivership Estate. As part of the agreement, Mr. Haye agreed to dismiss his then-pending appeal before the Eleventh Circuit, eliminating ongoing litigation risk and preventing further delay in the administration of the Estate.

The third motion seeking turnover of and imposition of a constructive trust over real property filed by the Receiver during a prior reporting period involved property located in Indianapolis, Indiana purchased with approximately $1.9 million in misappropriated investor funds and titled in the name of former Drive Planning

agent Gerardo Linarducci and his wife.  *See* ECF No. 131.  Shortly after the Receiver's filing, Mr. Linarducci filed a petition for bankruptcy protection.  *See* ECF No. 151.  During the Reporting Period, the Receiver actively litigated issues arising from the automatic stay by the Bankruptcy Code and pursued relief in the Bankruptcy Court to allow the Receivership Court to confirm the Estate's ownership of the property, pursuant to the definitions of Receivership Assets and Recoverable Assets in the Appointment Order, and recover that property given the imposition of a constructive trust upon it by operation of law when it was acquired, years before the bankruptcy filing, thus making it not property of the Bankruptcy Estate. Following extensive briefing and multiple hearings, the Bankruptcy Court granted the Receiver's motion for relief from the automatic stay, permitting the Receiver to refile the constructive trust motion in the District Court.  After the Reporting Period, the Receiver filed his renewed motion for turnover and constructive trust as to the Indiana property.

In parallel, the Receiver continued to prosecute an adversary proceeding against Mr. Linarducci in the Bankruptcy Court, seeking to exempt from his bankruptcy discharge more than $7.8 million in debts arising from the fraudulent commissions he received from Drive Planning.  The parties have now moved into the discovery phase of the adversary proceeding.

During a prior reporting period, the Receiver filed a Motion for Turnover of and Imposition of a Constructive Trust over the Bliss Condominium Unit owned by Defendant Russell Todd Burkhalter and Relief Defendant Jacqueline Burkhalter (the "Bliss Condominium Unit"), as more than $1 million in Drive Planning investor funds were traced to its acquisition, and seeking an order declaring the Bliss Condominium Unit to be Receivership Property subject to a constructive trust in favor of the Estate. During the prior reporting period, the Court entered an order granting the Receiver's motion, finding that the property is subject to a constructive trust in favor of the Receivership Estate and ordering the turnover of title and possession to the Receiver. *See* ECF No. 246. The Bliss Condominium Unit was turned over to the Receiver, and the Receiver began coordinating necessary repairs and maintenance to the unit to ensure it is in marketable condition and positioned for listing and sale.

During the Reporting Period, the Receiver also worked to resolve his claims against Embry Development Group, LLC ("Embry"), a Georgia-based developer to which Drive Planning had transferred in excess of $6 million, through settlement negotiations and exchanging drafts of a settlement agreement with counsel for Embry. Despite their efforts, however, the parties could not reach an agreement. As such, during the next reporting period, the Receiver will commence an action against Embry to recover the transferred amount.

Also, during the Reporting Period, the Receiver engaged in extensive negotiations with the Estate of Richard A. McNelley and his successors, Vanessa McNelley and Wesley McNelley, who hold the note encumbering the Blue Ridge property, to resolve disputes affecting the property's marketability, including issues related to alleged easements and loan terms. In connection with these efforts, the Receiver conducted discovery, including issuing subpoenas and taking a deposition, and explored potential payoff and sale options. These negotiations ultimately resulted in a resolution in principle, subject to a forthcoming written agreement and Court approval. During the next reporting period, the Receiver will file a motion to approve this proposed resolution.

During the prior reporting period, the Receiver investigated and traced more than $1 million in investor funds from Drive Planning into SFH Holdings and its affiliate, SFHR Development, including funds used in connection with the Whiteland Raceway Park project, and issued a demand for repayment. During the Reporting Period, following the sale of the Whiteland Raceway Park property, $600,000 of the sale proceeds, pursuant to an agreement among the parties, were retained in escrow while the Receiver continues to engage in negotiations regarding the Receivership Estate's claim to such proceeds.

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg,

12

Florida known as Club 201 at the Detroit ("Club 201").  The Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201, LLC, which was granted in the prior reporting period. During the Reporting Period, upon taking control of Club 201, the Receiver identified several issues requiring immediate attention, including that certain taxes and other financial obligations were not being timely paid, which resulted in the freezing of Club 201's operating account, significantly impacting its operations.  As a result, Club 201 quickly located and engaged an accountant to resolve the outstanding issues and prepare the necessary sales tax returns that had not been filed, and the Receiver coordinated Club 201's payment of the outstanding taxes to the Department of Revenue and lifting of the freeze on the account.  The Receiver continued to actively manage and monitor Club 201's operations with the goal of stabilizing the business, preserving its value, and positioning the asset for its sale for the benefit of the Receivership Estate.  And, the Receiver has engaged in discussions with several potential purchasers of Club 201 and is facilitating their due diligence so they are able to present purchase offers.

During the Reporting Period, the Receiver initiated an additional ancillary action against Jon Clement and Trigger Time Gun and Pawn, LLC to recover approximately $1.4 million in investor funds that Drive Planning had improperly transferred to them.  These funds were diverted and used to acquire firearms inventory, fund business operations unrelated to Drive Planning, and pay personal

13

expenses, without any goods, services, or reasonably equivalent value provided to Drive Planning in return. The Receiver asserts claims for actual and constructive fraudulent transfer under the Georgia Uniform Voidable Transactions Act, as well as unjust enrichment, and seeks to avoid and recover the transfers for the benefit of the Receivership Estate and its investors. The matter remains in its early stages, and the Receiver will continue to pursue his claims during the next reporting period.

During the Reporting Period, the Receiver continued to stabilize and operate the Burkhalter Ranch and Staurolite Barn and to liquidate certain associated assets not necessary for operations, for the benefit of the Receivership Estate. The Receiver previously launched and maintained a dedicated asset-sale website (www.ReceivershipAssetSale.com) to market unused and unnecessary ranch equipment, tools, trailers, utility vehicles, furniture, and other personal property to the public, which should facilitate the sale of multiple items and the recovery of funds for the Estate. During the Reporting Period, the Receiver sold certain equipment and furniture that had been purchased with investor funds but were not necessary for ongoing operations or properties, further reducing carrying costs while generating liquidity. With respect to the cattle operation, the Receiver, working with professional ranch management, has undertaken the steps necessary to register eligible cattle, obtain DNA testing where required, and ensure proper documentation so that the animals can be sold at full registered value rather than as unregistered

livestock.  During the Reporting Period, breeding efforts resulting in confirmed pregnancies that will enhance the future value of the herd.  Shortly after the close of the Reporting Period, the Receiver completed the sale of certain heavy equipment and utility vehicles not necessary for ranch operations for approximately $98,000 and sold a steer that was not suitable for the ranch's breeding or operational goals for $3,500.  In addition, the Receiver has taken steps to reduce ongoing expenses by eliminating unnecessary payroll, including discontinuing payments to an event coordinator due to a lack of bookings, while transitioning certain functions to the Receiver's administrative staff to maintain operations more efficiently.  As a result of these efforts, the Receiver has already secured at least one new booking.

During a prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent.  *See* ECF No. 240.  The motion outlined a comprehensive procedure for administering and adjudicating claims of investors and creditors of Drive Planning, including the form of the Legal Notice of Claims Process and Proof of Claim and Release Form.  On August 25, 2025, the Court entered an Order granting the motion and approving the Receiver's proposed claims process.  *See* ECF No. 251.  Since entry of that Order, the Receivership has administered thousands of individualized claim packets, an online claims portal was launched, and Stretto Inc. staffed a dedicated call center and email response team to assist investors with

15

technical issues, uploading documentation, correcting beneficiary information, understanding their pre-calculated net loss amounts, and addressing their disputes with the pre-calculated loss amounts.  During the Reporting Period, the Receiver worked through a substantial volume of objections and disputes submitted by claimants, conducting detailed reviews of supporting documentation, financial records, and investor communications to reconcile and adjudicate each claim.

Further, during the Reporting Period, the Receiver sent more than 2,200 final determinations to claimants, resolving disputed amounts and finalizing net loss calculations for each claimant, and the Receivership has now transitioned into the appeal phase of the claims process, analyzing and preparing responses to certain claimants' appeals of the Receiver's final determinations of their claims and filing a consolidated Response with the Court.  Based on the Court's determination of appeals, the Receiver will then file a motion to approve a distribution plan.

Moreover, during the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically: (i) the Franklin Limestone / Mount View Road Project, which is under contract with a national homebuilder and progressing through final governmental approvals with anticipated repayment by the end of 2026, (ii) the Horton Highway Project, which remains undeveloped and requires additional infrastructure investment and potential

16

parcel sales or restructuring strategies to facilitate recovery, and (iii) the Manchester Pointe Townhomes Project, for which horizontal development is nearing completion and the developer is actively pursuing vertical construction financing anticipated to repay the Receivership Estate by Summer 2026. In connection with the Horton Highway Project, because there is no formal construction financing or loan currently in place to support development, the parcels have been listed for sale, with individual lots being marketed at approximately $1 million each as part of an effort to generate interest and maximize recovery.

During the Reporting Period, the Receiver continued to preserve and manage all remaining assets of the Receivership Estate to maximize their value as they are marketed for sale, including the Live More yacht, equipment, luxury furniture, and vehicles. The Receiver engaged in negotiations with a potential purchaser for the Live More yacht, ultimately reaching an agreement for a purchase price of $1.9 million, subject to the Receiver's addressing various repair and maintenance items and a final sea trial and survey and Court approval. Given that this price reflects or exceeds the current market value of vessel according to Receiver's broker's analysis of market conditions, sales of comparable yachts, and extensive marketing efforts, while also taking into account the significant ongoing costs associated with maintaining the asset, the Receiver believed that selling it pursuant to this agreement would be in the best interest of the Estate. As such, the Receiver filed a motion to

17

approve the sale, and the Court granted that motion.  *See* ECF Nos. 369 and 372. Shortly after the Reporting Period, the sale was completed and the Estate received the net sale proceeds.

During the Reporting Period, the Receiver and his counsel also worked with counsel for the SEC and counsel for the Relief Defendants on a global settlement of the SEC's claims against the Relief Defendants, which included the resolution of issues related to various real properties in Georgia and the Receiver's preparation of documents providing for the transfer of certain properties to the Estate and the retention of other properties by one Relief Defendant and related parties in exchange for payments to the Estate pursuant to secured promissory notes.  As a result of those negotiations, multiple properties are in the process of being turned over to the Receivership Estate.

The Receiver will continue to work diligently with his team of professionals to fulfill his duties under the Appointment Order and report his efforts and activities in status reports and other court filings until such time as the Court may discharge him of his duties.

## II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief against Drive Planning, LLC and Russell Todd Burkhalter, alleging they

operated a massive Ponzi scheme under the guise of real estate-related investment programs.  *See* ECF No. 1.

## A.    Preliminary Injunction and Appointment of Receiver

As detailed in the SEC's initial filings and the Court's prior orders, the SEC filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and continued defrauding of investors.  *See* ECF No. 2.  The Court found that the SEC had established a *prima facie* case of securities law violations by Defendants Burkhalter and Drive Planning, and that the Relief Defendants improperly received funds derived from the fraudulent activities.  *See* ECF No. 11 at ¶¶ 2, 4.  Accordingly, the Court entered a Preliminary Injunction freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting.  *See id.*  On August 13, 2024, the Court also entered an Order Appointing Kenneth D. Murena, Esq., as Receiver over Drive Planning and all assets derived from investor funds.  *See* ECF No. 10.  The Receiver was tasked with, *inter alia*, securing and recovering assets traceable to investor funds, managing and liquidating Receivership assets, and filing quarterly reports with the Court.  *See id.* at ¶¶ 4–7, 54.

### III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER

#### A.    Receiver's Employment of Professionals

Promptly after his appointment, pursuant to his authority under the Appointment Order and with this Court's approval, the Receiver employed legal counsel, forensic accountants, and other professionals to assist in taking possession, custody, and control of all identified assets of Drive Planning, marshaling records and assets in the hands of third parties, affiliates, and insiders of Drive Planning, analyzing and reconstructing Drive Planning's financial records, investigating potential assets and claims of the Estate, developing a secure online portal to obtain information and documents from investors, and otherwise fulfilling his duties under the Appointment Order.  Specifically, the Receiver employed Damian Valori Culmo as his lead counsel ("Lead Counsel"), Henry F. Sewell Jr. LLC as his Georgia counsel ("Georgia Counsel"), and Hays Financial Consulting LLC as his forensic accountant and financial advisor ("Forensic Accountant").  *See* ECF Nos. 21, 24.

Further, the Receiver employed Preti Flaherty Beliveau & Pachios, LLP as counsel in New Hampshire to assist with litigation pending against Drive Planning, and Johnathan Pikoff as counsel in San José del Cabo, Mexico, to take control of and facilitate the marketing and sale of real property of the Receivership Estate and ensure the sale proceeds are transferred to the Estate.  *See* ECF Nos. 46, 47.

Additionally, the Receiver obtained the Court's approval to employ Stretto Inc. to set up and manage a secure online portal through which investors can upload information and documents necessary for the Forensic Accountant to complete the reconstruction of Drive Planning's accounts and which will facilitate the processing of claims in any claims process that may be approved by the Court and implemented by the Receiver in this Receivership. *See* ECF No. 37. Finally, the Court approved the Receiver's employment of a captain to maintain the 70-foot yacht of which the Receiver took control and began marketing for sale. *See* ECF No. 42.

During a prior reporting period, the Receiver sought and obtained the Court's approval to employ Bose McKinney & Evans LLP as his local bankruptcy counsel in Indiana. *See* ECF Nos. 240, 242. Bose McKinney & Evans, through partner James P. Moloy, was engaged to represent the Receiver in the Chapter 13 bankruptcy case filed by former Drive Planning agent Gerardo Linarducci (Case No. 25-03768-JMC-13) in the United States Bankruptcy Court for the Southern District of Indiana.

**B.      Securing and Reviewing Books and Records of Drive Planning**

During the Reporting Period, the Receiver continued to take steps to obtain, secure, organize, and review the books and records of Drive Planning in compliance with the Appointment Order. The Receiver and his team continued the review of these records to identify communications, transaction histories, and other documents

21

that assisted in tracing investor funds and determining the extent, use, and location of assets of the Receivership Estate.

### 1. Subpoenas

During prior reporting periods and the Reporting Period, the Receiver issued a number of subpoenas to third parties believed to have received investor funds or engaged in transactions with Drive Planning, its principal, and/or affiliated entities. These subpoenas are part of the Receiver's ongoing effort to trace the flow of misappropriated investor funds and identify recoverable assets.

During a prior reporting period, the Receiver issued a cease-and-desist letter to Wesley McNelley, the son of the deceased lender for property on Blue Ridge Drive in Georgia owned by Relief Defendant TBR Supply House, Inc., directing him to stop asserting the existence of a purported seventy-foot easement and an exorbitant prepayment penalty under the note secured by the property, which were determined to be unsupported by the public record and loan documents and which were impeding the Receiver's marketing and sale of the property. Shortly thereafter, the Receiver served a Subpoena for Deposition Duces Tecum on Mr. McNelley seeking documents and testimony concerning the Blue Ridge Drive property, including his communications with Defendant Burkhalter and Relief Defendant Jacqueline Burkhalter, Drive Planning, and any claimed encumbrances or ownership interests. Mr. McNelley, through counsel, produced responsive materials, and his

deposition was taken on September 19, 2025. During the Reporting Period, the Receiver worked to negotiate a potential loan payoff in connection with a prospective sale of the property, but Mr. McNelley's baseless easement claim and payoff demand resulted in the potential purchaser withdrawing its offer. Thereafter, the Receiver and counsel for Mr. McNelley engaged in discussions to resolve all issues related to the disposition of the property and the related loan and mortgage and, during the Reporting Period, reached an agreement in principle. Upon finalizing that agreement, the Receiver will confer with the parties to the enforcement action and present it to the Court for approval.

## 2. Analysis of Records and Consolidation of Investor Accounts

During the Reporting Period, the Receiver and his forensic accounting team continued analyzing Drive Planning's financial records and investor transaction data to ensure accurate calculation of each investor's net loss. This review included identifying and reconciling accounts in which investors transacted through limited liability companies or other entities, rather than in their individual names. In several instances, the same individuals both invested and received commissions through affiliated entities, requiring consolidation of those accounts to avoid duplication and properly determine their net investment position.

The Receiver's forensic accountant completed the cross-referencing of deposits, withdrawals, and commission payments across personal, joint, and entity

23

accounts to produce a comprehensive money-in, money-out analysis for each claimant. This work ensured that all investments, redemptions, and commission payments were attributed to the correct beneficial owner and formed the basis of each claimant's pre-filled allowed claim amount under the Court-approved claims process.

### 3. Demand Letters to Agents and Third-Parties

Based on the Receiver's forensic analysis and reconstruction of Drive Planning's financial records, during prior reporting periods, the Receiver issued demand letters to numerous former agents and advisors of Drive Planning who received commissions funded by investor monies in return for procuring investments in Drive Planning's fraudulent scheme. The letters demanded the return of commissions to the Receivership Estate and detailed the Receiver's legal claims under the applicable fraudulent transfer statutes, as well as unjust enrichment. For those agents who were also investors and had no knowledge of the fraudulent nature or activities of Drive Planning, the Receiver considered the amounts they invested and the investment returns and commissions they received from Drive Planning in determining whether they received a recoverable net gain (as a fraudulent transfer and/or unjust enrichment) or suffered a net loss. For those investor/agents who suffered a net loss, the Receiver determined that no recovery was warranted and withdrew his demand letters.

During the prior reporting period and the current Reporting Period, the Receiver received partial or full payments from certain recipients of the demand letters and actively negotiated with others who were not named as defendants in the Court-authorized ancillary action the Receiver filed against Drive Planning agents who had received significant commissions.  Shortly following the Reporting Period, the Receiver will be filing a complaint in the U.S. District Court for the Northern District of Georgia against those agents (including agent/investors who received net gains) with whom the Receiver is unable to reach settlements for the repayment of some or all of the commissions (or net gains) they received.

### 4.    Demand Letters to Net Winners

The Receiver is also continuing efforts to maximize recoveries for the Receivership Estate through the pursuit of claims against "net winners," defined as individuals or entities that received transfers from Drive Planning in excess of any principal investment they made without providing equivalent value to Drive Planning in exchange for the excess received.  In furtherance of these efforts, during the Reporting Period, the Receiver began issuing demand letters to such net winners seeking the return of those funds for the benefit of defrauded investors.  During the next reporting period, the Receiver anticipates completing the initial round of these demand letters, engaging in negotiations where appropriate, and, if necessary, initiating litigation to recover the net gains.

25

C.    **Real Property, Businesses, and Personal Property in Which Receivership Estate Has an Interest**

Upon his appointment, the Receiver immediately reviewed the SEC's analysis of Defendants' and Relief Defendants' interests in real property and associated personal property and businesses and began marshaling those assets, taking control of or monitoring those businesses as directed in the Appointment Order, and demanding turnover of all such assets held by third parties to the extent there is equity and value for the Receivership Estate.

1. **Real Properties and Businesses in Georgia, Florida, Indiana, and Mexico**

    *i.    Efforts to Sell Properties*

During the Reporting Period, the Receiver, with the assistance of reputable and experienced realtors, continued the process of marketing the Georgia, Florida, Indiana, and Mexico properties for sale. Additionally, the Receiver continued to collect rent for tenant occupied properties generating $61,953.42 in income during the Reporting Period.

Based on a review of the acquisition history and independent market evaluations, the Receiver determined that many of these properties were acquired at the height of the respective real estate markets or for prices significantly above market value. During the Reporting Period, the Receiver lowered the listing prices for certain properties for which no purchase offers were received. Additionally, the

Receiver obtained appraisal reports for select properties, which confirmed that their current fair market values are substantially lower than the original purchase prices.

During the Reporting Period, and pursuant to Court approval (ECF Nos. 311, 337, 348, 365), the Receiver closed on the sales of three properties: (i) the St. Petersburg, Florida condominium unit sold for $1,825,000; (ii) the Panama City Beach, Florida condominium unit sold for $217,509, (iii) a Sumter County, South Carolina condominium unit sold for $185,000, and (iv) another Sumter County, South Carolina Property for $173,000. Further, the Receiver sought and obtained Court approval to sell the condominium unit in San José del Cabo, Mexico for $4,138,000. *See* ECF Nos. 377 and 378.

After the Reporting Period, the Receiver requested and obtained Court approval for the sale of Regency Villas for $2,650,000. *See* ECF Nos. 396 and 398. Additionally, the Receiver sought and obtained Court approval for the sale of one property in Montevallo, Alabama for $160,000. *See* ECF Nos. 386, 387, 397, 399. The Receiver also sought and obtained Court approval for the sale of one property in Sumter County, South Carolina for $164,000, which subsequently closed. *See* ECF Nos. 384 and 385. Finally, after the Reporting Period, the Receiver entered into an agreement for the sale of another property in Sumter County, South Carolina for $162,500 and intends to seek Court approval of that sale shortly. The Receiver anticipates that these sales will close during the next reporting period.

27

### ii.    Property in Florida

During the Reporting Period, the Receiver, with the assistance of a property manager, continued to rent out units at a multi-unit apartment complex named Regency Villas located in St. Petersburg, Florida.  The rental income from this multi-unit property was used to fund necessary maintenance, repairs, and utilities for the property, and the property manager's salary, and the surplus income is held in the operating account at Truist Bank that the Receiver is using to manage the property. After the Reporting Period, the Receiver sought and obtained Court approval to sell Regency Villas for $2,650,000, which sale is expected to close during the next reporting period.  *See* ECF Nos. 396 and 398.

During prior reporting periods, the Receiver took control of, made repairs to, marketed for sale, entered into Purchase and Sale Agreements for, and sought and obtained Court approval of the sale of, condominium units located in St. Petersburg, Florida and Panama City Beach, Florida.  *See* ECF Nos. 306, 311, 333, and 337. During the Reporting Period, the Receiver closed on the sale of that property for $217,509.

### iii.    The Burkhalter Ranch

During the Reporting Period, the Receiver continued overseeing operations of the Burkhalter Ranch and made several key staffing and cost-efficiency improvements.  Following the Receiver's decision to reduce ranch management

28

hours to align with current operational needs and budget, during the prior reporting period, former ranch manager Mark Gregory resigned.  The Receiver subsequently retained Sean Cook as the new ranch manager.  Mr. Cook has proven to be both cost-effective and highly capable, implementing improved maintenance procedures and exploring new opportunities for revenue generation, including registration of the herd with the American Highland Cattle Association to increase the market value of the calves.

Under Mr. Cook's supervision, the Receiver employed one full-time ranch hand and one part-time ranch hand to assist with maintenance, livestock care, and property management.  The Receiver also continued to reduce operational costs by eliminating unnecessary service contracts, including outsourced garbage collection and landscaping, and by utilizing ranch staff to perform repairs and maintenance in-house.  These changes have lowered expenses while maintaining the property and equipment in marketable condition.

During the Reporting Period, the Receiver identified and listed multiple pieces of ranch equipment that were not necessary for ongoing operations for sale through the Receivership's asset sales platform.  In addition, the Receiver listed cattle for sale through the same platform and continues to evaluate the appropriate timing and structure of future livestock sales to maximize the recovery by the Receivership Estate.  During the Reporting Period, the Receiver liquidated certain equipment

29

through an auction process, resulting in the successful sale of seven items. The assets sold included a Kubota excavator ($49,000), a Kubota skid steer ($33,000), a Land Pride seed drill ($13,000), two six-seater carts for $4,700 and $4,100, respectively, and two excavator buckets for $800 each

In parallel, the Receiver has been working to obtain and confirm historical records, lineage information, and registration eligibility for the herd through the American Highland Cattle Association.  This process is ongoing and is intended to ensure accurate classification and documentation of the cattle, which the Receiver believes will improve transparency for potential buyers and increase potential sale proceeds for the Estate.  The Receiver has also confirmed that the remaining cattle have been bred and some of the cows are now pregnant, which is expected to further enhance the market value and overall attractiveness of the herd to prospective purchasers.

*iv.    Staurolite Barn*

Staurolite Barn is a luxury event venue located on the Ranch.  The venue is being marketed for sale together with the Ranch, and its potential as a revenue-generating event space is expected to increase the overall sale price.  During the Reporting Period, event coordinator Shelby Cook stopped working at Staurolite Barn, and the Receiver assumed oversight of ongoing venue operations and bookings.  To date, the Receiver has secured one wedding event.  The Receiver has

also continued efforts to identify and reduce expenses associated with managing and marketing the venue and is evaluating the potential engagement of a part-time contractor to assist with in-person showings to potential customers and/or serve as the on-site coordinator during any booked events.

###### v. Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC

During the Reporting Period, the Receiver continued efforts to secure and recover Receivership assets associated with Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC, which collectively received approximately $1.4 million in investor money transferred from Drive Planning. On September 11, 2025, the Receiver issued a cease-and-desist letter to Mr. Clement demanding that he immediately halt all sales and operations involving firearms, ammunition, and related merchandise held at the Blue Ridge, Georgia location, after learning that he was continuing to operate the business and dispose of Receivership assets without remitting any portion of the sale proceeds to the Estate, in violation of the Court's Appointment Order.

Despite repeated demands, Mr. Clement failed to cooperate or to conduct the agreed-upon liquidation of inventory and turnover of proceeds. The Receiver therefore served Subpoenas for Deposition Duces Tecum on Mr. Clement individually and on Trigger Time Gun and Pawn, LLC requiring production of financial records, bank statements, inventory lists, and communications related to

31

the $1.4 million transfer from Drive Planning and subsequent use of those funds. Mr. Clement and Trigger Time Gun and Pawn, LLC did not initially comply with the subpoenas and delayed their appearance for deposition and threatened to take actions against the Receivership Estate's interest in TBR Outdoor Supply, LLC, which would violate the Appointment Order.

During the Reporting Period, as a result of his continued non-compliance with the Receiver's demands, and misappropriation of Receivership property, the Receiver filed an ancillary action seeking to recover the $1.4 million transferred to Mr. Clement and Trigger Time Gun and Pawn, LLC, asserting claims for fraudulent transfer and unjust enrichment under Georgia law. This action remains in its early stages, and the Receiver is in the process of pursuing discovery and evaluating all available remedies to recover these funds for the benefit of the Receivership Estate.

vi.    *Club 201 at the Detroit in St. Petersburg, Florida*

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg, Florida known as Club 201 at the Detroit ("Club 201"). The Receiver was tasked with monitoring its operations pursuant to the Appointment Order. The Receiver traced transfers totaling $861,839.65 from investor-funded accounts to Club 201. After Mr. Burkhalter declined to turn over Club 201 to the Receiver so it could be sold and the proceeds could be remitted to the Estate, on October 3, 2025, the

32

Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201 LLC, including all its Assets and Membership Interest [ECF No. 293], requesting that the Court declare the business to be property of the Receivership Estate and compel immediate turnover of all assets, membership interests, and operations to the Receiver.

During a prior reporting period, the Court granted the Receiver's Motion [ECF No. 293], determining that Club 201 constitutes property of the Receivership Estate and authorizing the Receiver to take control of the business and its related assets.  *See* ECF No. 339.

After obtaining control of Club 201, the Receiver began evaluating options for disposition of the business in a manner designed to maximize the recovery by the Estate.  The Receiver has been approached by multiple prospective purchasers expressing interest in acquiring Club 201 and, during the Reporting Period, provided them with financial records of the business, subject to executed non-disclosures agreements, to facilitate their due diligence and submission of purchase offers. During the next reporting period, the Receiver expects to receive offers to purchase Club 201.

In connection with the Receiver's review of Club 201's records and operations, the Receiver identified certain outstanding sales tax issues that needed to be resolved prior to any sale or transfer of the business.  During the Reporting

33

Period, the Receiver investigated the nature and scope of these issues and coordinated with the appropriate taxing authorities to determine and pay the amounts owed and take other steps necessary to bring the business into compliance. In addition, the Receiver identified liens and other encumbrances affecting Club 201 that will need to be addressed or resolved in order to deliver clear title to any buyer and effectuate a sale of the business. The Receiver continues to analyze these matters and will take appropriate steps to resolve them in the most cost-effective manner possible.

### 2. Real Properties in South Carolina and Alabama

During a prior reporting period, the Receiver reached an agreement with David Bradford, a former Drive Planning agent, providing for his turnover of eleven rental homes in Sumter County, South Carolina and two properties in Montevallo, Alabama to the Receivership Estate. During the Reporting Period, the deeds transferring these properties to the Receivership Estate were properly recorded. The Receiver has taken operational control of the properties to maintain and preserve their value and is collecting rent from existing tenants to cover the maintenance expenses and generate income for the Receivership Estate. Also, during the Reporting Period, multiple properties were listed for sale, and the Receiver closed on the sale of a condominium unit in Sumter County, South Carolina for $185,000, which sale was approved by the Court during the prior reporting period. *See* ECF

No. 348.  Finally, during the Reporting Period, the Receiver sought and obtained Court approval of and closed on the sale of another property in Sumter County, South Carolina for $173,000.  *See* ECF Nos. 360 and 365.

After the Reporting Period, the Receiver sought and obtained Court approval for the sale of another property in Sumter County, South Carolina for $164,000.  *See* ECF Nos. 384 and 385.  And, the Receiver sought and obtained Court approval for the sales of one property in Montevallo, Alabama for $160,000.  *See* ECF Nos. 386, 387, 397, 399.  Finally, after the Reporting Period, the Receiver entered into an agreement for the sale of another property in Sumter County, South Carolina for $162,500 for which the Receiver will seek Court approval after conferring with the parties.  The Receiver expects all of the foregoing sales to close during the next reporting period.

### 3.  Investment in Real Property in Medellin, Colombia

During the Reporting Period, the Receiver continued to investigate Drive Planning's $1,200,000 investment in the boutique hotel project in Medellín, Colombia known as "La Casa Project."  Although the project was promoted in Drive Planning's marketing materials as a forthcoming luxury development, all indications suggest it remains in the pre-construction phase.  The Receiver made repeated efforts to engage with individuals and entities associated with the project, including prior contacts and other affiliated parties. Those outreach efforts, however, have yielded

35

limited responses and no new substantive information.  The Receiver is continuing to explore alternative avenues to obtain documentation and verify the current status and location of the project to assess potential recovery options.

### 5.  Real Property Owned or Occupied by Third-Parties

During a prior reporting period, the Receiver identified a number of properties that were purchased by Drive Planning or with funds traceable to its investors but are not currently owned by Drive Planning and/or are occupied by third parties who have refused to turn them over to the Estate, notwithstanding the Receiver's demands pursuant to the Appointment Order.

During the prior reporting period, the Receiver filed motions against former Drive Planning agents and/or high-level insiders Mark Haye, Julie Ann Edwards, and Gerardo Linarducci, seeking the turnover of real properties acquired with misappropriated investor funds and the imposition of constructive trusts over those assets.  *See* ECF Nos. 98, 114, 131.

The Court granted the Receiver's motion for turnover and constructive trust as to Mr. Haye's luxury condominium unit in St. Petersburg, Florida (the "Haye Property"), which was purchased for approximately $1.4 million using investor funds transferred from a Drive Planning bank account.  *See* ECF No. 152.  After the Court's ruling, Mr. Haye launched a campaign of serial filings seeking to reverse the Court's ruling, which caused the Estate to incur further and unnecessary expenses.

36

Further, Mr. Haye filed a notice of appeal of the Court's Opinion and Order granting the Receiver's motion for constructive trust to the Eleventh Circuit Court of Appeals.

Pursuant to the Opinion and Order, the Receiver filed a motion under Federal Rule of Civil Procedure 70 requesting that the Court authorize the Clerk of Court to execute a Quit Claim Deed transferring title of the Haye Property to the Receivership Estate. The Court granted the motion, the clerk executed the deed, and title to the property was then held by the Receiver.

Thereafter, the Receiver took actions to remove Mr. Haye from the property, including obtaining a Writ of Possession from the U.S. District Court for the Middle District of Florida in which the property is located so it could be marketed for sale. During the Reporting Period, the Receiver negotiated an agreement with Mr. Haye that would provide for a substantial and immediate monetary recovery for the Receivership Estate in exchange for deeding of the property to Mr. Haye. The agreement was approved by the Court, and during the Reporting Period Mr. Haye paid $1,600,000 to the Receivership Estate and dismissed his Eleventh Circuit appeal, thereby eliminating ongoing litigation risk and preventing further delay in the administration of the Estate. In exchange, the Receiver transferred ownership of the property back to Mr. Haye.

The Court also granted a similar motion for turnover and constructive trust against Ms. Edwards with respect to a personal residence in Cumming, Georgia (the

37

"Edwards Property"), which was purchased for approximately $630,000 using investor funds transferred from a Drive Planning bank account. *See* ECF No. 163. During the prior reporting period, Ms. Edwards executed a Quit Claim Deed, which has since been recorded, transferring title to the Receivership Estate. Ms. Edwards requested permission to remain in the property as a tenant, paying monthly rent, homeowners' association fees, and property insurance while the property is marketed for sale. The Receiver agreed to permit Ms. Edwards to remain in the property under a rental arrangement that will generate income for the Receivership Estate while ensuring the property remains maintained and insured during the marketing period. During the Reporting Period, the Receiver continued to collect rent from Ms. Edwards.

The Receiver also filed a motion seeking turnover of and imposition of a constructive trust over a residential property in Indianapolis, Indiana, purchased with investor funds for approximately $1.9 million for the benefit of Drive Planning agent Gerardo Linarducci. *See* ECF No. 131. Shortly after the Receiver's filing, Mr. Linarducci filed a petition for bankruptcy protection. *See* ECF No. 151. During the Reporting Period, the Receiver actively litigated issues arising from the automatic stay imposed by the Bankruptcy Code and pursued relief in the Bankruptcy Court to allow the Receiver to refile his constructive trust motion so this Court could confirm the Estate's ownership of the property, pursuant to the definitions of Receivership

Assets and Recoverable Assets in the Appointment Order.  As explained in the Receiver's motion, a constructive trust was imposed upon the Indiana property by operation of law when it was acquired with funds fraudulently obtained from investors, years before Mr. Linarducci's bankruptcy filing, thus making it not property of the Bankruptcy Estate.  Following extensive briefing and multiple hearings, the Bankruptcy Court granted the Receiver's motion for relief from the automatic stay, permitting the Receiver to refile the constructive trust motion in this Court. After the Reporting Period, the Receiver filed his renewed motion for turnover and constructive trust as to the Indiana property.

In parallel, the Receiver continued to prosecute an adversary proceeding against Mr. Linarducci seeking to exempt from his bankruptcy discharge more than $7.8 million in debts arising from the fraudulent commissions he had received from Drive Planning.  During the Reporting Period, the Bankruptcy Court denied Mr. Linarducci's motion to dismiss the Receiver's claims.  After the Reporting Period, the Receiver propounded written discovery requests on Mr. Linarducci.

**5.  Deeds of Trust and Investments in Real Property in Tennessee**

During the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically:

1. <u>Franklin Limestone / Mount View Road Project (Davidson County)</u>: The Court previously approved the Receiver's

unopposed motion to reallocate $600,000 in investor funds from the stalled Franklin Limestone Project to the Mount View Road Project. The new project, a 54-unit townhome development, is supported by a letter of intent from a national homebuilder and provides the Receivership Estate with a first-lien position. It is currently under contract with the national builder for $5.8 million and is progressing toward final governmental approvals. This property has little debt in comparison to its value. The builder anticipates that he will be able to repay the entire investment to the Receivership Estate by the end of 2026.

2. <u>Horton Highway Project (Williamson County)</u>: Drive Planning transferred $4,534,400 to Canaan Builders, LLC, in connection with a planned six-lot subdivision for luxury residential development. The project was structured to be fully funded by Drive Planning, and as a result remains stalled. The builder has been unable to obtain a construction loan due to Drive Planning's existing first-lien position. During the Reporting Period, the Receiver evaluated the current status of the project, including the fact that all six lots remain undeveloped, and that additional capital would be required to complete a necessary bridge (required to access the lots) at approximately $500,000. The Receiver also reviewed recent appraisals valuing the individual lots for their potential listing. Although the subdivision has received permit approvals, meaningful recovery of invested capital may require either securing construction financing to complete home builds or implementing a restructuring strategy involving partial lien releases and lot sales to fund the bridge for access. During the Reporting period, the six lots were listed for sale for $1,000,000.

3. <u>West Meade Hills Project (Davidson County)</u>: Drive Planning also transferred $615,000 to Canaan Builders, LLC, secured by property in the West Meade Hills subdivision. In a prior reporting period, the Receiver recovered the full $615,000 investment upon sale of the property. Additionally, the Receiver successfully negotiated the payment of $20,000 in interest to the Receivership Estate.

4. <u>Manchester Pointe Townhomes Project (Coffee County)</u>: Drive Planning invested $2,200,000 in Manchester Pointe Townhomes, LLC, secured by a deed of trust on 23.65 acres in Coffee County. The funds were allocated for horizontal development of a multi-phase apartment complex. The development phase remains ongoing, and site plans for vertical construction are actively being prepared. The project is planned to proceed in multiple phases, including an initial phase of approximately 100 units followed by a second phase of approximately 152 units. During the Reporting Period, the Receiver continued to monitor the progress of the Manchester Pointe Townhomes project, which remains active and advancing in accordance with its long-term development timeline. The horizontal development work is expected to be completed within the next 90 days, and the developer is in the process of finalizing plans for vertical construction. In parallel, the developer is actively working to secure construction financing for the vertical phase, which would enable the developer to repay the entire investment to the Receivership Estate. The builder anticipates the Estate will have its investment returned as soon as Summer 2026.

During the next reporting period, the Receiver will continue to devise and seek to implement the most cost-effective strategies for recovering the funds that Drive Planning had transferred for the real estate developments.

**6. Transfers to Embry Development Company for Real Estate Projects**

During the Reporting Period, the Receiver continued settlement discussions and financial analysis of Drive Planning's investment with Embry Development Company and its principal, which collectively had received approximately $6.7 million from Drive Planning. Given that a settlement has not been reached, during

the next reporting period, the Receiver will file a lawsuit against Embry to recover the $6.7 million investment.

### 7.  Drive Plan Financial Services LLC

During the Reporting Period, the Receiver continued investigating Drive Plan Financial Services, LLC ("DPFS"), which was formed jointly by Drive Planning, LLC (80%) and Accelerated Financial Services, Inc. (20%), an entity owned by former Drive Planning agent James Thomasson.  The Receiver confirmed that investor funds totaling $675,724.97 were used to purchase commercial property located on Carpenter Drive in Sandy Springs, Georgia (the "Sandy Springs Property") on May 1, 2024.  Title was taken in the name of DPFS.

Following the commencement of the Receivership, the Receiver discovered that in October 2024, Mr. Thomasson, acting without authority, sold the Sandy Springs Property for $650,000 and executed all sale documents as the purported "sole member" of DPFS.  The sale was partially seller-financed through a $550,000 promissory note maturing on October 1, 2026, with only $98,000 received in cash at closing.  These actions violated the DPFS Operating Agreement and the Court's Appointment Order, as the Receiver did not consent to the sale or receive any sale proceeds or an assignment of the note.

On September 18, 2025, the Receiver issued a demand to Mr. Thomasson to turn over the $675,724.97 in investor funds misappropriated through the purchase

and sale of the Sandy Springs Property and notifying him that his conduct constituted a willful violation of the Court's Order.  Following this demand, Mr. Thomasson engaged in communications with the Receiver's counsel and agreed to assign all rights and future payments due under the seller-financed note to the Receivership Estate, including the October 2026 balloon payment of $430,000.

The Receiver prepared a formal Assignment of LLC Membership Interest and Withdrawal as Member, pursuant to which Accelerated Financial Services, Inc. would transfer its 20% ownership interest in DPFS to the Receiver, consolidating control of the company within the Receivership Estate.  During the prior reporting period, the assignment was executed.  The Receiver continues receiving $5,000 per month in payments from the tenant/buyer of the Sandy Springs Property.  During the Reporting Period, the Receiver continued to negotiate with Mr. Thomasson to finalize the transfer of money that he had received from Drive Planning or DPFS.

### 8.  Personal Property

#### i. Luxury Furniture

During prior reporting period, the Receiver contacted five consignment shops (Sarah Cyrus Home, Swoox Curated Consignment, Southern Comforts New & Consigned, Board of Trade Fine Consignments, and Whiskey Creek Furniture Consignments) to explore options for liquidating the high-end furnishings that the Receiver is storing in a secure storage facility.  The Receiver provided a detailed

price list and photo catalog to the vendors and received preliminary pricing feedback from three of them; however, the proposed consignment values were significantly below market expectations and would yield minimal recovery for the Estate.  As a result, during the Reporting Period, the Receiver began exploring alternative options, including estate sales or bulk liquidation, to maximize the Estate's recovery and facilitate prompt disposition of the furnishings.  The Receiver previously launched and maintained a dedicated asset-sale website (www.ReceivershipAssetSale.com) to market the luxury furniture.  During the Reporting Period, the Receiver's office responded to requests from potential purchasers for details regarding various items of furniture and furnishings and the procedures and logistics for the sale and shipment of the items.

### ii. "Live More" Yacht

During the initial reporting period, the Receiver identified and took control of the "Live More" yacht, a 70-foot Galeon 680 Fly purchased by Mr. Burkhalter for $3,386,004 using Drive Planning's funds derived from investors.

During the Reporting Period, the Receiver continued to maintain and market for sale the *Live More* yacht.  The Receiver received an initial offer to purchase the yacht in the amount of approximately $1.7 million subject to the Receiver's addressing a list of issues identified by the potential purchaser. Through negotiations conducted by the Receiver and his retained yacht broker, and without the Receiver

44

issuing a counteroffer, the prospective purchaser increased the proposed purchase price to $1.85 million and then to $1.9 million. The Receiver and his yacht broker determined that the increased offer closely approximated if not exceeded the fair market value of the yacht under current market conditions. Accordingly, the Receiver executed a Purchase and Sale Agreement, received the required deposit, and sought and obtained SEC and Court approval for the sale during the Reporting Period. The transaction successfully closed shortly thereafter, resulting in a substantial recovery for the Receivership Estate.

### 9.  SFHR Development LLC (Sarah and Andy Fisher)

During the prior reporting period, the Receiver began investigating Drive Planning's ownership stake in the Whiteland Raceway Park property. The Receiver requested copies of all agreements and communications related to (1) the sponsorship arrangement between Drive Planning and SFHR Development LLC, and (2) any agreements concerning the acquisition or investment in the Whiteland Raceway go-kart facility, to determine whether investor funds were properly used and whether any recovery is available to the Receivership Estate. The Receiver investigated and traced more than $1 million in investor funds from Drive Planning into SFH Holdings and its affiliate, SFHR Development, LLC, including funds that were used for marketing and sponsorship activities and funds that were applied toward the acquisition and operation of the Whiteland Raceway Park property. Of

45

the amount transferred, $500,000 was paid pursuant to a May 2024 Unit Purchase Agreement under which Drive Planning had agreed to purchase up to a 50% membership interest in SFH Holdings for a total purchase price of $1,250,000, with the remaining funds expended on marketing, advertising, and sponsorship activities promoting the Whiteland Raceway Park project.   Under the Unit Purchase Agreement, Drive Planning's ownership interest was to be issued incrementally "per transaction" as installment payments were made, and Drive Planning made only the initial $500,000 payment.  As a result, Drive Planning's $500,000 payment vested 20 units, representing a 20% membership interest in SFH Holdings.

The Receiver issued a formal demand for repayment of the misappropriated investor funds.  When SFH Holdings advised that it intended to sell the Whiteland Raceway Park property, the Receiver asserted a claim to the sale proceeds based on the traced transfers and required that a portion of the proceeds be placed into escrow pending a resolution of the Receiver's claim after the transaction closed.  That arrangement was memorialized in a written Escrow Agreement among SFH Holdings, the Receiver, and the Escrow Agent, which requires that $600,000 of the sale proceeds be held in escrow and may be released only by written agreement of SFH Holdings and the Receiver or by court order, preserving a source of recovery for the Receivership Estate while negotiations continue.  During the Reporting Period, the Receiver received confirmation that the $600,000 is being held in escrow

46

and is currently negotiating with SFH Holdings, who is maintaining it may have an interest in these funds.

## 10.    Bradford Private Placement Investments

During the Reporting Period, the Receiver's counsel undertook a comprehensive review and analysis of the subscription agreements, operating agreements, and other governing documents for each of the seven private placement investments that Mr. Bradford transferred to the Receivership Estate pursuant to the Voluntary Asset Transfer Agreement and related assignment documents. That review was designed to identify the transfer restrictions applicable to each investment, assess the Receiver's authority under the Appointment Order to act in Mr. Bradford's stead, and determine the specific steps required to formally substitute the Receivership Estate as the recognized investor or member in each asset. The Receiver's counsel prepared analyses of each investment's governing documents and developed a strategy for effectuating the transfers in a manner consistent with both the Appointment Order and the applicable organizational documents.

Having completed that review, the Receiver commenced outreach to the fund managers, administrators, and relevant counterparties associated with each investment to provide notice of the receivership, assert the Receiver's authority under the Appointment Order, and take all steps necessary to ensure proper recognition of the Receivership Estate as the substituted member or investor. During

47

the Reporting Period, the Receiver coordinated and participated in telephone conferences with representatives of Ascension Property Development, LLC, the Georgia-based entity in which Mr. Bradford holds a 30% membership interest in connection with the Booth Place Apartments project, and with representatives of Viking Real Estate Fund, LLC, in which Mr. Bradford's interest is held through D&G Legacy, LLC. Those discussions focused on the mechanics of recognizing the Receiver as Mr. Bradford's successor-in-interest, the process for directing all future distributions to the Receivership Estate, the current status and valuation of each investment, and the steps required to formally record the transfer on each entity's books and records. The Receiver will continue to pursue the formal recognition of the Estate's interests in these and the remaining investment vehicles during the next reporting period.

### D.    Known Investors and Creditors

The Receiver is aware of nearly 2,400 investors who transferred more than $380,000,000 to Drive Planning. The Receiver and his Forensic Accountant completed the forensic reconstruction of Drive Planning's accounts, which reflects losses to investors of approximately $220 million. All investor deposits and distributions have been reported to the Court in the Receiver's Sworn Accounting. ECF No. 81. Through the Court-approved claims process, which the Receiver commenced during the prior reporting period and continued to implement during the

48

Reporting Period, the Receiver confirmed the investors who actually suffered losses and the precise amounts of those losses.

### E.  Investor Communications

The Receiver and his team have devoted significant time and effort to communicating with investors of Drive Planning.  Soon after his appointment, the Receiver set up a dedicated telephone line and an email address for investors to communicate with the Receiver's office and obtain information regarding the enforcement action and the Receivership, and created a website (www.DrivePlanningReceivership.com), which contains a summary of this action, important court filings, key dates and deadlines, answers to frequently asked questions, and other information relevant to investors.  During the Reporting Period, the Receiver responded to hundreds of investor inquiries by email and telephone regarding the status of the Receivership Estate, the deadlines and requirements of the Court-approved  claims process and future distributions, concerns regarding tax reporting issues, the submission of information regarding their investments and losses and supporting documents, confirmation of their contact information, and other issues.

### F.  Claims Process

During the prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims

Processing Agent.  See ECF No. 240.  The motion outlined a comprehensive procedure for administering and adjudicating claims of investors and creditors of Drive Planning, including the form of the Legal Notice of Claims Process and Proof of Claim and Release Form.  On August 25, 2025, the Court entered an Order granting the motion and approving the Receiver's proposed claims process.  *See* ECF No. 251.  Since entry of that Order, the Receivership has administered thousands of individualized claim packets, an online claims portal was launched, and Stretto Inc. staffed a dedicated call center and email response team to assist investors with technical issues, uploading documentation, correcting beneficiary information, understanding their pre-calculated net loss amounts, and addressing their disputes with the pre-calculated loss amounts.  During the Reporting Period, the Receiver worked through a substantial volume of objections and disputes submitted by claimants, conducting detailed reviews of supporting documentation, financial records, and investor communications to reconcile and adjudicate each claim.  During the Reporting Period, the Receiver sent more than 2,200 final determinations to claimants, resolving disputed amounts and finalizing net loss calculations for each claimant, and the Receivership has now transitioned into the appeal phase of the claims process, analyzing and preparing responses to certain claimants' appeals of the Receiver's final determinations of their claims and filing a consolidated

Response with the Court.  After the Court makes its determinations of the appeals, the Receiver will file a motion to approve a distribution plan.

### G.    Identifying and Pursuing Liquidated and Unliquidated Claims

During the Reporting Period, the Receiver continued investigating whether Drive Planning holds liquidated and unliquidated claims against third parties, affiliates, insiders, and investors of Drive Planning who received net gains.

The Receiver and his professionals will continue to analyze potential sources of recovery and gather evidence for purposes of developing and pursuing the Receivership Estate's claims to recover funds or other assets belonging to or improperly transferred from Drive Planning, including without limitation turnover and fraudulent transfer actions.  During a prior reporting period, the Receiver prepared and filed a motion for authority to commence ancillary actions to recover commissions from Drive Planning agents, net gains from investors, and other amounts from third parties and to approve settlement procedures to streamline the resolution of claims before and during litigation.  Thereafter, the Court granted that motion and the Receiver finalized and filed a complaint commencing an ancillary action in the U.S. District Court for the Northern District of Georgia, Case No. 1:25-cv-04587-VMC, asserting fraudulent transfer and unjust enrichment claims against forty-six agents, seeking to recover the commissions they had received from Drive Planning in connection with bringing investors into the Drive Planning scheme or,

51

if they were also investors, to recover the net gains they had received as a result of their commissions.

During the next reporting period, the Receiver anticipates commencing another ancillary action against additional agents and a separate recovery action against various investors who received significant net gains, and will consider commencing other actions against third parties who received significant transfers from Drive Planning without providing reasonably equivalent value to Drive Planning.  Further, the Receiver will investigate the Estate's potential claims against professionals and institutions that may have facilitated the alleged misconduct of Defendants or otherwise contributed to the damages sustained by Defendants' investors.  The Receiver will complete his investigation of those claims and, after consultation with the SEC and with this Court's approval, pursue those claims he believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## IV. CASH-ON-HAND AND ACCRUED EXPENSES OF ESTATE

As of March 31, 2026, the Receiver held a total of $69,083,240.13 in cash-on-hand in his fiduciary accounts for the Receivership Estate at City National Bank of Florida, Synovus Bank, and Huntington Bank, and in the operating account for the Florida properties at Truist Bank.  During the Reporting Period, the fiduciary accounts earned $510,668.04 in interest.

The SEC's Standardized Fund Accounting Report (the "SFAR") for the Reporting Period, setting forth the receipts and disbursements of the Receivership Estate, is attached hereto as **Exhibit A**.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and his Court-approved professionals, including Lead Counsel, Georgia Counsel, and local counsel in other jurisdictions, and the Forensic Accountant, for the work they performed and the costs they incurred in connection with fulfilling the Receiver's duties under the Appointment Order. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshaled and deposited into his fiduciary accounts since he was appointed.

## V. CONCLUSION

The Receiver and his professionals appreciate the opportunity to assist the Court in this matter. Until further order of the Court, the Receiver and his professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the Appointment Order in the most cost-effective manner while seeking to maximize the ultimate recovery by the Receivership Estate.

Respectfully submitted,

s/*Adriana M. Pavon*
Adriana M. Pavon
Florida Bar No. 1025060
*Admitted Pro Hac Vice*

*Lead Counsel for Kenneth D. Murena, as Court-Appointed Receiver*
Adriana M. Pavon
  Florida Bar No. 1025060
  apavon@dvcattorneys.com
*Admitted Pro Hac Vice*
Russell Landy
  Florida Bar No. 44417
  rlandy@dvllp.com
*Admitted Pro Hac Vice*
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*Local Counsel for Kenneth D. Murena, as Court- Appointed Receiver*
Henry F. Sewell, Jr.
  Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

## CERTIFICATE OF SERVICE, FONT AND MARGINS

I hereby certify that on April 30, 2026, I electronically filed the foregoing *Status Report* using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record, and sent the *Status Report* to Defendant Burkhalter by email.

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: April 30, 2026.

s/*Adriana M. Pavon*
Adriana M. Pavon, Esq.
Florida Bar No. 1025060
*Admitted Pro Hac Vice*