**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> DRIVE PLANNING, LLC, et al. <br><br> Defendants. | Civil Action No. 1:24-cv-03583-VMC |

**ORDER ON APPEALS OF RECEIVER'S
FINAL CLAIMS DETERMINATIONS**

**Contents**

Introduction ..................................................................................................... 2

Standard for Claim Determinations ................................................................ 3

Orders on Appeal ............................................................................................ 6

    A.    Claim No. 1000987 ...................................................................... 6
    B.    Claim No. 1000565 ...................................................................... 9
    C.    Claim No. 1001583 .................................................................... 19
    D.    Claim No. 1001660 .................................................................... 20
    E.    Claim No. 1001973 .................................................................... 21
    F.    Claim No. 1001622 .................................................................... 24
    G.    Claim No. 1002142 .................................................................... 25

Conclusion ..................................................................................................... 29

**Introduction**

Before the Court are the Receiver's Responses to Appeals of Receiver's Final Claims Determinations. (Doc. 388). On August 25, 2025, the Court entered an Order Approving Claims Process and Employment of Stretto Inc. as Noticing and Claims Processing Agent. ("Claims Order," Doc. 251).[1] The Claims Order provided the following procedure for the Court's review of claims determinations:

> **4.5 Court's Final Adjudication of Claims:** A claimant with a partially or wholly disallowed claim may appeal the Receiver's Final Determination to this Court for final adjudication by no later than 30 days after the Receiver sends the Final Determination to the claimant by email. A Final Determination is appealed by replying to the Final Determination email in writing specifying (1) the intent to appeal the decision to this Court and (2) the basis for disagreement with the Receiver's Final Determination. Any subsequent communications made by the claimant to the Receiver after 30 days from the date of the Final Determination email shall not be part of the record on review. The Receiver will file with the Court a response to any such appeal by no later than 30 days after claimant's written appeal email is received by the Receiver. The response should include the record on review consisting of the Claim Form, Final Determination, claimant's written appeal, and all documents considered by the Receiver or submitted for inclusion by the claimant. The Receiver shall redact the record on review as required under Federal Rule of Civil Procedure 5.2(a). The Court shall have sole jurisdiction and serve as the exclusive venue to consider the appeal of any claimant who objects to any part of the Receiver's

---

[1] Capitalized terms not defined in this Order have the meanings the Court gave them in the Claims Order. Page numbers in record citations refer to the page numbers stamped at the top of the documents by the Court's CM/ECF software.

Final Determination. This Court's determination on a claimant's appeal is final. Absent an order granting a stay of final distribution pending appeal, any further appeal of the Court's decision on claim allowance will not stay final distribution and neither the Receiver nor any investor, creditor, or other estate professional shall be liable to repay any payment received prior to or during the pendency of any such appeal in the event the claim is later allowed on appeal.

(Doc. 251 at 11–12).

Seven claimants filed appeals from the Receiver's Final Determinations.

## Standard for Claim Determinations

"The district court has broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) (citing *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372 (5th Cir .1982); *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir. 1978); *SEC v. United Fin. Grp., Inc.*, 474 F.2d 354, 358 (9th Cir.1973)). "This discretion derives from the inherent powers of an equity court to fashion relief." *Id.* (citing *Safety Fin.*, 674 F.2d at 372.) In granting relief, it is appropriate for the district court to use summary proceedings. *Id.* (citing *SEC v. Hardy*, 803 F.2d 1034, 1040 (9th Cir. 1986)). Summary proceedings are suitable for proceedings to evaluate claims and priorities among claims, as well as allowing, disallowing, and subordinating claims of creditors." 65 Am. Jur. 2d Receivers § 171.

3

Courts have explained that "[i]n accepting or rejecting the claims of creditors . . . a receiver acts like a master." *United States v. Fairway Cap. Corp.*, 433 F. Supp. 2d 226, 231–32 (D.R.I. 2006) (quoting 3 Ralph Ewing Clark, Clark on Receivers § 650, 657 (3d ed. 1959), *aff'd*, 483 F.3d 34 (1st Cir. 2007)). Thus, the default rule is that "[a] federal district court may review de novo the findings of fact and conclusions [made] by a federal receiver in accepting or rejecting the claims of creditors against the receivership estate." 65 Am. Jur. 2d Receivers § 168. However, a court may commit matters relating to payment of claims to the receiver's discretion. *State of Oklahoma v. State of Texas*, 265 U.S. 490, 491–92 (1924). Matters within the receiver's discretion are reviewed for abuse of discretion. *S.E.C. v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2002 WL 1792053, at *1 (S.D.N.Y. Aug. 2, 2002).

The Court's Claims Order provides for summary proceedings and provides the Receiver with discretion in certain areas. Under the Claims Order, an investor must at a minimum "sufficiently demonstrate[] to the satisfaction of the Receiver through documentation and/or sworn statements":

> (i) that such claimant invested funds with, and/or provided goods or services or a loan directly to, Drive Planning;
>
> (ii) that the total amount that such claimant transferred, or the value of the goods or services the claimant provided, to Drive Planning, exceeds the total amount that Drive Planning or its affiliates transferred back or paid to such claimant;

4

> (iii) that such claimant (a) was not a member, owner, officer, director, or other insider of Drive Planning, (b) was not a member, owner, officer, director, or other insider of any entity owned in full or in part by Drive Planning, and (c) did not knowingly assist Drive Planning or Defendant Burkhalter to effectuate, perpetuate, or promote any of Drive Planning's investment scheme(s) or have knowledge of the fraudulent nature of such scheme at the time of the investment, loan, or other transaction underlying the claim.

(Claims Order 4–6). These requirements are necessary, but not sufficient conditions for allowance, as "[t]he Receiver may consider other factors in determining whether a claim is an Allowed Claim," and "the Receiver is hereby authorized to analyze each claim and the circumstances surrounding each investor's investment in or transfers to Drive Planning, and relationship with, Drive Planning and/or Defendant Burkhalter and the corporate entities owned by Drive Planning and/or Defendant Burkhalter and object to and seek to disallow any claim based on any information or circumstances." (*Id.* at 5 & n.4). The Proof of Claim form provides:

> The undersigned certifies under penalty of perjury under the laws of the United States of America that the information contained in this Proof of Claim, including any attachment(s), is correct and that the undersigned is authorized to make this claim.

(Doc. 251-2 at 7).

5

Claimants who dispute the Receiver's Allowed Claim Amount must submit "supporting documentation . . . comprised of bank account statements, brokerage account statement, Individual Retirement Account statements, wire transfer receipts, and/or cancelled checks evidencing transfers to and withdrawals and/or distributions from Drive Planning." (Claims Order at 9). In reviewing the documentation, "[t]he Receiver is not required to rely on any documents prepared by Drive Planning or Defendant Burkhalter in calculating a claimant's Allowed Claim Amount." (*Id.*).

## Orders on Appeal

**A.    Claim No. 1000987**

Claim No. 1000987 (the "'987 Claim") was submitted on October 31, 2025 in the proposed amount of $500,000. (Doc. 388-1). The '987 Claim was based on a purported June 18, 2024 transfer to Drive Planning. Claimant supported the '987 Claim by providing a wire transfer receipt to Drive Planning for that date and amount with a reference for "Investment REAL." (*Id.* at 2). Claimant also provided a Bank Certification from Banco Pichincha matching the wire receipt which showed a beneficiary "Drive Gulfport Properties, LLC" with a JPMorgan Chase Bank account number ending in 5317 and a corresponding bank statement. (*Id.* at 4–5).

The Receiver could find no record of Claimant in Drive Planning's business records or bank accounts, and no promissory note issued to Claimant. (Doc. 388 at 6–7). The Receiver explained that the account ending in 5317 corresponds to a Truist credit card account associated with Drive Planning, LLC, not a deposit account, and could not locate a wire transfer on the credit card statement or in any other Relief Defendant account. (*Id.*; Doc. 393 at 2). The Receiver requested additional documentation, including an International Bank Account Number (IBAN) number, but was not provided with the information. (Doc. 388 at 6–7).

As an initial matter, the Court finds that the '987 Claim complied with the Claims Order by providing documentation and a sworn statement that Claimant invested funds with Drive Planning, that the funds invested exceeded amounts paid by Drive Planning to Claimant, and that Claimant is not an insider of Drive Planning or a Ponzi scheme co-conspirator. Moreover, in response to the Receiver's proposed disallowance, Claimant submitted "supporting documentation . . . comprised of bank account statements, brokerage account statement, Individual Retirement Account statements, wire transfer receipts, and/or cancelled checks evidencing transfers to and withdrawals and/or distributions from Drive Planning." (Claims Order at 9). Because Claimant complied with the Claims Order, the question then is whether the Receiver abused his discretion under the Claims Order to disallow the '987 Claim based on

Claimant's failure to "prove all three of the foregoing factors to the Receiver's satisfaction." (Claims Order at 5–6).

An abuse of discretion review recognizes that the Receiver had a range of choice that cannot be reversed just because the Court "might have come to a different conclusion had it been [its] call to make." *United States v. Harris*, 989 F.3d 908, 912 (11th Cir. 2021) (quoting *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 934 (11th Cir. 2007)) (quotation marks omitted). But the Receiver abuses his discretion if he "applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (citing *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002)).

Under these standards, the Court finds that the Receiver did not abuse his discretion by disallowing the '987 Claim. Even though Claimant prima facie complied with the Claims Order, the Receiver was authorized under that Order to conduct an accounting of Drive Planning's records and bank statements to determine if Drive Planning received the funds. (Claims Order at 5 n.4) ("Notwithstanding these factors for determining whether a claim should be allowed, the Receiver is hereby authorized to analyze each claim and the circumstances surrounding each investor's investment in or transfers to Drive Planning, and relationship with, Drive Planning and/or Defendant Burkhalter

8

and the corporate entities owned by Drive Planning and/or Defendant Burkhalter and object to and seek to disallow any claim based on any information or circumstances."). Moreover, in matters of estate accounting, the Court is entitled to credit the Receiver's account until a reason to doubt the accounting is provided. 65 Am. Jur. 2d Receivers § 178 ("The examination of the account of a receiver is conducted in a spirit of equity, assuming the receiver to be honest until the contrary appears . . . .); *see also id.* § 177 ("On an objection to the receiver's account, the burden of going forward with the evidence is on the objector."). In sum, the Receiver did not deviate from the Claims Procedure or make a clear error of fact in determining that the '987 Claim did not "prove" its entitlement to allowance "to the Receiver's satisfaction." (Claims Order at 5–6). The Receiver's determination with respect to Claim No. 1000987 is **AFFIRMED**; that claim is **DISALLOWED IN FULL**.

**B.     Claim No. 1000565**

Claim No. 1000565 (the "'565 Claim") was submitted on October 27, 2025 in the proposed amount of $ $2,053,100. (Doc. 388-2). The '565 Claim was based on a purported June 18, 2024 transfer to Drive Planning. The '565 Claim broke down the total transfers to Drive Planning as follows:

| Date of Transfer | Amount of Transfer | Promissory Note Page |
|---|---|---|
| 2/2/2024[2] | $400,000.00 | 388-2 at 8 |
| 4/17/2024 | $450,000.00 | 388-2 at 6 |
| 3/20/2024 | $203,100.00 | 388-2 at 7 |
| 12/29/2023 | $400,000.00 | 388-2 at 9 |
| 8/9/2023 | $200,000.00 | 388-2 at 3 |
| 6/23/2025 | $300,000.00 | 388-2 at 5 |
| 1/17/2023[3] | $100,000.00 | 388-2 at 4 |
| Total | $2,053,100.00 | |

The Receiver disallowed the '565 Claim in full. The Receiver calculated Claimant's net investment in Drive Planning at $1,529,600. (Doc. 388 at 9–10). The Receiver then determined that Drive Planning had paid Claimant a total of $1,897,556.96, rendering Claimant a net winner and subjecting the '565 Claim to disallowance. Claimant appealed this determination, (Doc. 388-2 at 10), and the Court permitted Claimant to file a Reply and the Receiver to file a sur-reply. (Doc. 394).

As an initial matter, the Court sustains the Receiver's net investment calculation. Under the Claims Order, Claimants who dispute the Receiver's Allowed Claim Amount must submit "supporting documentation . . . comprised of bank account statements, brokerage account statement, Individual Retirement

---

[2] The relevant promissory note appears to reflect a loan date of February 12, not February 2.

[3] The relevant promissory note appears to reflect a loan date of July 17, not January 17.

Account statements, wire transfer receipts, and/or cancelled checks evidencing transfers to and withdrawals and/or distributions from Drive Planning." (Claims Order at 9). Claimant has not provided any of this documentation for the $2,053,100.00 figure. Claimant provided copies of the promissory notes, but "[t]he Receiver is not required to rely on any documents prepared by Drive Planning or Defendant Burkhalter in calculating a claimant's Allowed Claim Amount." (*Id.*). Moreover, as the Receiver correctly observes, "the existence of these promissory notes does not transform Claimant into a lender any more than any of the other 2,300 claimants, or exempt him from the Receiver's equitable net winner analysis." (Doc. 402 at 11). Accordingly, Claimant has not met his burden of showing the Receiver miscalculated the net investment of $1,529,600. Claimant also does not dispute the Receiver's calculation that Drive Planning paid Claimant $1,897,556.96, so the Court adopts this figure as unopposed.[4]

The first issue on appeal is whether the Court should credit post-Receivership payments by Claimant to the estate in the net winner calculation. Claimant submitted wire transfer receipts showing payments to the Receiver as follows:

---

[4] The Court's summary ruling on these numbers does not bind Claimant in any subsequent plenary fraudulent transfer action.

| Date of Transfer | Amount of Transfer | Wire Transfer Page |
|---|---|---|
| 1/28/2026 | $100,000.00 | 388-2 at 15 |
| 1/26/2026 | $300,000.00 | 388-2 at 16 |
| 1/22/2026 | $1,000,000.00 | 388-2 at 17 |
| 1/5/2026 | $200,000.00 | 388-2 at 18 |
| **Total** | $1,600,000.00 | |

Claimant contends that these payments should be credited against his withdrawals such that he is considered a net loser.

The Receiver correctly points out that the $1,600,000 was paid pursuant to a settlement between the Receiver and Claimant the Court approved on February 26, 2026. (Docs. 380–81). The terms of that settlement were that

> The Obligor shall pay to the Receiver $1,600,000.00 (One Million Six Hundred Thousand Dollars) (the "Resolution Payment"), which the Receiver acknowledges is currently being held in escrow in the Receiver's fiduciary account. All payments must.be made by Mark Haye directly, and the Receiver may reject any payments made by any third party.
>
> . . .
>
> Conveyance of Property: Upon satisfaction of all conditions precedent, including (i) receipt of $1,600,000.00 in cleared funds in accordance with this Agreement, . . . the Receiver shall (1) convey title to the Property to Mark Haye by quitclaim deed, (2) deliver a satisfaction of the Promissory Note dated January I 0, 2024 given by Mark Haye to Drive Planning LLC . . .

(Doc. 380-1 at 3).

12

The Receiver was correct not to apply this settlement payment to offset Claimant's gain. On January 26, 2024, Drive Planning transferred $1.4 million originating from an account containing investor funds for the purchase of Claimant's residence. (Doc. 152 at 5–6). This $1.4 million, not included in the Receiver's net gain calculation is effectively a transfer for Claimant's benefit that would largely offset the $1.6 million paid as part of the settlement.[5] In his appeal memorandum, Claimant argues that "[b]ecause the $1.4 million used to purchase the condominium has now been fully repaid — and in fact over-repaid — it cannot be counted as a 'gain' to me," (Doc. 388-2 at 10) but Claimant provides no basis for ignoring the money paid from the estate to purchase the property but not the money paid to the estate to retain the property.

In his Reply brief, Claimant argues that the net-winner "doctrine does not properly apply to arms-length loan transactions governed by promissory notes." (Doc. 391 at 4). Claimant appears to be arguing that the $1.4 million paid on his behalf did not constitute "gain" to him because it was tied to an offsetting note for repayment. But by this logic, the payment of the $1,600,000 did not constitute a

---

[5] Without accounting for appreciation in the value of the property or unpaid interest due Drive Planning, these numbers alone combined with the Receiver's calculation would render Claimant a net winner to the extent of $167,956.96.

13

complete "loss" to him because it relieved his obligation to repay the note as shown below:[6]

| Date | Account | Debit | Credit |
|------|---------|-------|--------|
| Jan-24 | DP Investor Funds | | $ 1,400,000.00 |
| | Claimant Note Receivable | $ 1,400,000.00 | |
| Feb-26 | DP Investor Funds | $ 1,600,000.00 | |
| | Claimant Note Receivable | | $ 1,600,000.00 |

In sum, no matter how it is characterized, Claimant's post-receivership payment to the estate does not materially impact the net-winner analysis even assuming the $200,000[7] excess payment is counted as an additional investment.

Claimant next argues that commissions paid to Claimant represent compensation for services performed and should not be counted in the net winner analysis. (Doc. 391 at 4). Under the Claims Order, a provider of services to Drive Planning is only entitled to a distribution to the extent "the value of the . . . services the claimant provided . . . to Drive Planning . . . exceeds the total amount that Drive Planning or its affiliates transferred back or paid to such claimant." (Claims

---

[6] To completely balance the transaction, the Receiver could ostensibly credit the additional $200,000 as interest income or gain on sale of asset. This table does not account for Claimant's alleged payments on the loan of $74,004.00 through commissions, although as the Court holds later, Claimant fails to establish those commissions had value to Drive Planning.

[7] Just as the Court does not bind Claimant to the net winner analysis for the purpose of defending against a fraudulent transfer action, the Court does not bind Receiver to any assumption about the nature of the $200,000.

Order at 4). Hence, any payment to Claimant may be offset against the value provided by Claimant in exchange for services.

To interpret "value" under the Claims Order, the Court looks to bankruptcy law to provide an analogy. *See SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017) (receivership courts may look to analogous bankruptcy law).[8] In the context of fraudulent transfer liability under the Bankruptcy Code, the Eleventh Circuit addressed whether brokers who provided services to a Ponzi scheme could be considered to have given "value" in exchange for their commissions in *In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1331 (11th Cir. 2002). In that case, the Eleventh Circuit rejected the lower courts' reliance on decisions holding that "because [the brokers] assisted in perpetuating the scheme . . . 'no value was or could be legally given'" in exchange for their commissions. *Id.* (quoting *In re Randy,* 189 B.R. 425, 442 (Bankr. N.D. Ill. 1995)). The Eleventh Circuit instead determined that "whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *Id.* at 1332.

Instead, the Eleventh Circuit followed *Merrill v. Allen (In re Universal Clearing House Co.),* 60 B.R. 985 (D. Utah 1986). *Universal Clearing House* involved a

---

[8] The Court requested the Receiver to brief the issue in his sur-reply, which he did. (Doc. 402).

15

Ponzi scheme.[9] Merrill, as trustee of one of the clearinghouse companies involved in the Ponzi scheme, brought an adversary proceeding to recover funds that the debtors paid to its sales agents as commission payments for inducing investors to invest with the clearinghouses. *Universal Clearing House*, 60 B.R. at 989. The Bankruptcy Court "held as a matter of law that because the [brokers'] services deepened the debtors' insolvency and furthered a fraudulent scheme, the services were 'without legally cognizable value.'" *Id.* at 998.

However, the District Court reversed, concluding that the brokers' services did in fact constitute "value" in consideration for the commissions under Section 548(c). The District Court in *Universal Clearing House* stated:

> Under the present Bankruptcy Code, satisfaction of a present or antecedent debt constitutes value. See 11 U.S.C. § 548(d)(2)(A). In these cases, the debtors contracted with [brokers] for the sale of [investor] contracts. Pursuant to their contracts, [brokers] performed services thereby giving consideration to the debtors under the terms of their contracts. Accordingly, the debtors incurred the obligation to pay [brokers] for their services. That obligation constituted a debt that was satisfied by the payment of commissions pursuant to the contracts. The satisfaction of the debts to [brokers] falls

---

[9] The following discussion of *Universal Clearing House* is drawn directly from *Yip v. Perez (In re Providence Financial Investments, Inc.)*, No. 16-20516-BKC, 2018 WL 5003972, at *5–7 (Bankr. S.D. Fla. Oct. 15, 2018), *aff'd*, No. 18-cv-24810, 2019 WL 11660557 (S.D. Fla. May 6, 2019), *aff'd sub nom. In re Perez*, 791 F. App'x 167 (11th Cir. 2020). Quotation marks are omitted to improve readability.

> squarely within the definition of value found in 11 U.S.C.
> § 548(d)(2)(A).

*Id.* at 998–99. The District Court concluded that "a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." The court in *Universal Clearing House* held that, as a matter of law, the services provided by the brokers did constitute value, as that term is used in section 548 of the Bankruptcy Code. 60 B.R. at 1000.

Courts in this circuit have extended the logic of *Universal Clearing House* to analogous circumstances to this case. *Providence Financial Investments* involved a defendant who "was retained and paid to produce investors to the Debtors for the purpose of selling them promissory notes as investments." 2018 WL 5003972, at *6. In that case, the record confirmed that "the Defendant produced investors who paid approximately $1.1 million dollars to the Debtors, thereby giving value to the Debtors. As a result, Defendant was contractually due a commission from the Debtors." *Id.* (citing *Balaber-Strauss v. Sixty-Five Brokers, (In re Churchill Mortg. Inv. Corp).*, 256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000)). However, the Court determined that the value of the services was excessive because it exceeded the value in the commission contract. *Id.*

In sum, just because commissions paid by Ponzi schemes to brokers *can* be supported by the reasonably equivalent value of the brokers' services does not

17

mean that Claimant has established the value of his services here. Ultimately, the Court concludes the question is one of burden of proof. Under the Claims Order, it is the burden of the Claimant to "sufficiently demonstrate[] to the satisfaction of the Receiver through documentation and/or sworn statements . . . that the total amount that such claimant transferred, or the **value of the goods or services the claimant provided, to Drive Planning**, exceeds the total amount that Drive Planning or its affiliates transferred back or paid to such claimant." (Claims Order at 4) (emphasis added). *See also SEC v. Nadel*, No. 8:09-cv-00087, 2013 WL 12323969, at *4 (M.D. Fla. Aug. 29, 2013) ("Absent any binding authority to the contrary, the burden of proof in this proceeding lies on the claimant who filed the proof of claim pursuant to the objection procedure approved by this Court.").

Claimant has submitted no evidence supporting the value of his services. Other courts considering disputes of value have relied on evidence such as written agreements. *See Universal Clearing House Co.*, 60 B.R. at 1000; *Providence Fin. Invs.*, 2018 WL 5003972, at *6. Claimant simply states that his "[c]ommissions . . . [r]epresent earned compensation for services rendered" and "[a]re distinct from investment returns." (Doc. 391 at 4). This does not meet the burden of showing his services provided reasonably equivalent value.[10] Accordingly, the Receiver did

---

[10] Thus, the Court does not need to reach the Receiver's argument that any agreement between Drive Planning and Claimant to sell investments for commissions should be voided due to illegality and any resulting commissions

not clearly err by failing to exclude these sums from the net winner analysis. Because Claimant is a net winner, the Receiver's determination with respect to Claim No. 1000565 is **AFFIRMED**; that claim is **DISALLOWED IN FULL**.

## C.    Claim No. 1001583

Claim No. 1001583 (the "'583 Claim") was submitted on November 12, 2025 in the proposed amount of $225,111.60. (Doc. 388-3). The '987 Claim was based on a purported February 27, 2024 transfer to Drive Planning. Claimant supported the '987 Claim by providing a copy of a check to Drive Planning for that date in the amount of $250,124 with a reference for "REAL." (*Id.* at 3). Claimant also included a Drive Planning withdrawal statement showing a withdrawal distribution of $25,012.40, leaving an alleged net loss of $225,111.60.

The Receiver alleges that Drive Planning never received the funds from Claimant because the check was returned unpaid. (Doc. 388 at 13). The Receiver attached a Drive Planning bank statement showing the check was returned on February 29, 2024. (Doc. 388-3 at 13). The Receiver contacted Claimant multiple times requesting evidence that Claimant submitted a new check, but did not receive any response. (*Id.* at 13–14).

---

disgorged. (Doc. 402 at 4) (citing *Hays v. Adam*, 512 F. Supp. 2d 1330, 1344 (N.D. Ga. 2007)).

19

The Court incorporates its analysis of the Receiver's discretion to disallow a claim that prima facie complies with the Claims Order in its analysis of Claim No. 1000987 on page 6 above. The Court finds that the Receiver has produced sufficient evidence to overcome any probative effect that the '583 Claim would be entitled to as a result of prima facie compliance with the Claims Order by showing that the Receivership affirmatively did not receive the funds from the February 27, 2024 check for $250,124. Accordingly, the Receiver did not abuse its discretion in disallowing the claim. The Receiver's determination with respect to Claim No. 1001583 is **AFFIRMED**; that claim is **DISALLOWED IN FULL**.

D.    **Claim No. 1001660**

Claim No. 1001660 (the "'660 Claim") was submitted on November 14, 2025 in the proposed amount of $66,500.00. (Doc. 388-4). The '987 Claim form lists a purported January 30, 2024 transfer to Drive Planning in the amount of $4,300. Claimant supported the '987 Claim by providing a copy of a wire transfer receipt for $4,300 dated January 30, 2024 and a second wire transfer receipt for $66,500 dated May 6, 2024. (*Id.* at 2–3).

The Receiver allowed the '660 Claim in the reduced amount of $59,450 based on a forensic analysis showing that Claimant had deposited an additional $20,000 and withdrawn $31,350. (Doc. 388-15). Claimant appealed.

As an initial matter, the Court finds that the '660 Claim did not strictly comply with the Claims Order because it did not disclose all of the transactions with Drive Planning and did not attach supporting documentation for all of the investments into Drive Planning. It is also mathematically inconsistent. Accordingly, the Court affords the Proof of Claim form no evidentiary effect to the extent it conflicts with the Receiver's forensic analysis. Instead, the Court fully credits the Receiver's analysis. The Receiver's determination with respect to Claim No. 1001660 is **AFFIRMED**; that claim is **ALLOWED IN PART** in the amount of $59,450.

### E.    Claim No. 1001973

Claim No. 1001973 (the "'973 Claim") was submitted on November 11, 2025 in the proposed amount of $630,000.00. (Doc. 388-5). The '987 Claim form lists three transfers to Drive Planning: bank wires for $30,000 on August 19, 2022 and $140,000 on March 27, 2023, and a cash payment of $500,000 on April 4, 2024. (*Id.* at 1–2). The '987 Claim form also discloses a distribution of $40,000 on January 18, 2024. (*Id.* at 2). The Receiver allowed the claim in the amount of $130,000 because he could not locate a cash deposit of approximately $500,000 in Drive Planning's account around that time. (Doc. 388 at 17).

Claimant submits the following evidence to support the '973 Claim: (1) two promissory notes from Drive Planning dated May 17, 2024 for $14,461.50 and

$705,974, and (2) an affidavit from Stephanie Maus authenticating text messages between her and Mr. Burkhalter that indicate Claimant and Mr. Burkhalter met in person at his St. Petersburg, FL home with cash. (Doc. 388-5 at 8–12).

The Receiver reached out to Mr. Burkhalter and David Bradford to see if they recalled the meeting. Mr. Bradford's counsel provided the following information:

> I discussed this with David. He does recall generally it happening. David and Todd Burkhalter met with the investor and one of his friends in St. Petersburg. A realtor named Melissa provided a cash counting machine that they used to count the cash, but to the best of his memory, she did not stay and witness the counting. David is not certain, but he thinks the amount was significant but less than $500K (maybe $300K). He cannot say for sure. David believes the best way to verify the amount of the investment is from Commission records. Both he and the sales agent on his team who made the sale (he can't remember the name, but it was a woman from the DC area) would have received commissions that should be reflected on the records Drive Planning kept. As for the cash, Burkhalter took it and told David he was going to put it in a safe to use as additional collateral for the promissory notes. David did not witness whatever Burkhalter did with the cash after they left the location where it was counted (which was not the location referred to in the text messages you attached).

(*Id.* at 13).

The Court upholds the Receiver's initial determination. Under the Claims Order, claimants who dispute the Receiver's Allowed Claim Amount must submit "supporting documentation . . . comprised of bank account statements, brokerage

account statement, Individual Retirement Account statements, wire transfer receipts, and/or cancelled checks evidencing transfers to and withdrawals and/or distributions from Drive Planning." (Claims Order at 9). Claimant did not submit any records (which could have included a withdrawal receipt from the source of funds or a receipt form signed by Burkhalter) substantiating the $500,000 deposit. Claimant's evidence and Mr. Bradford's corroborating account do establish that Claimant did in fact visit Burkhalter with cash. However, no piece of evidence submitted by Claimant establishes the dollar amount of the cash he brought. While Claimant does submit a promissory note in the amount of $705,974, this does not establish the source of the investment funds to include $500,000 cash, and in any case "[t]he Receiver is not required to rely on any documents prepared by Drive Planning or Defendant Burkhalter in calculating a claimant's Allowed Claim Amount." (Claims Order at 9). Unfortunately, while the Court does believe that the meeting and payment of cash did in fact happen, without any documentary proof of the amount of cash that was paid, the Court has no basis to set aside the Receiver's determination. The Receiver's determination with respect to Claim No. 1001973 is **AFFIRMED**; that claim is **ALLOWED IN PART** in the amount of $130,000.

**F.    Claim No. 1001622**

Claim No. 1001622 (the "'622 Claim") was submitted on November 14, 2025

in the proposed amount of $56,000.00. (Doc. 388-6). The '622 Claim form lists two

transfers to Drive Planning: $40,000 on October 17, 2023 and $20,000 on February

6, 2024. (*Id.* at 1). The '622 Claim form also discloses a distribution of $4,000 on

January 17, 2024. (*Id.*). The Receiver disallowed the claim in full on the grounds

that Claimant did not disclose four[11] transfers from Drive Planning totaling

$70,000 between May 28 and August 12, 2024 which rendered her a net winner:

| | | |
|---|---|---|
| 05/28/24 | Check | $20,000.00 |
| 05/31/24 | Check | $20,000.00 |
| 07/08/24 | Check | $15,000.00 |
| 08/12/24 | Check | $15,000.00 |

(Doc. 388 at 18). As the Court noted in the appeal of Claim No. 1000565 on page 9

above, services provided to a Ponzi scheme do not inherently lack value. *In re Fin.*

*Fed. Title & Trust*, 309 F.3d at 1331. However, as the Court also held above, in the

context of the summary claims allowance procedure approved by the Claims

Order, Claimant has the burden of showing the value of her services as part of

demonstrating that she is a net loser. Claimant provided a list of her work

responsibilities while employed at Drive Planning, but did not include any details

---

[11] It appears that Claimant also failed to disclose a second interest payment for $4,000 on April 17, 2024, but the non-disclosure of that payment is not at issue in the appeal. (Doc. 388 at 18).

about agreements for compensation. While the Court does not doubt Claimant provided the services she claims she provided, the Court needs some factual basis to distinguish the money that Claimant received from the investments that Claimant made. A list of job responsibilities does not provide the Court with any sort of formula to allocate the payments. Accordingly, the Court finds the Receiver did not clearly err by determining that Claimant was a net winner. The Receiver's determination with respect to Claim No. 1001622 is **AFFIRMED**; that claim is **DISALLOWED IN FULL**.

### G.    Claim No. 1002142

Claim No. 1002142 (the "'142 Claim") was submitted on November 24, 2025 in the proposed amount of $0. (Doc. 388-7). The '142 Claim form lists one transfer to Drive Planning in the amount of $100,000 on May 12, 2022 and one distribution of $100,000 on August 14, 2023. (*Id.*). The Receiver disallowed the claim in full on the grounds that Claimant did not suffer a net loss.

In her appeal, Claimant appears to amend her claim to seek $67,156. (Doc. 388 at 31). According to Claimant "For $100,000.00, interest I made 67,156 which I paid tax on. I had 167,156 in drive. I decided to take a partial withdrawal of 100.000.00. Left 67,156 in drive the suffered net loss." (Doc. 388-7 at 10). To prove she paid tax on the interest, she included a form 1099-INT issued by Drive Planning, but that form indicated interest of $46,156.10. (*Id.* at 3).

25

As an initial matter, the Court finds that the '142 Claim did not comply with the Claims Order because it did not demonstrate through documentation or sworn statements "that the total amount that such claimant transferred, or the value of the goods or services the claimant provided, to Drive Planning, exceeds the total amount that Drive Planning or its affiliates transferred back or paid to such claimant." (Claims Order at 4). The face of the '142 Claim indicates that the total amount Claimant transferred does not exceed the total amount that Drive Planning paid back to Claimant. For this reason alone, Receiver was correct in disallowing the '142 Claim. Moreover, Claimant's attempt to amend the '142 Claim after the Claims Bar Date may constitute an improper attempt to file a late claim.[12]

---

[12] Under the Claims Order, a claimant may only file a late claim in one of two ways:

> 3.9 Late-Filed Claims: Any completed Claim Form not submitted through the online claims portal, or by physical mail delivery actually received by Stretto or the Receiver and postmarked by the Claims Bar Date shall be barred, and claims submitted after the Claims Bar Date will not be allowed except (i) in any case, for good cause shown, to be determined in the Receiver's sole discretion; or (ii) upon motion filed with the Court alleging constitutionally deficient notice, if the motion is filed promptly upon receipt of actual notice of the Receivership proceedings and determination of the allowability of the claim prior to final distribution is practicable.

Assuming Claimant's post-Bar Date amendment constitutes a late claim, it satisfies neither of these requirements.

*See In re Fowler*, No. 03-92256-MGD, 2006 WL 6591597, at *6 (Bankr. N.D. Ga. July 10, 2006) ("Prior to the bar date leave to amend is freely given, but post-bar date amendments are closely scrutinized.") (citing *In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir. 1985); *Integrated Res., Inc. v. Ameritrust Co. Nat'l Ass'n (In re Integrated Res. Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993)); *SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017) (determining bankruptcy law was "analogous and instructive" in receivership case).

But the Court does not need to reach the question of whether, by seeking $67,156 on appeal, Claimant is attempting to improperly submit a late claim. This is because, the Receiver is correct that under the Claims Order and governing law, investors are not entitled to interest on their transfers to Drive Planning, even if they paid taxes on it.

First, the Claims Order. It provides that "[t]he calculation of a claimant's Allowed Claim Amount will not include any interest, profit, or fees promised, but not paid, to an investor or creditor." (Doc. 251). In a Ponzi receivership case, "it remains within the court's discretion to determine how and to whom the money will be distributed." *SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-cv-81205, 2024 WL 5348580, at *6 (S.D. Fla. Dec. 16, 2024), *appeal dismissed,* No. 25-10157-JJ, 2025 WL 1950916 (11th Cir. Apr. 30, 2025).

27

Second, under general debtor–creditor law, particularly in the bankruptcy context, retention or recovery of interest on a Ponzi scheme investment is impermissible. "In the case of Ponzi schemes, the general rule is that a defrauded investor" is only entitled to the "principal amount of the investment, but not as to any payments in excess of principal." *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citing *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995)). This is because "defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment." *Id.* (citing *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1340–42 (10th Cir. 1996); *Wyle v. Rider (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir. 1991)). But "[a]ny transfers over and above the amount of the principal—i.e., for fictitious profits— . . . exceed the scope of the investors' fraud claim." *Id.* (quoting *Sender v. Buchanan (In re Hedged–Invs., Assoc., Inc.)*, 84 F.3d 1286, 1290 (10th Cir.1996); *In re United Energy*, 944 F.2d at 595 n.6)). These cases do not turn on whether the investor paid taxes on their interest, and the Court can discern no reason why this fact would change the outcome here.[13] The Receiver's determination with respect to Claim No. 1002142 is **AFFIRMED**; that claim is **DISALLOWED IN FULL**.

---

[13] The Receiver has posted information about taxes on the Receivership website: https://driveplanningreceivership.com/faq.htm

## Conclusion

For the above reasons, it is

**ORDERED** that the Court has determined the allowed claim amount for each Appeal of the Receiver's Final Claims Determinations as follows:

| Claim Number | Filed Claim Amount | Receiver's Determination of Allowed Claim Amount | Amount Claimed in Appeal | Court's Determination of Allowed Claim Amount |
|---|---|---|---|---|
| 1000987 | $500,000 | $0 | $500,000 | $0 |
| 1000565 | $2,053,100 | $0 | $2,053,100 | $0 |
| 1001583 | $225,111.60 | $0 | $250,124 | $0 |
| 1001660 | $66,500 | $59,450 | $60,292.88 | $59,450 |
| 1001973 | $630,000 | $130,000 | $630,000 | $130,000 |
| 1001622 | $56,000 | $0 | $56,000 | $0 |
| 1002142 | $67,156 | $0 | $67,156 | $0 |

This Order constitutes the Court's final adjudication of all Appeals of the Receiver's Final Claims Determinations. Therefore, the Receiver has thirty days from the date of entry of this Order to file his proposed Plan of Distribution for consideration and/or approval by this Court.

The Receiver is **DIRECTED** to serve a copy of this Order on the email addresses and mailing addresses listed on each of the above Claimant's Proof of

Claim forms and file a certificate of service within 7 days of the date of entry of this Order.

**SO ORDERED** this 21st day of May, 2026.

Victoria Marie Calvert
United States District Judge