**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**Civil Action No. 1:24-cv-03583-VMC**

**DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER,**

**Defendants,**

**and**

**JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,**

**Relief Defendants.**

________________________________/

# RECEIVER'S EIGHTH STATUS REPORT

Kenneth D. Murena, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits his Eighth Status Report setting forth his activities and efforts to fulfill his duties under the Order Appointing Receiver [ECF No. 10] (the "Appointment Order") for the period from April 1, 2026, through June 30, 2026 (the "Reporting Period").

# TABLE OF CONTENTS


I. SUMMARY ....................................................................................4

II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER ....................................................19

A. Preliminary Injunction and Appointment of Receiver ............................20

III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER.....................................................21

A. Receiver's Employment of Professionals..............................................21

B. Securing and Reviewing Books and Records of Drive Planning.............22

1. Analysis of Records and Consolidation of Investor Accounts ...........23

2. Claims Against Drive Planning Agents ............................................24

3. Claims Against Net Winners ..........................................................26

C. Real Property, Business, and Personal Property in Which Receivership Estate Has an Interest ....................................................28

1. Real Properties and Businesses in Georgia, Florida, Indiana, and Mexico ......................................................................................28

i. *Efforts to Sell Properties* .....................................................28

ii. *The Burkhalter Ranch* .........................................................30

iii. *Staurolite Barn* ....................................................................32

iv. *Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC* ..........................................................32

v. *Club 201 at the Detroit in St. Petersburg, Florida* ...................34

2. Real Properties in South Carolina and Alabama................................36

3. Investment in Real Property in Medellin, Colombia .......................... 37

4. Real Property Owned or Occupied by Third-Parties .......................... 37

5. Deeds of Trust and Investments in Real Property in Tennessee ......... 41

6. Transfers to Embry Development Company for Real Estate Projects .......................... 43

7. Drive Plan Financial Services LLC .......................... 43

8. Personal Property .......................... 45

*i. Luxury Furniture* .......................... 45

9. SFHR Development LLC (Sarah and Andy Fisher) .......................... 46

10. Bradford Private Placement Investments .......................... 48

D. Known Investors and Creditors .......................... 50

E. Investor Communications .......................... 50

F. Claims Process .......................... 51

G. Identifying and Pursuing Liquidated and Unliquidated Claims .......................... 54

IV. CASH-ON-HAND AND ACCUED EXPENSES OF ESTATE .......................... 55

V. CONCLUSION .......................... 56

## I. SUMMARY

Since his appointment on August 13, 2024, the Receiver has made significant progress in identifying, securing, and recovering all identified funds, assets, and records of Drive Planning LLC (the "Receivership Estate"). These efforts resulted in the recovery of $4,902,508.48 during the Reporting Period from the sale of real estate, rental income, the liquidation and proceeds from certain assets that David Bradford had turned over to the Estate, settlements with companies with which Drive Planning did business or to which it transferred funds, settlements with net winners, and settlements with certain Drive Planning agents and insiders who had received commissions for soliciting investors. As of the end of the Reporting Period, the Estate held $73,169,493.41 in cash-on-hand in the fiduciary accounts at City National Bank of Florida, Synovus Bank, and Huntington National Bank and in the operating account for the Florida properties at Truist Bank. These funds in the fiduciary accounts are maintained in insured cash sweep accounts that are fully FDIC insured and earned interest at a rate of 3.05% totaling $536,038.43, during the Reporting Period.

During the Reporting Period, the Receiver and Receiver's Lead Counsel undertook extensive efforts to fulfill the Receiver's duties under the Appointment Order. In particular, the Receiver and Receiver's Lead Counsel devoted time to the management, maintenance, and sale of real properties and personal property owned

by Drive Planning and/or acquired with investor funds. This included overseeing the marketing for sale of real estate in Georgia, Florida, Indiana, South Carolina, Alabama, and Mexico, coordinating with realtors and property managers, and addressing operational issues with rental properties, such as payment of maintenance expenses, HOA fees, and property taxes, insurance renewals, renegotiating leases, and addressing tenant disputes. During the Reporting Period, and pursuant to Court approval (ECF Nos. 384, 397, 403) the Receiver closed on the sales of three properties generating a total of $486,500 in gross sale proceeds, including properties on: (i) Grimble Court in Sumter, SC for $164,000; (ii) Moody Street in Montevallo, AL for $160,000; and (iii) Beacon Drive in Sumter County, SC for $162,500.

Shortly following the Reporting Period, the Receiver closed on the sale of a condominium unit in San José del Cabo, Mexico for $4,138,000 [ECF Nos. 377, 378], an apartment building in St. Petersburg for $2,650,000 [ECF Nos. 396, 398], and a property on Tower Road in Mineral Bluff, GA for $1,350,000 [ECF Nos. 432, 437]. On July 31, 2026, the Receiver expects to close on the sale of a property on Preot Street in Sumter, SC for $160,000 [ECF Nos. 440, 441], and a property on Calypso Way in Cumming, GA for $600,000 [ECF Nos. 445, 446]. In addition, the Receiver entered into a Purchase and Sale Agreement, pending Court Approval, for a property on Dartmouth Drive in Sumter, SC for $173,000. In sum, these

transactions have generated or will generate approximately $9,071,000 in gross sale proceeds.

In addition to the proceeds realized from asset sales, the Receiver's continued management of the receivership properties that generated $78,659.73 in rental income for the Estate.

During the Reporting Period, the Receiver continued his investigation into improper transfers made to insiders, affiliates, and third parties. In prior reporting periods, the Receiver issued demand letters to former Drive Planning agents, advisors, and other individuals who received significant transfers of investor funds without providing reasonably equivalent value to Drive Planning in return. The Receiver obtained Court approval to enter into agreements (pursuant to certain settlement procedures and meeting particular settlement amount thresholds) with various agents for the return of all or a portion of the commissions they had received from Drive Planning.

During a prior reporting period, upon obtaining leave of Court, the Receiver initiated an ancillary action to recover more than $27.5 million based on fraudulent transfer and unjust enrichment claims against forty-six former agents and affiliates of Drive Planning. During the Reporting Period, the Receiver served written discovery, analyzed the information produced in discovery, and continued preparing

the case for trial, including coordinating with the Receiver's forensic accountant regarding the preparation of an expert report.

During the Reporting Period, the Receiver filed his second ancillary action against certain agents in the U.S. District Court for the Northern District of Georgia, seeking to recover in excess of $3,300,000 in commissions they received for selling illegal unregistered securities and procuring investors for Drive Planning. In the ancillary complaint against these agents, the Receiver asserts claims under the Georgia Uniform Voidable Transactions Act and Georgia common law for unjust enrichment, seeking to avoid, recover, and disgorge commissions paid to those agents for promoting and expanding Drive Planning's Ponzi scheme between 2020 and 2024. The Clerk has since issued summonses for the defendants, and the Receiver worked to effectuate service of process on all defendants. At the same time, the Receiver continued to engage in settlement discussions and pursue negotiated resolutions where appropriate in an effort to maximize recoveries for the Receivership Estate while minimizing litigation costs.

Pursuant to settlements reached with former Drive Planning agents, the Receiver has entered into settlement agreements providing for total recoveries of $4,304,858.74. In addition to these cash recoveries, certain settlement agreements require the turnover or liquidation of assets for the benefit of the Receivership Estate.

To date, the Receiver has collected $1,954,277.27 under those agreements, including $1,083,176.16 during the Reporting Period.

During the Reporting Period, the Receiver pursued recovery from individuals and entities who received more from Drive Planning than they had invested (the "Net Winners"). Following issuance of demands to these Net Winners, the Receiver and his professionals engaged in extensive correspondence and negotiations with numerous recipients or their counsel, responding to legal and factual disputes, analyzing defenses asserted by the recipients, and evaluating settlement proposals. The Receiver entered into settlement agreements with various Net Winners providing for total recoveries of $1,448,737.62, including installment payment arrangements where appropriate, and received $901,435.88 in settlement proceeds during the Reporting Period. During the next reporting period, the Receiver anticipates filing one ancillary action against those Net Winners who have declined to resolve the Receiver's claims through settlement.

During a prior reporting period, the Receiver completed negotiations and entered into an agreement with former Drive Planning agent, David Bradford, who had received the largest amount of transfers from Drive Planning, providing for his turnover of millions of dollars' worth of assets, including thirteen real properties in South Carolina and Alabama, a 30% interest in a multi-unit apartment community in Alabama, seven private placement investments, twenty-five life insurance

policies, and one IRA. During the Reporting Period, the Receiver and his professionals continued to undertake substantial efforts to effectuate the transfer of and realization of value from the private placement investments. These efforts included, among other things, identifying and analyzing the governing subscription agreements and operating documents for each investment; preparing, revising, and negotiating assignment and transfer agreements necessary to convey Bradford's interests to the Receivership Estate; and coordinating execution of such assignments with Mr. Bradford and relevant counterparties. The Receiver further engaged in extensive outreach and communications with fund managers and administrators associated with the private placements to obtain consent to ensure proper recognition of the Receivership Estate as the substituted member or investor.

During a prior reporting period, the Receiver filed one motion for turnover of and imposition of a constructive trust over real property located in Indianapolis, Indiana purchased with approximately $1.9 million in misappropriated investor funds and titled in the name of former Drive Planning agent Gerardo Linarducci and his wife. *See* ECF No. 131. Shortly thereafter, Mr. Linarducci filed a petition for bankruptcy protection. *See* ECF No. 151. During the Reporting Period, the Receiver filed his renewed motion for turnover and constructive trust as to the Indiana property. On May 21, 2026, the Court granted the Receiver's renewed motion, declared that any interest held by the Linarduccis in the property was subject to a

constructive trust in favor of the Receivership Estate relating back to the date the property was acquired, and ordered the Linarduccis to execute a quitclaim deed conveying the property to the Receiver and vacate the property within forty-five (45) days. ECF No. 412. Shortly after the Reporting Period, the Linarduccis executed the quitclaim deed and began vacating the property in accordance with the Court's Order, though as of the filing of this Report the Linarduccis have not fully vacated and turned over the property to the Receiver despite the expiration of the deadline to do so. During the next reporting period, if the Linarduccis continue to violate the Court's Order requiring them to vacate the property, the Receiver will seek a writ of possession to enforce the Court's Order. The Receiver is in the process of recording the deed and, once possession of the property has been fully surrendered to the Receiver, will promptly begin preparing the property to be marketed for sale for the benefit of the Receivership Estate.

In parallel, the Receiver continued to prosecute an adversary proceeding against Mr. Linarducci in the Bankruptcy Court, seeking to exempt from his bankruptcy discharge more than $7.8 million in debts arising from the fraudulent commissions he received from Drive Planning. During the Report Period, the parties moved into the discovery phase of the adversary proceeding.

During a prior reporting period, the Receiver filed a Motion for Turnover of and Imposition of a Constructive Trust over the Bliss Condominium Unit owned by

Defendant Russell Todd Burkhalter and Relief Defendant Jacqueline Burkhalter (the "Bliss Condominium Unit"), as more than $1 million in Drive Planning investor funds were traced to its acquisition, and seeking an order declaring the Bliss Condominium Unit to be Receivership Property subject to a constructive trust in favor of the Estate. During the prior reporting period, the Court entered an order granting the Receiver's motion, finding that the property is subject to a constructive trust in favor of the Receivership Estate and ordering the turnover of title and possession to the Receiver. *See* ECF No. 246. During the Reporting Period, the Receiver continued to make repairs to the property to ensure it is in marketable condition and positioned for listing and sale.

During the Reporting Period, the Receiver also continued efforts to resolve his claims against Embry Development Group, LLC ("Embry"), a Georgia-based developer to which Drive Planning transferred in excess of $6 million. The Receiver and Embry have continued to engage in settlement negotiations; however, as of the close of the Reporting Period, the Receiver and Embry have not reached a settlement and the Receiver may need to file suit against Embry during the next reporting period.

During the Reporting Period, the Receiver finalized negotiations with the Estate of Richard A. McNelley and his successors, Vanessa McNelley and Wesley McNelley (collectively, the "McNelley Parties"), regarding a Blue Ridge, Georgia

property, which had become a significant financial burden to the Receivership Estate due to its lack of equity, ongoing carrying costs, and disputes affecting its marketability. The Receiver filed a motion seeking approval of a Settlement and Release Agreement with the McNelley Parties, which the Court approved during the Reporting Period. Pursuant to the approved settlement, the Receiver agreed to convey the property to the McNelley Parties by deed in lieu of foreclosure in exchange for the return of $306,593.25 in post-receivership mortgage payments previously made by the Estate, together with an additional $10,000 payment for certain personal property remaining at the premises, resulting in a total recovery of $316,593.25 for the Receivership Estate. *See* ECF Nos. 425, 438. The settlement also eliminates the Estate's continuing obligations associated with the property, including mortgage payments, insurance, property taxes, and the costs and risks of further litigation and ownership, thereby preserving additional assets for the benefit of defrauded investors. *See id*.

Also during the Reporting Period, the Receiver continued investigating and pursuing claims arising from approximately $1.58 million in investor funds transferred by Drive Planning to SFH Holdings LLC, SFHR Development LLC, and Andrew and Sarah O'Gara, including approximately $1.085 million used in connection with the marketing and promotion of Drive Planning through the Whiteland Raceway Park project and $500,000 paid toward the purchase of a twenty

percent (20%) ownership interest in SFH Holdings. Following the sale of the Whiteland Raceway Park property, a portion of the sale proceeds was retained in escrow pursuant to an agreement among the parties while the Receiver investigated and evaluated the Estate's claims. These efforts ultimately resulted in a negotiated settlement in principle, subject to an executed agreement and Court approval, pursuant to which the Receivership Estate will recover $176,083.00 (representing 20% of the sale proceeds based on Drive Planning's 20% ownership of SFH Holdings) in exchange for a release of the Estate's claims against the settling parties.[1] Shortly after the Reporting Period, the Receiver will be filing his motion to approve settlement.

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg, Florida known as Club 201 at the Detroit ("Club 201"). The Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201, LLC, which was granted in the prior reporting period. During the Reporting Period, upon taking control of Club 201, the Receiver identified several issues requiring immediate attention, including that certain taxes and other financial obligations were not being timely paid, which resulted in the freezing of Club 201's operating account,

[1] The Receiver confirmed that the $1.085 million that Drive Planning had paid for marketing and promotion of Drive Planning was used for such purposes and, as such, the Estate did not have a viable claim to recover such amount.

significantly impacting its operations. As a result, Club 201 quickly located and engaged an accountant to resolve the outstanding issues and prepare the necessary sales tax returns that had not been filed, and the Receiver coordinated Club 201's payment of the outstanding taxes to the Department of Revenue and lifting of the freeze on the account. The outstanding sales tax issues have since been resolved, all required sales tax returns have been brought current, and Club 201 is now timely remitting its ongoing sales tax obligations. The Receiver continues to oversee Club 201's operations to preserve the value of the business pending a sale or other disposition.

During the prior reporting period, the Receiver initiated an additional ancillary action against Jon Clement and Trigger Time Gun and Pawn, LLC to recover approximately $1.4 million in investor funds that Drive Planning had improperly transferred to them. These funds were diverted and used to acquire firearms inventory, fund business operations unrelated to Drive Planning, and pay personal expenses, without any goods, services, or reasonably equivalent value provided to Drive Planning in return. The Receiver asserts claims for actual and constructive fraudulent transfer under the Georgia Uniform Voidable Transactions Act, as well as unjust enrichment, and seeks to avoid and recover the transfers for the benefit of the Receivership Estate and its investors. During the Reporting Period, defendants filed their Answers and Affirmative Defenses, the parties filed their Joint

Preliminary Report and Discovery Plan, and the Receiver served his Rule 26 Initial Disclosures on defendants. The matter remains in its early stages, and the Receiver will continue to pursue his claims during the next reporting period.

During the Reporting Period, the Receiver continued to operate the Burkhalter Ranch and Staurolite Barn and to liquidate certain associated assets not necessary for operations, for the benefit of the Receivership Estate. The Receiver previously launched and maintained a dedicated asset-sale website (www.ReceivershipAssetSale.com) to market for sale unused and unnecessary ranch equipment, tools, trailers, utility vehicles, furniture, and other personal property to the public, which should facilitate the sale of multiple items and the recovery of funds for the Estate. During the Reporting Period, the Receiver collected $98,430.00 from the sale of equipment. With respect to the cattle operation, the Receiver continues working with professional ranch management, has undertaken the steps necessary to register eligible cattle and obtain DNA testing where required, and ensure proper documentation so that the animals can be sold at full registered value rather than as unregistered livestock. The Receiver sold one steer during the Reporting Period generating $3,500 for the Estate. Additionally, the Receiver secured one new wedding booking at Staurolite Barn for $7,400, of which an initial deposit of $2,500 was received during the Reporting Period.

During a prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent. *See* ECF No. 240. On August 25, 2025, the Court entered an Order granting the motion and approving the Receiver's proposed claims process. *See* ECF No. 251.

During the prior reporting period, the Receiver completed the claims administration process by reviewing and resolving a substantial volume of objections to his initial claims determinations, conducting detailed analyses of supporting documentation, financial records, and investor communications, and issuing more than 2,300 final claim determinations to claimants. Several claimants appealed the Receiver's final determinations, and the Receiver was able to resolve most of those appeals.

During the Reporting Period, the Receiver filed his response to the remaining claimant appeals that were not resolved. *See* ECF No. 388. Thereafter, the Court entered its Order on Appeals of Receiver's Final Claims Determinations, approving the Receiver's final claims determinations that had been appealed. *See* ECF No. 413. The Receiver then focused on formulating a plan for making distributions to the claimants holding allowed claims. In connection with such distribution plan, the Receiver sought and obtained Court approval to retain Ankura Consulting Group, LLC as Distribution Analyst to assist in developing and validating a claimant-by-

claimant distribution model utilizing the Receiver's proposed "rising-tide" methodology for distributions to holders of allowed claims. *See* ECF Nos. 421, 439. Shortly following the Reporting Period, Ankura completed the necessary distribution analyses and calculations, and the Receiver filed a Motion to Approve Final Claims Determinations, Plan of Distribution, Initial Distribution to Claimants with Allowed Claims and Employ Stretto, Inc. as Distribution Agent (the "Distribution Plan Motion"). *See* ECF No. 449. The motion seeks Court approval of the Receiver's final claim determinations, approval of the rising-tide methodology, authorization to make an initial distribution of approximately $60 million to holders of allowed claims that will provide for a 35% recovery of their investments. In response to the Distribution Plan Motion, the Receiver received a common objection from approximately 40 claimants who had withdrawn funds from and then reinvested them with Drive Planning, which resulted in them not being included among the claimants to whom the Receiver proposed to make initial distributions. After further investigation of their transactions with Drive Planning and the resulting inequities of their circumstances, the Receiver will be filing an Amended Distribution Plan Motion, proposing further analysis of those claimants' transactions and circumstances and a modification to the distribution plan as to those claimants, and seeking authority to expand the scope of Ankura's engagement to assist the Receiver to perform such analysis. The Amended Motion will also increase

the proposed initial distribution from $60 million to $65 million to account for the increase in the total number of claimants who will be entitled to receive initial distributions pursuant to the modified rising-tide methodology and the additional analysis to be performed.

Moreover, during the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically: (i) the Franklin Limestone / Mount View Road Project, which is under contract with a national homebuilder and progressing through final governmental approvals with anticipated repayment by the end of 2026, (ii) the Horton Highway Project, which remains undeveloped and requires additional infrastructure investment and potential parcel sales or restructuring strategies to facilitate recovery, and (iii) the Manchester Pointe Townhomes Project, for which horizontal development is nearing completion and the developer is actively pursuing vertical construction financing anticipated to repay the Receivership Estate by the end of 2026. In connection with the Horton Highway Project, because there is no formal construction financing or loan currently in place to support development, the parcels have been listed for sale, with individual lots being marketed at approximately $1 million each as part of an effort to generate interest and maximize recovery.

During a prior reporting period, the Receiver and his counsel also worked with counsel for the SEC and counsel for the Relief Defendants on a global settlement of the SEC's claims against the Relief Defendants, which included the resolution of issues related to various real properties in Georgia and the Receiver's preparation of documents providing for the transfer of certain properties to the Estate and the retention of other properties by one Relief Defendant and related parties in exchange for payments to the Estate pursuant to secured promissory notes. During the Reporting Period, and pursuant to the negotiated agreement, the Receivership Estate took over the management of four additional properties in Georgia. The deeds to these properties, executed by Relief Defendant Jacqueline Burkhalter, are currently being held in escrow for the benefit of the Receivership Estate pending the SEC's approval of the negotiated agreement.

The Receiver will continue to work diligently with his team of professionals to fulfill his duties under the Appointment Order and report his efforts and activities in status reports and other court filings until such time as the Court may discharge him of his duties.

## II. COMPLAINT, ENTRY OF PRELIMINARY INJUNCTION, AND APPOINTMENT OF RECEIVER

On August 13, 2024, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief against Drive Planning, LLC and Russell Todd Burkhalter, alleging they

operated a massive Ponzi scheme under the guise of real estate-related investment programs. *See* ECF No. 1.

**A. Preliminary Injunction and Appointment of Receiver**

As detailed in the SEC's initial filings and the Court's prior orders, the SEC filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and continued defrauding of investors. *See* ECF No. 2. The Court found that the SEC had established a *prima facie* case of securities law violations by Defendants Burkhalter and Drive Planning, and that the Relief Defendants improperly received funds derived from the fraudulent activities. *See* ECF No. 11 at ¶¶ 2, 4. Accordingly, the Court entered a Preliminary Injunction freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting. *See id.* On August 13, 2024, the Court also entered an Order Appointing Kenneth D. Murena, Esq., as Receiver over Drive Planning and all assets derived from investor funds. *See* ECF No. 10. The Receiver was tasked with, *inter alia*, securing and recovering assets traceable to investor funds, managing and liquidating Receivership assets, and filing quarterly reports with the Court. *See id.* at ¶¶ 4–7, 54.

## III. THE RECEIVER'S EFFORTS TO FULFILL HIS DUTIES UNDER THE APPOINTMENT ORDER

### A. Receiver's Employment of Professionals

Promptly after his appointment, pursuant to his authority under the Appointment Order and with this Court's approval, the Receiver employed legal counsel, forensic accountants, and other professionals to assist in taking possession, custody, and control of all identified assets of Drive Planning, marshaling records and assets in the hands of third parties, affiliates, and insiders of Drive Planning, analyzing and reconstructing Drive Planning's financial records, investigating potential assets and claims of the Estate, developing a secure online portal to obtain information and documents from investors, and otherwise fulfilling his duties under the Appointment Order. Specifically, the Receiver employed Damian Valori Culmo as his lead counsel ("Lead Counsel"), Henry F. Sewell Jr. LLC as his Georgia counsel ("Georgia Counsel"), and Hays Financial Consulting LLC as his forensic accountant, financial advisor, and tax consultant ("Forensic Accountant"). *See* ECF Nos. 21, 24.

Further, the Receiver employed Preti Flaherty Beliveau & Pachios, LLP as counsel in New Hampshire to assist with litigation pending against Drive Planning, and Johnathan Pikoff as counsel in San José del Cabo, Mexico, to take control of and facilitate the marketing and sale of real property of the Receivership Estate,

address legal and tax issues related to the Mexican entity that owns the property, and ensure the sale proceeds are transferred to the Estate. *See* ECF Nos. 46, 47.

Additionally, the Receiver obtained the Court's approval to employ Stretto Inc. to set up and manage a secure online portal through which investors could upload information and documents necessary for the Forensic Accountant to complete the reconstruction of Drive Planning's accounts and which facilitated the processing of claims in the claims process that was approved by the Court and implemented by the Receiver in this Receivership. *See* ECF No. 37. Finally, the Court approved the Receiver's employment of a captain to maintain the 70-foot yacht while the Receiver was marketing it for sale. *See* ECF No. 42.

During a prior reporting period, the Receiver sought and obtained the Court's approval to employ Bose McKinney & Evans LLP as his local bankruptcy counsel in Indiana. *See* ECF Nos. 240, 242. Bose McKinney & Evans, through partner James P. Moloy, was engaged to represent the Receiver in the Chapter 13 bankruptcy case filed by former Drive Planning agent Gerardo Linarducci (Case No. 25-03768-JMC-13) in the United States Bankruptcy Court for the Southern District of Indiana.

**B. Securing and Reviewing Books and Records of Drive Planning**

During the Reporting Period, the Receiver continued to take steps to obtain, secure, organize, and review the books and records of Drive Planning in compliance with the Appointment Order. The Receiver and his team continued the review of

these records to identify communications, transaction histories, and other documents that assisted in formulating the distribution plan based on the final determination in the claims administration process and tracing investor funds and determining the extent, use, and location of assets of the Receivership Estate.

**1. Analysis of Records and Consolidation of Investor Accounts**

During the Reporting Period, the Receiver and his forensic accounting team continued analyzing Drive Planning's financial records and investor transaction data to ensure accurate calculation of each investor's net loss and proposed initial distribution amount for purposes of the proposed distribution plan. This review included identifying and reconciling accounts in which investors transacted through limited liability companies or other entities, rather than in their individual names. In several instances, the same individuals both invested and received commissions through affiliated entities, requiring consolidation of those accounts to avoid duplication and properly determine their net investment position.

The Receiver's forensic accountant continued the cross-referencing of deposits, withdrawals, and commission payments across personal, joint, and entity accounts to produce a comprehensive money-in, money-out analysis for each claimant for purposes of the claim process and formulation of the distribution plan. This work ensured that all investments, redemptions, and commission payments were attributed to the correct beneficial owner and formed the basis of the Receiver's

final determination of each claimant's claim amount under the Court-approved claims process and the initial distribution amounts under the proposed rising-tide distribution plan.

**2. Claims Against Drive Planning Agents**

Based on the Receiver's forensic analysis and reconstruction of Drive Planning's financial records, during prior reporting periods, the Receiver issued demand letters to numerous former agents and advisors of Drive Planning who received commissions funded by investor monies in return for procuring investments in Drive Planning's fraudulent scheme. The letters demanded the return of commissions to the Receivership Estate and detailed the Receiver's legal claims under the applicable fraudulent transfer statutes, as well as unjust enrichment. For those agents who were also investors and had no knowledge of the fraudulent nature or activities of Drive Planning, the Receiver considered the amounts they invested and the investment returns and commissions they received from Drive Planning in determining whether they received a recoverable net gain (as a fraudulent transfer and/or unjust enrichment) or suffered a net loss. For those investor/agents who suffered a net loss, the Receiver determined that no recovery was warranted and withdrew his demand letters.

During a prior reporting period, the Receiver filed a motion for authority to commence ancillary actions to recover commissions from Drive Planning agents,

net gains from investors, and other amounts from third parties and to approve settlement procedures to streamline the resolution of claims before and during litigation. *See* ECF No. 230. Thereafter, the Court granted that motion and the Receiver filed a complaint commencing an ancillary action in the U.S. District Court for the Northern District of Georgia, asserting fraudulent transfer and unjust enrichment claims against forty-six agents, seeking to recover the commissions they had received from Drive Planning in connection with bringing investors into the Drive Planning scheme or, if they were also investors, to recover the net gains they had received as a result of their commissions. *See* Case No. 1:25-cv-04587-VMC at ECF No. 1.

During the prior reporting period and the current Reporting Period, the Receiver received partial or full payments from certain agents to whom the Receiver had sent demand letters to recover the commissions and/or net gains they had received from Drive Planning and actively negotiated with others who were not named as defendants in the Court-authorized ancillary action the Receiver filed against Drive Planning agents who had received significant commissions.

The Receiver continued to prosecute the ancillary action throughout the Reporting Period while simultaneously pursuing settlement discussions with numerous defendants, resulting in additional negotiated resolutions where appropriate.

During the Reporting Period, after completing further forensic analysis and continuing his investigation into commissions paid by Drive Planning, the Receiver filed a second ancillary action against an additional group of former agents who received commissions funded by investor monies and who were unable or unwilling to resolve the Receiver's claims through settlement. As with the first ancillary action, the Receiver seeks to recover those commissions for the benefit of the Receivership Estate and all defrauded investors. The Receiver will continue to evaluate additional claims, negotiate settlements to the extent doing so maximizes recoveries while minimizing litigation expenses, and aggressively pursue litigation against those parties who fail to resolve the Receiver's claims on acceptable terms.

**3. Claims Against Net Winners**

During the Reporting Period, the Receiver devoted substantial time and resources to pursuing recovery from individuals and entities who received more from Drive Planning than they had invested (the "Net Winners"). Because Drive Planning operated as a Ponzi scheme, the Receiver has asserted that these recipients received fictitious profits and other transfers funded with money contributed by later investors, rather than legitimate investment returns, and therefore seeks recovery of their net gains (*i.e.*, the amount in excess of their principal investment that Drive Planning returned to them) for the benefit of the Receivership Estate and the defrauded investors. To maximize recoveries while minimizing litigation costs, the

Receiver undertook an extensive pre-suit settlement initiative, issuing individualized demand letters to Net Winners that detailed the factual basis for the Receiver's claims, the transfers at issue, and the legal theories supporting recovery of the net gains. Following issuance of those demands, the Receiver and his professionals engaged in extensive correspondence and negotiations with numerous recipients or their counsel, responding to legal and factual disputes, analyzing defenses asserted by the recipients, and evaluating settlement proposals.

As part of these negotiations, many recipients asserted that immediate payment of the Receiver's demand would impose a significant financial hardship. In response, the Receiver developed and implemented procedures requiring recipients seeking substantial reductions of the Receiver's demands to submit sworn financial disclosure packages, including tax returns, bank statements, financial statements, and supporting documentation substantiating their claimed inability to pay their net gains to the Estate. These efforts required extensive communications with recipients or their counsel, review of voluminous financial records, preparation and revision of settlement agreements, and ongoing administration of settlement payments.

During the Reporting Period, the Receiver entered into settlement agreements providing for total recoveries of $1,448,737.62 from Net Winners, including installment payment arrangements where appropriate, and received $901,435.88 in

settlement proceeds during the Reporting Period. During the next reporting period, the Receiver anticipates filing one ancillary action against those Net Winners who have declined to resolve the Receiver's claims through settlement.

### C. Real Property, Businesses, and Personal Property in Which Receivership Estate Has an Interest

Upon his appointment, the Receiver immediately reviewed the SEC's analysis of Defendants' and Relief Defendants' interests in real property and associated personal property and businesses and began marshaling those assets, taking control of or monitoring those businesses as directed in the Appointment Order, and demanding turnover of all such assets held by third parties to the extent there is equity and value for the Receivership Estate.

#### 1. Real Properties and Businesses in Georgia, Florida, Indiana, and Mexico

*i. Efforts to Sell Properties*

During the Reporting Period, the Receiver, with the assistance of reputable and experienced realtors, continued the process of marketing the Georgia, Florida, Indiana, and Mexico properties for sale. Additionally, the Receiver continued to collect rent for tenant occupied properties generating $78,659.73 in income during the Reporting Period.

Based on a review of the acquisition history and independent market evaluations, the Receiver determined that many of these properties were acquired at

the height of the respective real estate markets and/or in some instances for prices significantly above market value. During the Reporting Period, the Receiver lowered the listing prices for certain properties for which no purchase offers were received. Additionally, the Receiver obtained appraisal reports for select properties, which confirmed that their current fair market values are substantially lower than the original purchase prices.

During the Reporting Period, the Receiver and Receiver's Lead Counsel undertook extensive efforts and devoted time to the management, maintenance, and sale of real properties and personal property owned by Drive Planning and/or acquired with investor funds. This included overseeing the marketing for sale of real estate in Georgia, Florida, Indiana, South Carolina, Alabama, and Mexico, coordinating with realtors and property managers, and addressing operational issues with rental properties, such as payment of maintenance expenses, HOA fees, and property taxes, insurance renewals, renegotiating leases, and addressing tenant disputes. Pursuant to Court approval (ECF Nos. 384, 397, 403), the Receiver closed on the sales of three properties, generating a total of $486,500 in gross sale proceeds including: (i) property on Grimble Court in Sumter, SC for $164,000; (ii) property on Moody Street in Montevallo, AL for $160,000; and (iii) property on Beacon Drive in Sumter County, SC for $162,500.

Shortly following the Reporting Period, the Receiver closed on a condominium unit in San José del Cabo, Mexico for $4,138,000 [ECF Nos. 377, 378], an apartment building in St. Petersburg for $2,650,000 [ECF Nos. 396, 398], and a property on Tower Road in Mineral Bluff, GA for $1,350,000 [ECF Nos. 432, 437]. On July 31, 2026, the Receiver expects to close on the sale of property on Preot Street in Sumter, SC for $160,000 [ECF Nos. 440, 441], and a property on Calypso Way in Cumming, GA for $600,000 [ECF Nos. 445, 446]. In addition, the Receiver entered into a Purchase and Sale Agreement, pending Court approval, for a property on Dartmouth Drive in Sumter, SC for $173,000. In total, these transactions generated or will generate $9,071,000 in gross sale proceeds.

As a result of these sales,the Receivership Estate recovered and will recover significant funds while eliminating the ongoing expenses associated with owning and maintaining the properties, including property taxes, insurance premiums, utilities, landscaping and general maintenance costs, homeowner or condominium association dues, security expenses, and other carrying costs.

*ii. The Burkhalter Ranch*

During the Reporting Period, the Receiver continued overseeing operations of the Burkhalter Ranch and made several key staffing and cost-efficiency improvements. Following the Receiver's decision to reduce ranch management hours to align with current operational needs and budget, during a prior reporting

period, former ranch manager resigned. The Receiver subsequently retained Sean Cook as the new ranch manager. Mr. Cook has proven to be both cost-effective and highly capable, implementing improved maintenance procedures and exploring new opportunities for revenue generation, including registration of the herd with the American Highland Cattle Association to increase the market value of the calves and the sale of various utility vehicles and heavy equipment that was stored at, but not necessary for the operations of, the ranch.

Under Mr. Cook's supervision, the Receiver employed one full-time ranch hand and one part-time ranch hand to assist with maintenance, livestock care, and property management. The Receiver also continued to reduce operational costs by eliminating unnecessary service contracts, including outsourced garbage collection and landscaping, and by utilizing ranch staff to perform repairs and maintenance in-house. These changes have lowered expenses while maintaining the property and equipment in marketable condition. The Receiver with the assistance of the ranch manager sold various utility vehicles and heavy equipment that were not used in the ranch at a nearby public auction. During the Reporting Period, the Receiver collected $98,430.00 in net sale proceeds.

In parallel, the Receiver has been working to obtain and confirm historical records, lineage information, and registration eligibility for the herd through the American Highland Cattle Association. This process is ongoing and is intended to

ensure accurate classification and documentation of the cattle, which the Receiver believes will improve transparency for potential buyers and increase potential sale proceeds for the Estate. Finally, during the prior reporting period and the current Reporting Period, the ranch manager and ranch hands managed the breeding and natural reproduction of the cattle and certain of the cows are now pregnant, which is expected to further enhance the market value and overall attractiveness of the herd and the ranch to prospective purchasers.

*iii. Staurolite Barn*

Staurolite Barn is a luxury event venue located on the Burkhalter Ranch. The venue is being marketed for sale together with the ranch, and its potential as a revenue-generating event space is expected to increase the overall sale price. During the Reporting Period, event coordinator Shelby Cook stopped working at Staurolite Barn, and the Receiver assumed oversight of ongoing venue operations and bookings. To date, the Receiver has secured one wedding event, which will take place in September 2026.

*iv. Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC*

During the Reporting Period, the Receiver continued efforts to secure and recover Receivership assets associated with Jon Clement, TBR Outdoors Supply, LLC, and Trigger Time Gun and Pawn, LLC, which collectively received approximately $1.4 million in investor money transferred from Drive Planning. On

September 11, 2025, the Receiver issued a cease-and-desist letter to Mr. Clement demanding that he immediately halt all sales and operations involving firearms, ammunition, and related merchandise purchased with funds Drive Planning had obtained from investors and held at the outdoor/gun store (Trigger Time Gun and Pawn, LLC) he was operating from the Blue Ridge, Georgia property owned by Relief Defendant TBR Supply House, Inc., after learning that he was continuing to operate the business and dispose of those Receivership assets without remitting any portion of the sale proceeds to the Estate, in violation of the Court's Appointment Order.

Despite repeated demands, Mr. Clement failed to cooperate or to conduct the liquidation of inventory and turnover of proceeds upon which the parties had previously agreed. The Receiver therefore served Subpoenas for Deposition Duces Tecum on Mr. Clement individually and on Trigger Time Gun and Pawn, LLC requiring production of financial records, bank statements, inventory lists, and communications related to the $1.4 million transfer from Drive Planning and subsequent use of those funds. Mr. Clement and Trigger Time Gun and Pawn, LLC did not initially comply with the subpoenas and delayed their appearance for deposition and threatened to take actions against the Receivership Estate's interest in TBR Outdoor Supply, LLC, which would violate the Appointment Order.

During the prior reporting period, as a result of his continued non-compliance with the Receiver's demands, and misappropriation of Receivership property, the Receiver filed an ancillary action seeking to recover the $1.4 million transferred to Mr. Clement and Trigger Time Gun and Pawn, LLC, asserting claims for fraudulent transfer and unjust enrichment under Georgia law. During the Reporting Period, the defendants filed their Answers and Affirmative Defenses, the parties filed their Joint Preliminary Report and Discovery Plan, and the Receiver served his Rule 26 Initial Disclosures. This action remains in its early stages, the Receiver is in the process of pursuing discovery, and the Receiver will continue to pursue his claims during the next reporting period.

*v. Club 201 at the Detroit in St. Petersburg, Florida*

During the initial reporting period, the Receiver inspected a bar owned by Mr. Burkhalter, located in the historic Detroit building in downtown St. Petersburg, Florida known as Club 201 at the Detroit ("Club 201"). The Receiver was tasked with monitoring its operations pursuant to the Appointment Order. The Receiver traced transfers totaling $861,839.65 from investor-funded accounts to Club 201. After Mr. Burkhalter declined to turn over Club 201 to the Receiver so it could be sold and the proceeds could be remitted to the Estate, on October 3, 2025, the Receiver filed a Motion for Turnover of and Imposition of Constructive Trust over Club 201 LLC, including all its Assets and Membership Interest [ECF No. 293],

requesting that the Court declare the business to be property of the Receivership Estate and compel immediate turnover of all assets, membership interests, and operations to the Receiver.

During a prior reporting period, the Court granted the Receiver's Motion [ECF No. 293], determining that Club 201 constitutes property of the Receivership Estate and authorizing the Receiver to take control of the business and its related assets. *See* ECF No. 339.

After obtaining control of Club 201, the Receiver began evaluating options for disposition of the business in a manner designed to maximize the recovery by the Estate. The Receiver has been approached by multiple prospective purchasers expressing interest in acquiring Club 201 and, during the Reporting Period, continued to provide them with financial records of the business, subject to executed non-disclosures agreements, to facilitate their due diligence and submission of purchase offers. During the Reporting Period, the Receiver received one low-ball offer for the purchase of Club 201, which the Receiver rejected.

During the Reporting Period, the Receiver successfully resolved all outstanding sales tax issues affecting Club 201 by determining and paying the amounts due, have certain penalties waived, and bringing the business into full compliance with applicable tax requirements. The Receiver also implemented procedures to ensure that all ongoing sales tax obligations are timely paid and remain

current. In addition, the Receiver resolved all known liens and other encumbrances affecting the business, thereby eliminating obstacles to a potential sale and enabling the Receiver to convey clear title to a purchaser. As a result of these efforts, Club 201 is now in a significantly stronger position for marketing and sale. Although the Estate initially received limited interest from prospective purchasers due to the unresolved tax issues and liens, the Receiver anticipates increased buyer interest now that those issues have been resolved and the business can be offered free and clear of those encumbrances.

**2. Real Properties in South Carolina and Alabama**

During a prior reporting period, the Receiver reached an agreement with David Bradford, a former Drive Planning agent, providing for his turnover of eleven rental homes in Sumter County, South Carolina and two properties in Montevallo, Alabama to the Receivership Estate. The deeds transferring these properties to the Receivership Estate were properly recorded. Thereafter, the Receiver took operational control of the properties to maintain and preserve their value and began collecting rent from existing tenants to cover the maintenance expenses and generate income for the Receivership Estate. Also, during prior reporting periods, multiple properties were listed for sale. As a result of these efforts, four properties have been sold as of the end of the Reporting Period, and two are set to close shortly after the Reporting Period as detailed herein.

### 3. Investment in Real Property in Medellin, Colombia

During the Reporting Period, the Receiver continued to investigate Drive Planning's $1,200,000 investment in the boutique hotel project in Medellín, Colombia known as "La Casa Project." Although the project was promoted in Drive Planning's marketing materials as a forthcoming luxury development, all indications suggest it remains in the pre-construction phase. The Receiver made repeated efforts to engage with individuals and entities associated with the project, including prior contacts and other affiliated parties. Those outreach efforts, however, have yielded limited responses and no new substantive information. The Receiver is continuing to explore alternative avenues to obtain documentation and verify the current status and location of the project to assess potential recovery options.

### 4. Real Property Owned or Occupied by Third-Parties

During a prior reporting period, the Receiver identified a number of properties that were purchased by Drive Planning or with funds traceable to its investors but were not currently owned by Drive Planning and/or were occupied by third parties who refused to turn them over to the Estate, notwithstanding the Receiver's demands pursuant to the Appointment Order.

As a result, the Receiver filed three motions against former Drive Planning agents and/or high-level insiders seeking the turnover of and imposition of constructive trusts over real properties in Florida, Georgia, and Indiana acquired

with misappropriated investor funds and the imposition of constructive trusts over those assets. *See* ECF Nos. 98, 114, 131. The Court granted two of the Receiver's motions, ordering the owners/occupants of properties in Florida and Georgia to sign Quit Claim Deeds transferring title to the Estate and vacating the premises by dates certain. *See* ECF Nos. 152 and 163.

The third motion sought turnover of and imposition of a constructive trust over real property located in Indianapolis, Indiana purchased with approximately $1.9 million in misappropriated investor funds and titled in the name of former Drive Planning agent Gerardo Linarducci and his wife. *See* ECF No. 131. Shortly after the Receiver's filing, Mr. Linarducci filed a petition for bankruptcy protection. *See* ECF No. 151. During prior reporting periods, the Receiver actively litigated issues arising from the automatic stay by the Bankruptcy Code and pursued relief in the Bankruptcy Court to allow the Receivership Court to confirm the Estate's ownership of the property, pursuant to the definitions of Receivership Assets and Recoverable Assets in the Appointment Order, and recover that property given the imposition of a constructive trust upon it by operation of law when it was acquired, years before the bankruptcy filing, thus making it not property of the Bankruptcy Estate. During the prior reporting period, following extensive briefing and multiple hearings, the Bankruptcy Court granted the Receiver's motion for relief from the automatic stay, permitting the Receiver to refile the constructive trust motion in the District Court.

During the Reporting Period, the Receiver filed his renewed motion for turnover and constructive trust as to the Indiana property. *See* ECF No. 390. On May 21, 2026, the Court granted the Receiver's renewed motion, declared that any interest held by the Linarduccis in the property was subject to a constructive trust in favor of the Receivership Estate relating back to the date the property was acquired, and ordered the Linarduccis to execute a quitclaim deed conveying the property to the Receiver and vacate the property within forty-five (45) days. *See* ECF No. 412. Shortly after the Reporting Period, the Linarduccis executed the quitclaim deed which is the process of being recorded. Upon obtaining possession, the Receiver will promptly prepare the property to be marketed for sale for the benefit of the Receivership Estate. The Linarduccis have remained on the property in violation of the Court's Order. During the next reporting period, if the Linarduccis continue to violate the Court's Order requiring them to vacate the property, the Receiver will seek a writ of possession to enforce the Court's Order.

In parallel, the Receiver continued to prosecute an adversary proceeding against Mr. Linarducci in the Bankruptcy Court, seeking to exempt from his bankruptcy discharge more than $7.8 million in debts arising from the fraudulent commissions he received from Drive Planning. During the prior reporting period, the Bankruptcy Court denied Mr. Linarducci's motion to dismiss the Receiver's claims. During the Reporting Period, the Receiver propounded written discovery

requests on Mr. Linarducci, and Mr. Linarducci served his responses invoking the Fifth Amendment in response to nearly every request. During the next reporting period, the Receiver will file a motion for summary judgment with the goal of bringing the adversary proceeding to a swift conclusion in favor of the Receivership Estate.

The Court also granted a similar motion filed by the Receiver seeking the turnover and constructive trust over the personal residence of former Drive Planning employee Julie Edwards located in Cumming, Georgia (the "Edwards Property"), which was purchased for approximately $630,000 using investor funds transferred from a Drive Planning bank account. *See* ECF No. 163. During the prior reporting period, Ms. Edwards executed a Quit Claim Deed, which has since been recorded, transferring title to the Receivership Estate. Ms. Edwards requested permission to remain in the property as a tenant, paying monthly rent, homeowners' association fees, and property insurance while the property is marketed for sale. The Receiver agreed to permit Ms. Edwards to remain in the property under a rental arrangement that generated income for the Receivership Estate while ensuring the property remained maintained and insured during the marketing period. During the Reporting Period, the Receiver continued to collect rent from Ms. Edwards. Additionally, the property is now under contract to be sold for $600,000 with a closing date of July 31, 2026, and Ms. Edwards vacated the property on July 25, 2026.

**5. Deeds of Trust and Investments in Real Property in Tennessee**

During the Reporting Period, the Receiver continued to monitor, provide oversight and input regarding, and explore options for recovering Drive Planning's real estate development investments in Tennessee, specifically:

1. Franklin Limestone / Mount View Road Project (Davidson County): The Court previously approved the Receiver's unopposed motion to reallocate $600,000 in investor funds from the stalled Franklin Limestone Project to the Mount View Road Project. The new project, a 54-unit townhome development, is supported by a letter of intent from a national homebuilder and provides the Receivership Estate with a first-lien position. It is currently under contract with the national builder for $5.8 million and is progressing toward final governmental approvals. This property has little debt in comparison to its value. The builder anticipates that he will be able to repay the entire investment to the Receivership Estate by the beginning of 2027.

2. Horton Highway Project (Williamson County): Drive Planning transferred $4,534,400 to Canaan Builders, LLC, in connection with a planned six-lot subdivision for luxury residential development. The project was structured to be fully funded by Drive Planning, and as a result remains stalled. The builder has been unable to obtain a construction loan due to Drive Planning's existing first-lien position. During the Reporting Period, the Receiver evaluated the current status of the project, including the fact that all six lots remain undeveloped, and that additional capital would be required to complete a necessary bridge (required to access the lots) at approximately $500,000. The Receiver also reviewed recent appraisals valuing the individual lots for their potential listing. Although the subdivision has received permit approvals, meaningful recovery of invested capital may require either securing construction financing to complete home builds or implementing a restructuring strategy involving partial lien releases and lot sales to fund the bridge for access. During the prior reporting period, the six lots were listed for sale for $1,000,000. During the Reporting Period, the builder

requested that the Receiver release its lien on one of the lots to enable the builder to obtain construction financing for the construction of a bridge that would provide the only practical access to the six-lot subdivision. Without the bridge, the lots are effectively inaccessible, significantly impairing their marketability and preventing the builder from selling or developing the property. The Receiver evaluated the proposal to determine whether the requested lien release could be structured in a manner that would preserve and enhance the Receivership Estate's collateral position. Among other protections, the Receiver explored requiring replacement collateral, increasing the liens on the remaining lots, and cross-collateralizing the indebtedness to ensure that the Estate remained fully secured while facilitating construction of the bridge, which is expected to materially increase the value and marketability of the development.

3. <u>West Meade Hills Project (Davidson County)</u>: Drive Planning also transferred $615,000 to Canaan Builders, LLC, secured by property in the West Meade Hills subdivision. In a prior reporting period, the Receiver recovered the full $615,000 investment upon sale of the property. Additionally, the Receiver successfully negotiated the payment of $20,000 in interest to the Receivership Estate.

4. <u>Manchester Pointe Townhomes Project (Coffee County)</u>: Drive Planning invested $2,200,000 in Manchester Pointe Townhomes, LLC, secured by a deed of trust on 23.65 acres in Coffee County. The funds were allocated for horizontal development of a multi-phase apartment complex. The development phase remains ongoing, and site plans for vertical construction are actively being prepared. The project is planned to proceed in multiple phases, including an initial phase of approximately 100 units followed by a second phase of approximately 152 units. During the Reporting Period, the Receiver continued to monitor the progress of the Manchester Pointe Townhomes project, which remains active and advancing in accordance with its long-term development timeline. The horizontal development work is expected to be completed within the next 90 days, and the developer is in the process of finalizing plans for vertical

> construction. In parallel, the developer is actively working to secure construction financing for the vertical phase, which would enable the developer to repay the entire investment to the Receivership Estate. The builder anticipates the Estate will have its investment returned as soon as the end of 2026. During the Reporting Period, the Receiver requested a payoff amount for a constructive loan which is expected upon completion of a permit review.

During the next reporting period, the Receiver will continue to devise and seek to implement the most cost-effective strategies for recovering the funds that Drive Planning had transferred for these real estate developments.

**6. Transfers to Embry Development Company for Real Estate Projects**

During the Reporting Period, the Receiver continued settlement discussions and financial analysis of Drive Planning's investment with Embry Development Company and its principal (together, "Embry"), which collectively had received approximately $6.7 million from Drive Planning. Given that a settlement has not been reached, during the next reporting period, the Receiver will likely file a lawsuit against Embry to recover the $6.7 million transfer.

**7. Drive Plan Financial Services LLC**

During the Reporting Period, the Receiver continued investigating Drive Plan Financial Services, LLC ("DPFS"), which was formed jointly by Drive Planning, LLC (80%) and Accelerated Financial Services, Inc. (20%), an entity owned by former Drive Planning agent James Thomasson. The Receiver confirmed that

investor funds totaling $675,724.97 were used to purchase commercial property located on Carpenter Drive in Sandy Springs, Georgia (the "Sandy Springs Property") on May 1, 2024. Title was taken in the name of DPFS.

Following the commencement of the Receivership, the Receiver discovered that in October 2024, Mr. Thomasson, acting without authority, sold the Sandy Springs Property for $650,000 and executed all sale documents as the purported "sole member" of DPFS. The sale was partially seller-financed through a $550,000 promissory note maturing on October 1, 2026, with only $98,000 received in cash at closing. These actions violated the DPFS Operating Agreement and the Court's Appointment Order, as the Receiver did not consent to the sale or receive any sale proceeds or an assignment of the note.

On September 18, 2025, the Receiver issued a demand to Mr. Thomasson to turn over the $675,724.97 in investor funds misappropriated through the purchase and sale of the Sandy Springs Property and notifying him that his conduct constituted a willful violation of the Court's Order. Following this demand, Mr. Thomasson engaged in communications with the Receiver's counsel and agreed to assign all rights and future payments due under the seller-financed note to the Receivership Estate, including the October 2026 balloon payment of $430,000.

The Receiver prepared an Assignment of LLC Membership Interest and Withdrawal as Member, pursuant to which Accelerated Financial Services, Inc.

would transfer its 20% ownership interest in DPFS to the Receiver, consolidating control of the company within the Receivership Estate. During a prior reporting period, the assignment was executed and the Receiver began monthly loan payments in the amount of $5,000 from tenant/buyer of the Sandy Springs Property. During the Reporting Period, the Receiver continued to receive the $5,000 monthly payments. Also, the Receiver continued to negotiate with Mr. Thomasson to finalize the return of funds that he had received from Drive Planning or DPFS. If the Receiver is unable to reach an agreement with Mr. Thomasson, the Receiver will commence an action against him during the next reporting period.

**8. Personal Property**

*i. Luxury Furniture*

During prior reporting periods, the Receiver contacted five consignment shops (Sarah Cyrus Home, Swoox Curated Consignment, Southern Comforts New & Consigned, Board of Trade Fine Consignments, and Whiskey Creek Furniture Consignments) to explore options for liquidating the high-end furnishings that the Receiver is storing in a secure storage facility. The Receiver provided a detailed price list and photo catalog to the vendors and received preliminary pricing feedback from three of them; however, the proposed consignment values were significantly below market expectations and would yield minimal recovery for the Estate. As a result, during the prior reporting period, the Receiver began exploring alternative

options, including estate sales or bulk liquidation, to maximize the Estate's recovery and facilitate prompt disposition of the furnishings. The Receiver previously launched and maintained a dedicated asset-sale website (www.ReceivershipAssetSale.com) to market the luxury furniture. During the Reporting Period, the Receiver's office responded to requests from potential purchasers for details regarding various items of furniture and furnishings and the procedures and logistics for the sale and shipment of the items.

**9. SFHR Development LLC (Sarah and Andy Fisher)**

During a prior reporting period, the Receiver began investigating Drive Planning's ownership stake in the Whiteland Raceway Park property. The Receiver requested copies of all agreements and communications related to (1) the sponsorship arrangement between Drive Planning and SFHR Development LLC, and (2) any agreements concerning the acquisition or investment in the Whiteland Raceway go-kart facility, to determine whether investor funds were properly used and whether any recovery is available to the Receivership Estate. The Receiver investigated and traced more than $1 million in investor funds from Drive Planning into SFH Holdings and its affiliate, SFHR Development, LLC (together, the "SFH Parties"), including funds that were used for marketing and sponsorship activities and funds that were applied toward the acquisition and operation of the Whiteland Raceway Park property. Of the amount transferred, $500,000 was paid pursuant to

a May 2024 Unit Purchase Agreement under which Drive Planning had agreed to purchase up to a 50% membership interest in SFH Holdings for a total purchase price of $1,250,000, with the remaining funds expended on marketing, advertising, and sponsorship activities promoting the Whiteland Raceway Park project. Under the Unit Purchase Agreement, Drive Planning's ownership interest was to be issued incrementally "per transaction" as installment payments were made, and Drive Planning made only the initial $500,000 payment. As a result, Drive Planning's $500,000 payment vested 20 units, representing a twenty percent (20%) membership interest in SFH Holdings.

The Receiver issued a formal demand for repayment of the misappropriated investor funds. When SFH Holdings advised that it intended to sell the Whiteland Raceway Park property, the Receiver asserted a claim to the sale proceeds based on the traced transfers and required that a portion of the proceeds be placed into escrow pending a resolution of the Receiver's claim after the transaction closed. That arrangement was memorialized in a written Escrow Agreement among SFH Holdings, the Receiver, and the Escrow Agent, which requires that $600,000 of the sale proceeds be held in escrow and may be released only by written agreement of SFH Holdings and the Receiver or by court order, preserving a source of recovery for the Receivership Estate while negotiations continue. During a prior reporting

period, the Receiver received confirmation that the $600,000 was being held in escrow by SFH Holdings, which claimed to have an interest in these funds.

During the Reporting Period, based upon the Receiver's Estate's twenty percent ownership interest in SFH Holdings, the parties agreed that the Estate would be entitled to twenty percent ($176,083) of the net proceeds generated from the sale of the Whiteland Raceway Park business and real estate, subject to an executed settlement agreement and Court approval. The Receiver then prepared a settlement agreement providing for the SFH Parties' payment to the Receivership Estate of $176,083.00 in a lump-sum payment in exchange for a full release of the Receiver's claims. The settlement further provides that, in the event of a payment default, the Receiver may seek the immediate entry of a consent judgment for the unpaid settlement amount, thereby preserving the Estate's ability to enforce the agreement while avoiding the expense and uncertainty of further litigation. The Receiver will file a motion to approve this settlement once it is fully executed during the next reporting period.

**10. Bradford Private Placement Investments**

During the prior reporting period, the Receiver's counsel undertook a comprehensive review and analysis of the subscription agreements, operating agreements, and other governing documents for each of the seven private placement investments that Mr. Bradford transferred to the Receivership Estate pursuant to the

Voluntary Asset Transfer Agreement and related assignment documents. That review was designed to identify the transfer restrictions applicable to each investment, assess the Receiver's authority under the Appointment Order to act in Mr. Bradford's stead, and determine the specific steps required to formally substitute the Receivership Estate as the recognized investor or member in each asset. The Receiver's counsel prepared analyses of each investment's governing documents and developed a strategy for effectuating the transfers in a manner consistent with both the Appointment Order and the applicable organizational documents.

Having completed that review during the prior reporting period, the Receiver's counsel commenced outreach to the fund managers, administrators, and relevant counterparties associated with each investment to provide notice of the receivership, assert the Receiver's authority under the Appointment Order, and take all steps necessary to ensure proper recognition of the Receivership Estate as the substituted member or investor. The Receiver's counsel then coordinated and participated in telephone conferences with representatives of Ascension Property Development, LLC, the Georgia-based entity in which Mr. Bradford holds a 30% membership interest in connection with the Booth Place Apartments project, and with representatives of Viking Real Estate Fund, LLC, in which Mr. Bradford's interest is held through D&G Legacy, LLC. Those discussions focused on the mechanics of recognizing the Receiver as Mr. Bradford's successor-in-interest, the

process for directing all future distributions to the Receivership Estate, the current status and valuation of each investment, and the steps required to formally record the transfer on each entity's books and records.

During the Reporting Period, the Receiver continued to pursue the formal recognition of the Estate's interests in these and the remaining investment vehicles.

**D. Known Investors and Creditors**

The Receiver is aware of nearly 2,400 investors who transferred more than $380,000,000 to Drive Planning. The Receiver and his Forensic Accountant completed the forensic reconstruction of Drive Planning's accounts, which reflects losses to investors of approximately $229 million. All investor deposits and distributions have been reported to the Court in the Receiver's Sworn Accounting. ECF No. 81. Through the Court-approved claims process, which the Receiver commenced during a prior reporting period and continued to implement during the prior reporting period, the Receiver confirmed the investors who actually suffered losses and the precise amounts of those losses, which are discussed below.

**E. Investor Communications**

The Receiver and his team have devoted significant time and effort to communicating with investors of Drive Planning. Soon after his appointment, the Receiver set up a dedicated telephone line and an email address for investors to communicate with the Receiver's office and obtain information regarding the

enforcement action and the Receivership, and created a website (www.DrivePlanningReceivership.com), which contains a summary of this action, important court filings, key dates and deadlines, answers to frequently asked questions, and other information relevant to investors. During the Reporting Period, the Receiver responded to hundreds of investor inquiries by email and telephone regarding the status of the Receivership Estate, the status of the Court-approved claims process, the proposed distribution plan, and future distributions, concerns regarding tax reporting issues, the submission of information regarding their investments and losses and supporting documents, confirmation of their contact information, and other issues.

**F. Claims Process**

During a prior reporting period, the Receiver filed a Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent. *See* ECF No. 240. The motion outlined a comprehensive procedure for administering and adjudicating claims of investors and creditors of Drive Planning, including the form of the Legal Notice of Claims Process and Proof of Claim and Release Form. On August 25, 2025, the Court entered an Order granting the motion and approving the Receiver's proposed claims process. *See* ECF No. 251. Since entry of that Order, the Receivership has administered thousands of individualized claim packets, an online claims portal was launched, and Stretto Inc.

staffed a dedicated call center and email response team to assist investors with technical issues, uploading documentation, correcting beneficiary information, understanding their pre-calculated net loss amounts, and addressing their disputes with the pre-calculated loss amounts.

During the prior reporting period, the Receiver completed the claims administration process by reviewing and resolving a substantial volume of objections to the Receiver's initial claims determinations, conducting detailed analyses of supporting documentation, financial records, and investor communications, and issuing more than 2,300 final claim determinations to claimants. A number of claimants submitted appeals to the Receiver's final determinations, and the Receiver was able to resolve most of those appeals.

During the Reporting Period, the Receiver filed his response to the remaining claimant appeals that were not resolved. *See* ECF No. 388. Thereafter, the Court entered its Order on Appeals of Receiver's Final Claims Determinations, approving the Receiver's final claims determinations that had been appealed. *See* ECF No. 413. The Receiver then focused on formulating a plan for making distributions to the claimants holding allowed claims. In connection with such distribution plan, the Receiver sought and obtained Court approval to retain Ankura Consulting Group, LLC as Distribution Analyst to assist in developing and validating a claimant-by-

claimant distribution model utilizing the Receiver's proposed "rising-tide" methodology for distributions to holders of allowed claims. *See* ECF Nos. 421, 439.

Shortly following the Reporting Period, Ankura completed the necessary distribution analyses and calculations, and the Receiver filed a Motion to Approve Final Claims Determinations, Plan of Distribution, Initial Distribution to Claimants with Allowed Claims and Employ Stretto, Inc. as Distribution Agent. *See* ECF No. 449. The motion seeks Court approval of the Receiver's final claim determinations, approval of the rising-tide methodology, and authorization to make an initial distribution of approximately $60 million to holders of allowed claims that will provide for a 35% recovery of their investments. *See id*.

In response to the Distribution Plan Motion, the Receiver received a common objection from approximately 40 claimants who had withdrawn funds from Drive Planning and subsequently reinvested those same funds. Under the Receiver's original application of the risingtide methodology, those prior withdrawals were treated as recoveries, resulting in higher historical recovery percentages for those claimants. As a result, many of those claimants were not included among those proposed to receive an initial distribution, even though the withdrawn funds had been reinvested into Drive Planning and ultimately lost. The objecting claimants argued that this approach overstated their actual recoveries because it treated reinvested funds as realized recoveries rather than recognizing that those funds had

been placed back into the fraudulent scheme and lost, effectively causing those claimants to bear the loss twice. After further investigation of their transactions with Drive Planning and the resulting inequities of their circumstances, the Receiver will be filing an Amended Distribution Plan, proposing further analysis of those claimants' transactions and circumstances and a modification to the distribution plan as to those claimants, and seeking authority to expand the scope of Ankura's engagement to assist the Receiver to perform such analysis. The Amended Motion will also increase the proposed initial distribution from $60 million to $65 million to account for the increase in the total number of claimants who will be entitled to receive initial distributions pursuant to the proposed modified rising-tide methodology and the additional analysis to be performed.

### G. Identifying and Pursuing Liquidated and Unliquidated Claims

During the Reporting Period, as discussed above, the Receiver continued to prosecute the claims he asserted against former Drive Planning agents in the ancillary actions pending before this Court. Moreover, the Receiver continued investigating whether Drive Planning or the Receivership Estate holds other unliquidated or liquidated claims against third parties, affiliates, and insiders against which the Receiver has not yet asserted claims.

During the next reporting period, the Receiver and his professionals will continue to analyze potential sources of recovery and gather evidence for purposes

of developing and pursuing the Receivership Estate's claims to recover funds or other assets belonging to or improperly transferred from Drive Planning, including without limitation turnover and fraudulent transfer actions. In particular, as discussed above, the Receiver will commence a separate ancillary action against the Net Winners who decide not to resolve the Receiver's claims asserted in his demand letters through the ongoing settlement negotiations. And, the Receiver will consider commencing other actions against third parties who received significant transfers from Drive Planning without providing reasonably equivalent value to Drive Planning, including Mr. Thomasson.

Further, the Receiver will investigate the Estate's potential claims against professionals and institutions that may have facilitated the alleged misconduct of Defendants or otherwise contributed to the damages sustained by Defendants' investors. The Receiver will complete his investigation of those claims and, after consultation with the SEC and with this Court's approval, pursue those claims he believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

## IV. CASH-ON-HAND AND ACCRUED EXPENSES OF ESTATE

As of June 30, 2026, the Receiver held a total of $73,169,493.41 in cash-on-hand in his fiduciary accounts for the Receivership Estate at City National Bank of Florida, Synovus Bank, and Huntington National Bank, and in the operating account

for the Florida properties at Truist Bank. During the Application Period, the fiduciary accounts earned $536,038.43 in interest.

The SEC's Standardized Fund Accounting Report (the "SFAR") for the Reporting Period, setting forth the receipts and disbursements of the Receivership Estate, is attached hereto as **Exhibit A**.

During the Reporting Period, the Receivership Estate incurred administrative expenses in the form of fees and costs of the Receiver and his Court-approved professionals, including Lead Counsel, Georgia Counsel, and local counsel in other jurisdictions, and the Forensic Accountant, for the work they performed and the costs they incurred in connection with fulfilling the Receiver's duties under the Appointment Order. Pursuant to the Appointment Order, the Receiver will file an application seeking approval and payment of those fees and costs from the funds the Receiver has marshaled and deposited into his fiduciary accounts since he was appointed.

## V. CONCLUSION

The Receiver and his professionals appreciate the opportunity to assist the Court in this matter. Until further order of the Court, the Receiver and his professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the Appointment Order in the most cost-effective manner while seeking to maximize the ultimate recovery by the Receivership Estate.

Respectfully submitted,

s/*Adriana M. Pavon*
Adriana M. Pavon
Florida Bar No. 1025060
*Admitted Pro Hac Vice*

*Lead Counsel for Kenneth D. Murena, as Court-Appointed Receiver*
Adriana M. Pavon
Florida Bar No. 1025060
apavon@dvcattorneys.com
*Admitted Pro Hac Vice*
Russell Landy
Florida Bar No. 44417
rlandy@dvllp.com
*Admitted Pro Hac Vice*
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

*Local Counsel for Kenneth D. Murena, as Court- Appointed Receiver*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

**CERTIFICATE OF SERVICE, FONT AND MARGINS**

I hereby certify that on July 30, 2026, I electronically filed the foregoing *Status Report* using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record, and sent the *Status Report* to Defendant Burkhalter by email.

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

Dated: July 30, 2026.

s/*Adriana M. Pavon*
Adriana M. Pavon, Esq.
Florida Bar No. 1025060
*Admitted Pro Hac Vice*