**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Case No. 1:24-cv-03583-VMC

Plaintiff,

v.

DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER,

Defendants,

and

JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,

Relief Defendants.

---

**RECEIVER'S UNOPPOSED AMENDED MOTION TO APPROVE RECEIVER'S FINAL CLAIMS DETERMINATIONS, PLAN OF DISTRIBUTION, AND INITIAL DISTRIBUTION TO CLAIMANTS WITH ALLOWED CLAIMS, AND TO EMPLOY STRETTO, INC. AS DISTRIBUTION AGENT [ECF No. 449], AND MOTION TO EXPAND SCOPE OF ANKURA'S EMPLOYMENT**

Kenneth D. Murena, as Court-Appointed Receiver (the "Receiver") of the assets of Drive Planning LLC (the "Estate"), files this Unopposed Amended Motion to Approve Receiver's Final Claims Determinations, Plan of Distribution, and Initial

Distribution to Claimants with Allowed Claims, and to Employ Stretto, Inc. as Distribution Agent [ECF No. 449] (the "Distribution Plan") and incorporates a Motion to Expand the Scope of Ankura's Employment (collectively, the "Amended Motion"),[1] and states:

## I. INTRODUCTION

The Receiver files this Amended Motion to resolve a common objection now raised by approximately forty (40) claimants regarding the treatment of reinvested withdrawals under the Rising Tide distribution methodology proposed in the Distribution Plan. The Receiver's investigation has revealed that this issue may affect as many as 883 claims. The Receiver has therefore developed a proposed hybrid Rising Tide methodology that incorporates a principal reinvestment analysis to address withdrawals that were later reinvested into Drive Planning. And, the Receiver informed the objecting investors that he would amend the proposed Distribution Plan to apply this hybrid methodology and thereby avoid addressing 40 or more individual objections to the Distribution Plan that may have been submitted to this Court.

Because implementation of this hybrid methodology could materially alter both the Rising Tide recovery percentages and resulting distribution amounts, the

[1] This Amended Motion entirely replaces the Distribution Plan [ECF No. 449], which the Receiver filed on July 14, 2026.

Receiver proposes to defer all distributions until the necessary review and recalculations are completed. The Receiver presently anticipates increasing the initial distribution from $60 million to approximately $65 million to account for claimants whose distributions may increase under the proposed hybrid Rising Tide methodology, including claimants who otherwise would receive little or no distribution under a strict Rising Tide analysis. The Receiver had obtained Court approval to employ data analysis firm Ankura to perform the Rising Tide calculations for the Distribution Plan. The Receiver will need Ankura's assistance to investigate the withdrawals and reinvestments at issue, develop formulas to apply the principal reinvestment analysis, and recalculate the initial distribution amounts, and as such, he seeks Court approval to expand the scope of Ankura's employment.

While the Receiver continues to believe that the Rising Tide methodology is legally supported and generally equitable to the majority of investors holding allowed claims, the Receiver now believes additional review is warranted to determine whether a limited modification addressing certain reinvestment transactions may produce a fairer result without significantly delaying the substantial distribution proposed in the original Distribution Plan.

Accordingly, the Receiver files this Amended Motion seeking Court approval of: (i) a plan of distribution that utilizes the hybrid Rising Tide methodology proposed herein; (ii) the continued employment of Stretto Inc. but as distribution

agent; and (iii) the expansion of the scope of Ankura's employment to perform the transaction analysis and recalculations necessary to implement the proposed methodology. After the Receiver completes the analysis of the reinvestment claims and prepares a revised Reconciled Claims Report that reflects the Receiver's final determinations of all claims and proposed amounts of the initial distributions to all eligible claimants (including those with reinvestment claims), the Receiver will file a Motion to approve (i) the Receiver's final claims determinations, (ii) the proposed initial distribution amounts, and (iii) the final procedures and deadlines for sending out the initial distribution.

## II. FACTUAL BACKGROUND

### A. The Enforcement Action

This action commenced on August 13, 2024, with the filing of the Securities and Exchange Commission's ("SEC") Complaint against Defendants Drive Planning, LLC and Russell Todd Burkhalter and Relief Defendants Jacqueline Burkhalter, The Burkhalter Ranch Corporation, Drive Properties, LLC, Drive Gulfport Properties LLC, and TBR Supply House, Inc. The SEC also filed an Expedited Motion for Emergency Relief to prevent the dissipation of assets and continued defrauding of investors. *See* ECF No. 2. The Court found that the SEC had established a prima facie case of securities law violations by Defendants Burkhalter and Drive Planning, and that the Relief Defendants improperly received

funds derived from the fraudulent activities. *See* ECF No. 11 at ¶¶ 2, 4. Accordingly, the Court entered a Preliminary Injunction freezing the assets of the Defendants and Relief Defendants, prohibiting the destruction of documents, and requiring an accounting, among other things. *See id.*

**B. Appointment and Duties of Receiver**

On August 13, 2024, the Court also entered an Order Appointing Receiver (the "Appointment Order"), appointing Kenneth D. Murena, Esq. as Receiver of Drive Planning and all assets owned by or purchased with funds derived from investors or clients of Drive Planning (collectively, "Receivership Property"). *See* ECF No. 10. The Court found that the appointment of a Receiver was necessary to marshal, preserve, and recover assets derived from fraudulent activities tied to the Defendants' alleged Ponzi scheme. *See id.* at pp. 1-2. The Receiver was tasked with, *inter alia*, securing assets acquired with or otherwise traceable to investor funds, managing the Receivership Estate, and liquidating assets for the benefit of defrauded investors. *See id.* at ¶¶ 4-7.

**C. Known Investors and Creditors**

Based on the Receiver's review of Defendants' bank records, documents provided by investors, and a bank reconstruction prepared by the Receiver's forensic accountant, the Receiver is aware of approximately 2,800 investors who transferred more than $380,000,000 to Drive Planning. The Receiver and his forensic

accountant have substantially completed the forensic reconstruction of Drive Planning's accounts, which reflect payments back to investors of approximately $160,000,000 and investor losses of approximately $229,000,000.

The Receiver and his counsel confirmed each investor's identity and contact information through a data collection portal emailed to all investors. The Receiver also requested documentation from all investors and received supporting documents evidencing the investment amounts from a majority of investors. He reviewed those documents with the bank reconstruction prepared by his forensic accountant and calculated a net loss amount for each investor who suffered a loss because of his or her investment with Drive Planning.

## III. THE CLAIMS PROCESS

### A. Order Approving Claims Process

On August 11, 2025, the Receiver filed his Motion to Approve Claims Process and for Authorization to Employ Stretto Inc. as Noticing and Claims Processing Agent (ECF No. 240). On August 25, 2025, the Court entered the Claims Order (ECF No. 251), which: (1) authorized the Receiver to engage Stretto Inc. ("Stretto") as Claims Agent; (2) approved the proposed Claims Process; (3) authorized the Receiver to email a Claims Package to all known, potential claimants; and (4) established the procedures for filing, reviewing, and adjudicating claims.

The Claims Order established the following schedule (the "Claims Process Schedule"):

| | |
|---|---|
| Day 0 | Plan Approval Date |
| Day 60 | Receiver to send out Claims Packages |
| Day 90 | Claims Bar Date |
| Day 120 | Receiver's Final Determination Date |
| Day 150 | Claimant Deadline to Appeal Final Determination to the Court |
| Day 180 | Receiver's Deadline to File Responses to Appeals |
| TBD | Receiver's Deadline to File Motion to Approve Plan of Distribution and Proposed Initial Distribution Amounts |

**B. Implementation of the Claims Process**

In accordance with the Claims Order and all Court-approved extensions of time, the Receiver met all deadlines set forth in the Claims Process Schedule. The Receiver, with the assistance of Stretto, sent the Claims Package, comprising the Notice of Claims Process and a pre-filled Proof of Claim and Release Form, to all known investors and creditors of Drive Planning by email within sixty (60) days of the Approval Date. The Claims Package was written in English and Spanish, consistent with the Claims Order, given that the primary language of many investors is Spanish.

The Claim Form for investor claimants was pre-filled with each investor's contact information and net loss amount (the "Allowed Claim Amount"), as calculated by the Receiver using Drive Planning's bank account records, the forensic reconstruction of Drive Planning's bank accounts prepared by the Receiver's forensic accountant, and the investors' documents uploaded to the data collection portal hosted by Stretto. The Receiver calculated the Allowed Claim Amount by subtracting the total amount of transfers that an investor or creditor received from Drive Planning from the total amount of transfers that such investor made to Drive Planning (*i.e.*, a simple money-in, money-out calculation). The calculation of a claimant's Allowed Claim Amount did not include any interest, profit, or fees promised, but not paid, to an investor or creditor. A claimant's net loss was calculated on a consolidated basis, such that if a claimant had multiple accounts, including personal accounts held individually or jointly with a spouse, individual retirement accounts, trust accounts, and/or sole-owned limited liability company accounts, the Allowed Claim Amount was the total deposits in all accounts minus the total withdrawals from all accounts.

Claimants who accepted the Receiver's Allowed Claim Amount only needed to complete the release and certification to have an Allowed Claim. Claimants who disputed the Allowed Claim Amount were required to complete a blank Claim Form and upload supporting documentation. The Receiver also engaged Stretto to provide

technical phone support to investors attempting to upload their documentation, and to organize, review, and store the claims data in a searchable database. Stretto received, processed, and maintained a register of all submitted Claim Forms.

**C. Receiver's Final Determinations and Appeals**

By the Receiver's Final Determination Date, the Receiver reviewed Stretto's initial determinations for each disputed claim and made a final determination as to the amount, if any, to be allowed for each claim. Where the Receiver rejected a claim in whole or in part, the Receiver sent the claimant an email setting forth his final determination, including the reason(s) for the rejection, the classification of the claim, and the deadline and method to appeal to this Court. Seven (7) claimants timely submitted appeals of the Receiver's Final Determinations. The Receiver filed his Responses to Appeals of Receiver's Final Claims Determinations (ECF No. 388) by the deadline established in the Claims Order. The Court considered all seven (7) appeals and entered the Appeals Order on May 21, 2026 (ECF No. 413). The Court resolved all timely appeals in the Appeals Order, making final adjudications as follows:

| Claim No. | Filed Amount | Receiver's Determination | Amount on Appeal | Court's Determination |
|---|---|---|---|---|
| 1000987 | $500,000 | $0 | $500,000 | $0 |
| 1000565 | $2,053,100 | $0 | $2,053,100 | $0 |
| 1001583 | $225,111.60 | $0 | $250,124 | $0 |

| | | | | |
|---|---|---|---|---|
| 1001660 | $66,500 | $59,450 | $60,292.88 | $59,450 |
| 1001973 | $630,000 | $130,000 | $630,000 | $130,000 |
| 1001622 | $56,000 | $0 | $56,000 | $0 |
| 1002142 | $67,156 | $0 | $67,156 | $0 |

The Appeals Order constitutes the Court's final adjudication of all appeals of the Receiver's final claims determinations. *See* ECF No. 413 at 29. The Court directed the Receiver to file the proposed Plan of Distribution within thirty (30) days of entry of the Appeals Order, which deadline was extended to July 14, 2026, by this Court's Order. *See id.* and ECF No. 436.

## IV. DISTRIBUTION PLAN, OBJECTIONS, AND PROPOSED RESOLUTION

On July 14, 2026, the Receiver filed his motion seeking Court approval of: (1) the Receiver's final determinations for all claims as set forth in the Reconciled Claims Report; (2) the Plan of Distribution employing the Rising Tide method; (3) a proposed initial distribution anticipated to total approximately $60,000,000 from the Drive Planning Recovery Fund to all eligible claimants holding Allowed Claims based on the Rising Tide method of calculation; and (4) the retention of Stretto, Inc. as distribution agent (the "Distribution Plan"). *See* ECF No. 449.

### A. Investors' Objections to Rising Tide Distribution Methodology

Since filing the Distribution Plan, the Receiver has received communications from approximately 40 investors expressing frustrations regarding the proposed use

of the Rising Tide methodology and suggesting alternative distribution methods based solely on each investor's recognized net loss without consideration of previous distributions.

More specifically, these investors contend that where an investor received a return of principal, immediately or shortly thereafter reinvested those same funds with Drive Planning and ultimately lost those reinvested funds when the scheme collapsed, the prior withdrawal should not be considered a recovery in calculating the investor's Rising Tide percentage. Instead, they argue that only the amount retained by the investor (or alternatively only purported "profits" received) should be considered a pre-receivership recovery.

By incorporating the principal reinvestment approach, investors who temporarily withdrew funds before reinvesting them would receive larger initial distributions than under the Receiver's proposed Rising Tide methodology because the intervening withdrawal would effectively be disregarded for purposes of calculating the investor's pre-receivership recovery percentage.

As illustrated in the below example, an investor who never withdrew funds has a 0% pre-receivership recovery, an investor who withdrew and reinvested those same funds once has a 50% pre-receivership recovery, and an investor who repeatedly withdrew and reinvested funds has a 67% pre-receivership recovery. These objecting investors argue that because each of them ultimately sustained the

same net loss, the prior withdrawals that were later reinvested should be disregarded when calculating the Rising Tide distribution.

| Scenario | Event 1 | Event 2 | Event 3 | Event 4 | Net Loss | Rising Tide % |
|---|---|---|---|---|---|---|
| **1. Single Investment** | Invest $50,000 | — | — | — | $50,000 | **0%** |
| **2. One Reinvestment** | Invest $50,000 | Withdraw $50,000 | Reinvest $50,000 | — | $50,000 | **50%** |
| **3. Multiple Reinvestments** | Invest $50,000 | Withdraw $50,000 | Reinvest $50,000 | Withdraw $50,000 & Reinvest $50,000 | $50,000 | **67%** |

### B. Receiver's Response to Objection to Rising Tide Methodology

While the Receiver understands the equitable concerns raised by these investors, adopting the proposed approach would require the Receiver to disregard certain pre-receivership withdrawals based upon the individual circumstances surrounding each transaction. Such an approach would fundamentally depart from the objective methodology proposed in the Distribution Plan (and supported by applicable case law) and instead require individualized determinations regarding whether a particular withdrawal constituted a true recovery, a temporary withdrawal, a reinvestment of principal, a reinvestment of purported profits, or some combination thereof. This approach, while administratively feasible, will require a time-consuming claim-by-claim review of the potentially affected claims (and

assessment of the amounts of the withdrawals and the timing and sources of the reinvestments) by the Receiver with the assistance of Ankura.

For example, the Receiver would be required to determine, on a claimant-by-claimant basis, for all claimants with allowed claims who received any withdrawals from Drive Planning (not just the objecting claimants), whether funds withdrawn from Drive Planning were reinvested even if they were not deposited immediately, but rather, several weeks or months later, or only partially reinvested. The Receiver would likewise be required to determine whether subsequent investments consisted of previously withdrawn principal, purported profits, new capital contributed by the investor, or a combination of those funds. Many investors made dozens of, if not more, deposits and withdrawals over several years. Investors also withdrew funds and reinvested them under a new limited liability company, trust, personal, or retirement account, thereby changing the name of the Drive Planning account holder. These withdrawals and reinvestments were made anywhere from a couple of days to many months apart. Because all investor funds were commingled in Drive Planning's bank accounts, there is no objective formula or universally applicable methodology to determine what constitutes a reinvested withdrawal. Moreover, adopting such a methodology for only those investors who can demonstrate that withdrawn funds were later reinvested will create disparities among other investors whose investment histories involved different timing, different withdrawal patterns,

partial reinvestments, or additional capital contributions. Instead, the Receiver would be required to conduct an individualized transaction-by-transaction review of each claimant's investment history and make discretionary factual determinations regarding the source and character of each deposit and withdrawal. Such an exercise would substantially increase the cost of and the recourses necessary to complete the claims administration process and delay the initial distribution.

While the Receiver and his professionals are willing to conduct the necessary analysis to prevent an injustice to the claimant objectors (and others who withdrew and reinvested funds), the Receiver feels compelled to inform the Court that adopting the objectors' proposal would not simply affect a handful of claimants. Rather, it would require the Receiver to individually evaluate the transaction histories of approximately 883 claims to determine whether any prior withdrawals should be disregarded as "reinvested".

**C. Investors' Request for *Pro Rata* Distribution Methodology**

Investors seeking to avoid the Rising Tide approach due to pre-receivership recoveries have suggested the alternative methodology of a straight *pro rata* distribution, pursuant to which the Receiver would distribute the same $60,000,000 among all Allowed Claims in proportion to the amount of each claimant's Allowed Claim, without regard to whether a claimant had already recovered a substantial portion of his or her investment before the Receiver's appointment. This approach

seems patently unfair here where so many early investors already recovered a significant portion of their investment from the pooled investor funds of later investors, while 1,330 investors have not recovered anything from Drive Planning.

### D. Receiver's Response to Request for *Pro Rata* Distribution Methodology

Under the Receiver's proposed Rising Tide methodology, approximately 67.3% of all claimants would receive an initial distribution that exceeds the amount they would receive under a straight *pro rata* distribution. By contrast, a *pro rata* distribution would result in every claimant receiving only approximately 26.2% of his or her Allowed Claim, regardless of the amount previously recovered from the Ponzi scheme before the Receiver's appointment.

The straight *pro rata* distribution methodology also ignores the fundamental equitable purpose of the Rising Tide doctrine. Under a straight *pro rata* distribution based solely on net losses, investors who previously recovered a substantial portion of their investments before the Receiver's appointment would receive the same percentage distribution as investors who recovered little or nothing. For example, an investor who recovered 80% of his or her investment before the Receivership would nonetheless receive an additional distribution based solely on the remaining net loss, while another investor who received no pre-receivership recovery whatsoever would receive the same *pro rata* percentage despite having borne the entire loss throughout the life of the scheme (or period of their investment). Such a

result would disproportionately benefit investors who were fortunate enough to receive significant pre-receivership distributions at the expense of those who recovered little or nothing.

Ultimately, the selection of a distribution methodology rests with this Court. The Receiver recognizes that no distribution methodology can perfectly or equally compensate every investor or eliminate the unfortunate consequences of the Ponzi scheme. Any method adopted by the Court will necessarily benefit some claimants more than others.

**E. Receiver's Proposes Hybrid Rising Tide Distribution Methodology to Resolve Objections Based on Reinvestments**

The Rising Tide methodology is supported by substantial authority, and the Receiver believes it remains an appropriate framework for the initial distribution. Nevertheless, in light of information received after filing the Distribution Plan regarding withdrawals and reinvestments allegedly undertaken at the direction of Drive Planning agents, the Receiver has determined that a strictly mechanical application of Rising Tide would not fully account for the inequities presented by certain claimants. Accordingly, although the case law discussed below strongly supports approval of a traditional Rising Tide methodology, the Receiver submits that incorporating the principal reinvestment analysis directly into the initial distribution calculation, rather than applying it only after an initial distribution has

been made, will provide a more equitable result for the approximately 883 claimants whose transaction histories may reflect withdrawals that were later reinvested.

Under the traditional Rising Tide methodology, every withdrawal is treated as a recovery and every deposit is treated as a new investment, regardless of whether the withdrawn funds were later reinvested. To address the inequities that such a methodology would impose on approximately 883 of the claimants (who withdrew and reinvested funds), the Receiver proposes to incorporate the principal reinvestment analysis in his application of the Rising Tide methodology to calculate the initial distribution amounts, rather than adjusting those distribution amounts (as to the affected claimants) after the initial distribution. The principal reinvestment analysis distinguishes between principal and profits, treating reinvested principal as a continuation of the original investment while continuing to treat withdrawn profits as recoveries, thereby avoiding penalizing investors who merely moved their principal back into Drive Planning.

Because incorporating this methodology requires the Receiver to review and recalculate approximately 883 claims before the Rising Tide percentages and corresponding distribution amounts can be finalized, no distributions will be made under the Distribution Plan until that review and recalculation are complete. Upon completion of the recalculations, the Receiver will file a revised Reconciled Claims

Report reflecting the recalculated Rising Tide percentages and initial distribution amounts for all claimants for this Court's approval.

### F. The District Court's Broad Discretion to Select a Distribution Methodology

A district court supervising an equity receivership possesses "broad equitable power" in approving a plan of distribution, and the receiver's "choice among allocation schemes [is] one within the discretion of the district court to approve or disapprove, like other aspects of the administration of a receivership." *S.E.C. v. Huber*, 702 F.3d 903, 908 (7th Cir. 2012); *S.E.C. v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017). The court's "primary job" is to ensure that the proposed plan "is fair and reasonable," not to identify the single theoretically optimal methodology. *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010). Because "a district court's power to supervise a receivership is extremely broad," appellate review of an order approving a distribution plan is narrow, and reversal is warranted only where the reviewing court has "a definite and firm conviction that there has been a clear error of judgment." *CCWB Asset Invs., LLC v. Milligan*, 112 F.4th 171 (4th Cir. 2024) (upholding implementation of straight Rising Tide after consideration of overruling of objection based on reinvested withdrawals).

This Circuit applies the same standard: "The goal of such receiverships is to grant fair relief to as many investors as possible." *S.E.C. v. Torchia*, 922 F.3d 1307, 1311 (11th Cir. 2019); *accord S.E.C. v. Capital Consultants*, LLC, 397 F.3d 733,

738–39 (9th Cir. 2005). No single distribution methodology is legally mandated. Of the three most-commonly-employed methodologies—Rising Tide, net investment/net loss, and last statement/*pro rata*—the choice among them is committed to the sound discretion of the court supervising the receivership, guided by the equities of the particular case. *See Huber*, 702 F.3d at 906; *In re Bernard L. Madoff Invs. Secs. LLC*, No. 15-CV-01151, 2016 WL 183492, at *1 (S.D.N.Y. 2016).

### G. The Rising Tide Methodology Credits Pre-Receivership Withdrawals Against an Investor's Recovery

"Rising tide" is, by the courts' own description, "the method most commonly used (and judicially approved) for apportioning receivership assets." *Huber*, 702 F.3d at 906 (collecting cases). Under that method, "withdrawals are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals." *Id*. at 905. The necessary consequence is that "investors who have made withdrawals will tend to be better off when the Ponzi scheme collapses than investors who have made no withdrawals," because the former have already recovered part of their principal while the latter have recovered none of it. *See id.* at 906–07; *accord S.E.C. v. Callahan*, 193 F. Supp. 3d 177, 199 (E.D.N.Y. 2016) (Rising Tide "prevents an investor who previously received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive any withdrawals"); *In*

*re The Vaughan Co., Realtors*, 543 B.R. 325, 337 (Bankr. D.N.M. 2015) ("The rising tide method is designed so early investors do not receive a windfall from later investors' money, and later investors are not penalized based on the timing of their investments.").

Courts adopt Rising Tide precisely because, even though it produces a lower percentage recovery for investors who already withdrew funds, it tends to maximize the benefit to all investors as a group by equalizing recovery among those with the lowest pre-receivership returns and providing recovery to the greatest number of claimants. *See Huber*, 702 F.3d at 906–07.

### H. The Reinvestment Objection Raised Here Has Already Been Litigated to Decision and Rejected on Materially Indistinguishable Facts

The objection raised by the approximately 40 investors here, that a withdrawal later reinvested in the scheme should be disregarded, or credited only to the extent ultimately retained, rather than treated as a pre-receivership recovery, is not a novel or open question. It was raised, briefed, decided by a district court, and affirmed on appeal in the receivership of Kevin Merrill, Jay Ledford, and Cameron Jezierski, on which the Receiver's proposed methodology here is modeled. *See CCWB Asset Invs., LLC v. Milligan*, 112 F.4th 171 (4th Cir. 2024), (*aff'g* Mem. Order, *S.E.C. v. Merrill*, No. 1:18-cv-02844-RDB (D. Md. Nov. 18, 2022)), ECF No. 690.

In that case, three affiliated investor entities argued that they had reinvested the substantial majority of their withdrawals back into the Ponzi scheme and retained only a small fraction, and that the reinvested amounts should therefore be treated as though "rescinded, i.e., never received in the first place," relying on a passage of dicta in *Huber* describing a hypothetical "maximum balance" approach under which an investor's maximum balance in the scheme, rather than gross investment less gross withdrawals, would be treated as the relevant investment. *See Huber*, 702 F.3d at 907–08. Notably, the *Huber* court itself declined to adopt that approach, expressly noting that it could "find [no] discussion in case law or commentary regarding this 'maximum balance' approach" and that it "needn't pursue the issue" on the facts before it. *Id.*

Both the Maryland District Court and, on appeal, the Fourth Circuit rejected the reinvestment/maximum-balance objection, for reasons directly applicable to the investors' objection raised here:

- No court has adopted a reinvestment carve-out. The maximum balance approach "exists merely as dicta" in *Huber* and "has not been subsequently adopted by any other court." *S.E.C. v. Merrill*, No. 1:18-cv-02844-RDB, at Receiver's Reply to Objections, ECF No. 584 at 6; see also Huber, 702 F.3d at 907–08. Because "there existed no 'discussion in case law or commentary'" supporting the approach, the

district court found the concerns "explained in Huber about reinvestments are dicta," and no subsequent court, including the Fourth Circuit on direct appeal, has adopted a reinvestment carve-out to Rising. *S.E.C. v. Merrill*, No. 1:18-cv-02844-RDB, at Tide. Mem. Order, ECF No. 690 at 6.

- The approach is administratively infeasible where transaction volume is high. Crediting reinvested withdrawals differently than retained withdrawals requires the receiver to trace, transaction by transaction, whether specific withdrawn funds were the same funds later reinvested, whether they were commingled with funds from unrelated sources, whether reinvestment occurred immediately or only after a substantial delay, and whether any given deposit represented a reinvestment of principal, of purported profits, of new capital, or some combination. In the receivership underlying *CCWB*, the evidence showed delays between withdrawal and reinvestment of up to four months, continuous commingling with non-receivership transactions, and millions of dollars in unrelated receipts and disbursements running through the same accounts making it "impossible to be certain" that any given reinvestment used the same funds previously withdrawn. *S.E.C. v. Merrill*, No. 1:18-cv-02844-RDB, at Receiver's Reply, ECF No. 584 at

8–10. The Maryland District Court agreed that "the sheer number of transactions" made individualized tracing "impracticable," *id*. at Mem. Order, ECF No. 690 at 6, and the Fourth Circuit affirmed that a receiver need not undertake that individualized, costly, and time-intensive tracing exercise to the benefit of particular claimants at the expense of the group. *See CCWB Asset Invs.*, 112 F.4th at 179-80.

- Similarly situated investors must be treated consistently. Even where one claimant's records happen to make tracing straightforward, a receiver need not apply a different methodology to that claimant while applying Rising Tide to every other similarly situated investor whose records are less tractable; equity requires consistent treatment across the claimant pool rather than case-by-case exceptions keyed to which claimants can most easily reconstruct their transaction history. *See id.*
- An investor derives a real benefit from a withdrawal regardless of subsequent reinvestment. A claimant who receives a distribution obtains the use of that cash, the ability to save it, spend it, invest it elsewhere, or choose to put it back into the scheme for whatever period it was in hand. As the Maryland District Court found, "when each entity withdrew money, there was a benefit from that withdrawal, however big or small." *Id.* (citing *S.E.C. v. Merrill*, No. 1:18-cv-02844-

> RDB, at Mem. Order, ECF No. 690 at 6). That benefit is not retroactively erased merely because the claimant later elected to reinvest; it is precisely that access to and control over withdrawn funds, not simply the retention of the last dollar, that Rising Tide is designed to account for. *See id*. at 179-80.

The Maryland District Court further observed that the objecting investors' own reinvestment calculations contained errors and inaccuracies notwithstanding their access to their own records reinforcing the unreliability of a reinvestment-based approach. *S.E.C. v. Merrill*, No. 1:18-cv-02844-RDB, at Receiver's Reply, ECF No. 584 at 7–9. On this record, the Maryland District Court overruled the objection and approved the receiver's Rising Tide calculation without a reinvestment carve-out, and the Fourth Circuit affirmed, holding that the District Court did not abuse its discretion in affirming the Rising Tide approach and rejecting the Maximum Balance approach. *See CCWB Asset Invs., LLC*, 112 F.4th at 180.

The circumstances presented by the objecting investors here are materially indistinguishable from those rejected in the *CCWB* case. As in that case, adopting a reinvestment carve-out would require the Receiver to conduct an individualized, transaction-by-transaction review of the investment histories of approximately 883 investors determining, claimant by claimant, whether particular withdrawals were reinvested immediately, weeks later, or months later; whether reinvested funds

represented principal, purported profits, new capital, or some blend; and whether reinvestments were made through the same or a different account, entity, trust, or retirement vehicle. Because all investor funds were commingled in Drive Planning's accounts, there is, as in *CCWB*, "no objective formula or universally applicable methodology" capable of resolving those questions on a claimant-wide basis. That administrative burden and the attendant cost, delay, and risk of inconsistent, subjective results is precisely what led both the Maryland District Court and the Fourth Circuit to reject the near identical proposal in *CCWB*.

Those same considerations compelled the Receiver to propose implementation of the Rising Tide method without regard for the reinvestment of withdrawals. However, that was before the Receiver was aware of the Drive Planning conduct leading to many of the reinvested investor withdrawals at the direction of Drive Planning's agents.[2] The Receiver does not aim to further injure these investors while he seeks the fairest outcome for most investors. Accordingly, the Receiver proposes the following amendment to the proposed Distribution Plan [ECF No. 449].

---

[2] Drive Planning's agents encouraged investors to withdraw and immediately reinvest their funds because each reinvestment generated additional commissions for the agents, even though the transactions did not materially alter the investors' investment positions, thereby allowing the agents to receive additional compensation.

## V. IMPLEMENTATION OF PROPOSED DISTRIBUTION PLAN

### A. Additional Analysis Required for Hybrid Rising Tide Distribution Methodology

The Receiver respectfully requests that the Court approve a Rising Tide distribution methodology that incorporates the principal reinvestment analysis described herein. The Receiver requests authority to review the transaction histories of approximately 883 claims to determine which withdrawals were subsequently reinvested and therefore qualify as reinvested principal.

As part of that review, the Receiver requests authority to establish and apply reasonable parameters defining when a withdrawal and subsequent investment should be treated as a reinvestment transaction. The Receiver will review the facts and circumstances of each claim, determine which claimants qualify for application of the principal reinvestment analysis, and, with the assistance of his data analysis professionals at Ankura, recalculate each affected claimant's Rising Tide recovery percentage and corresponding initial distribution amount. The Receiver estimates that this review will take approximately ninety (90) days to complete, however, it could take longer if the Receiver needs to obtain transaction details from banks, credit card companies, payment processors, and/or IRA administrators.

### B. Proposed Plan Will Require Revision of Reconciled Claims Report

Promptly upon completion of that review, the Receiver will file a revised Reconciled Claims Report reflecting the recalculated Rising Tide percentages and

initial distribution amounts for all claimants, together with revised distribution schedules, for the Court's approval.[3] The Receiver has also corrected the allowed claim amounts for ten (10) claimants based on documentation received after the close of the Claims Process. And, he has received seven (7) late-filed claims from investors who contend they lacked notice of the Claims Process. The Receiver intends to include any allowed late-filed and/or corrected claims in the revised Reconciled Claims Report. Upon filing the revised Reconciled Claims Report, the Receiver will request Court approval of his final claim determinations and the corresponding initial distribution amounts.

**C. Proposed Retention of Stretto Inc. as Distribution Agent**

Pursuant to the Court's *Order Approving Claims Process and Employment of Stretto Inc. as Noticing and Claims Processing Agent* [ECF No. 251], entered August 25, 2025 (the "Claims Order,"), the Receiver employed Stretto Inc. ("Stretto") as the noticing and claims process agent for purposes of the claims administration process. The Receiver seeks authority to continue employing Stretto, but as distribution agent, to prepare and send the distributions to claimants in accordance with the Plan of Distribution proposed herein, under the same retention

[3] The original Reconciled Claims Report was attached as Exhibit A to the original Distribution Plan [ECF No. 449]. The revised Reconciled Claims Report to be submitted to the Court after the Receiver completes the analysis proposed herein will entirely replace that Reconciled Claims Report.

terms and conditions previously approved by this Court in the Claims Order. In this capacity, Stretto's services will include preparing distribution checks and wires, maintaining distribution records, communicating with claimants regarding distributions, resolving technical issues, and other related services. The Receiver will continue to seek Court approval of Stretto's fees and expenses incurred in connection with the distribution, to the extent they exceed $10,000 in any given month, as required by the Appointment Order and the Claims Order (approving their employment as claims agent). Stretto shall be paid from the Receivership Estate only as authorized by the Court.

**D. Method and Logistics of Distribution**

In his Motion to approve the Reconciled Claims Report, which the Receiver will file after completing the reinvestment analysis proposed herein, the Receiver will propose that he be given ninety (90) days from the date of the Court's approval of the Reconciled Claims Report to complete the initial distribution to all eligible claimants who provide accurate and complete payment instructions within sixty (60) days of the approval date. After the Court approves the revised Reconciled Claims Report, the Receiver will work with Stretto to make the initial distribution to claimants by check. Only claimants that cannot receive a distribution by check will receive a wire transfer. Stretto will prepare and send the distribution checks (and, as applicable, wire transfers) to claimants in accordance with the payment instructions

provided by each claimant in the online Payment Instructions Form disseminated by Stretto via email. Claimants who made their investments with Drive Planning through retirement accounts, corporate entities, and/or trusts may provide separate payment instructions for each, and the Receiver will follow those instructions in making distributions. The Receiver is not in a position to provide tax or investment advice and therefore will not opine on how claimants should receive their distributions or how distributions should be allocated among claimants' multiple investment accounts or sources. Claimants are encouraged to consult their own tax and investment advisors regarding the most appropriate manner of receiving their distribution and how to allocate it among different types of investment accounts/sources.

The Receiver, with the assistance of Stretto, will require claimants requesting that their distribution be allocated among multiple checks to different accounts/sources to confirm the amount of each such check. This allocation process will require communication and coordination with claimants, which will be performed by the Receiver's office. During the 90-day distribution period, the Receiver will send distributions on a rolling basis, beginning with claimants requesting payment in a single check, followed by claimants who must allocate their distribution among multiple checks.

Any distribution check that is returned as undeliverable or remains uncashed for ninety (90) days following issuance shall be returned to the Drive Planning Recovery Fund, and the corresponding claimant's distribution shall be held and reissued with the next distribution. The Receiver reserves the right to seek Court guidance regarding the disposition of unclaimed or undeliverable distribution proceeds.

**E. Subordination of Creditor Claims**

During the course of the Claims Process, the Receiver provided the Court-approved Notice and Claim Form to all known creditors of Drive Planning. The Drive Planning Estate received two creditor claims during the Claims Process. The creditor claims were reviewed for proof of debt owed by Drive Planning and required supporting documentation for consideration. The Receiver only allowed the principal debt owed for goods or services received by Drive Planning. The Receiver did not allow claims for interest, late fees, collection costs, or penalties assessed on debts owed to creditors. As a result, the Receiver made his final determinations on the unsecured creditor claims and allowed them as follows:

| CREDITOR CLAIM NUMBER | POC AMOUNT | BASIS FOR DEBT | RECEIVER DETERMINATION |
|---|---|---|---|
| DP-C0001 | $77,915.50 | Vehicle installment contract | $15,733.23 |
| DP-C0002 | $543,098.92 | Court-approved settlement agreement | $543,098.92 |

The Receiver's determinations as to the creditor claims are now final. Consistent with the Claims Process, the Receiver provided each creditor with notice of its Allowed Claim Amount and advised each creditor of the procedure and deadline to appeal the Receiver's determination. Neither creditor filed an appeal or otherwise challenged the Receiver's determination. Accordingly, the Allowed Claim Amounts reflected herein constitute the final adjudicated amounts of those unsecured creditor claims and are not subject to further dispute.

The Receiver further submits that equitable subordination of the creditor claims to investor claims is appropriate under the circumstances of this receivership. First, the settlement agreement with the creditor holding DP-C0002 for $543,098.92 provides that the claim will only be paid with claims of the same priority and in accordance with the distribution rules set forth in this Motion, as approved by the Court. *See* Settlement Agreement, ¶ G at ECF No. 103-1. The parties had contemplated the subordination of creditor claims as is often done in receivership cases. Indeed, the primary purpose of this SEC enforcement action and the receivership created by this Court is to marshal and preserve assets acquired through Defendants' fraudulent scheme and maximize recoveries for the victims who entrusted their funds to Drive Planning. Unlike the investor claimants, who collectively suffered more than $229 million in net losses as a result of the Ponzi scheme, the two creditor claimants provided goods or services to Drive Planning in

the ordinary course of business and do not stand in the same position as the defrauded investors whose funds constitute the source of the Drive Planning Recovery Fund. The assets presently available for distribution were recovered through the Receiver's efforts to reclaim and liquidate property acquired with investor funds and to recover transfers made from investor monies.

Federal courts supervising equity receiverships possess broad discretion to establish priorities among claimants and to approve distribution plans that achieve fairness and equity under the circumstances. *See SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *SEC v. Infinity Group Co.*, 226 F. App'x 217, 218 (3d Cir. 2007). In exercising those equitable powers, courts routinely recognize that defrauded investors are the principal intended beneficiaries of receivership recoveries and may be afforded priority where necessary to achieve an equitable result. *See, e.g., United States CFTC v. PrivateFX Global One,* 778 F. Supp. 2d 775, 786 (2011) (quoting *Quilling v. Trade Partners, Inc.,* No. 1:04-CV-723, 2006 WL 3694629, at *1 (W.D. Mich. Dec. 14, 2006) (As "an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud.")). Here, permitting distributions to general creditors before investors have recovered their net losses would dilute the limited pool of recovered assets and reduce

distributions to the victims of the fraud whose funds generated the Drive Planning Recovery Fund in the first instance.

Accordingly, the Receiver proposes that the two allowed creditor claims be subordinated to all allowed investor claims and that no distribution be made on account of any creditor claim unless and until all investors holding Allowed Claims have received distributions equal to their full Allowed Claim Amounts. Given the relatively small number and aggregate amount of creditor claims, and the substantial unrecovered losses suffered by investors, such treatment is fair, reasonable, and consistent with the equitable objectives of this receivership.

## MOTION TO EXPAND THE SCOPE OF ANKURA'S EMPLOYMENT

The Receiver submits that, due to the complexity and volume of investor transactions at issue, the proposed review cannot be performed efficiently through a manual, claim-by-claim analysis by the Receiver's office alone. To carry out the proposed investigation of investor withdrawals and reinvestments, the Receiver must analyze thousands of transactions, determine which transfers qualify as reinvestments of principal, recalculate each affected claimant's pre-receivership recovery percentage, and compute any resulting revised initial distribution amounts. This process requires specialized data analysis and forensic accounting support beyond the ordinary administration of the Claims Process.

Accordingly, the Receiver proposes to utilize Ankura, the Court-approved data analysis firm that has assisted the Receiver to perform the necessary data analysis and initial distribution calculations. *See* ECF No. 439 (Order approving Ankura's limited scope employment as the Receiver's data analysts for calculating the Rising Tide distribution amounts). Ankura possesses the underlying transactional database, forensic accounting records, and expertise in data modeling to perform the proposed analysis, all required to assist with this review in a consistent and reliable manner across all affected claimants. Given the substantial number of investor accounts and transactions that must be evaluated and the expected back and forth communications with affected investors, and the possible need for transaction details from third-party financial institutions, the Receiver anticipates that the investigation and recalculation process will require significant time and resources from both the Receiver's office and Ankura's data analysts. As a result, the Receiver estimates that the fees and expenses associated with this review may exceed $100,000.

The Receiver requests authorization to compensate Ankura up to $15,000 per month in fees and expenses without further Order from this Court for the duration of the period required to complete the proposed analysis. The Receiver will carefully review Ankura's invoices for the fees and expenses it incurs in connection with the proposed expanded scope of work to confirm they are reasonable and the

corresponding analysis was necessary to perform the additional analysis proposed herein and, to the extent such fees and costs exceed $15,000 in any given month, the Receiver will submit any invoice for such additional fees and costs to this Court for approval. The Receiver believes that incurring these costs is justified only if the Court determines that such a recalculation of the initial distribution should proceed, as the costs of the review would ultimately reduce funds otherwise available for distribution to investors. Given the significant expense and administrative burden associated with this undertaking, the Receiver seeks guidance from the Court before incurring those costs and commencing the review process.

The Receiver further notes that the proposed review could have a material impact on the distribution amounts payable to affected claimants. If the review determines that certain pre-receivership withdrawals should be treated as qualified reinvestments rather than recoveries, those claimants' pre-receivership recovery percentages would decrease, thereby increasing the amount they are entitled to receive under the strict Rising Tide methodology. Based on a preliminary assessment of the investor transaction data, the Receiver understands that implementation of the principal reinvestment analysis would materially increase the aggregate initial distribution payable to claimants. Therefore, the Receiver proposes to increase the total initial distribution amount to approximately $65 million.

**CERTIFICATION OF CONFERRAL**

Undersigned counsel certifies that the Receiver provided a copy of this Amended Motion to counsel for the SEC and counsel confirmed that the SEC has no objection to any of the relief requested herein. Further, undersigned counsel for the Receiver conferred with Defendant Todd Burkhalter regarding the relief requested herein and he confirmed that he has no objection to any of the relief requested herein. Undersigned counsel also conferred with counsel for the Relief Defendants regarding the relief requested herein and counsel confirmed that the Relief Defendants have no objection to any of the relief requested herein.

WHEREFORE, the Receiver respectfully requests that the Court:

(a) approve the hybrid Rising Tide methodology incorporating the principal reinvestment analysis as proposed herein;

(b) authorize the Receiver to conduct the review and recalculation of approximately 883 claims involving withdrawals and reinvestments;

(c) approve expansion of Ankura's scope of employment and compensation as requested herein;

(d) authorize the Receiver, after completing the reinvestment analysis and calculations based on the hybrid Rising Tide methodology proposed herein, to file a revised Reconciled Claims Report reflecting the Receiver's final claims determinations and proposed initial distribution amounts;

(e) authorize the Receiver to continue to employ Stretto but as distribution agent for purpose of making the initial and all subsequent distributions pursuant to the Court-approved Distribution Plan; and

(f) grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of August, 2026.

*s/Adriana Pavon*
Adriana M. Pavon, Esq.
Florida Bar No. 1025060
Admitted Pro Hac Vice

Lead Counsel for Kenneth D. Murena,
as Court-Appointed Receiver
Adriana M. Pavon
Florida Bar No. 1025060
apavon@dvcattorneys.com
Admitted Pro Hac Vice
Russell Landy
Florida Bar No. 44417
rlandy@dvllp.com
Admitted Pro Hac Vice
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

Local Counsel for Kenneth D. Murena,
as Court- Appointed Receiver
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com

**CERTIFICATE OF SERVICE, FONT AND MARGINS**

I hereby certify that, on August 11, 2026, I electronically filed the foregoing Amended Motion using the CM/ECF System that will automatically send e-mail notification of such filing to all registered attorneys of record, and I served the Amended Motion on Defendant Russell Todd Burkhalter via e-mail.

I further certify that I prepared this document in 14 point Times New Roman font and complied with the margin and type requirements of this Court.

*s/Adriana Pavon*
Adriana M. Pavon, Esq.
Florida Bar No. 1025060
Admitted Pro Hac Vice